Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, New York 10005
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net
jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:

**E. GLUCK CORPORATION,**
Tax I.D. No. 13-2907195

　　　　　　　　　　　Debtor.
-------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (MG)

**MOTION OF THE DEBTOR FOR AN ORDER PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE
AUTHORIZING (I) USE OF EXISTING BUSINESS FORMS AND
RECORDS; (II) LIMITED MAINTENANCE OF EXISTING CORPORATE BANK
ACCOUNTS; AND (III) MAINTENANCE OF CASH MANAGEMENT SYSTEM**

TO THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE IN THIS PROCEEDING:

　　　　　E. Gluck Corporation, the debtor and debtor-in-possession herein ("E. Gluck" or the "Debtor"), by its proposed counsel, Halperin Battaglia Benzija, LLP, hereby moves this Court for the entry of an Order, pursuant to section 105(a) of Title 11 of the United States Code, as amended (the "Bankruptcy Code") authorizing the Debtor's (a) continued use of existing business forms and records, (b) limited maintenance of existing corporate bank accounts; and (c) maintenance of its cash management system (the "Motion"). In support of the Motion, the Debtor respectfully represents, as follows:

{00353365.2 / 1539-001 }

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the Amended Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein is §105(a) of the Bankruptcy Code.

## BACKGROUND

2. On December 1, 2025 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

3. No creditors' committee or trustee has been appointed in this case.

4. E. Gluck has been in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Its proprietary anchor is Armitron, a longstanding name in the U.S. watch market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others. At its peak, the company generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores. Beyond the domestic market, E. Gluck also built international distribution through third-party distributors and maintained a meaningful presence in travel retail, including duty-free and cruise channels.

5. E. Gluck's business model rested on a durable combination of long-term brand licenses, strong proprietary positioning, a broad and healthy SKU variety, high-quality products and deep retail relationships, all supported by an in-house team capable of delivering design, production and distribution at scale. For many years, this mix created a stable and profitable foundation.

6. Yet, in recent years, management recognized that traditional watches were a mature, slow-growth category, increasingly pressured by shifts in consumer behavior and the rise of smart devices. To diversify and with the goal of positioning the company for future growth, E. Gluck acquired WITHit, a company specializing in reading accessories and smartwatch and wearable-tech accessories. The strategic goal was for WITHit to extend E. Gluck's reach into faster-growing product categories, leverage E. Gluck's retail distribution muscle and create a hedge against the long-term decline of conventional watch demand due to, among other reasons, the advent and increased market share of smart devices..

7. Unfortunately, the acquisition of WITHit did not deliver the benefits that management anticipated. The expectation was that smartwatch accessories, and the broader category of wearables, would provide a meaningful growth engine to offset the gradual decline in traditional watch demand. However, in practice, the category proved more fragmented, competitive and difficult to scale than projected. Integration challenges, overlapping costs and slower-than-expected consumer adoption all contributed to results that fell materially short of the original business forecasts. The end result was that not only were the anticipated synergies unrealized, but forecasted growth related to WITHit's legacy business failed to materialize such that sales even trended downward from pre-merger periods.

8. At the same time, external factors compounded the challenge. The COVID-19 pandemic disrupted supply chains, tightened retail ordering, and shifted consumer demand patterns. Tariffs and freight costs spiked, further eroding already thin margins. Retail partners across channels became more aggressive in managing their own inventories, often leaning on suppliers to absorb costs and risks. Meanwhile, the traditional watch category faced mounting structural headwinds as smart devices captured a larger share of consumer attention and spending.

9. The cumulative effect is a company burdened by fixed costs and new obligations from the WITHit acquisition that are not offset by the anticipated increases in revenue, all while E. Gluck's core revenue and profitability have come under sustained pressure from macroeconomic shocks and long-term shifts in the consumer marketplace.

10. E. Gluck is seeking relief under Chapter 11 to reset its cost structure, shed unproductive obligations, and position its long-standing business for long-term stability. The Chapter 11 process will allow the company to exit the unfavorable service contracts associated with the WITHit acquisition, as well as unwind operational redundancies that never integrated cleanly with the core watch business. It will also enable E. Gluck to reject costly or underutilized leases and to restructure its Hong Kong operations into a smaller, more efficient presence that reflects the company's current sourcing needs. Further, Chapter 11 will give the company the ability to rightsize its workforce, eliminating duplicative roles and reducing fixed overhead that has become unsustainable relative to revenue, while preserving a material number of jobs into the future – a goal that is in jeopardy should E. Gluck not undertake this restructuring.

11. E. Gluck's foundations are strong and its goals are to preserve and reinforce those foundations that have served it well for decades. The company continues to hold valuable proprietary and licensed brands, including Armitron and Anne Klein, which remain trusted names in the U.S. watch market. Its retail relationships span the full spectrum of distribution and its distribution partners continue to view E. Gluck as a reliable, creative and capable supplier. With burdensome contracts and unproductive costs behind it, the company will return to a variable-cost model in line with its revenue base, its financial profile will stabilize and a leaner but sustainable workforce will be protected. With a restructured balance sheet and operating model, E. Gluck will be positioned to compete effectively in today's challenging retail environment and to achieve sustainable profitability.

