Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, New York 10005
Phone: (212) 765-9100; Fax: (212) 765-0964
ahalperin@halperinlaw.net
jgoldberg@halperinlaw.net

*Proposed Counsel to the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

**E. GLUCK CORPORATION,**
Tax I.D. No. 13-2907195

                  Debtor.
-------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (MG)

**MOTION FOR ORDERS (I) SCHEDULING HEARING TO
CONSIDER (A) SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S NON-WITHIT ASSETS, FREE AND CLEAR OF ALL LIENS, CLAIMS
AND ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS; AND
(B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS;
(II) SCHEDULING HEARING TO CONSIDER APPROVAL OF (A) BREAK-UP
FEE/EXPENSE REIMBURSEMENT AND (B) BIDDING PROCEDURES FOR THE
CONDUCT OF AN AUCTION AND ENTERING ORDER THEREON; (III) FIXING A
CURE CLAIMS BAR DATE WITH RESPECT TO THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS; (IV) FIXING MANNER AND
NOTICE OF SALE HEARING; (V) AUTHORIZING THE DEBTOR TO SELL ASSETS,
FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, SUBJECT TO
HIGHER AND BETTER OFFERS; AND (VI) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS**

TO THE HONORABLE MARTIN GLENN
CHIEF UNITED STATES BANKRUPTCY JUDGE:

        E. Gluck Corporation, the debtor and debtor-in-possession herein ("E. Gluck" or the

"Debtor"), by its proposed counsel, Halperin Battaglia Benzija, LLP, makes this motion (the "Motion"),

pursuant to sections 105, 363 and 365 of Title 11 of the United States Code, as amended (the "Bankruptcy

Code"), for entry of orders:

{00354048.2 / 1539-001 }

1. fixing the date and time of a hearing (the "Sale Hearing") to consider:

    a. approval of a certain asset purchase agreement and all ancillary agreements documents (collectively, the "Sale Agreement" substantially in the form attached hereto as **Exhibit A**) by and between the Debtor, as seller, and E. Gluck Global LLC (the "Buyer"), dated as of November 30, 2025, pursuant to which, among other things, the Debtor proposes to sell substantially all of its assets, subject to certain exceptions (the "Assets") to Buyer, free and clear of all liens, claims and encumbrances, subject to higher or better offers, and

    b. approval of the assumption and assignment to the Buyer, or its designee, of certain executory contracts of the Debtor related to the Assets (the "Assigned Contracts and Leases"). A schedule of all of the Debtor's executory contracts and unexpired leases, together with (among other things) the cure costs associated with each (if any) calculated in accordance with the Debtor's books and records, is attached as Exhibit B to the Bidding Procedures Order (as defined herein). The Buyer shall have the rights to designate which Executory Contracts and Leases it wishes to have assumed and assigned no later than five (5) calendar days prior to the Sale Hearing;

2. fixing the date and time of a hearing (the "Bidding Procedures Hearing") to consider approval of a break-up fee and expense reimbursement (the "Break-Up Fee/Expense Reimbursement"), and bidding procedures (the "Bidding Procedures") to be utilized in connection with the Auction of the Assets to be held prior to the Sale Hearing (the "Auction"), and, in connection therewith, approving the Break-Up Fee/Expense Reimbursement and Bidding Procedures,

3. fixing the last date by which the non-debtor parties to the Assigned Contracts and Leases must file Cure Claims (as defined herein) with respect to the respective Debtor's assumption and assignment to Buyer, or its designee, of the Assigned Contracts and Leases,

4. fixing the manner and form of notice of the Sale Hearing, and

5. approving the Sale Agreement and authorizing the sale of the Assets pursuant to section 363(b) of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), free and clear of claims, liens and other encumbrances and, in connection therewith, approving the assumption and assignment of the Assigned Contracts and Leases pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

In support thereof, the Debtor respectfully represents, as follows:

**Introduction**

1. By this Motion, the Debtor seeks entry of an Order approving the sale of the Assets, free and clear of all liens, claims and encumbrances (the "Asset Sale"), as well orders granting the related relief described above, all of which is in furtherance of the Debtor's efforts to maximize the value of its assets for the benefit of its estate and creditors.