12. Additional information regarding E. Gluck's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Declaration of Adam Gelnick Pursuant to Local Bankruptcy Rule 1007-2 (the "Gelnick Declaration") filed contemporaneously herewith.

## RELIEF REQUESTED AND BASIS THEREFOR

13. By this Motion, the Debtor respectfully requests entry of an Order, substantially in the form of the proposed Order annexed hereto as **Exhibit B**, authorizing the Debtor to: (a) continue using existing business forms and records; (b) maintain existing corporate bank accounts in a limited manner; and (c) maintain its cash management system. A list of the bank accounts the Debtor seeks to maintain and in what capacity, including addresses and redacted account numbers are provided on **Exhibit A** hereto (the "Accounts").[1]

---

[1] The Debtor's Accounts are predominantly held at Israel Discount Bank of New York ("IDB"), with one account at Bank of America. For the avoidance of doubt, both banks are on the U.S. Trustee Region 2 List of Authorized Depository Institutions dated June 4, 2025. Contemporaneously with the filing of the Motion, the Debtor filed *the Motion for an Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured*

{00353365.2 / 1539-001 }  5

14. The Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, among other things, (a) close all existing bank accounts and to open new debtor-in-possession bank accounts, (b) establish one debtor-in-possession account for all estate monies required for the payment of taxes including payroll taxes, (c) maintain a separate debtor-in-possession account for cash collateral, and (d) obtain checks for all debtor-in-possession accounts which bear the designation "debtor-in-possession," the bankruptcy case number and the type of account. These requirements are designed to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent the inadvertent postpetition payment of pre-petition claims.

### Existing Business Forms and Records

15. The Debtor seeks a waiver of the requirement that it open a new set of books and records as of the Petition Date. The Debtor respectfully submits that opening a new set of books and records would create an unnecessary administrative burden, causing unnecessary expense, utilization of resources and delay. The Debtor has a fully computerized record keeping system that is supported by various reporting and detailed subsidiary ledger packages. Given the Debtor's corporate structure, there are multiple employees at the various premises that have been trained to follow the Debtor's bank account protocols. Modifying the Debtor's bank accounts and routines would be unnecessarily cumbersome and onerous in this case, particularly given the Debtor's overseas production operations.

---

*Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Authorizing the Use of Cash Collateral; (V) Scheduling Final Hearing; and (VI) Granting Related Relief* (the "DIP Motion"). By the DIP Motion, the Debtor requests entry of interim and final orders approving the extension of post-petition financing by IDB subject to the Approved Budget (as defined in the DIP Motion). Any relief requested herein shall be subject to the then applicable DIP order (such DIP Order, the "DIP Order") and the Approved Budget.

{00353365.2 / 1539-001 }    6

16. In addition, the Debtor, in the ordinary course of its business, uses many invoices, stationery and other business forms for the operation of its business. By virtue of the nature and scope of the business in which the Debtor is engaged, and the numerous other parties with whom the Debtor deals, the Debtor requests that it be permitted to use its existing business forms without alteration or change to minimize a substantial expense to the estate in creating new business forms and using the Debtor's stock inventory. Additionally, although it would be possible to change the Debtor's forms, the Debtor submits that any change at this juncture would create confusion among its customers and delay among its employees and other third-parties. Accordingly, the Debtor respectfully requests that it be authorized to continue to use its existing business forms in order to permit a smooth transition into Chapter 11.

17. There is extensive authority supporting the relief the Debtor seeks in the Motion. In other Chapter 11 cases, courts have recognized that strict enforcement of the requirement that a debtor open a new set of books and records as of the petition date does not always serve the purposes of Chapter 11. Accordingly, courts have often waived such requirements and replaced them with alternative procedures. *See, e.g., In re Hollander Sleep Products, LLC*, Case No. 19-1608 (MEW) (Bankr. S.D.N.Y. July 2, 2019) (authorizing use of existing business forms); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. 2019) (same); *In re FULLBEAUTY Brands Holdings Corp.*, Case No. 19-22185 (RDD) (Bankr. S.D.N.Y. Feb. 7, 2019) (same); *In re Aegean Marine Petrol. Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Nov. 9, 2018) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. June 26, 2018) (same).

18. The Debtor requests entry of an order authorizing it to maintain its cash management system, existing bank accounts (in a limited fashion as described more fully herein) and

{00353365.2 / 1539-001}    7

existing business forms. The Debtor believes that the relief requested is essential to its ability to efficiently administer the case and maximize the value of the estate. Given the material amount of international transactions required in producing and distributing the Debtor's inventory, any disruption in the means by which the Debtor manages its financial affairs and satisfies its ordinary course post-petition obligations would hamper its operations, unnecessarily jeopardizing the chapter 11 case at the outset.