2. The Debtor has received an offer from the Buyer to purchase the Assets (the "Offer"). The proposed sale under the Offer shall be subject to higher and better offers that may be made at the Auction to be scheduled prior to the Sale Hearing, provided that a Qualified Bid (as defined herein) is received pursuant to the Bidding Procedures (as described herein). For the reasons set forth herein, the Debtor requests that the Court approve a Break-Up Fee/Expense Reimbursement and establish Bidding Procedures for the conduct of the Auction. The proposed sale is the result of substantial, good faith, arms' length negotiation and provides a vehicle for the Debtor to maximize asset values through an auction sale process.

**Jurisdiction and Venue**

3. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), (m) and (n) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 9014. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §1409.

**Background**

4. On December 1, 2025 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. No creditors' committee or trustee has been appointed in this case.

6. E. Gluck has been in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Its proprietary anchor is Armitron, a longstanding name in the U.S. watch market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others. At its peak, the company generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores. Beyond the domestic market, E. Gluck also built international distribution through third-party distributors and maintained a meaningful presence in travel retail, including duty-free and cruise channels.

7. E. Gluck's business model rested on a durable combination of long-term brand licenses, strong proprietary positioning, a broad and healthy SKU variety, high-quality products and deep retail relationships, all supported by an in-house team capable of delivering design, production and distribution at scale. For many years, this mix created a stable and profitable foundation.

8. Yet, in recent years, management recognized that traditional watches were a mature, slow-growth category, increasingly pressured by shifts in consumer behavior and the rise of smart devices. To diversify and with the goal of positioning the company for future growth, E. Gluck acquired WITHit, a company specializing in reading accessories and smartwatch and wearable-tech accessories. The strategic goal was for WITHit to extend E. Gluck's reach into faster-growing product categories, leverage E. Gluck's retail distribution muscle and create a hedge against the long-term decline of conventional watch demand due to, among other reasons, the advent and increased market share of smart devices..

9. Unfortunately, the acquisition of WITHit did not deliver the benefits that management anticipated. The expectation was that smartwatch accessories, and the broader category of wearables, would provide a meaningful growth engine to offset the gradual decline in traditional watch

demand. However, in practice, the category proved more fragmented, competitive and difficult to scale than projected. Integration challenges, overlapping costs and slower-than-expected consumer adoption all contributed to results that fell materially short of the original business forecasts. The end result was that not only were the anticipated synergies unrealized, but forecasted growth related to WITHit's legacy business failed to materialize such that sales even trended downward from pre-merger periods.

10. At the same time, external factors compounded the challenge. The COVID-19 pandemic disrupted supply chains, tightened retail ordering, and shifted consumer demand patterns. Tariffs and freight costs spiked, further eroding already thin margins. Retail partners across channels became more aggressive in managing their own inventories, often leaning on suppliers to absorb costs and risks. Meanwhile, the traditional watch category faced mounting structural headwinds as smart devices captured a larger share of consumer attention and spending.

11. The cumulative effect is a company burdened by fixed costs and new obligations from the WITHit acquisition that are not offset by the anticipated increases in revenue, all while E. Gluck's core revenue and profitability have come under sustained pressure from macroeconomic shocks and long-term shifts in the consumer marketplace.

12. E. Gluck is seeking relief under Chapter 11 to reset its cost structure, shed unproductive obligations, and position its long-standing business for long-term stability. The Chapter 11 process will allow the company to exit the unfavorable service contracts associated with the WITHit acquisition, as well as unwind operational redundancies that never integrated cleanly with the core watch business. It will also enable E. Gluck to reject costly or underutilized leases and to restructure its Hong Kong operations into a smaller, more efficient presence that reflects the company's current sourcing needs. Further, Chapter 11 will give the company the ability to rightsize its workforce, eliminating duplicative roles and reducing fixed overhead that has become unsustainable relative to revenue, while preserving a material number of jobs into the future – a goal that is in jeopardy should E. Gluck not undertake this

restructuring.

13. E. Gluck's foundations are strong and its goals are to preserve and reinforce those foundations that have served it well for decades. The company continues to hold valuable proprietary and licensed brands, including Armitron and Anne Klein, which remain trusted names in the U.S. watch market. Its retail relationships span the full spectrum of distribution and its distribution partners continue to view E. Gluck as a reliable, creative and capable supplier. With burdensome contracts and unproductive costs behind it, the company will return to a variable-cost model in line with its revenue base, its financial profile will stabilize and a leaner but sustainable workforce will be protected. With a restructured balance sheet and operating model, E. Gluck will be positioned to compete effectively in today's challenging retail environment and to achieve sustainable profitability.