19. Accordingly the Debtor seeks authority to continue to use its existing cash management system and to maintain existing bank accounts, as described below. The Debtor also seeks authority to continue using its existing business forms, as is, at least until its substantial existing stock is depleted. With regard to the Debtor's cash management system, the Debtor seeks authorization for its banks to service, administer and debit the accounts in the ordinary course of the Debtor's operations.

## Overview of the Cash Management System

20. In the ordinary course of business operations, the Debtor maintains an integrated network of bank accounts that facilitate the timely and efficient collection, concentration, management and disbursement of funds (the "Cash Management System"). The Debtor's primary banking relationship is with Israel Discount Bank, with one additional account at the New York City branch of Bank of America. A complete list of the Debtor's bank accounts is attached hereto as **Exhibit A**. The Debtor also maintains a system designed to accurately record such collections, transfers and disbursements as they are made. All of the bank accounts that are part of the Debtor's current, active Cash Management System are in the Debtor's name, as detailed further on **Exhibit A**. As of the Petition Date, the principal flow of funds through the Cash Management System, which the Debtor seeks to maintain, is as follows:

a. <u>Operating</u>. Account used for operations, including ordinary course receipts and payments via ACH or wire transfer, as well as funding of payroll.

b. <u>Disbursement Checking</u>. Separate account for all checks cut; facilitates tracking of paper checks and clearance.

c. <u>"FBO"</u>. Accounts for incoming ACH and wire payments that sweep daily into lockbox for secured lender.

d. <u>"Taxes"</u>. Account that holds all external tax payments, including sales tax.

e. <u>Checking Account at Bank of America</u>. Though the Debtor's primary banking relationship is at Israel Discount Bank, it maintains a special use account at Bank of America simply to facilitate certain transactions that are simpler for the Debtor's counterparts at a major bank.

21. The Debtor's Cash Management System is similar to those commonly employed by corporate entities of similar size and complexity. The continued use of the Debtor's Cash Management System allows for, among other things, the efficient tracking and control of funds, while at the same time, reducing administrative costs. Additionally, but for certain payroll checks and obligations for which "first day" relief is sought, there are effectively no known uncashed checks outstanding against the Debtor's deposit accounts; thus, the administrative burden of forcing the Debtor into new accounts when compared to the benefit to the estate, if any, is high. There is extensive authority supporting the relief the Debtor seeks with respect to the Accounts, and bankruptcy courts have often waived such requirements. *In re*

*Delphi Corp., et al.*, Case No. 05-44481 (Bankr. S.D.N.Y. 2005); *In re Dana Corp., et al.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. 2006); *In re Delta Air Lines, Inc.*, No. 05-17923 (ASH) (Bankr. S.D.N.Y. 2005).

**The Relief Requested Herein Is in the
Best Interests of the Debtor and its Estate**

22. The Court has the authority to grant the relief requested herein pursuant to § 105(a) of the Bankruptcy Code, which provides, in relevant part, "[t]he court may issue any order, process, judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a). For the reasons set forth herein, the Debtor seeks permission to maintain its existing business forms and a waiver of the requirement that its bank accounts be closed and new accounts be opened as of the Petition Date. The Debtor believes that enforcement of these requirements would unnecessarily disrupt the Debtor's business and impair its efforts to preserve the value of its estate. Attendant delays, confusion and disruptions would necessarily result from a change in the accounts. Among the Debtor's main objectives in the initial stage in Chapter 11 is to preserve both its brand and its customer relationships in order to maximize the value of the Debtor's business for the benefit of creditors. The Debtor asserts that court approval of the continuity of business forms, the treatment of the accounts, and the continued use of the Debtor's cash management system is in the Debtor's best interests and the best interests of the estate.

**NOTICE**

23. Notice of this Motion has been provided to the Office of the United States Trustee. In light of the nature of the relief requested, the Debtor submits that the notice provided is appropriate under the circumstances and that no further notice is required.

**NO PREVIOUS REQUEST**

24. No previous request for the relief sought herein has been made by the Debtor to this or any other court.

**WHEREFORE**, the Debtor respectfully requests the entry of an Order in the form annexed hereto as **Exhibit B**: (i) authorizing the Debtor to continue using its existing business forms and records; (ii) authorizing the Debtor to maintain its bank accounts in the manner set forth on Exhibit A; (iii) authorizing the Debtor to maintain its cash management system; and (iv) granting such other and further relief as may be just and proper.

Dated: New York, New York
December 1, 2025

> **E-GLUCK CORPORATION**
> Debtor and Debtor-in-Possession
>
> By: */s/ Adam Gelnick*
> Adam Gelnick,
> its Chief Financial Officer

Filed by:

**HALPERIN BATTAGLIA BENZIJA, LLP**

By: */s/ Julie Dyas Goldberg, Esq.*
Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
40 Wall Street, 37th Floor
New York, New York 10005
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net;
jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor- in-Possession*