14. Additional information regarding E. Gluck's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Declaration of Adam Gelnick Pursuant to Local Bankruptcy Rule 1007-2 (the "Gelnick Declaration") filed contemporaneously herewith.

**Marketing the Assets for Sale**

15. Prior to the Petition Date, the Debtor has endeavored to identify a strategic or financial investor for the business and/or an acquirer for all or a portion of the assets. To that end, the Debtor's management team engaged a chief restructuring officer and an investment banking firm, and worked with its team of professionals to prepare financial and operational materials for dissemination to potential investors and/or acquirers of all or a portion of the Debtor's assets. The Debtor and its professionals identified approximately sixty-five (65) targets then solicited formal expressions of interest from 11 of the candidates, including strategic buyers, private equity firms and other investors. After extensive dialog and diligence, the Debtor received two formal offers to serve as stalking horse in a sale pursuant to Section 363 of the Bankruptcy Code. The marketing efforts have continued on a rolling basis through the Petition Date and all 65 original targets, plus any other parties that may have come to light

during this thorough canvassing of the market will be resolicited immediately upon establishing the relevant Bidding Procedures.

16. In the Debtor's business judgment, Buyer has made the highest and best offer, to date, to acquire certain of the Debtor's assets and business on a going concern basis. Buyer is an industry leader in the licensed apparel and consumer goods business and offers reasonable assurance of future performance to the Debtor's licensors. The Debtor believes that the Offer is fair and reasonable - - although it intends to submit the Offer to the rigors of the marketplace. The Offer has been memorialized in the Sale Agreement for which the Debtor now seeks approval.

17. The Debtor, through its chief restructuring officer, Cometrics Partners, LLC, and its managing principal, Gary Herwitz (the "CRO") and East Wind Securities, LLC (the "Investment Banker"), has updated its financial and operational materials and intends to solicit offers for the Assets from parties previously solicited as well as other parties that the CRO and Investment Banker believe may have an interest in acquiring the Assets. The Debtor submits that - - with the Offer from the Buyer and the Debtor's ability to transfer the Assets, free and clear of liens, claims and encumbrances, pursuant to an Order of the Bankruptcy Court -- there is a potential for a competitive bidding process for the Assets.

## The Sale Agreement[1]

18. The Sale Agreement is a comprehensive, purchase and sale agreement setting forth all the rights and obligations contemplated thereunder by and between the Debtor and the Buyer. The Sale Agreement provides a vehicle for the disposition of certain of the Debtor's operating assets and, at the same time, enables the Debtor to canvass the marketplace for any higher and better offers for the Assets.

19. The following is a general description of the salient terms of the Sale Agreement. Capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Agreement:[2]

---

[1] The Sale Agreement attached hereto is in substantially final form, but without either exhibits or schedules. The final, executed form of the Sale Agreement, together with exhibits and schedules (but redacted to preserve confidentiality) will be filed with the Court no later than 2 business days prior to the Bidding Procedures Hearing.

{00354048.2 / 1539-001 }        7

Acquired Assets: All assets of the Debtor including all rights and benefits under Assumed Contracts, Inventory, Receivables, tangible personal property, goodwill, Transferred Intellectual Property, unfulfilled customer orders, cash and equivalents, IT Systems, customs and tariff refunds, certain real property refunds, insurance policy claims, and all other assets that related to the Business; provided that the Buyer shall have no rights to any of the Excluded Assets, including Seller's membership interests in WITHit Holdings, LLC and certain other subsidiaries, that certain cause of action against Ruben Azrak and/or Steven Jacob Odzer and Avoidance Actions.

Purchase Price: The purchase price for the Acquired Assets is (a) assumption at Closing of the Assumed Liabilities (which amount includes Cure Costs) plus (b) the IDB Payoff Amount. The Estimated Purchase Price is $30 million.

Assumed Liabilities: All Liabilities arising after the Closing Date relevant to the Acquired Assets; all Liabilities under Assigned Contracts including all Determined Cure Costs; all Liabilities under any Unfulfilled Customer Orders; all Transfer Taxes, any Liability related to pre-Closing ordinary course customer programs and certain other expressly scheduled liabilities.

Outside Date and Other Deadlines: The Bidding Procedures must be approved by the Court no later than December 24, 2025, the Sale Hearing must have occurred no later than February 6, 2026, Closing must occur no later than February 13, 2026.

**Additional Disclosures Regarding Potential Related Transactions**

20. Buyer and the Debtor's principals have had discussions concerning certain key employee retention issues by the Buyer in the event Buyer is the successful bidder for the Assets. No agreement has been reached, to date, between the parties.

**The Sale is Supported by Sound Business
Judgment and Should be Approved**

21. The Debtor submits that the terms of the Sale Agreement are fair and reasonable, and that ample authority exists for the approval of the sale of the Assets to the Buyer. Section 363(b) of the

---

[2] The following is merely a summary of the Sale Agreement and is qualified in its entirety by the actual, express terms of the Sale Agreement. To the extent there is any discrepancy between this summary and the terms of the Sale Agreement, the terms of the Sale Agreement shall control.

Bankruptcy Code provides that a debtor-in-possession, after notice and a hearing, may use, sell, or lease property of the estate other than in the ordinary course of business. In pertinent part, the section provides:

> (b)(1) The trustee, after notice and hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

See 11 U.S.C. § 363(b)(1).

22. In order for a court to approve a request for the use of property of the estate outside the ordinary course of business, the court must find that the proposed course of action is supported by sound business reasons. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983); *see also In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1993); *Bartel v. Bar Harbor Airways, Inc.*, 196 B.R. 268, 273 (S.D.N.Y. 1996); *In re Caldor, Inc.- NY*, 193 B.R. 182, 187 (Bankr. S.D.N.Y. 1996); *In re Thomas McKinnon Securities, Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990). In reviewing such proposed transactions, courts should give substantial deference to the business judgment of the debtor-in-possession. *See e.g., Esposito v. Title Inc. Co. of Pa. (In re Fernwood Mkts.),* 73 B.R. 616, 621 n.2 (Bankr. E.D. Pa. 1987).

23. The Debtor submits that consideration of these factors militates in favor of this Court's approval of a section 363(b) sale process. Given its current cash crisis, the Debtor does not have the operation funds necessary to promulgate a plan of reorganization and does not believe it would be able to reorganize on a stand-alone basis. If the DIP Facility is approved, the Debtor believes it has sufficient funds to continue to operate pending the Sale Hearing. However, the Debtor is concerned that unless it is permitted to undertake the Asset Sale at this time it will lose the value of its assets, in particular, its name recognition and good will in the industry that has been developed over the past sixty (60) years. Accordingly, the Debtor believes that conducting an auction sale process will maximize the prospect of a sale of the Assets on a going concern basis. Approval of the Sale Agreement provides the Debtor the ability to maximize the value of its assets through a fair and open auction process.

24. Based upon the foregoing, the Debtor submits that the Sale Agreement and the proposed sale of the Assets is in the best interests of the Debtor, its estate, and its creditors, and is based upon sound, reasoned and informed business judgment warranting this Court's approval. *See In re Lionel Corp.*, 722 F.2d at 1071; *Bar Harbor Airways, Inc.*, 196 B.R. at 273; *In re Caldor, Inc. - NY*, 193 B.R. at 187.

25. The Debtor and the Buyer seek findings that the transactions contemplated by the Sale Agreement are (a) subject to the protections afforded to "good faith" purchasers under section 363(m) of the Bankruptcy Code and (b) not subject to avoidance under section 363(n) of the Bankruptcy Code. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under section (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). In addition, section 363(n) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount . . . [including] punitive damages . . . .

11 U.S.C. § 363(n).

26. The negotiations and the resulting transaction contemplated by the Sale Agreement are the result of good faith and arm's length negotiations between the Debtor and the Buyer and resulted in a Purchase Price that is both fair and reasonable in light of the circumstances. At the Sale Hearing, the parties will adduce evidence in support of the foregoing and will request that the Court incorporate findings on these matters as part of the Order approving the sale.

## The Sale should be Approved Free and
## Clear of All Liens, Claim and Encumbrances

27. Pursuant to section 363(f) of the Bankruptcy Code, after notice and a hearing, a debtor may sell property of the estate free and clear of all liens and encumbrances. In pertinent part, the section provides:

> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-
>
> (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which the property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Here, the Debtor's pre-petition secured creditor has consented to the sale of the Assets.

## Bidding Procedures

28. The Debtor and the Buyer recognize that the sale of the Assets must be subject to higher and better offers pursuant to applicable bankruptcy law. The Buyer is prepared to consent to subject its offer to higher and better bids provided it receives overbid protection and the Court approves the Break-Up Fee/Expense Reimbursement, and appropriate bidding procedures are put in place. Set forth below are the proposed Bidding Procedures to be employed with respect to the Auction (if any):

  a. <u>Alternative Bid Deadline</u>. All alternative bids must be submitted to the Debtor, c/o Gary Herwitz, the Debtor's Chief Restructuring Officer (the "<u>CRO</u>"), 1411 Broadway, 8th Floor, New York, NY 10018, gary@cometricsllc.com, by **January 30, 2026 at 4:00 p.m. (ET)** (the "<u>Alternative Bid Deadline</u>"), with a copy to Debtor's counsel, Halperin Battaglia Benzija, LLP, 40 Wall Street, 37th Floor, New York, New York 10005, Attn: Alan D. Halperin, Esq. and Julie Dyas Goldberg, Esq., ahalperin@halperinlaw.net; jgoldberg@halperinlaw.net.

b. <u>Due Diligence</u>. To the extent any proposed bidder wants to undertake any due diligence with respect to the Assets, such proposed bidder must execute a non-disclosure agreement (to the extent such an agreement has not been previously executed and delivered by such proposed bidder) in form and substance reasonably acceptable to the Debtor prior to undertaking any such due diligence and all such due diligence must be undertaken and completed prior to the Alternative Bid Deadline.

c. <u>Qualified Bid</u>. Only alternative bids that meet with the following qualifications will be considered a "<u>Qualified Bid</u>":

   i. the bid must be <u>received</u> by the Debtor, , c/o Gary Herwitz, the Debtor's chief restructuring officer, with copies as detailed in paragraph (a), above, by the Alternative Bid Deadline;

   ii. The bid must :

      A. Be in writing;

      B. State that it is irrevocable;

      C. Be accompanied by a duly executed sale agreement, marked to reflect variations to the Sale Agreement;

      D. Be accompanied by a down payment deposit in immediately available funds of not less than ten (10%) percent of the proposed purchase price (the "<u>Deposit</u>"). The Deposit will be subject to forfeiture upon a breach by the bidder and non-refundable if the bidder is selected as a Successful Bidder (as defined below) and fails to consummate the purchase (other than as a result of a breach by the Debtor). The Deposit will be refunded if the bidder is not selected as a Successful Bidder;

      E. Be accompanied by written confirmation that the bidder has secured consent from any licensor-counterparties to licenses that are proposed to be assumed and assigned as part of the Sale Agreement; and

      F. State that the bid is not subject to any further due diligence or financing;

   iii. The proposed purchase price for a Qualified Bid shall be an amount in cash of at least the sum of (A) the Purchase Price as defined in the Sale Agreement (the "<u>Stalking Horse Bid</u>"), plus (B) the amount of the Break-Up Fee/Expense Reimbursement (*i.e.*, $850,000), plus (C) $100,000 (the "<u>Subsequent Incremental Bid Amount</u>")((A), (B) and (C), collectively, the "<u>Initial Overbid</u>"). In the event a bidder (including Buyer) is the second best bidder (the "<u>Back-Up Bidder</u>"), its bid shall be irrevocable and such bidder shall remain ready, willing and able to purchase the Assets through the closing of the transaction with the Successful Bidder (subject to the terms and conditions of such Backup Bidder's last submitted bid);

    iv. Without limiting the generality of the foregoing, such bid shall be for substantially all of the Assets and the Assumed Liabilities and any liabilities to be assumed under the Sale Agreement on an as-is, where-is basis and shall not include any due diligence, financing or other contingency;

    v. The bid must be expressly made subject to the Debtor's obligations to pay the Break-Up Fee/Expense Reimbursement pursuant to the terms of the Sale Agreement;

    vi. Simultaneously with the delivery of the Deposit and the executed sale agreement, an entity submitting an alternative bid shall deliver financial information evidencing that such party has the financial wherewithal to (A) consummate the proposed transaction on the terms proposed; and (B) provide adequate assurance of future performance with respect to any contracts and leases proposed to be assumed and assigned to such entity. Such financial information may include current audited or verified financial statements and/or a letter from a depository institution indicating the ability to close on a proposed transaction and provide adequate assurance of future performance. In the event the financial information pertains to the parent or other equityholder of an acquisition affiliate, the bid of the affiliate shall be guaranteed by the parent or other equityholder. Upon receipt of the financial information and a determination by the Debtor, in consultation with the Official Committee of Unsecured Creditors of the Debtor (the "Committee") that the bid constitutes a Qualified Bid, the Debtor shall deliver such financial information to each counterparty to any executory contract or unexpired lease proposed by to be assigned to such Qualified Bidder (provided however that each such counterparty shall maintain the confidentiality of such information and shall not use it for any purpose other than evaluating the Qualified Bidder's ability to provide adequate assurance of future performance);

    vii. The entity submitting an alternative bid shall also provide (A) evidence or affirm under oath that all necessary approvals have been obtained authorizing the submission of the bid by such entity; and (B) provide assurances that, in the event of a sale of a customer list, that the bidder will substantially follow the Debtor's current privacy policy;

    viii. Only those bids bidders having submitted Qualified Bids (a "Qualified Bidder") will be permitted to participate in the Auction. The CRO, upon consultation with the Committee, will promptly notify each alternative bidder after the Alternative Bid Deadline whether it is a Qualified Bidder. The Auction shall occur no later than two (2) business days following the Alternative Bid Deadline. Buyer shall be deemed a Qualified Bidder.

    d. <u>Auction Procedures and Bidding Increments</u>.

        i. In the event one or more Qualified Bids are received by the Debtor prior to the Alternative Bid Deadline, the Debtor will conduct the Auction. No later than noon on the business day prior to the Auction, the Debtor shall circulate to each Qualified Bidder a copy of the Qualified Bid determined to be the highest or best Qualified Bid submitted as of the Alternative Bid Deadline, and that will constitute the opening bid at the Auction.

        ii. At the Auction (A) all bids shall be made and received on an open basis and all other bidders shall be entitled to be present for all bidding with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each bid will be fully disclosed to all other bidders throughout the entire Auction; (B) the opening bid at the Auction shall not be less than the Initial Overbid; (C) all offers subsequent to the opening bid at the Auction (*i.e.*, the Subsequent Incremental Bid Amount) must exceed the prior offer by not less than $100,000; (D) with respect to any such further overbid submitted by the Buyer, the consideration offered by the Buyer shall be deemed to include the full amount of the Break-Up Fee/Expense Reimbursement potentially payable to the Buyer; and (E) bidding at the Auction will continue until such time as no further bids are made within the time limit announced by the CRO, upon consultation with the Committee;

        iii. Upon conclusion of the Auction, the CRO, upon consultation with the Committee shall determine the highest or otherwise best bid (the "<u>Successful Bidder</u>"), and such bid shall be submitted for approval by the Bankruptcy Court. Subject to the Court's calendar, the Sale Hearing will occur no later than two (2) business days after the conclusion of the Auction.

        iv. The Successful Bidder shall have the burden of establishing by competent evidence that it qualifies for section 363(m) protections, and that it is capable of providing adequate assurance of future performance with respect to any executory contract or unexpired lease it wishes to have assumed and assigned pursuant to section 365;

        v. If the Debtor does not receive any Qualified Bids, the Debtor will report the same to the Bankruptcy Court and will proceed with the Sale Hearing and no Auction shall be held;

        vi. The CRO, upon consultation with the Committee, reserves the right to establish such other reasonable rules and procedures for the conduct of the Auction, provided that such rules and procedures are publicly announced at the Auction. The Debtor reserves the right to extend the dates and deadlines herein, in the exercise of its business judgment and consistent with its fiduciary duties to the estate.

    e. <u>Break-Up Fee/Expense Reimbursement.</u> The Break-Up Fee/Expense Reimbursement shall be payable to Buyer under the terms and conditions set forth in the Sale Agreement.

**The Bidding Procedures are**
**Reasonable and should be Approved**

29. Bankruptcy Rule 6004(f)(1) provides that a sale of property outside of the ordinary course of business may be by private sale or public auction. The Debtor believes that subjecting the Offer to higher or better bids will ensure the maximization of the value of the Assets. The Debtor submits that the Bidding Procedures are fair and reasonable and should be approved. They afford the Debtor the opportunity to subject the Assets to competitive bidding while preserving the Buyer as a stalking horse bidder and thereby providing a floor price for the Assets.

30. The Bidding Procedures will also ensure that the Sale Hearing is conducted in a fair and orderly manner, and that participants are *bona fide* bidders with ability and desire to consummate any proposed transaction. The Initial Overbid will ensure that the competitive bidding process compensates the Debtor for the cost of the Break-Up Fee/Expense Reimbursement and permits the Debtor to derive an added economic benefit from any such bids. The Subsequent Incremental Bid Amount reflects a fair and reasonable increment that should encourage competitive bidding and ensure that there is a true economic benefit to the Debtor and the estate for each successive bid.

31. The Break-Up Fee/Expense Reimbursement is intended to compensate the Buyer for its out of pocket expenses, the time expended by its staff in connection with the pursuit of this transaction, and as an incentive for the Buyer to serve as the Debtor's stalking horse bidder and subject the Assets to competitive bidding. The structure of the Break-Up Fee/Expense Reimbursement is the result of good faith, arm's length negotiation among the parties. *See In re: Integrated Resources, Inc.,* 147 B.R. 650, 658 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2nd Cir. 1993); *In re: 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (Break-up fee which is the result of good faith, arm's length agreement and not tainted by self-dealing should be upheld).

32. In the instant case, the proposed Break-Up Fee/Expense Reimbursement is fair and reasonable in relation to the proposed Purchase Price in light of the funds and efforts expended by the Buyer to consummate this transaction. Accordingly, the Debtor respectfully requests that this Court enter an order approving the Break-Up Fee/Expense Reimbursement and Bidding Procedures (the "Bidding Procedures Order") in the form annexed hereto as **Exhibit C**.

## Assumption and Assignment of Executory Contracts

33. Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume and assign executory contracts or unexpired leases subject to court approval. The Sale Agreement provides for the assumption and assignment of the Assigned Contracts and Leases. The decision to assume and assign an executory contract or unexpired lease is based upon the exercise of the debtor's "business judgment." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (!984); *In re III Enterprises Inc. V.*, 163 B.R. 453, 469 (Bankr.E.D.Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment - - a standard which we have concluded many times is not difficult to meet"). Section 365(b) of the Bankruptcy Code requires that a debtor-in-possession satisfy certain requirements at the time of assumption if a default exists under the contract or lease to be assumed.

34. Here, the Debtor has made the business decision to sell the Assets to Buyer pursuant to the Sale Agreement, subject to higher and better offers. The Debtor is licensee under a number license agreements with third parties to use the licensed marks in connection with the manufacture and sale of certain products in the ordinary course of the Debtor's business. Thus, a meaningful element of the value of the business to be sold stems from the executory contracts. As such, the assumption and assignment of the Assigned Contracts and Leases is an integral component of the Sale Agreement. If the Debtor is not able to assume and assign the

{00354048.2 / 1539-001 }    16

Assigned Contracts and Leases, the sale of the Assets would be crippled - - resulting in materially reduced proceeds for the benefit of the estate.

35. To effectuate the assumption/assignment process, the Debtor proposes to serve the non-debtor parties to the Assigned Contracts and Leases set forth on Exhibit B to the Bidding Procedures Order advising each of them of the Debtor's interest to assume and assign such executory contract. The list of Assigned Contracts and Leases, which comprises all of the Debtor's executory contracts and unexpired leases,[3] sets forth (a) the name and address of the counterparties to the executory contracts proposed to be assumed and assigned to the Buyer, or its designee; (b) the nature of the executory contract; and (c) the amount of any cure costs that the Debtor believes to be due and owing as reflected on its books and records. Buyer shall, no later than 5 business days prior to the Sale Hearing, advise the Debtor of those executory contracts and unexpired leases it wishes to have assumed and assigned.

36. Under the terms of the Sale Agreement, the Buyer is responsible for paying cure costs, if any, under any Assigned Contracts and Leases that are ultimately assumed and assigned to Buyer. The proposed pre-fixed Order Scheduling Hearing provides for a bar date for the assertion of any cure costs by the non-debtor parties to the Assigned Contracts and Leases to be assumed and assigned to the Buyer under the Sale Agreement. The Debtor submits that such non-debtor parties to the Assigned Contracts and Leases must be required to file a claim by the deadline fixed by the Court setting forth all claims and arrearages against the Debtor under such Assigned Contracts and Leases, to the extent any such party disagrees with the amount set forth in its respective Cure Notice (the "Cure Claims"). In order to facilitate the sale process, the Debtor requests that all Cure Claims be filed on or before January [12], 2026, and

---

[3] The Debtor has prepared this list to the best of its knowledge and ability. To the extent the Debtor subsequently determines that there are any other executory contracts or unexpired leases not included on the list, the Debtor will supplement the list, file it with the Court, and provide prompt notice to the counterparty (or counterparties) thereto.

{00354048.2 / 1539-001}    17

the Court hear any disputed Cure Claims at the Sale Hearing or a later date to be determined by the Court. The Debtor further requests that the Court provide that any party that is required to file a Cure Claim, but fails to do so, shall be bound by the cure amount corresponding to their contract as set forth on Exhibit B to the Bidding Procedures Order, or on the party's Cure Notice, as applicable, and shall be forever barred from asserting any other claim(s) against the Debtor, the estate and/or any successful purchaser of the Assets arising under such executory contract.

37. In an effort to provide the most up-to-date information to non-debtor parties to the Assigned Contracts and Leases, in the event the Buyer is not the Successful Bidder at the Auction, the Debtor will use its reasonable best efforts to provide non-debtor parties to the Assigned Contracts and Leases with the identity of the Successful Bidder prior to the Sale Hearing. Otherwise, the non-debtor parties to the Assigned Contracts and Leases may wish to plan to attend the Sale Hearing.

**The Debtor Requests that the Court
Schedule the Sale Hearing and
<u>Fix the Manner and Notice of Sale</u>**

38. The purpose of the Sale Hearing is to approve the sale of the Assets to the Buyer, or such other bidder as may tender a higher or better offer at the Auction. Nevertheless, the Debtor respectfully requests that the Sale Hearing be scheduled at the earliest possible time. Bankruptcy Rule 2002(a)(2) provides for twenty (20) days' notice of a "proposed use, sale or lease of property of the estate other than in the ordinary course of business . . . ." Thus, it is requested that the Court schedule the Auction and Sale Hearing on or about February [4], 2026. The Debtor submits that such relief is reasonable and appropriate under the circumstances.

39. The Debtor proposes that a true and complete copy of the proposed pre-fixed Order Scheduling Hearing, this Motion, together with all exhibits be served upon: (a) counsel to the Buyer, (b) the Prepetition Lender, by its counsel, (c) all entities known to assert a lien, claim, interest or

encumbrance in the Debtor's assets; (d) the twenty (20) largest creditors of the Debtor; (e) the United States Attorney's Office for the Southern District of New York; (f) all parties that have previously expressed interest in acquiring all or a portion of the Debtor's assets; and (g) the Office of the United States Trustee.

40. The Debtor further requests that the Court approve the form of notice annexed as **Exhibit B** hereto (the "Sale Notice"). The Debtor proposes to serve a copy of the Sale Notice upon (a) all known creditors of the Debtor; (b) all federal, state and local taxing authorities in which the Debtor operates business; and (c) all parties that have filed a notice of appearance in the case.

**No Previous Request**

41. No previous application for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests that this Court enter (a) the Order Scheduling Hearing (i) fixing the date and time of a Sale Hearing to consider approval of the Sale; (ii) if a timely objection to the Break-Up Fee/Expense Reimbursement and Bidding Procedures is timely filed, fixing the date and time of the Bidding Procedures Hearing to consider any objections to approval of the Break-Up Fee/the Expense Reimbursement and Bidding Procedures and entering orders thereon, (iii) fixing a bar date for the Cure Claims, and (iv) fixing the manner and form of notice of the Sale Hearing; (b) the Bidding Procedures Order in the form annexed as **Exhibit C** hereto; and (c) enter an Order authorizing the sale of the Assets pursuant to §§105(a), 363(b), (f), (k), (m), and (n) of the Bankruptcy Code and Bankruptcy Rule 2002, 6004 and 9014 and approving the assumption and assignment of the Assigned Contracts and Leases pursuant to §365 of the Bankruptcy Code and Bankruptcy Rule 6006, and (d) for such other and further relief as this Court deems just and proper.

Dated: New York, New York
      December 1, 2025

                                    **E-GLUCK CORPORATION**
                                    Debtor and Debtor-in-Possession

                                    By: _/s/ Adam Gelnick_
                                         Adam Gelnick,
                                              its Chief Financial Officer

Filed by:

**HALPERIN BATTAGLIA BENZIJA, LLP**

By: _/s/ Julie Dyas Goldberg_
     Alan D. Halperin, Esq.
     Julie Dyas Goldberg, Esq.
     40 Wall Street, 37th Floor
     New York, New York 10005
     Phone: (212) 765-9100; Fax: (212) 765-0964
     ahalperin@halperinlaw.net;
     jgoldberg@halperinlaw.net

_Proposed Counsel to the Debtor and Debtor- in-Possession_