EXECUTION VERSION

---

ASSET PURCHASE AGREEMENT

DATED AS OF

NOVEMBER 30, 2025

BY AND AMONG

E. GLUCK CORPORATION

AND

E. GLUCK GLOBAL LLC

---

# TABLE OF CONTENTS

## ARTICLE 1 DEFINITIONS

SECTION 1.01   Definitions. ................................................................................ 6
SECTION 1.02   Other Definitions and Interpretive Matters. .................................................. 18

## ARTICLE 2 PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01   Purchase and Sale of Acquired Assets. ......................................................... 19
SECTION 2.02   Excluded Assets............................................................................... 22
SECTION 2.03   Assumed Liabilities. .......................................................................... 23
SECTION 2.04   Excluded Liabilities. ......................................................................... 24
SECTION 2.05   Purchase Price: ............................................................................... 26
SECTION 2.06   Payment of Purchase Price. .................................................................... 26
SECTION 2.07   Allocation of Purchase Price. ................................................................. 26

## ARTICLE 3 CLOSING

SECTION 3.01   Closing Date. ................................................................................. 27
SECTION 3.02   Closing Deliveries by Buyer.................................................................... 27
SECTION 3.03   Closing Deliveries by Seller. ................................................................. 28
SECTION 3.04   Further Assurances. ........................................................................... 29

## ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER

SECTION 4.01   Organization and Good Standing. ............................................................... 29
SECTION 4.02   Authority; Validity; Consents. ................................................................ 30
SECTION 4.03   Subsidiaries.................................................................................. 30
SECTION 4.04   No Conflict. .................................................................................. 31
SECTION 4.05   Financial Statements; No Undisclosed Liabilities.............................................. 31
SECTION 4.06   Real Property. ................................................................................ 32
SECTION 4.07   Environmental Matters. ........................................................................ 32
SECTION 4.08   Title to Acquired Assets. ..................................................................... 32
SECTION 4.09   Taxes......................................................................................... 33
SECTION 4.10   Absence of Certain Developments. .............................................................. 33
SECTION 4.11   Sufficiency of Assets. ........................................................................ 33
SECTION 4.12   Tangible Property and Equipment................................................................ 33
SECTION 4.13   Legal Proceedings............................................................................. 33
SECTION 4.14   Compliance with Laws; Permits................................................................. 34
SECTION 4.15   Employment Matters. ........................................................................... 34
SECTION 4.16   Intellectual Property. ........................................................................ 35
SECTION 4.17   No Brokers or Finders. ........................................................................ 36
SECTION 4.18   Affiliate Transactions. ....................................................................... 36
SECTION 4.19   Material Contracts and Leases; No Breach of Assigned Contracts or Assigned
Leases........................................................................................ 36

SECTION 4.20   Insurance. ................................................................................ 37
SECTION 4.21   Receivables. .............................................................................. 37
SECTION 4.22   Accounts Payable. ..................................................................... 37

## ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER

SECTION 5.01   Organization and Good Standing. ............................................. 38
SECTION 5.02   Authority; Validity; Consents. ................................................. 38
SECTION 5.03   No Conflict. .............................................................................. 39
SECTION 5.04   No Brokers or Finders. ............................................................. 39
SECTION 5.05   Buyer's Acknowledgment. ..............................**Error! Bookmark not defined.**
SECTION 5.06   Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same. ....... 39

## ARTICLE 6 BANKRUPTCY COURT MATTERS

SECTION 6.01   Bankruptcy Court Approval. ..................................................... 40
SECTION 6.02   Bankruptcy Court Filings. ........................................................ 41
SECTION 6.03   Break-up Fee and Expense Reimbursement. .............................. 41
SECTION 6.04   Assumption and Assignment of Assigned Contracts and Assigned Leases... 41
SECTION 6.05   Determined Cure Costs. ............................................................. 42

## ARTICLE 7 ADDITIONAL AGREEMENTS

SECTION 7.01   Investigation of the Business By Buyer Prior to Closing. .............. 43
SECTION 7.02   Conduct of Business Prior to the Closing Date. ......................... 43
SECTION 7.03   Third Party Consents. ............................................................... 44
SECTION 7.04   Reasonable Best Efforts. ........................................................... 44
SECTION 7.05   Seller's Disclosure Schedule. ................................................... 44
SECTION 7.06   Notice of Developments. ........................................................... 45
SECTION 7.07   Taxes. ....................................................................................... 45
SECTION 7.08   Collection of Receivables. ........................................................ 46
SECTION 7.09   Name Change. ........................................................................... 46
SECTION 7.10   Employee Matters. .................................................................... 46
SECTION 7.11   Post-Closing Cooperation and Access to Books and Records. ...... 46
SECTION 7.12   Tax Returns. ............................................................................. 47
SECTION 7.13   Use of Customer Deposits. ....................................................... 47
SECTION 7.14   Insurance Proceeds. .................................................................. 47

## ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

SECTION 8.01   Accuracy of Representations ..................................................... 49
SECTION 8.02   Seller's Performance. ................................................................ 49
SECTION 8.03   No Order .................................................................................. 49
SECTION 8.04   No Proceedings. ........................................................................ 49
SECTION 8.05   Consents and Approvals. ........................................................... 49
SECTION 8.06   No Material Adverse Effect. ...................................................... 49

SECTION 8.07   Seller's Deliveries.................................................................................. 50
SECTION 8.08   Sale Order. ....................................................................................................... 50
SECTION 8.09   Delivery of Final Seller's Disclosure Schedule................................................ 50

## ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

SECTION 9.01   Accuracy of Representations. .......................................................................... 50
SECTION 9.02   Buyer's Performance. ...................................................................................... 50
SECTION 9.03   No Order. .......................................................................................................... 51
SECTION 9.04   No Proceedings. ............................................................................................... 51
SECTION 9.05   Consents and Approvals. ................................................................................. 51
SECTION 9.06   Buyer's Deliveries. .......................................................................................... 51
SECTION 9.07   Sale Order. ....................................................................................................... 51
SECTION 9.08   Payment of Purchase Price. ............................................................................. 51

## ARTICLE 10 TERMINATION

SECTION 10.01   Termination. .................................................................................................. 51
SECTION 10.02   Effect of Termination.  ................................................................................. 53

## ARTICLE 11 GENERAL PROVISIONS

SECTION 11.01   Survival of Representations, Warranties and Covenants............................... 53
SECTION 11.02   Confidential Nature of Obligations. .............................................................. 53
SECTION 11.03   Public Announcements. ................................................................................. 54
SECTION 11.04   Notices. ......................................................................................................... 54
SECTION 11.05   Waiver. .......................................................................................................... 55
SECTION 11.06   Entire Agreement; Amendment...................................................................... 55
SECTION 11.07   Assignment. ................................................................................................... 55
SECTION 11.08   Severability. .................................................................................................. 56
SECTION 11.09   Section Headings, Construction. ................................................................... 56
SECTION 11.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver. .... 56
SECTION 11.11   Counterparts.................................................................................................. 57
SECTION 11.12   Time of Essence............................................................................................ 57
SECTION 11.13   No Third Party Beneficiaries......................................................................... 57
SECTION 11.14   Seller's Disclosure Schedule. ........................................................................ 57
SECTION 11.15   Expenses. ...................................................................................................... 58
SECTION 11.16   Non-Recourse.  ............................................................................................. 58

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Assignment of Copyrights |
| Exhibit B | Form of Assignment of Domain Names |
| Exhibit C | Form of Assignment of Patents |
| Exhibit D | Form of Assignment of Trademarks |
| Exhibit E | Form of Assumption Agreement |
| Exhibit F | Form of Bid Procedures Order |
| Exhibit G | Form of Bill of Sale |
| Exhibit H | Seller's Disclosure Schedule |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of November __, 2025 by and among E. Gluck Corporation, a New York corporation ("E. Gluck" or "Seller") and E. Gluck Global LLC, a Delaware limited liability company ("Buyer").

## RECITALS

**WHEREAS**, E. Gluck has been in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Its proprietary anchor is Armitron, a longstanding name in the U.S. watch market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others (the "Business");

**WHEREAS**, Seller owns the Acquired Assets (as defined below);

**WHEREAS**, in order to consummate the transactions contemplated hereby, Seller has commenced or will commence a voluntary case (Case No. 25-_____) (the "Chapter 11 Case") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, Seller continues to operate the Business and remains in possession of its assets (including those comprising the Acquired Assets (as defined below)) as debtor and debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Acquired Assets, and Buyer intends to assume the Assumed Liabilities (as defined below), all upon the terms and conditions set forth herein;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated hereby in accordance with sections 363 and 365 of the Bankruptcy Code and the terms and conditions hereof;

**WHEREAS**, the execution and delivery of this Agreement, and Seller's ability to consummate the transactions set forth in this Agreement, are subject, among other things, to the entry of the Sale Order (as defined below) by the Bankruptcy Court pursuant to sections 363 and 365 of the Bankruptcy Code, among others; and

**WHEREAS**, in connection with the transactions contemplated hereby, Buyer may designate prior to Closing, one or more of its Affiliates to purchase the Acquired Assets and to assume the Assumed Liabilities pursuant to Section 11.07.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound, the Parties agree as follows.

{00354796.10 / 1539-001 }                                          5

## ARTICLE 1
## DEFINITIONS

SECTION 1.01      Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Acquired Assets" has the meaning set forth in Section 2.01.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"Affiliate Transaction" has the meaning set forth in Section 4.18.

"Agreement" has the meaning set forth in the preamble.

"Allocation" has the meaning set forth in Section 2.07.

"Alternative Proposal" means any proposal or potential proposal in respect of (a) a sale, transfer, lease or other disposition, directly or indirectly, including through an asset sale, stock sale, lease, stock issuance, merger, plan of reorganization, or similar transaction, whether in connection with a bankruptcy case or otherwise, of all or a substantial portion of the capital stock or assets of Seller, or (b) any recapitalization, restructuring, liquidation, dissolution, issuance of significant indebtedness (except for the DIP Obligations), or other transaction, whether in connection with a bankruptcy case or otherwise, that in the case of either (a) or (b) would be inconsistent with the transactions contemplated hereby.

"Assigned Contracts" means the Contracts described in Section 1.01(b)(i) of the Seller's Disclosure Schedule, as such section may be amended pursuant to Section 2.02(b). Notwithstanding anything herein to the contrary, "Assigned Contracts" shall not include any Contracts that are Excluded Assets.

"Assigned Leases" means the Leases described in Section 1.01(b)(ii) of the Seller's Disclosure Schedule, as such section may be amended pursuant to Section 2.02(b). Notwithstanding anything herein to the contrary, "Assigned Leases" shall not include any Leases that are Excluded Assets.

"Assignment of Copyrights" has the meaning set forth in Section 3.03(b), and shall be in substantially the form attached hereto as **Exhibit A**.

"Assignment of Domain Names" has the meaning set forth in Section 3.03(b), and shall be in substantially the form attached hereto as **Exhibit B**.

"Assignment of Patents" has the meaning set forth in Section 3.03(b), and shall be in substantially the form attached hereto as **Exhibit C**.

"<u>Assignment of Trademarks</u>" has the meaning set forth in <u>Section 3.03(b)</u>, and shall be in substantially the form attached hereto as **<u>Exhibit D</u>**.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.03</u>.

"<u>Assumption Agreement</u>" has the meaning set forth in <u>Section 2.03</u>, and shall be in substantially the form attached hereto as **<u>Exhibit E</u>**.

"<u>Auction</u>" has the meaning set forth in the Bid Procedures.

"<u>Avoidance Actions</u>" means any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code.

"<u>Acquired Assets</u>" has the meaning set forth in <u>0</u>.

"<u>Permits</u>" has the meaning set forth in <u>Section 2.01(a)(xvi)</u>.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Benefit Plan</u>" has the meaning set forth in <u>Section 4.15(b)</u>.

"<u>Bid Procedures</u>" means the bid procedures attached as an exhibit to the Bid Procedures Order, as the same may be entered by the Bankruptcy Court and shall have become a Final Order, and which Bid Procedures (as they may be amended, modified, supplemented from time to time) shall be in form and substance acceptable to Buyer.

"<u>Bid Procedures Order</u>" means an Order of the Bankruptcy Court, which Order (including exhibits) shall be in substantially the form attached hereto as **<u>Exhibit F</u>**, and which Order, as it may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"<u>Bill of Sale</u>" means a bill of sale which shall be in substantially the form attached hereto as **<u>Exhibit G</u>**.

"<u>Break-up Fee</u>" has the meaning set forth in <u>Section 6.03(a)</u>.

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"<u>Business Trade Secrets</u>" has the meaning set forth in <u>Section 4.16(f)</u>.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"Buyer Termination Notice" has the meaning set forth in Section 10.01(b)(i).

"Chapter 11 Case" has the meaning set forth in the recitals.

"Closing" has the meaning set forth in Article 3.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 3.01.

"Confidentiality Agreement" means the confidentiality agreement, dated as of April 4, 2025, between Buyer's Affiliate and Seller.

"Consent" means any consent, waiver, approval, Order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"Consent Pending Contract" has the meaning set forth in Section 6.04(c).

"Contract" means any agreement, contract, obligation, understanding, or undertaking (whether written or oral) or any other instrument that is legally binding.

"Copyrights" means all United States and foreign copyrights and copyrightable subject matter (including, but not limited to, Software), whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals, extensions, restorations and reversions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

"Credentials" means all (including without limitation, administrative and owner level) passwords, login information, user names, documentation, authentication credentials, multi-factor authentication devices or codes, access tokens, security keys, biometric authentication data (to the extent transferable), and other security credentials necessary to access and utilize the Acquired Assets, including any systems, accounts, or assets requiring multi-factor authentication or enhanced security protocols.

"Cure Costs" means, for any given Assigned Contract or Assigned Lease, the amounts required to cure any defaults arising under such Assigned Contract or Assigned Lease, as applicable, including for any pecuniary losses arising from such defaults, and all contingent, unliquidated or unmatured liabilities under such Assigned Contracts or Assigned Leases, as applicable, as may be required to be paid upon the assumption and assignment of such Assigned Contract or Assigned Lease, as applicable pursuant to section 365(b) of the Bankruptcy Code.

"Current Accounts Receivable" means the aggregate amount of all Receivables (other than any intercompany receivables) that are less than 90 days outstanding from the date of invoice.

"Data" means all information and data, whether in printed or electronic form and whether contained in a database or otherwise.

"<u>Determined Cure Costs</u>" means, in the aggregate, all Cure Costs payable to counterparties of Assigned Contracts and Assigned Leases as such amounts are determined pursuant to the Sale Order.

"<u>DIP Credit Agreement</u>" has the meaning set forth in the Ratification Agreement.

"<u>DIP Loan Documents</u>" has the meaning set forth in the Ratification Agreement.

"<u>DIP Obligations</u>" has the meaning set forth in the Ratification Agreement.

"<u>Domain Names</u>" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.  A Domain Name may or may not also be a Trademark.

"<u>Encumbrance</u>" means any charge, lien, claim, mortgage, lease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

"<u>Environmental, Health and Safety Laws</u>" has the meaning set forth in <u>Section 4.07(b)</u>.

"<u>Environmental, Health and Safety Permits and Licenses</u>" means any Consent required under any Environmental, Health and Safety Laws.

"<u>Equipment</u>" means all furniture, equipment, computers, machinery, apparatus, appliances, implements, spare parts, supplies and all other tangible personal property of every kind and description owned by Seller.

"<u>Equity Interests</u>" means the legal, equitable, contractual and other rights of any ownership interest in a Person (other than an individual or Governmental Authority), including, without limitation, all issued, unissued authorized or outstanding shares or stock (including common stock or preferred stock), and the rights of any Person to purchase or demand the issuance of any of the foregoing, and shall include, without limitation:  (i) conversion, exchange, voting, participation and dividend rights; (ii) liquidation preferences; (iii) any warrants, options, puts, calls, rights, awards, commitments or contract rights to purchase or acquire any such shares or stock at any time or other contract rights with the Seller in any way related thereof; and (iv) share-appreciation rights.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" has the meaning set forth in <u>Section 4.15(b)</u>.

"<u>Estimated Cure Costs</u>" has the meaning set forth in <u>Section 6.05(b)</u>.

"<u>Estimated Purchase Price</u>" means $30,000,000.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Expense Reimbursement" has the meaning set forth in Section 6.03(b).

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the Proceeding or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Proceeding or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the Proceeding or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the Proceeding or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Final Purchase Price" has the meaning set forth in Section 2.05. "Financial Statements" has the meaning set forth in Section 4.05.

"GAAP" means United States generally accepted accounting principles.

"Governmental Authority" means any United States federal, state or local, or any foreign (federal, state, provincial, local or otherwise) government, governmental authority, regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction, or any quasi-governmental or private body exercising any regulatory, governmental or quasi-governmental authority, or any self-regulatory organization.

"Hazardous Substance" means any "pollutant", "contaminant", "solid waste", "hazardous waste", "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws.

"IDB" means Israel Discount Bank of New York.

"IDB Closing Certificate" means a certificate from IDB, dated the Closing Date (or one Business Day earlier), that specifies the IDB Payoff Amount.

"IDB Loan Documents" means, collectively, the Ratification Agreement, the DIP Credit Agreement and the other DIP Loan Documents.

"IDB Payoff Amount" means an amount equal to the sum of (i) the DIP Obligations as of the Closing (stated to the minute), as set forth in the IDB Closing Certificate, plus (ii) the Prepetition Obligations, plus (iii) all amounts payable by Seller to IDB pursuant to Section 9.6 of the Ratification Agreement.

"<u>Indebtedness</u>" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the ordinary course of the business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"<u>Intellectual Property</u>" means all intellectual property rights of any kind (whether owned, used or licensed (as licensor or licensee)), including all Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, Technology, social media accounts, all rights of privacy and publicity and all proprietary rights to personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

"<u>Interim Order</u>" shall mean the interim order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable Law), together with all extensions, modifications and amendments thereto, authorizing, on an interim basis, Seller to execute and perform under the terms of the Ratification Agreement, the DIP Credit Agreement and the other DIP Loan Documents.

"<u>Invention</u>" means any discovery, improvement or invention, whether or not patentable, and all related know-how, designs, mask works, formulae, processes, manufacturing techniques, ideas, graphics, invention disclosures, certificates of invention, artwork, software or other copyrightable or patentable works, and all unregistered rights, applications, registrations, renewals and extensions of any of the foregoing.

"<u>Inventory</u>" means all inventory and all finished goods, merchandise, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables relating to the Business and maintained, held or stored by or for Seller or any of its Subsidiaries as of the Closing Date, wherever located, and any prepaid deposits for any of the same.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended, and regulations issued by the IRS pursuant to the Internal Revenue Code.

"IRS" means the Internal Revenue Service of the United States.

"IT Systems" means electronic data processing, information, recordkeeping, data storage systems, email systems, communications, telecommunications, networking, account management, inventory management and other such applications, Software, and hardware, equipment and services (including, but not limited to, all applications and Software installed on all hardware and equipment, and all databases, firmware, and related documentation), and Internet websites and related content.

"Law" means any federal, state, regional, local or foreign law, statute, ordinance, code, treaty, rule, regulation, Order, action or requirement of any Governmental Authority.

"Leased Real Property" means the leasehold interests of Seller and the security deposits appurtenant thereto, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing, (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, (c) all fixtures, systems and items of personal property of Seller used or useful in the Business attached or appurtenant thereto, and (d) all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Lease" means any lease or other occupancy agreement pertaining to the Leased Real Property or the Subsidiary Leased Real Property.

"Liability" means all liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"License" has the meaning set forth in Section 4.16(b).

"Licensors" means the entities set forth in Section 1.01(c) of the Seller's Disclosure Schedule.

"Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event ("Effect"), individually or in the aggregate, (i) that has, or would reasonably be likely to have, a material adverse effect on the assets, liabilities, properties, results of operations or financial condition of the Business (excluding the Excluded Assets and the Excluded Liabilities), and the Acquired Assets and the Assumed Liabilities, taken as a whole, or (ii) has or would reasonably be likely to prevent, materially delay or materially impair the ability of the Seller to perform their respective obligations hereunder or to consummate the transactions contemplated hereby ; provided, however, that "Material Adverse Effect" shall not include the following, nor shall any of the following be taken into account in determining whether there has been a Material Adverse Effect: (a) events or conditions that generally affect the industry in which Seller and its Subsidiaries operate; (b) general business or economic conditions; (c) national or international political or social conditions, including the engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any actual or threatened military or terrorist attack; (d) the conditions

of any financial, banking, or securities markets; (e) changes in GAAP made after the date hereof; (f) acts or omissions of any Seller carried out (or omitted to be carried out) in accordance with this Agreement or upon the written consent of Buyer in accordance with this Agreement; or (g) any condition arising by reason of the commencement of the Chapter 11 Case (other than any deterioration in the Business or Acquired Assets resulting from the Chapter 11 Case) .

"Material Contract or Lease" means any of the following Contracts or Leases relating to, connected with or used in the Business, to which any Seller or Subsidiary of Seller is a party, or by which any of the Acquired Assets or any of the assets and properties of Seller's Subsidiaries are bound:

(i)    any limited liability company agreement, joint venture, partnership agreement, profit sharing arrangement or other similar agreement or arrangement relating to the formation, creation, operation, management or control of any partnership or joint venture with regard to which a Seller is a party;

(ii)    any Contract for the purchase of goods, services, assets, properties, rights and claims (A) resulting in expenses by the Seller in excess of $50,000 individually or $150,000 in the aggregate per annum, or (B) that cannot be terminated by Seller without penalty or further payment upon notice of ninety (90) days or less;

(iii)    any Contract for the sale of goods, services, assets, properties, rights or claims (A) resulting in revenue to the Seller in excess of $50,000 individually or $150,000 in the aggregate per annum, or (B) that cannot be terminated by Seller without penalty or further payment upon notice of ninety (90) days or less;

(iv)    any Contract relating to (A) any outstanding capital lease obligations requiring annual payments in excess of $50,000 or (B) conditional sale arrangements;

(v)    a loan, guarantee of Indebtedness or Contract relating to Indebtedness of Seller, or pursuant to which Seller has mortgaged, pledged or otherwise placed an Encumbrance on any portion of the properties or assets of Seller;

(vi)    any Contract that requires Seller to make a loan or capital contribution to or investment in any Person;

(vii)    any Benefit Plan;

(viii)    any Contract for the lease of tangible personal property;

(ix)    any Contract providing for the indemnification by Seller;

(x)    any Contract which purports to limit the right of Seller to engage freely or compete in any line of business or to compete with any Person or operate in any location;

(xi)     any Contract that relates to the development, ownership, licensing or use of Intellectual Property (other than a shrink wrap or similar license for generally available "off-the-shelf" software);

(xii)     a settlement or similar agreement with any Governmental Authority or Order or Consent of a Governmental Authority to which Seller is subject involving future performance by Seller which is material to Seller;

(xiii)    any Lease; and

(xiv)    any other Contract that is material to Seller.

"Order" means any award, writ, injunction, judgment, order, ruling, directive, stipulation, determination or decree entered, issued, made, or rendered by or with any Governmental Authority.

"Outside Date" means February 13, 2026.

"Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, discoveries, ideas, inventions (whether or not patentable or reduced to practice) or improvements thereto.

"Permitted Encumbrances" means Encumbrances listed in Section 1.01(d) of the Seller's Disclosure Schedule.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or Governmental Authority.

"Petition Date" means November __, 2025.

"Prepetition Obligations" has the meaning set forth in the Ratification Agreement.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity) and prepaid charges and expenses of Seller.[1]

"Purchase Price" has the meaning set forth in Section 2.05.

--------

[1] NTD: Buyer to confirm existence of deposits

"<u>Ratification Agreement</u>" means, that certain Ratification and Amendment Agreement, dated as of November ____, 2025, by and among IDB, in its capacites as agent and sole lender thereunder, and Seller, as the same exists on the Petition Date and as may be amended, modified, ratified, extended, renewed, restated or replaced.

"<u>Real Property</u>" means, collectively, the Leased Real Property and the Subsidiary Leased Real Property.

"<u>Receivables</u>" means, with respect to Seller, any and all accounts receivable, rights to payment, notes and other amounts receivable from third parties, including customers, but excluding intercompany receivables, in each case, arising from the conduct of the Business before the Closing in the ordinary course of business, together with any unpaid financing charges accrued thereon.

"<u>Registered</u>" with respect to Intellectual Property, means issued, registered, renewed or the subject of a pending application.

"<u>Release</u>" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"<u>Representative</u>" means with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, financial advisors and restructuring advisors.

"<u>Requested Party</u>" has the meaning set forth in <u>Section 7.11(b)</u>.

"<u>Sale Hearing</u>" has the meaning set forth in the Bid Procedures.

"<u>Sale Order</u>" means an Order of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, <u>inter alia</u>, the sale of the Acquired Assets to the Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances, and the assumption by Seller, and assignment to Buyer, of the Assigned Contracts and Assigned Leases, and containing a finding that Buyer has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, which Order, including exhibits, and as the same may be amended, modified, supplemented from time to time, shall be in form and substance acceptable to Buyer.

"<u>Seller</u>" has the meaning set forth in the preamble.

"<u>Seller's Chief Restructuring Officer</u>" means Cometrics Partners, LLC.

"<u>Seller's Disclosure Schedule</u>" means the Disclosure Schedule delivered by Seller to Buyer on the date hereof in draft form attached hereto as **<u>Exhibit H</u>**, it being understood and agreed that the final form of the Seller's Disclosure Schedule shall be delivered by Seller to Buyer in accordance with <u>Section 7.05(a)</u> hereof.

"Seller's Knowledge" means the actual knowledge of the persons listed in Section 1.01(d) of the Seller's Disclosure Schedule after due inquiry of direct reports and review of relevant files and records.

"Seller's Termination Notice" has the meaning set forth in Section 10.01(c).

"Software" means all computer software programs (whether in source code, object code or other form) and software systems (whether owned, licensed, or used), including all databases, compilations, tool sets, compilers, "proprietary" languages, related documentation, technical manuals and materials, and any license to use or other rights related to the foregoing.

"Successful Bid" has the meaning set forth in the Bid Procedures.

"Successful Bidder" has the meaning set forth in the Bid Procedures.

"Subsidiaries" means, when used with reference to any Person, any corporation, partnership, limited liability company, joint venture, stock company or other entity of which such Person (either acting alone or together with its other Subsidiaries), directly or indirectly, owns or has the power to vote or to exercise a controlling influence with respect to 50% of more of the capital stock or other voting interests, the holders of which are entitled to vote for the election of a majority of the board of directors or any similar governing body of such corporation, partnership, limited liability company, joint venture, stock company or other entity.

"Subsidiary Leased Real Property" means the leasehold interests of Seller's Subsidiaries and the security deposits appurtenant thereto, together with (a) any prepaid rent, security deposits and options to renew or purchase relating to the foregoing, (b) all buildings and other structures, facilities or improvements currently or hereafter located thereon, (c) all fixtures, systems and items of personal property of Seller's Subsidiaries attached or appurtenant thereto, and (d) all easements, rights of way, options, renewal rights, licenses, rights and appurtenances relating to the foregoing.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the IRC), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee Liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules,

statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Tax Laws.

"Technology" means all algorithms, application programming interfaces (APIs), fabrication processes and engineering materials, engineering and technical drawings, engineering data, design and engineering specifications, circuit designs and assemblies, concepts, data, databases and data collections, designs, devices, diagrams, documentation, drawings, flow charts, formulae, Inventions (whether or not patentable or reduced to practice), materials, quality control, safety information, marketing and development plans, methods, industrial models, utility models and any other models, technical information, procedures, protocols, prototypes, manufacturing and product formulae, manufacturing, processes, schematics, software code (in any form including source code and executable or object code), firmware, specifications, annotations, techniques, trade secrets, confidential information, and specialized knowledge (including technology, product knowledge, technical data, and use and application knowledge), development and other tools, user interfaces, web sites, works of authorship, and other forms of know-how and technology.

"Third Party Consents" means the Consents set forth in Section 1.01(e) of the Seller's Disclosure Schedule.

"Title IV Plan" has the meaning set forth in Section 4.15(c).

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, brand names, certification names, collective marks, trade dress and trade names (including all assumed or fictitious names), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing.

"Trade Payables" means any and all trade payables of Seller arising from the conduct of the Business, incurred by Seller prior to the Closing and that are not yet due and payable to such third parties on or prior to the Closing Date in accordance with the terms of the Contracts giving rise to such trade payables, in each case solely to the extent such trade payables are (i) incurred in the ordinary course of business, and (ii) disclosed in Section 4.22 of the Seller's Disclosure Schedule.

"Trade Secrets" means confidential and proprietary information and trade secrets and know-how, including, without limitation, processes, schematics, databases, formulae, prototypes, models, drawings and customer lists.

"Transaction Documents" means this Agreement and any other agreements, instruments, or documents entered into pursuant to this Agreement.

"Transfer" has the meaning set forth in Section 6.04(c).

"Transferred Intellectual Property" has the meaning set forth in Section 2.01(vi).

"Transfer Taxes" has the meaning set forth in Section 7.07(b).

"Unfulfilled Customer Orders with Purchased Deposits" has the meaning set forth in Section 2.01(xi).

"Unfulfilled Customer Orders without Purchased Deposits" has the meaning set forth in Section 2.01(a)(xiii).

SECTION 1.02    Other Definitions and Interpretive Matters.

(a)    For purposes of this Agreement, the following rules of interpretation shall apply, except to the extent otherwise expressly provided or the context otherwise requires:

(i)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(ii)    any reference in this Agreement to $ shall mean U.S. dollars;

(iii)    all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement;

(iv)    any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa;

(v)    the words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear; and

(vi)    the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The parties hereto participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2
## PURCHASE AND SALE; PURCHASE PRICE

SECTION 2.01    Purchase and Sale of Acquired Assets.

Upon the terms, and subject to the conditions, of this Agreement, at Closing:

Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase and acquire, free and clear of all Encumbrances (other than Permitted Encumbrances), all right, title and interest of Seller in the following (collectively, the "Acquired Assets"):

(i)    all rights and benefits accruing under any Assigned Contracts and Assigned Leases, including any outstanding deposits thereunder;

(ii)    the Inventory (save and except for any Inventory that is an Excluded Asset);

(iii)    the Receivables (save and except for any Receivables that are Excluded Assets);

(iv)    all tangible personal property related to, or used or useful in or held for use in the conduct of, the Business, including, without limitation, servers, archives, samples, furniture, fixtures, furnishings, screens, artwork, equipment (including, without limitation, warehouse, office and computer equipment), machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock, furniture, fixtures, trade fixtures, leasehold improvements, office materials and supplies, and other tangible personal property located on, or off, the premises of any Real Property (save and except for any such tangible personal property that is an Excluded Asset);

(v)    all goodwill associated with the Business or the Acquired Assets, including rights under any confidentiality agreements executed by any third party for the benefit of Seller to the extent relating to the Business;

(vi)    all Intellectual Property related to, owned or used by Seller (save and except for any such Intellectual Property that is an Excluded Asset) (collectively, the "Transferred Intellectual Property");

(vii)    all telephone numbers used in connection with the Business;

(viii)    all domain name registrations (including all domain name registrar account access and transfer authorizations, DNS configurations, and SSL/TLS certificates and associated private keys) used in connection with the Business;

(ix)    the sales and promotional literature, customer lists and other sales related materials related to the Business (save and except for any that is an Excluded Asset);

(x)    all rights under any unfulfilled vendor purchase orders;

(xi)    all unfulfilled customer orders (including, without limitation, firm orders, pending approvals, custom orders, regular orders and reserve orders) in respect of which a Purchased Deposit has been made by the customer and the related payment has been made to the relevant vendor (collectively, the "Unfulfilled Customer Orders with Purchased Deposits");

(xii)    all unfulfilled customer orders (including, without limitation, firm orders, pending approvals, custom orders, regular orders and reserve orders) in respect of which no Purchased Deposit has been made the by customer (collectively, the "Unfulfilled Customer Orders without Purchased Deposits");

(xiii)    cash and cash equivalents (other than the Purchase Price), marketplace withheld-funds, payment processor withheld funds (including all chargeback reserves, rolling reserves, and other funds held by payment processors such as Stripe, Adyen, PayPal, and Amazon Pay), securities and other investments of Seller as of the Closing Date;

(xiv)    all IT Systems, API documentation, files, operating data, books of account, general, financial and Tax records, personnel records, invoices, shipping records, supplier lists, price lists, vendor lists, mailing lists, customer lists (including all customer and CRM data in exportable formats such as CSV or JSON, together with documentation of the lawful basis for collection and processing of such data under applicable privacy laws), catalogs, sales promotion literature, advertising materials, brochures, standard forms of documents, manuals of operations or business procedures, research materials, Contracts, instruments, filings, administrative and pricing manuals, correspondence, memoranda, plats, architectural plans, surveys, title insurance policies, drawings, plans and specifications, environmental reports, maintenance or service records, soil tests, engineering reports, expired purchase orders, operating records, operating safety manuals, email and SMS marketing suppression lists, consent artifacts and opt-in records, and other material and documents, books (including applicable portions of minute books), financial statements, records and files (whether or not in the possession of any of the Seller or their respective Representatives, stored in hardcopy form or on magnetic, optical or other media) and any rights thereto owned, associated with or employed by Seller in the conduct of the Business or otherwise related to the Acquired Assets or the Assumed Liabilities;

(xv)    all of the rights and benefits accruing under any franchises, permits, Consents, certificates, clearances, approvals, exceptions, variances, permissions, filings, publications, declarations, notices, licenses, agreements,

waivers and authorizations, including Environmental, Health and Safety Permits and Licenses, of or with any Governmental Authority (collectively, the "Permits") held, used or made by Seller in connection with the Business, and all deposits and prepaid expenses held by third parties and/or Governmental Authorities (save and except any such Permit that is an Excluded Asset);

(xvi)    all prepaid and deferred items that relate to the Business or the Acquired Assets, including all prepaid rentals and unbilled charges, fees and deposits (other than to the extent relating to Excluded Assets or Excluded Liabilities);

(xvii)    the amount of, and all rights to any, insurance proceeds received by Seller after the date hereof in respect of the loss, destruction or condemnation of any Acquired Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(xviii)    the amount of, and all rights to any, customs duty and  tariffs refund proceeds received by Seller after the date hereof that relates to the import of any Acquired Asset;

(xix)    The rights and interest in any refunds relating to that certain lease agreement between Seller and New York State Industrial Development Agency, or any proceeds thereof;

(xx)    all rights and obligations with respect to existing claims made as of the Closing Date under the insurance policies of any of the Seller that relate to the Business or any of the Acquired Assets or Assumed Liabilities, and all rights and benefits of any nature, including, without limitation, all insurance recoveries hereunder and rights to assert claims with respect to any such insurance recoveries, but excluding any D&O liability insurance policies;

(xxi)    to the extent transferable and to the extent related to the Acquired Assets, or in connection with the Business, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by Seller on the purchase or other acquisition of the Acquired Assets;

(xxii)    any rights, demands, claims, credits (including Tax refunds and similar credits and benefits), allowances, rebates, or rights of setoff arising out of or relating to any of the Acquired Assets;

(xxiii)    all confidentiality, non-compete and similar agreements entered into by Seller or any of its respective Representatives in connection with a sale of the Acquired Assets or the Business (save and except for any such agreement that is an Excluded Asset);

(xxiv)  all of Seller's direct and indirect equity, ownership and other rights, title and interests in and to Hedgehog eCommerce Corporation, together with all related rights to vote, to receive dividends, distributions or other payments (in cash, securities or other property), and all rights to any proceeds in respect of such equity interests (including on any sale, liquidation, dissolution or winding-up of Hedgehog eCommerce Corporation);

(xxv)  the Credentials; and

(xxvi)  all other assets, properties, rights and claims of any of the Seller of any kind or nature which relate to the Business, which are used or useful in or held for use in the Business, or which relate to the Acquired Assets (in each case, other than the Excluded Assets) not otherwise described above.

SECTION 2.02   Excluded Assets.

(a)      Notwithstanding anything in Section 2.01 to the contrary, nothing herein shall be deemed to sell, transfer, assign or convey the following assets to Buyer, and Seller shall retain all of their respective rights, title and interests in, to and under, and Buyer shall have no rights with respect to, any of the following (collectively, the "Excluded Assets"):

(i)      any portion of the Purchase Price delivered (or required to be delivered) to Seller pursuant to this Agreement;

(ii)      Seller's membership interest in WITHit Holdings, LLC;

(iii)      Seller's membership interest in EGC Holdings, LLC;

(iv)      Seller's ownership interest in Clarity Limited, incorporated under the companies ordinance of Hong Kong;

(v)      Seller's ownership interest in E. Gluck Company Limited, incorporated under the companies ordinance of Hong Kong;

(vi)      any Contract or Lease that is not an Assigned Contract or Assigned Lease, respectively (including, without limitation, any Contract or Lease that is excluded pursuant to Section 2.02(b) or Section 6.05(c) hereof), and any rights, benefits, or obligations thereunder;

(vii)      any rights, claims or causes of action of Seller under this Agreement or any other Transaction Document;

(viii)      all Purchased Deposits paid by Seller in connection with, or relating primarily to, any Excluded Asset or Excluded Liability;

(ix)      all proceeds of any Excluded Assets;

(x)      that certain cause of action against Ruben Azrak and/or Steven Jacob Odzer concerning a written guaranty dated June 10, 2020;

(xi)      any Equity Interests in Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other Equity Interests in Seller;

(xii)      any Benefit Plan;

(xiii)      Avoidance Actions;

(xiv)      any right, property or asset that is not an Acquired Asset; and

(xv)      any right, property or asset that is listed or described in Section 2.02(a)(xv) of the Seller's Disclosure Schedule.

(b)      At any time not later than five (5) Business Days prior to the Closing Date, and subject to Section 6.05(c), Buyer, in its sole discretion by written notice to Seller, may amend Section 1.01(b)(i) or Section 1.01(b)(ii) of the Seller's Disclosure Schedule to exclude from being assigned any Contract or Lease, respectively, whereupon such Contract or Lease so excluded shall not constitute an "Assigned Contract" or "Assigned Lease", respectively (and shall therefore constitute an Excluded Asset), and Buyer shall not acquire any rights, or assume any Liabilities, with respect thereto.  Buyer acknowledges and agrees that there shall be no reduction in the Purchase Price if it elects to exclude from being assigned any Contracts or Leases pursuant to the preceding sentence.  Upon Buyer's reasonable request, Seller shall provide additional information as to the Liabilities under the Contracts and Leases sufficient for Buyer to make an informed assessment whether to accept an assignment and assumption of such Contracts or Leases hereunder.

SECTION 2.03      Assumed Liabilities

Upon the terms and subject to the conditions of this Agreement, at Closing, Buyer shall execute and deliver to Seller an assumption agreement (the "Assumption Agreement") pursuant to which Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), the following Liabilities (collectively the "Assumed Liabilities") and no others:

(a)      all Liabilities arising after the Closing Date solely in connection with the ownership, operation and use of the Acquired Assets from and after the Closing Date;

(b)      all Liabilities of Seller under the Assigned Contracts and Assigned Leases, including all Determined Cure Costs (to be satisfied in accordance with Section 6.05(a));

(c)      the Liabilities of Seller under any Unfulfilled Customer Orders with Purchased Deposits;

{00354796.10 / 1539-001 }                    23

(d)        the Liabilities of Seller under any Unfulfilled Customer Orders without Purchased Deposits;

(e)        all Transfer Taxes;

(f)        any Liability of Seller relating to all pre-Closing liabilities to customers for returns, discounts and allowances  in accordance with customer agreements made in the ordinary course of business without amendment or expansion after the date hereof without Buyer's prior written consent);

(g)        the Liabilities of Seller under all outstanding supplier purchase orders set forth in Section 2.03(g) of the Seller's Disclosure Schedule; and

(h)        all other Liabilities set forth in Section 2.03(h) of the Seller's Disclosure Schedule.

SECTION 2.04    Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume, and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of Seller, and Seller shall be solely and exclusively liable with respect to all Liabilities of Seller, other than the Assumed Liabilities (collectively the "Excluded Liabilities").  The Excluded Liabilities include, but are not limited to, the following:

(a)        other than as specifically set forth in Section 2.03, any Liability of Seller arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all Liabilities for the expenses of Seller for the negotiation and preparation of this Agreement and expenses incurred in connection with the commencement and continuation of the Chapter 11 Case;

(b)        other than as specifically set forth in Section 2.03, any Liability relating to events or conditions occurring or existing in connection with, or arising out of, the Business as operated prior to the Closing Date, or the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Business);

(c)        any Liability of Seller arising under the IDB Loan Documents;

(d)        other than as specifically set forth in Section 2.03, any Liability to any current or former employee, independent contractor, consultant or agent at any time employed or engaged by Seller, or who otherwise provided services to Seller, at any time, or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Seller, whenever such claims mature or are asserted, including (except as otherwise specifically set forth herein), all Liabilities arising (i) under the Benefit Plans, (ii)

under any employment, wage and hour restriction, equal opportunity, discrimination, plant closing or immigration and naturalization Laws, (iii) under any collective bargaining Laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(e)       any Liability of Seller to its current or former employees or to any other Person under any Benefit Plan and any pension or retirement Liability of Seller to its current or former employees or to any other Person which are accrued as of the Closing Date, whether or not under any Benefit Plan;

(f)       other than as specifically set forth in <u>Section 2.03</u>, any Liability for Taxes attributable to periods prior to the Closing Date;

(g)       any Liability incurred by Seller or its respective directors, officers, stockholders, agents or employees (acting in such capacities) at any time;

(h)       any Liabilities arising from the operation of any successor liability Laws, including, without limitation, "bulk sales" statutes, to the extent that non-compliance therewith or the failure to obtain necessary clearances would subject the Buyer or the Acquired Assets to the claims of any creditors of Seller, or would subject any of the Acquired Assets to any Encumbrances or other restrictions (except for Permitted Encumbrances); provided, however, that Seller shall be responsible for compliance with all bulk sales and similar Laws;

(i)       any Liabilities of any of the Seller not related to the operation of the Business;

(j)       any Liabilities for personal injury claims, product liability claims, product recalls or similar claims or actions relating to the operation of the Business prior to the Closing, or relating to products manufactured, sold, or distributed by Seller prior to the Closing regardless of when such claims are asserted;

(k)       any Liability relating to or arising out of any violation of an applicable Law or Order prior to the Closing by the Seller;

(l)       any Liability relating to or arising out of the ownership or operation of an Excluded Asset; and

(m)       all other Liabilities set forth in <u>Section 2.04(m)</u> of the Seller's Disclosure Schedule.

Nothing contained in this Agreement shall require the Buyer to pay or discharge any Assumed Liabilities (i) prior to such Assumed Liabilities becoming due and payable in accordance with (if applicable) the underlying terms of any Contracts giving rise to or governing such Assumed Liabilities, (ii) so long as the Buyer shall in good faith contest the amount or validity thereof, or (iii) to the extent such Assumed Liabilities exceed the amounts disclosed in the Seller's Disclosure Schedule or otherwise disclosed to Buyer in writing prior to Closing.

SECTION 2.05    Purchase Price.  In addition to Buyer's assumption at Closing of the Assumed Liabilities pursuant to Section 2.03, the purchase price for the Acquired Assets (the "Purchase Price") shall equal the Estimated Purchase Price as adjusted to be an amount equal to the IDB Payoff Amount (such adjusted amount, the "Final Purchase Price"). For U.S. federal (and applicable state) income Tax purposes, the Purchase Price shall consist of the Final Purchase Price plus the amount of the Assumed Liabilities properly treated as purchase price under Section 1060 of the IRC. The Parties acknowledge that the Estimated Purchase Price is an indicative value only and does not constitute a floor, cap or minimum consideration; the Final Purchase Price shall be determined solely as set forth herein.

SECTION 2.06    Payment of Purchase Price.  On the terms and subject to the conditions set forth in this Agreement, at Closing, Buyer shall pay, directly to IDB, an amount in cash equal to the IDB Payoff Amount by wire transfer of immediately available funds to the account(s) specified in a customary IDB payoff letter. Upon receipt by IDB of the IDB Payoff Amount, Seller shall cause IDB to release and discharge all Liens granted by Seller on the Acquired Assets and deliver to Buyer UCC-3 termination statements and such other lien-release documentation as Buyer may reasonably request.

SECTION 2.07    Allocation of Purchase Price.

For purposes of this Section 2.07, the "Purchase Price" shall be deemed to equal the Final Purchase Price plus the amount of the Assumed Liabilities that are properly treated as purchase price for U.S. federal income Tax purposes. Buyer shall prepare an allocation of the Purchase Price (and any other amounts required to be treated as consideration for U.S. federal income Tax purposes) among the Acquired Assets in accordance with Section 1060 of the IRC and the applicable Treasury Regulations thereunder (the "Allocation"). Within fifteen (15) days after the Closing Date, Buyer shall deliver the Allocation to Seller. Seller shall have fifteen (15) days after receipt to review the Allocation and notify Buyer in writing of any objections. If Seller does not so object within such period, the Allocation shall be final and binding on the Parties. If Seller timely objects, Buyer and Seller shall negotiate in good faith to resolve such objections, and any unresolved items shall be submitted to an independent accounting firm mutually selected by Buyer and Seller, whose determination shall be final and binding on the Parties. Buyer and Seller shall (a) report the transactions contemplated by this Agreement, including the filing of IRS Form 8594 (and any similar forms required under state or local Law), in a manner consistent with the final Allocation, and (b) not take any Tax position inconsistent with the final Allocation, except as otherwise required by a "final determination" within the meaning of Section 1313(a) of the IRC.

SECTION 2.08    <u>Inventory</u>. Buyer shall have the right to cause a physical count of the Inventory at each location where any material portion of the Inventory is held (the "<u>Inventory Count</u>") to be conducted on a date and at a time reasonably agreed by Buyer and Seller. Seller shall, and shall cause its Affiliates and Representatives to, reasonably cooperate with and provide reasonable access and assistance to Buyer and its Representatives in connection with the Inventory Count. Promptly following completion of the Inventory Count, the Parties shall cooperate in good faith to reconcile any discrepancies between the Inventory Count and the Inventory reflected in Seller's books and records.

## ARTICLE 3
## <u>CLOSING</u>

SECTION 3.01    <u>Closing Date</u>.

The consummation of the transactions contemplated by this Agreement, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place no later than the third Business Day following the date on which the conditions set forth in <u>Article 8</u> and <u>Article 9</u> have been satisfied or waived (other than those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction of such conditions (or the waiver thereof by the party entitled to waive such conditions)), or at such other time as the parties hereto may mutually agree in writing; provided that the Closing shall not take place later than February 6, 2026 at 10:00 a.m. New York time.  The date and time at which the Closing actually occurs shall be the "<u>Closing Date</u>."

SECTION 3.02    <u>Closing Deliveries by Buyer</u>.

At or prior to the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a)    evidence of wire transfer of the IDB Payoff Amount to IDB pursuant to Section 2.06;

(b)    a certificate of an authorized officer of Buyer, dated as of the Closing Date, in form and substance satisfactory to Seller, as to (i) a copy of the resolutions of the manager or members of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the other Transaction Documents to which it is a party and the performance by Buyer of its obligations hereunder and thereunder; and (ii) incumbency and signatures of the officers of Buyer executing the Transaction Documents;

(c)    the Bill of Sale, the Assumption Agreement, and each other Transaction Document (other than the Transaction Documents set forth in <u>Section 3.02(d)</u>) to which Buyer is a party, duly executed by Buyer;

(d)    the Assignment of Patents, the Assignment of Trademarks, the Assignment of Copyrights and the Assignment of Domain Names, if any, duly executed by Buyer, in form for recordation with the appropriate Governmental Authorities, and any other assignments or instruments with respect to any Transferred Intellectual Property for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and

which other assignments or instruments shall be in form and substance acceptable to Seller and Buyer;

        (e)        the certificates required to be delivered pursuant to <u>Section 9.01</u> and <u>Section 9.02</u>; and

        (f)        such other bills of sale, assignments, deeds, endorsements and other good and sufficient instruments of conveyance, assumption and transfer, in form satisfactory to Seller, as Seller may reasonably request in order to consummate the transactions contemplated hereby.

        SECTION 3.03    <u>Closing Deliveries by Seller</u>.

        At or prior to the Closing, Seller shall deliver or cause to be delivered to Buyer:

        (a)        the Bill of Sale, Assumption Agreement, the Credentials, and each other Transaction Document (other than the Transaction Documents set forth in <u>Section 3.03(b)</u>) to which each Seller is a party, duly executed by the Seller party thereto;

        (b)        instruments of assignment of the Patents (the "<u>Assignment of Patents</u>"), Trademarks (the "<u>Assignment of Trademarks</u>"), Copyrights (the "<u>Assignment of Copyrights</u>") and Domain Names (the "<u>Assignment of Domain Names</u>") that are owned by Seller and included in the Acquired Assets, if any, duly executed by Seller, in form for recordation with the appropriate Governmental Authorities; evidence of completion of domain name registrar transfer (including delivery of DNS configuration and SSL private keys); evidence of transfer of Amazon Brand Registry owner email and completion of all verification flows, together with assignment of GS1 prefix; evidence of transfer of Shopify organization-owner role and completion or facilitation of re-KYB processes for all payment gateways (including Stripe, Adyen, PayPal, and Amazon Pay), together with disclosure of all chargeback reserves; evidence of assignment of all email and SMS marketing platform accounts (including Klaviyo and Attentive), including transfer of suppression lists and consent artifacts, together with executed DPA novations; evidence of transfer of primary admin roles for all social media handles (including Meta, TikTok, X, YouTube, and Pinterest) and rotation of two-factor authentication credentials; export of all direct-to-consumer data, including without limitation all orders, customer records, and CRM lists, in commonly readable formats (CSV or JSON), together with documentation of lawful basis for transfer, a controller-to-controller transfer covenant, and a customer notice strategy; and any other assignments or instruments with respect to any Transferred Intellectual Property or digital assets for which an assignment or instrument is required to assign, transfer and convey such assets to Buyer, and which other assignments or instruments shall be in form and substance reasonably acceptable to Seller and Buyer;

        (c)        a copy of the Sale Order, as entered by the Bankruptcy Court;

        (d)        a payoff letter from IDB setting forth the IDB Payoff Amount, confirming no default interest, penalties, make-whole or other excluded amounts are included and providing wire instructions;

(e)    the IDB Closing Certificate;

(f)    UCC-3 terminations and other customary lien-release documents from IDB with respect to the Acquired Assets, effective upon receipt of the IDB Payoff Amount;

(g)    the certificates required to be delivered pursuant to Section 8.01 and Section 8.02;

(h)    certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the IRC; and

(i)    such other bills of sale, assignments, deeds, endorsements, and other good and sufficient instruments of conveyance, assumption and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request in order to consummate the transactions contemplated hereby.

SECTION 3.04    Further Assurances.

At the Closing, and at all times thereafter as may be necessary, Seller shall execute and deliver to Buyer such other instruments of transfer as shall be reasonably necessary or appropriate to vest in Buyer good and indefeasible title to the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) and to comply with the purposes and intent of this Agreement and such other instruments as shall be reasonably necessary or appropriate to evidence the assignment by Seller and assumption by Buyer of the Assigned Contracts and Assigned Leases, and each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Law, and execute and deliver such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the corresponding sections or subsections of the Seller's Disclosure Schedule or in any update thereto pursuant to Section 7.05 (whether or not the representations and warranties in this Article 4 expressly refer to such schedule), Seller hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 4.01    Organization and Good Standing.

Seller has the full power and authority to own its property and assets, and Seller has the full power and authority to carry on the Business. Seller is a corporation duly organized, validly existing and, except as a result of the commencement or continuance of the Chapter 11 Case, in good standing under the Laws of the State of New York. Seller is duly qualified or licensed to do business and is in good standing in the respective jurisdictions where the character

of the Business or the nature of its properties makes such qualification or licensing necessary, except where the failure to so qualify or be licensed or in good standing would not have a Material Adverse Effect.

      SECTION 4.02     Authority; Validity; Consents.

      Subject to requisite Bankruptcy Court approval, Seller has the requisite power, capacity and authority necessary to enter into and deliver and perform its obligations under this Agreement and the other Transaction Documents to which Seller is party and to consummate the transactions contemplated hereby and thereby.  Subject to requisite Bankruptcy Court approval, the execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which Seller is party, the performance of Seller's obligations hereunder and thereunder and the consummation of the transactions contemplated herein and therein are within Seller's powers and have been duly and validly authorized by all requisite corporate actions in respect thereof and no other corporate proceedings on the part of such Seller are necessary to authorize this Agreement or to consummate the transactions contemplated hereby.  Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents to which the Seller is party constitute the legal, valid and binding obligations of Seller enforceable against each of them in accordance with their respective terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Subject to requisite Bankruptcy Court approval, except as set forth in Section 4.02 of the Seller's Disclosure Schedule, Seller is not required to give any notice to, make any filing with or obtain any Consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby or thereby.

      SECTION 4.03     Subsidiaries.

      (a)     Section 4.03 of the Seller's Disclosure Schedule sets forth a complete and accurate list of all Subsidiaries of Seller together with the jurisdiction of organization of each such Subsidiary and the jurisdiction in which each such Subsidiary is qualified or licensed to do business, all of the outstanding Equity Interests of each such Subsidiary (including all securities convertible into or exchangeable for Equity Interests of each such Subsidiary) and the record and beneficial owner of such Equity Interests.  All outstanding shares of capital stock of, or other Equity Interests or voting interests in, each Subsidiary of Seller have been duly authorized and validly issued and are fully paid and non-assessable, are owned beneficially and of record by the Seller free and clear of all Encumbrances, free of pre-emptive rights and issued in compliance with all applicable securities Laws and upon delivery by Seller of the Acquired Equity at Closing, good and valid title to the Acquired Equity, free and clear of all Encumbrances, other than those resulting from Buyer's ownership, will pass to Buyer other than those Equity Interests or Subsidiaries that are Excluded Assets.  Other than the Subsidiaries, Seller does not own, directly or indirectly, any capital stock, voting interests or Equity Interests in any Person.  Seller has provided to Buyer true and complete copies of the organizational and governing documents (including all amendments thereto) of each Subsidiary.

(b)        There are no preemptive or other outstanding rights, options, warrants, conversion rights, stock appreciation rights, redemption rights, repurchase rights, agreements, arrangements or commitments of any character under which the Subsidiaries are or may become obligated to issue or sell, or which give any Person a right to subscribe for or acquire, or in any way dispose of, any Equity Interests of the Subsidiaries, and no securities or obligations evidencing such rights are authorized, issued or outstanding.  The outstanding Equity Interests of the Subsidiaries are not subject to any voting trust agreement or other Contract restricting or otherwise relating to or providing voting rights, dividend rights or the disposition of such Equity Interests.  There are no phantom stock or other rights providing economic benefits based, directly or indirectly, on the value or price of the Equity Interests of the Subsidiaries.  No Subsidiary owns, directly or indirectly, any Equity Interests of any Person or has any direct or indirect Equity Interests in any business, or is a member of or participant in any partnership, joint venture or similar Person.  There are no outstanding contractual obligations of the Subsidiaries to provide funds to, or to make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person.

SECTION 4.04        No Conflict.

When the Consents and other actions described in Section 4.02 of the Seller's Disclosure Schedule have been obtained and taken, the execution and delivery of this Agreement and the other Transaction Documents, the performance by the Seller of their respective obligations hereunder and thereunder, and the consummation of the transactions provided for herein and therein will not (with or without notice, lapse of time or both) result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any termination, cancellation, modification or acceleration of any obligation of, the Seller, result in a loss of any benefit to which the Seller is entitled to, or result in the creation of any Encumbrance upon any of the Acquired Assets, under (a) any agreement, understanding or Contract to which Seller, or any of their respective properties or assets, is bound, (b) the certificates of formation or incorporation, bylaws or other organizational or governing documents of Seller, (c) any Order, or (d) any Permit or Law; in the case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 4.05        Financial Statements; No Undisclosed Liabilities.

(a)        Attached as Section 4.05(a) of the Seller's Disclosure Schedule are (i) the audited consolidated balance sheets of Seller as of December 31, 2023 and preceding four (4) calendar years and the related audited consolidated statements of operations, capital and cash flows for the fiscal years then ended, together with all related footnotes, accompanied by the unqualified reports thereon of Seller's independent auditors and (ii) the unaudited consolidated balance sheet of Seller and its Subsidiaries from January 1, 2024 through November 30, 2025 and the related unaudited consolidated statements of operations, capital and cash flows for the respective periods referred to therein (collectively, the "Financial Statements").  Each of the Financial Statements were prepared from the books and records of Seller and its Subsidiaries, in accordance with GAAP (in the case of such unaudited financial statements, subject to normal year-end adjustments (none of which are material in amount or effect) and the lack of footnotes)

and consistently applied and maintained throughout the periods indicated, and fairly present in all material respects the consolidated financial position, results of operations and cash flows of Seller and its Subsidiaries as of the date thereof and for the periods covered thereby.

SECTION 4.06    Real Property.

(a)    Section 4.06(a)(ii) of the Seller's Disclosure Schedule lists, as of the date hereof, all Leased Real Property and Subsidiary Leased Real Property. Seller has made available to Buyer true, complete and correct copies of all Leases, including any and all exhibits, schedules, annexes, amendments, supplements, and modifications thereto. Section 4.06(a)(i) and Section 4.06(a)(ii) of the Seller's Disclosure Schedule collectively list all of the Real Property used in connection with the Business.

(b)    Seller has received all material Permits that are necessary in connection with Seller's occupancy, ownership or leasing of the Real Property, and the present use of the Real Property by Seller does not materially violate the Permits applicable thereto.

(c)    The Real Property used by Seller, and the present uses of the Real Property by Seller, are in compliance in all material respects with, and not in default under or in material violation of, any building, zoning, land use, public health, public safety, sewage, water, sanitation or other comparable Law or Order.

SECTION 4.07    Environmental Matters.

Except as set forth in Section 4.07 of the Seller's Disclosure Schedule or as would not have a Material Adverse Effect:

(a)    Seller has all Environmental, Health and Safety Permits necessary for the lawful operation of the Business as currently conducted; and

(b)    the current operations of the Business comply with, and are not subject to any Order with respect to, any Laws concerning environmental, health or safety matters ("Environmental, Health and Safety Laws"), and Seller has not received notice alleging that the activities of the Business are in violation of any Environmental, Health and Safety Laws.

SECTION 4.08    Title to and Condition of Acquired Assets.

Seller has, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.03, and subject to the terms of the Sale Order, Seller will thereby transfer to Buyer, good and marketable title to, or, in the case of property leased or licensed by the Seller, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) as set forth in Section 4.08 of the Seller's Disclosure Schedule, (b) for the Assumed Liabilities and (c) for Permitted Encumbrances. The Acquired Assets are, in all respects, in good operating condition and repair (ordinary wear and tear excepted) and are fit for use for their intended purpose.

SECTION 4.09    Taxes.

Except as set forth in Section 4.09 of the Seller's Disclosure Schedule, Seller has timely filed all Tax Returns required to be filed with the appropriate Governmental Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted on behalf of Seller), and all Taxes shown to be payable on such Tax Returns have been paid.  Except as set forth in Section 4.09 of the Seller's Disclosure Schedule, on the date hereof, (i) no material examination of any such Tax Return of Seller is currently in progress by any Governmental Authority; (ii) no material adjustment has been proposed in writing with respect to any such Tax Returns for the last five (5) fiscal years by any Governmental Authority; and (iii) no material claim has been made in writing within the last five (5) years by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns to the effect that such filings may be required with respect to the Acquired Assets by that jurisdiction.

SECTION 4.10    Absence of Certain Developments.

Except as required by Law or GAAP, since January 1, 2020, through and including the date hereof:

(a)    Seller has conducted the Business in the ordinary course of business consistent with past practice;

(b)    there have not occurred any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that have had or would reasonably be expected to have a Material Adverse Effect; and

(c)    except as set forth on Section 4.10(c) of the Seller's Disclosure Schedule, Seller has not taken or authorized any action which, if taken or authorized on or after the date hereof, would require the consent of the Buyer pursuant to Section 7.02.

SECTION 4.11    Sufficiency of Assets.

Except as set forth in Section 4.11 of the Seller's Disclosure Schedule, the Acquired Assets constitute all of the assets, rights and interests of every nature and kind whatsoever necessary for the Buyer to operate the Business from and after the Closing Date in substantially the same manner as the Business is currently being operated by Seller.

SECTION 4.12    Tangible Property and Equipment.

Seller has good and valid record and marketable title to, or a valid leasehold interest in, the tangible property and Equipment constituting a portion of the Acquired Assets.

SECTION 4.13    Legal Proceedings.

(a)    Except as set forth in Section 4.13(a) of the Seller's Disclosure Schedule, Seller is not a party to any Proceeding nor, to Seller's Knowledge, has Seller been

threatened with, any Proceeding.  To Seller's Knowledge, there is no outstanding Order of any Governmental Authority to which the Seller is subject nor is any Seller in default with respect to any such Order.

(b)      Except as set forth in Section 4.13(a) of the Seller's Disclosure Schedule, there is no material suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Seller's Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, is reasonably likely to have a Material Adverse Effect on the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Seller has no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success. Seller and the Acquired Assets are not subject to any judgment, writ, award, injunction, order or decree that is related to the Business or the Acquired Assets.

SECTION 4.14      Compliance with Laws; Permits.

(a)      Except as set forth in Section 4.14(a) of the Seller's Disclosure Schedule, and except as would not have a Material Adverse Effect, the Seller (i) has conducted and continues to conduct the Business in all material respects in accordance with all Laws and Orders applicable to the Business, (ii) are not in violation of any Law or Order applicable to the operation of the Business and (iii) have not received any notice that any violation of any such Law or Order is being or may be alleged.

(b)      (i) Section 4.14(b) of the Seller's Disclosure Schedule sets forth a true and complete list of all material Permits.

SECTION 4.15      Employment Matters.

(a)      Seller is in compliance with all applicable Laws respecting employment and employment practices, terms and conditions of employment and wages and hours, except as would not have a Material Adverse Effect.

(b)      Section 4.15(b) of the Seller's Disclosure Schedule sets forth a true and complete list of each (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund or program (within the meaning of Section 3(I) of ERISA), (v) "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA), (vii) employment (other than offer letters entered into in the ordinary course of the Business), termination, severance or "change in control" agreement and (vii) other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or any of its Subsidiaries, as applicable, or by any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Seller or such Subsidiary, as applicable, would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Seller, any of its Subsidiaries, or

any ERISA Affiliate is party, for the benefit of any employee or director or any former employee or director of Seller or its Subsidiary, as applicable (each such plan is referred to herein as a "Benefit Plan").  Each Benefit Plan is operated and administered in all material respects in accordance with its terms and applicable Law (including ERISA and the Code).

(c)    With respect to each Benefit Plan subject to Title IV or Section 302 of ERISA ("Title IV Plan"), no material Liability under Title IV of ERISA has been incurred by Seller, or any ERISA Affiliate that has not been satisfied in full, and no condition exists that could reasonably be expected to result in the imposition of any Liability upon Buyer thereunder.  Except as set forth in Section 4.15(c) of the Seller's Disclosure Schedule, no Benefit Plan provides any medical, disability or life insurance benefits to any employees of the Business after termination of employment.  No Title IV Plan is a "multiemployer pension plan," as defined in Section 3(37) of ERISA, nor is any Title IV Plan a plan described in Section 4063(a) of ERISA.

SECTION 4.16    Intellectual Property.

(a)    Section 4.16(a) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; (iv) all Domain Names, including the identity of the domain name registrar for each Domain Name and confirmation that all DNS records and SSL private keys will be transferred to Buyer at Closing; (v) social media accounts, together with confirmation of the primary administrator role holder for each account; and (vi) all other Intellectual Property used or held for use in the conduct of the Business as currently conducted, in each case which is owned by Seller.  Except as set forth in Section 4.16(a) of the Seller's Disclosure Schedule, Seller is the sole record owner of all of the Intellectual Property set forth in Section 4.16(a) of the Seller's Disclosure Schedule, and all such Intellectual Property is subsisting and, to Seller's Knowledge, valid and enforceable.

(b)    Section 4.16(b) of the Seller's Disclosure Schedule sets forth a true, correct and complete list of all material licenses, sublicenses or other material Contracts or Leases to which Seller or any of its Subsidiaries is a party or otherwise bound pursuant to which Seller or its Subsidiary, as applicable, has granted to a third party or has been granted or have obtained by or from a third party any right to use any Intellectual Property (other than Contracts or Leases granting rights to use readily available commercial Software that is generally available on nondiscriminatory pricing terms and having an acquisition price of less than $25,000 in the aggregate for all such related Contracts or Leases) (each a "License").  Except as otherwise disclosed in Section 4.16(b) of the Seller's Disclosure Schedule, each License is in full force and effect and is a valid and binding obligation of Seller or its Subsidiary, as applicable, and, to Seller's Knowledge, the other parties thereto, in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency or other similar Laws affecting the enforcement of creditors' rights generally.  Upon entry of the Sale Order and payment of the applicable Determined Cure Costs, to Seller's Knowledge, (x) neither Seller nor any of its Subsidiaries is in breach or default of its obligations under any License, (y) no condition exists that with notice or lapse of time or both would constitute a default by Seller under any of the

Licenses, and (z) to Seller's Knowledge, no other party to any of the Licenses is in breach or default thereunder.

(c)        Seller, as applicable, owns, or has a valid right to use, free and clear of all Encumbrances (other than Permitted Encumbrances and any Encumbrances arising pursuant to the terms of a License), all Intellectual Property used in the Business and such Intellectual Property constitutes all Intellectual Property necessary to conduct the Business.

(d)        Except as disclosed in <u>Section 4.16(d)</u> of the Seller's Disclosure Schedule, (i) the conduct of the Business by Seller as currently conducted does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, and (ii) there has been no such claim or Proceeding asserted or threatened in writing in the past three years against Seller.

SECTION 4.17        <u>No Brokers or Finders</u>.

With the exception of the fees payable to Seller's investment bankers, as disclosed in accordance with the Chapter 11 Case, neither any Seller nor any Person acting on any Seller's behalf has paid or become obligated to pay any fee, commission, indemnification or similar payment to any broker, finder, investment banker, agent or intermediary in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

SECTION 4.18        <u>Affiliate Transactions</u>.

Except as disclosed in <u>Section 4.18</u> of the Seller's Disclosure Schedule, no Principal or any Affiliate of any Seller (a) is a party to any Material Contract or Lease with Seller, (b) is involved in any Proceeding against any Seller, or (c) has a loan outstanding from Seller (each of the transactions described in clauses (a) through (c), an "<u>Affiliate Transaction</u>").

SECTION 4.19        <u>Material Contracts and Leases; No Breach of Assigned Contracts or Assigned Leases</u>.

(a)        <u>Section 4.19(a)</u> of the Seller's Disclosure Schedule sets forth a true and complete list of all Material Contracts and Leases.

(b)        Except as set forth in <u>Section 4.19(b)</u> of the Seller's Disclosure Schedule, upon entry of the Sale Order and payment of the Determined Cure Costs and assuming the validity with respect to and binding effect on the applicable counterparty thereto, each Material Contract and Lease is valid and binding on Seller that is a party thereto, as applicable, and is in full force and effect and enforceable against Seller in accordance with its terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

SECTION 4.20    Insurance.

Each insurance policy and insurance arrangement that covers the Acquired Assets (the "Insurance Policies") are in full force and effect, all premiums thereon have been paid or Cure Cost identified and, to Seller's Knowledge, Seller is otherwise in compliance in all material respects with the terms and provisions of such policies. A complete and accurate list of all Insurance Policies as of the date of this Agreement is set forth on Section 4.20 of the Seller's Disclosure Schedule

SECTION 4.21    Receivables.

A complete and accurate list of all Receivables as of the date of this Agreement is set forth on Section 4.21 of the Seller's Disclosure Schedule. The Receivables, (i) except for intercompany claims, have arisen out of actual sales with unaffiliated third parties in the ordinary course of business consistent with past practice, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the ordinary course of business that are not material in the aggregate to the Business, and (iii) are collectible in the ordinary course of business consistent with past practice, net of reserves.

SECTION 4.22    Accounts Payable.

All of the accounts payable reflected on the unaudited consolidated balance sheet of Seller as of _____ arose from bona fide purchases of goods and services in the ordinary course of business.  Section 4.22 of the Seller's Disclosure Schedule sets forth the Trade Payables outstanding as of the date hereof.

SECTION 4.23    Unfulfilled Customer Orders. A complete list of all Unfulfilled Customer Orders as of the date of this Agreement is set forth on Section 4.23 of the Seller's Disclosure Schedule.

SECTION 4.24    Inventory. A complete list of all Inventory as of the date of this Agreement is set forth on Section 4.24 of the Seller's Disclosure Schedule. Except as set forth on Section 4.24 of the Seller's Disclosure Schedule, none of the Inventory is subject to any consignment, bailment, warehousing or similar agreement. The Inventory is of merchantable quality and not materially damaged in any significant way, including, but not limited to, damage caused by water. The Inventory has not been, and to Seller's Knowledge is not subject to, any current or past product recall, safety notice, or similar action by any Governmental Authority or manufacturer. The Inventory is in material compliance with applicable Laws for such products.

SECTION 4.25    Data. All Data may be lawfully transferred to and used by Buyer following the Closing without violation of any applicable law or contractual obligation, and all necessary consents, authorizations, and notices required for such transfer and use have been obtained and remain valid and enforceable. No sanctions, suspensions, restrictions, or other enforcement actions by any such third-party platform or service are pending or threatened against the Company, and the Company has not received any notices of non-compliance or violation from any such platform or service within the past three (3) years.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the corresponding sections (whether or not the representations and warranties in this Article 5 expressly refer to such schedule), Buyer hereby represents and warrants to Seller as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) as follows:

SECTION 5.01    Organization and Good Standing.

Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of _____. Buyer has the full power and authority to own its property, carry on its business as now being conducted and as proposed to be conducted following the Closing, and to carry out the transactions contemplated hereby.

SECTION 5.02    Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is party and the consummation of the transactions contemplated herein and therein have been duly and validly authorized by all necessary corporate actions in respect thereof.  This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal,

valid and binding obligations of Buyer, enforceable against it in accordance with their respective
terms, except as such enforceability is limited by bankruptcy, insolvency, reorganization,
moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or
general principles of equity.  Buyer is not required to give any notice to, make any filing with or
obtain any Consent from any Person (including any Governmental Authority) in connection with
the execution and delivery of this Agreement and the other Transaction Documents or the
consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 5.03    No Conflict.

The execution and delivery of this Agreement and the other Transaction
Documents, the performance by Buyer of its obligations hereunder and thereunder, and the
consummation of the transactions provided for herein and therein will not (with or without
notice, lapse of time or both) result in the breach of any of the terms and provisions of, or
constitute a default under, or conflict with, or cause any termination, cancellation, modification
or acceleration of any obligation of Buyer, result in a loss of any benefit to which Buyer is
entitled, or result in the creation of any material Encumbrance upon any assets or properties of
Buyer, under (a) any agreement, understanding or Contract to which Buyer or any of its
properties or assets is bound, (b) the certificates of formation or incorporation, bylaws or other
organizational or governing documents Buyer, (c) any Order, or (d) any Permit or Law; in the
case of the preceding clauses (a), (c) and (d), except for such breaches, defaults, conflicts or
accelerations that do not, and are not reasonably likely to, individually or in the aggregate,
materially and adversely affect the ability of Buyer to carry out its obligations under this
Agreement and the other Transaction Documents to which it is a party, and to consummate the
transactions contemplated hereby.

SECTION 5.04    No Brokers or Finders.

Neither Buyer nor any Person acting on its behalf has paid or become obligated to
pay any fee, commission, indemnification or similar payment to any broker, finder, investment
banker, agent or intermediary in connection with this Agreement, the other Transaction
Documents or the transactions contemplated hereby or thereby for which any Seller is or will
become liable, and Buyer shall indemnify and hold harmless Seller from any claims with respect
to any such fees, commissions or similar payments.

SECTION 5.05    Acquired Assets "AS IS"; Buyer's Acknowledgment Regarding Same.

Buyer agrees, warrants, and represents that, except as set forth in this Agreement,
(a) Buyer is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis
based solely on Buyer's own investigation of the Acquired Assets and (b) except as set forth in
this Agreement, none of the Seller nor any real estate broker, agent, officer, employee, servant,
attorney, or representative of any Seller has made any warranties, representations or guarantees,
express, implied or statutory, written or oral, respecting the Acquired Assets or the Assumed
Liabilities, any part of the Acquired Assets or the Assumed Liabilities, relating to the financial
performance of the Acquired Assets or the Business, or the physical condition of the Acquired
Assets; provided, however, that this "AS IS" provision shall not limit or disclaim (i) Seller's

express representations and warranties set forth in Article 4 of this Agreement, (ii) Buyer's remedies for any breach thereof, or (iii) any obligations of Seller under the Transaction Documents.  Buyer further acknowledges that the consideration for the Acquired Assets specified in this Agreement has been agreed upon by Seller and Buyer after good-faith arms-length negotiation in light of Buyer's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS".

## ARTICLE 6
## BANKRUPTCY COURT MATTERS

SECTION 6.01    <u>Bankruptcy Court Approval</u>.

(a)    Seller and Buyer acknowledge that this Agreement and the sale of the Acquired Assets (including the assumption and assignment of the Assigned Contracts and Assigned Leases) are subject to Bankruptcy Court approval after commencement of the Chapter 11 Case.  Seller and Buyer further acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or best price for the Acquired Assets, including giving notice thereof to creditors and other interested parties, providing information about the Acquired Assets to prospective bidders (subject to confidentiality agreements no less restrictive than the Confidentiality Agreement), entertaining higher or better qualified offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an auction, all in accordance with the Bid Procedures Order, as and when the same is approved by the Bankruptcy Court.

(b)    In furtherance of the foregoing, Seller shall use best efforts (including the filing of the necessary motions) to obtain entry by the Bankruptcy Court of the Bid Procedures Order (including approval of the Break-up Fee and Expense Reimbursement as set forth in <u>Section 6.03</u>) within 25 calendar days after the Petition Date. If Seller fails to obtain entry of the Bid Procedures Order within such 25 calendar day period through no fault of Buyer, Buyer may terminate this Agreement without penalty.

(c)    The Sale Motion and the proposed Sale Order shall expressly provide that Buyer is authorized to pay the IDB Payoff Amount directly to IDB at Closing and that, upon such payment, all Liens of IDB on the Acquired Assets are released and discharged and Buyer is authorized to file any related UCC-3 termination statements and other lien-release instruments.

(d)    In the event that the Bid Procedures Order and Sale Order are entered by the Bankruptcy Court, and an appeal is taken or a stay pending appeal is requested from either such Orders, Seller shall immediately notify Buyer of such appeal or stay request, and shall promptly provide to Buyer a copy of the related notice of appeal or Order of stay.  Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such Orders.  From and after the date hereof until the Closing Date, Seller shall not take any action which is intended to result in, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Bid Procedures Order or Sale Order.

SECTION 6.02    Bankruptcy Court Filings.

From and after the date hereof until the Closing Date, Seller shall make available to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Chapter 11 Case at the time of their filing.

SECTION 6.03    Break-up Fee and Expense Reimbursement.

(a)    The Buyer shall be entitled to payment of a break-up fee in cash in an amount equal to two percent (2%) of the IDB Payoff Amount as of the date on which the event giving rise to Seller's obligation to pay the Break-Up Fee to Buyer shall have occurred (the "Break-up Fee") which Break-up Fee shall be payable to Buyer only if:  (x) Buyer is not in material breach of its obligations under this Agreement, which breach or default has not been waived in writing by Seller; (y) Buyer and Seller have not otherwise terminated this Agreement pursuant to Section 10.01(a)(ii); and (z) following the Auction, either (1) the Bankruptcy Court approves an Alternative Proposal as the Successful Bid, and the closing of a transaction in respect of such Alternative Proposal has occurred, or (2) Buyer is the Successful Bidder, the conditions set forth in Article 8 and Article 9 have been satisfied or waived in accordance with Section 11.05 on or prior to the Outside Date, and the Buyer has represented to Seller that it is ready, willing and able to consummate the transactions contemplated hereby, but any of the Seller fail to so consummate the transactions contemplated hereby; provided that in the case of clause (2) the payment to Buyer of the Break-Up Fee shall not constitute Buyer's exclusive remedy.

(b)    In addition to the Break-up Fee, Buyer shall be entitled to reimbursement of its documented, out-of-pocket expenses reasonably incurred in connection with the transactions contemplated hereby, in an amount not to exceed $250,000 (the "Expense Reimbursement"), which Expense Reimbursement shall be payable to Buyer if the Break-up Fee is payable in accordance with Section 6.03(a).

(c)    The Break-up Fee and Expense Reimbursement shall be treated as an administrative expense claim with priority under section 503(b) of the Bankruptcy Code.

SECTION 6.04    Assumption and Assignment of Assigned Contracts and Assigned Leases.

(a)    On the Closing Date, and pursuant to the Sale Order, and/or the consent of the applicable counterparties to the extent necessary to effect the assumption and assignment, Seller shall assume and assign to Buyer, and Buyer shall assume from Seller, the Assigned Contracts and Assigned Leases.

(b)    Notwithstanding any provision in this Agreement to the contrary, from and after the date hereof through the Closing Date, the Seller will not reject or take any action to reject, repudiate or disclaim (or fail to take any action that would result in rejection, repudiation or disclaimer by operation of law of), any Contract or Lease without the prior written consent of Buyer.  Further, Seller shall file in the Chapter 11 Case such motions or pleadings (i) as may be

appropriate and necessary to preserve Seller's right or ability to assume and assign any of the Assigned Contracts (including, without limitation, pursuant to section 365(d)(4) of the Bankruptcy Code with respect to any Leased Real Property).

(c)    To the extent that any Assigned Contract or Assigned Lease to be sold, transferred, conveyed or assigned (any sale, transfer, conveyance or assignment, a "Transfer") to Buyer pursuant to the terms of Section 2.01 is not capable of being so Transferred to Buyer (after giving effect to the Sale Order) without the Consent of a third Person (each such Contract or Lease, a "Consent Pending Contract"), or if such Transfer or attempted Transfer, or the subsequent Transfer or attempted Transfer of the equity interests of Buyer would, constitute a breach thereof or a violation of any Law or Order, nothing in this Agreement or in any document, agreement or instrument delivered pursuant to this Agreement will constitute a Transfer or an attempted Transfer thereof prior to the time at which all Consents necessary for such Transfer have been obtained unless an Order of the Bankruptcy Court effects such Transfer without such Consent.

SECTION 6.05    Determined Cure Costs.

(a)    Seller shall use commercially reasonable efforts, including the filing and prosecution of any and all appropriate proceedings in the Bankruptcy Court, to establish the Estimated Cure Cost for each Assigned Contract or Assigned Lease as the Determined Cure Cost for such Assigned Contract or Assigned Lease, as applicable; provided, however, that Seller shall not agree to any Determined Cure Cost that exceeds the Estimated Cure Cost without Buyer's prior written consent.

(b)    By not later than five calendar days before the Sale Hearing, Seller shall make available, or cause to be made available, to Buyer (i) true and complete copies of the Assigned Contracts and Assigned Leases, or in the case of oral Assigned Contracts or Assigned Leases, true and complete written descriptions thereof (in each case including all amendments thereto and assignments thereof), and (ii) a schedule of Seller's good faith estimate of the Cure Costs (as the same may be updated, supplemented or amended, the "Estimated Cure Costs"), if any, associated with each Assigned Contract or Assigned Lease.

(c)    On the Closing Date, or as soon as reasonably practicable thereafter, in connection with the assumption by Seller, and assignment to Buyer, of the Assigned Contracts and Assigned Leases, Buyer shall make provision for the payment of the Determined Cure Costs in accordance with the Sale Order; provided, however, that, notwithstanding anything to the contrary herein (including the deadline applicable to and set forth in the lead-in to Section 2.02(b)), if the Determined Cure Cost for any Contract or Lease that, at the time, is an Assigned Contract or Assigned Lease, respectively, exceeds the Estimated Cure Cost in respect of such Contract or Lease, then Buyer, in its sole discretion, may (on notice to Seller and the applicable counterparty) elect to amend Section 1.01(b)(i) or Section 1.01(b)(ii) of the Seller's Disclosure Schedule, as applicable, so as to exclude such Contract or Lease, whereupon such Contract or Lease so excluded shall not constitute an "Assigned Contract" or "Assigned Lease" (and shall therefore constitute an "Excluded Asset"), and Buyer shall not acquire any rights, or assume any Liabilities, with respect to such Contract or Lease so excluded.  Notwithstanding anything to the

25-12683-mg    Doc 8-1    Filed 12/01/25    Entered 12/01/25 17:25:14    Exhibit A -
Asset Purchase Agreement    Pg 44 of 69

contrary herein, Buyer shall in no way be liable for Determined Cure Costs related to any Contract or Lease excluded from Section 1.01(b)(i) or Section 1.01(b)(ii) of the Seller's Disclosure Schedule, as applicable, in accordance with either this Section 6.05(c) or Section 2.02(b).

# ARTICLE 7
# ADDITIONAL AGREEMENTS

SECTION 7.01    Investigation of the Business By Buyer Prior to Closing.

(a)    From and after the date hereof until the Closing, and subject to the confidentiality obligations to which Seller may be bound, upon reasonable notice, Seller shall, afford Buyer's Representatives reasonable access during normal business hours to the offices, properties, and key employees.  Seller shall furnish to Buyer or its authorized Representatives such additional information concerning the Acquired Assets, the Business and the Assumed Liabilities as shall be reasonably requested by Buyer or its authorized Representatives, including all such information as shall be reasonably necessary to enable Buyer or its authorized Representatives to (i) verify the accuracy of Seller's representations and warranties contained in this Agreement, (ii) verify that Seller has complied with the covenants contained in this Agreement and (iii) determine whether the conditions set forth in Article 8 have been satisfied.

(b)    From and after the date hereof until the Closing, as reasonably requested by Buyer from time to time, Seller shall use its commercially reasonable efforts to cooperate with Buyer in connection with arranging such meetings or telephone conferences with landlords, material suppliers and customers of the Business as may be necessary and appropriate for Buyer to conduct a comprehensive review of Seller's relations with its landlords, customers and suppliers.

SECTION 7.02    Conduct of Business Prior to the Closing Date.

Between the date hereof and the Closing, Seller shall use its reasonable best efforts to maintain, or cause the maintenance of, the Acquired Assets and Business, and operate and carry on the Business only in the ordinary course consistent with past practice and taking into account Seller's status as debtor and debtor in possession except as otherwise expressly provided in this Agreement or as consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed). Seller will not incur unreasonable liabilities, including, without limitation, inappropriate increases in Inventory or factoring of accounts receivable. Without limiting the foregoing, Seller shall not, without Buyer's prior written consent: (i) engage in mass discounting or extraordinary promotions beyond those consistent with past practice; (ii) implement abnormal return merchandise authorization (RMA) or return policies; (iii) sell products through liquidation channels; (iv) change payment processors or redirect payment flows, including but not limited to Amazon or Shopify payouts; or (v) modify privacy policies, consent flows, or data collection practices in any manner that affects customer privacy choices or consent mechanisms. Seller shall use commercially reasonable efforts to (a) preserve and maintain the Business and the Acquired Assets (normal wear and tear excepted), (b) keep available the services of its officers and employees, (c) maintain satisfactory relationships

with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others
having business relationships with Seller in connection with the operation of the Business (other
than payment of pre-petition claims), (d) pay all of its post-petition obligations, and (e) continue
to operate the Business in all material respects in compliance with all Laws applicable to the
Business and Seller. Seller will not, directly or indirectly, sell, lease, license, transfer, encumber,
abandon, permit to lapse or otherwise dispose of any of the Acquired Assets, other than in the
ordinary course of business.

    SECTION 7.03    Third Party Consents.

    Subject to Section 6.04(c) and **Error! Reference source not found.**, from and
after the date hereof until the Closing, Seller, on the one hand, and Buyer, on the other hand, will
use their reasonable best efforts to cooperate with the other to secure, before the Closing Date, all
Third Party Consents to the extent such Third Party Consents are not provided for or satisfied by
the Sale Order; provided, however, that neither Buyer nor Seller shall be required to waive any
of the conditions to Closing set forth in Article 8 or Article 9, respectively.

    SECTION 7.04    Reasonable Best Efforts.

    From and after the date hereof until the Closing Date, Seller and Buyer shall use
their respective reasonable best efforts to cooperate with each other, to do or cause to be done, all
things necessary, proper or advisable consistent with applicable Laws and Orders to cause the
conditions precedent to the Closing to be satisfied and to cause the Closing to occur.

    SECTION 7.05    Seller's Disclosure Schedule.

    (a)    The parties hereto acknowledge and agree that (i) the Seller's
Disclosure Schedule delivered to Buyer on the date hereof and attached hereto as Exhibit H is in
draft form only, (ii) from and after the date hereof, the parties hereto shall use their commercially
reasonable efforts to cooperate to negotiate and finalize the Seller's Disclosure Schedule and (iii)
Seller, the Company and their respective advisors and representatives shall consider in good faith
the comments of Buyer and its legal advisors and other representatives on such Seller's
Disclosure Schedule.  Without limiting the generality of the foregoing, the Seller shall promptly
(but in no event later than 10 Business Days prior to the Closing Date) deliver, or cause to be
delivered, to Buyer the final Seller's Disclosure Schedule in form and substance reasonably
acceptable to Buyer, incorporating in good faith the comments of Buyer and its legal advisors
and other representatives provided to Seller and/or the Company prior to delivery thereof.

    (b)    After the date of the delivery of the final Seller's Disclosure Schedule
in accordance with Section 7.05(a) and the acceptance thereof by Buyer, but prior to the Closing,
Seller shall have the right to supplement, modify or update the Seller's Disclosure Schedule,
provided that any such supplement, modification or update that discloses a breach of a
representation or warranty or failure to satisfy a closing condition shall give Buyer the right to
terminate this Agreement without penalty.  Notwithstanding anything to the contrary herein,
except as set forth in the immediately preceding sentence, Buyer shall not be entitled to claim
that any representation or warranty of any Seller has been breached, and no Seller shall be liable

to Buyer, on account of any fact, matter or circumstance of which Buyer was aware on or prior to the date hereof or of which Buyer becomes aware prior to the Closing.  No supplement, modification or update of the Seller's Disclosure Schedule pursuant to this <u>Section 7.05</u> shall be taken into account for purposes of determining whether the conditions to consummation of the transactions contemplated hereby set forth in <u>Article 8</u> have been satisfied.

SECTION 7.06    <u>Notice of Developments</u>.

From and after the date hereof until the Closing, Seller shall promptly notify Buyer of (a) any change or development which would cause any of the representations and warranties in <u>Article 4</u> above not to be true and correct in all material respects, or (b) any material failure of Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

SECTION 7.07    <u>Taxes</u>.

(a)    Except as specifically set forth in this <u>Section 7.07</u> (including <u>Section 7.07(b)</u>), Selles shall be liable for and shall pay, and pursuant to <u>Section 7.07(c)</u> shall reimburse Buyer for, all Taxes (whether assessed or unassessed) applicable to the Business and the Acquired Assets, in each case attributable to periods (or portions thereof) ending on or prior to the Closing Date.  Without limiting the obligations of Buyer contained elsewhere in this Agreement (including <u>Section 7.07(b)</u>), Buyer shall be liable for and shall pay, and pursuant to <u>Section 7.07(c)</u> shall reimburse the applicable Seller for, all Taxes (whether assessed or unassessed) applicable to the Business, the Acquired Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date.  For purposes of this <u>Section 7.07(a)</u>, any period beginning before and ending after the Closing Date shall be treated as two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(a) of the Bankruptcy Code ("<u>Transfer Taxes</u>") shall be borne by Buyer. Seller and Buyer shall use their respective reasonable best efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes.  Buyer shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes; <u>provided</u>, <u>however</u>, that in the event any such Tax Return requires execution by Seller, Buyer shall prepare and deliver to Seller a copy of such Tax Return at least ten days before the due date thereof, and Seller shall promptly execute such Tax Return and deliver it to Buyer, which shall cause it to be filed.

(c)    Seller or Buyer, as the case may be, shall provide reimbursement for any Tax paid by one party all or a portion of which is the responsibility of the other party in accordance with the terms of this <u>Section 7.01</u>.  Within a reasonable time prior to the payment of any such Tax, the party paying such Tax shall give notice to the other of the Tax payable and

each party's respective Liability therefor, although failure to do so will not relieve the other party from its Liability hereunder.

SECTION 7.08    Collection of Receivables.

If, after the Closing Date, Seller shall receive payment from any account debtor with respect to any Assigned Contract or Assigned Lease, or any customer payments, refunds, chargebacks, or other funds related to the Business (including any payments received through payment gateways, e-commerce platforms, or other digital payment channels that were part of the Acquired Assets), Seller shall promptly thereafter deliver such funds and assets to Buyer and take all steps necessary to vest title to such funds and/or assets in Buyer. Seller shall also promptly forward to Buyer any customer data, communications, or inquiries received by Seller after the Closing Date that relate to the Business or Acquired Assets.

SECTION 7.09    Name Change.

Within ten days after the Closing Date, Seller shall take such corporate and other actions necessary to change its corporate name to one that is not confusingly similar to its current name or to any Trademark contained in the Transferred Intellectual Property, including any necessary filings required by the Secretary of the State of New York.

SECTION 7.10    Employee Matters.

Nothing contained in this Agreement shall be construed to require the employment of (or prevent the termination of employment of) any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any employee.  No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller or any other Person (including any beneficiary or dependent thereof) of any nature or kind whatsoever, including without limitation, in respect of continued employment (or resumed employment) for any specified period.

SECTION 7.11    Post-Closing Cooperation and Access to Books and Records.

For a period ending on the later of (i) the closing of the Chapter 11 Case and (ii) three (3) years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim):

(a)    Buyer shall not dispose of or destroy any of the business records and files of the Business held by Buyer or any of its Subsidiaries and relating to the period preceding the Closing Date.

(b)    Either of Buyer or Seller (the "Requested Party") shall allow the other party (including, for clarity, any trust established under a chapter 11 plan of Seller or any other successors of Seller) and any of their respective directors, officers, employees, counsel, representatives, accountants and auditors, at such other party's sole cost and expense, reasonable access during normal business hours, and upon reasonable advance notice, to all employees and files of the Requested Party and any books and records and other materials included in the

Acquired Assets relating to periods prior to the Closing Date in connection with (A) the wind-down of the operations of Seller, whether or not relating to or arising out of this Agreement or the transactions contemplated hereby, including the preparation of Tax Returns, amended Tax Returns or claim for refund (and any materials necessary for the preparation of any of the foregoing), financial statements for periods ending on or prior to the Closing Date, the management and handling of any audit, investigation, litigation or other proceeding in, whether such audit, investigation, litigation or other proceeding is a matter with respect to which indemnification may be sought hereunder), and complying with the rules and regulations of the IRS, the Securities and Exchange Commission or any other Governmental Authority or otherwise relating to Seller's other businesses or operations or such causes of action; (B) the prosecution, investigation or resolution of any pending or potential causes of action; (C) the resolution or reconciliation of claims filed against Seller's bankruptcy estate; or (D) otherwise in connection with carrying out the functions of any such trusts or successors; provided, however, that Seller, on the one hand, and Buyer, on the other hand, will be required to sign a non-disclosure agreement, if reasonably requested by Buyer or Seller, respectively, prior to Buyer's or Seller's provision of information that is confidential or proprietary in nature.

SECTION 7.12    Tax Returns.

Buyer hereby covenants that it will cooperate and assist Seller in the preparation and filing of all necessary Tax Returns that are required to be filed by Seller following the Closing Date; provided, however, that any costs and expenses with respect to the preparation and filing of any such Tax Returns by Seller shall be borne by Seller; provided, further, however, that, except as expressly set forth in this Agreement, Buyer shall have no Liability with respect to Taxes payable in connection with such Tax Returns, and Buyer shall have no Liability with respect to such Tax Returns other than in connection with the willful or intentional misconduct of Buyer.

SECTION 7.13    Use of Customer Deposits.  From and after the date hereof, upon the receipt of a customer deposit the Seller shall promptly place the necessary purchase order with a vendor to acquire the materials needed to fulfill the customer's order and either (a) promptly remit to the vendor funds necessary to pay for such goods, or (b) set aside from such customer deposit in a segregated account an amount sufficient to ensure that funds are available as and when necessary to effect payment for the materials needed to fulfill the customer's order.

SECTION 7.14    Insurance Proceeds.  The Seller shall, or shall cause their Affiliates to, assign, to the extent assignable, to Buyer any proceeds of Seller's third party-insurance policies to the extent related to any Assumed Liabilities.  Seller agree to use their reasonable efforts to obtain any necessary Consents of any insurance company or other third party relating to any such assignment.  If such proceeds are not assignable, Seller agrees to pay any such proceeds received by them or any of their Affiliates to Buyer promptly upon the receipt thereof.

SECTION 7.15    Data Transfer.

(a)    At Closing, Seller shall provide to Buyer all direct-to-consumer ("DTC") data, including but not limited to customer orders, customer information, and customer

relationship management ("CRM") lists, in commonly readable electronic formats, including CSV (comma-separated values) and JSON (JavaScript Object Notation) formats. Seller shall ensure that such data exports are complete, accurate, and include all relevant fields and records maintained by Seller in the ordinary course of business as of the Closing Date. The parties acknowledge that such DTC data constitutes a material component of the Acquired Assets and the Business being transferred hereunder.

(b)        Seller shall, within [●] days following the Closing Date, complete the following transfers and assignments to Buyer: (a) Domain and Infrastructure: (i) transfer all domain name registrations to Buyer's designated registrar account, including provision of authorization codes and unlocking of domains; (ii) transfer or migrate DNS management and hosting to Buyer's designated provider with complete zone file records; and (iii) transfer or reissue all SSL/TLS certificates to Buyer, including provision of private keys where applicable; (b) E-Commerce and Payment Systems: (i) assign or migrate all Shopify store accounts, including transfer of ownership, themes, apps, and settings; (ii) transfer all Amazon Seller Central accounts and listings; (iii) assign or migrate all payment processor accounts including Stripe, Adyen, PayPal, and Amazon Pay, completing all required verification and compliance procedures with such processors; (c) Marketing and Customer Service Platforms: (i) assign or migrate all email and SMS marketing platforms including Klaviyo and Attentive, including transfer of subscriber lists, templates, and automation workflows; (ii) assign or migrate all helpdesk and customer service platforms including Gorgias and Zendesk, including transfer of ticket history, macros, and integrations; and (iii) transfer ownership and administrative access to all analytics platforms including Google Analytics 4 (GA4), including historical data access; (d) Amazon Brand Registry: transfer complete ownership and administrative rights of all Amazon Brand Registry accounts and associated brand protections to Buyer; (e) Security Protocols: (i) rotate all multi-factor authentication (MFA) credentials and backup codes for all transferred accounts; (ii) remove all of Seller's team members, administrators, and authorized users from all accounts and platforms; (iii) confirm in writing that Seller has permanently deleted all access credentials, API keys, and authentication tokens; and (iv) certify that Seller retains no ongoing access, administrative rights, or recovery mechanisms to any transferred accounts or systems. Seller shall provide Buyer with written confirmation of completion for each subsection above and shall cooperate fully with Buyer and all third-party service providers to effectuate such transfers, including executing any required transfer documentation, consent forms, or verification procedures. Seller shall be responsible for any fees, penalties, or costs incurred due to delays or failures in completing such transfers in accordance with this Section.

## ARTICLE 8
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by Buyer:

SECTION 8.01    Accuracy of Representations

All of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); provided, however, that in the event of a breach of a representation or warranty, other than a representation or warranty qualified by a Material Adverse Effect, the condition set forth in this Section 8.03 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a Material Adverse Effect.  Buyer shall have received a certificate signed by a duly authorized representative of each of the Seller to such effect.

SECTION 8.02    Seller's Performance

Seller shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Seller on or prior to the Closing Date, and Buyer shall have received a certificate signed by a duly authorized representative of the Seller to such effect.

SECTION 8.03    No Order

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 8.04    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 8.05    Consents and Approvals.

All Consents of any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby as set forth on Section 8.07 of the Seller's Disclosure Schedule shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 8.06    No Material Adverse Effect.

Since the date hereof, there shall not have occurred any state of facts, event or change in circumstance that has had or could reasonably be expected to have a Material Adverse Effect on the Acquired Assets, as a whole, or the Business.

SECTION 8.07    Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 3.03 shall have been so delivered.

SECTION 8.08    Sale Order.

The Bankruptcy Court shall issue the Sale Order which Sale Order shall have been entered on or prior to the Outside Date.

SECTION 8.09    IDB Payoff Mechanics. Buyer shall have received (a) the IDB Closing Certificate and (b) an IDB payoff letter that (i) states the IDB Payoff Amount, (ii) confirms that such amount includes only principal and accrued, unpaid non-default interest, and (iii) attaches or commits to deliver upon receipt of funds UCC-3 terminations and other lien-release documents sufficient to release all Liens of IDB on the Acquired Assets.

SECTION 8.10    Physical Inventory. The Inventory Count shall have been completed.

SECTION 8.11    Delivery of Final Seller's Disclosure Schedule.

At least 10 Business Days prior to Closing, the Seller shall deliver, or cause to be delivered, to the Buyer the final Seller's Disclosure Schedule in form and substance reasonably satisfactory to the Buyer.

# ARTICLE 9
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived (but only in writing) by Seller:

SECTION 9.01    Accuracy of Representations.

All of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects (other than those representations and warranties that are qualified by materiality, which shall be true and correct in all respects) as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date).  Seller shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.02    Buyer's Performance.

Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by Buyer on or prior to the Closing Date, and Seller shall have received a certificate signed by a duly authorized representative of Buyer to such effect.

SECTION 9.03    No Order.

No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order or Law which is in effect and has the effect of making illegal or otherwise restraining or prohibiting the consummation of the transactions contemplated by this Agreement.

SECTION 9.04    No Proceedings.

There shall not be pending or threatened by any Governmental Authority any Proceeding challenging or seeking to enjoin or otherwise prohibit any of the transactions contemplated by this Agreement or seeking to obtain from Buyer in connection with the transactions contemplated by this Agreement any damages or to impose any restrictions or conditions.

SECTION 9.05    Consents and Approvals.

All Consents from any Person (including any Governmental Authority) which are necessary to consummate the transactions contemplated hereby shall have been filed, been obtained or occurred and such Consents shall not have expired or been withdrawn.

SECTION 9.06    Buyer's Deliveries.

Each of the deliveries required to be made to Seller pursuant to Section 3.02 shall have been so delivered.

SECTION 9.07    Sale Order.

The Bankruptcy Court shall issue the Sale Order which Sale Order shall have been entered on or prior to the Outside Date.

SECTION 9.08    Payment of Purchase Price.

Buyer shall have paid the IDB Payoff Amount in accordance with Section 2.06.

**ARTICLE 10**
**TERMINATION**

SECTION 10.01    Termination.

Notwithstanding anything contained to the contrary in this Agreement, this Agreement may be terminated at any time prior to the Closing Date:

(a)        by either Seller or Buyer:

(i)        if a Governmental Authority of competent jurisdiction issues a final non-appealable ruling or Order that permanently enjoins or otherwise prohibits the transactions contemplated hereby; or

(ii)      upon mutual written consent of Seller and Buyer.

(b)        by Buyer:

(i)      if the Closing Date shall not have occurred by the Outside Date; provided, however, that the right to terminate this Agreement under this Section 10.01(b)(i) shall not be available to the Buyer if the Buyer's failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to have occurred on or prior to such date;

(ii)      in the event of any material breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of Seller to cure such breach within seven days after receipt of the Buyer Termination Notice specified in this subsection; provided, however, that Buyer (i) is not itself in breach of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) notifies Seller in writing (the "Buyer Termination Notice") of its intention to exercise its rights under this Agreement as a result of the breach, and (iii) specifies in such Buyer Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Seller are allegedly in material breach;

(iii)      if (A) the Bankruptcy Court fails to enter the Bid Procedures Order on or before the date that is 25 days following the Petition Date, (B) Seller fails to hold an auction pursuant to the Bid Procedures Order on or before February 3, 2026, (C) Buyer has not entered into mutually agreeable license agreements with each of the Licensors on the terms and conditions previously agreed to by Buyer and the Licensors by December 15, 2025 (D) the Bankruptcy Court fails to enter an Order designating Buyer as the successful bidder on or before February 6, 2026, (E) the Bankruptcy Court fails to have issued the Sale Order which Sale Order shall have been entered on or prior to the Outside Date;

(iv)      if the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Seller and such trustee rejects the transactions contemplated by this Agreement;

(v)      Buyer is not the prevailing bidder in the auction pursuant to the Bid Procedures or the Bankruptcy Court enters an Order authorizing the Seller or any of their Affiliates to enter into any Contract with respect to or consummate an Alternative Proposal;

(vi)      the Bid Procedures Order or the Sale Order has been stayed, modified, amended, supplemented, reversed, vacated or otherwise rendered

ineffective by any court of competent jurisdiction without Buyer's prior written consent or otherwise fails to be in full force and effect; or

(vii)    any event of default under the IDB Loan Documents shall have occurred and be continuing which would result in an acceleration of Seller's obligations thereunder.

(c)    by the Seller, in the event of any material breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein, or of the Bid Procedures Order or the Sale Order, and the failure of the Buyer to cure such breach within seven days after receipt of the Seller Termination Notice specified in this subsection; provided, however, that (i) Seller is not in breach of their representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order or the Sale Order, (ii) Seller notifies Buyer in writing (the "Seller's Termination Notice"), and (iii) Seller specifies in such Seller's Termination Notice the representation, warranty, covenant or agreement contained herein or in the Bid Procedures Order or the Sale Order of which Buyer is allegedly in material breach.

SECTION 10.02    Effect of Termination.  In the event of termination of this Agreement by either party in accordance with Section 10.01 hereof, all rights and obligations of the parties under this Agreement shall terminate without any Liability of any party to any other party; provided, however, that the provisions of Section 6.03 and Article 11 (except Section 11.01) shall expressly survive the expiration or termination of this Agreement.

## ARTICLE 11
## GENERAL PROVISIONS

SECTION 11.01    Survival of Representations, Warranties and Covenants.

All representations and warranties herein shall terminate on the Closing Date; provided, however, that any claim for fraud or willful misrepresentation shall survive indefinitely.  The covenants and agreements contained herein that are required to be performed on or prior to the Closing Date shall terminate on the Closing Date and the covenants that require performance after the Closing Date shall survive in accordance with the terms thereof.

SECTION 11.02    Confidential Nature of Obligations.

Subject to any disclosure requirements under the Bankruptcy Code or imposed by the Bankruptcy Court, Buyer and Seller each agree that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, at the request of the disclosing party, will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith.  Such non-public documents, materials and information shall not be communicated to any third Person (other than to Buyer's and Seller's counsel,

accountants or financial advisors, in each case subject to the recipient's agreement to keep the same confidential).  No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed purchase and sale of the Acquired Assets; provided, however, that after the Closing, any confidential information included in the Acquired Assets or the Assumed Liabilities shall be deemed the confidential information of Buyer, and Seller shall maintain the confidentiality thereof in accordance with this Section 11.02.  The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than the disclosing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents or (iii) is required to be disclosed under applicable Law (including under the Bankruptcy Code or as required by the Bankruptcy Court), but only to the extent it must be disclosed.  Notwithstanding clause (iii) of the preceding sentence, in the event that any party is required to disclose any confidential information by applicable Law or rule of any national securities exchange, it is agreed that the party subject to such requirement will provide the other party with prompt notice of such requirement and such party may seek an appropriate protective order if it so desires.

SECTION 11.03   Public Announcements.

Unless otherwise required by applicable Law or by obligations of the parties hereto or any of their Affiliates pursuant to any listing agreement with or rules of any securities exchange, the parties hereto shall consult with each other before issuing any other press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other party and shall not issue any such release or make any such statement without the prior written consent of the other party (such consent not to be unreasonably withheld or delayed).

SECTION 11.04   Notices.

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given: (a) on the same Business Day if sent by email followed by facsimile (with written confirmation of receipt), (b) when delivered by hand (with written confirmation of receipt), (c) when sent by facsimile (with written confirmation of receipt), (d) when received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (e) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representative (if applicable) and facsimile numbers set forth below (or to such other addresses, representative and facsimile numbers as a party may designate by notice to the other Parties given in accordance with this Section 11.04):

(a)        If to Seller, then to:

Cometrics Partners, LLC
1411 Broadway, 14th Floor
New York, NY 10018
Attn: Gary Herwitz

with a copy (which shall not constitute notice) to:

Halperin Battaglia Benzija, LLP
40 Wall Street, 37th Floor
New York, NY 10005
Attention:  Alan D. Halperin and Julie Dyas Goldberg
E-mail: ahalperin@halperinlaw.net; jgoldberg@halperinlaw.net

(b)        If to Buyer, then to:

[INSERT]

with a copy (which shall not constitute notice) to:

The Dallal Firm
40 Wall Street, 45th Floor
New York, NY 10005
Attn: Uri Dallal, Esq.
E-mail: uri@dallalfirm.com

SECTION 11.05   Waiver.

Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by applicable Law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given; and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

SECTION 11.06   Entire Agreement; Amendment.

This Agreement (including the disclosure schedules and the exhibits hereto) and the other Transaction Documents supersede all prior agreements (other than the Confidentiality Agreement, which shall remain in full force and effect) between the Parties with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between the Parties with respect to their subject matter (other than the Confidentiality Agreement, which shall remain in full force and effect).  This Agreement may not be amended except by a written agreement executed by the Parties.

SECTION 11.07   Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any party hereto by operation of law or otherwise without the express written

consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other party); provided, however, that, prior to Closing, Buyer shall be permitted, upon prior notice to Seller, to assign all or part of its rights or obligations hereunder to an Affiliate, whereupon, references to "Buyer" herein shall be deemed to refer to such Affiliate; provided further that any such assignment shall not relieve Buyer of any of its financial obligations to Seller hereunder.

SECTION 11.08   Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party in any material respect.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

SECTION 11.09   Section Headings, Construction.

The headings of Sections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.  All references to "Article," "Section" or "Sections" refer to the corresponding Article, Section or Sections of this Agreement.  All words used in this Agreement shall be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.  The Exhibits attached hereto and the Schedules attached hereto (including the Seller's Disclosure Schedule referred to herein and attached hereto) are hereby incorporated herein and made a part hereof as if fully set forth herein.

SECTION 11.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)      This Agreement shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to Contracts executed in and to be performed in that State, and, to the extent applicable, the Bankruptcy Code.

(b)      The Parties agree that the Bankruptcy Court shall be the exclusive forum for enforcement of this Agreement or the transactions contemplated hereby and (only for the limited purpose of such enforcement) submit to the jurisdiction thereof; provided that if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to this Agreement, then each party: (i) agrees that all such actions or proceedings shall be heard and determined in a New York federal court sitting in The City of New York; (ii) irrevocably submits to the jurisdiction of such court in any such action or proceeding; (iii) consents that any such action or proceeding may be brought in such courts and waives any objection that such party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (iv) agrees that service

of process in any such action or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 11.04 to such party at its address as provided in Section 11.04 (provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law).

(c)    EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.10(C).

SECTION 11.11    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 11.12    Time of Essence.

Time is of the essence in this Agreement.

SECTION 11.13    No Third Party Beneficiaries.

This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

SECTION 11.14    Seller's Disclosure Schedule.

The Seller's Disclosure Schedule forms part of Article 4 solely to set out exceptions to the specific representations and warranties in Article 4 and shall not modify or qualify any covenant or agreement, nor expand the scope of any representation or warranty beyond what is expressly stated in this Agreement; information set forth in any section of the Seller's Disclosure Schedule qualifies only the representation or warranty to which that section expressly relates and no other provision, unless (i) the disclosure expressly cross-references the other section(s) intended to be qualified or (ii) its applicability to such other section is reasonably apparent on its face from the text of the disclosure without independent investigation; general, non-specific or "catch-all" disclosures (including statements that disclosures "include matters of

a similar nature") shall not be deemed responsive to, or to qualify, any representation or warranty, and each disclosure must describe the relevant facts with reasonable specificity; the inclusion of any item, dollar amount, estimate or range in the Seller's Disclosure Schedule is for disclosure purposes only and shall not, by itself, be deemed an admission of materiality or of ordinary course of business (it being understood that materiality qualifiers or thresholds expressly stated in this Agreement control for purposes of determining breach); no information in any data room, public filing or otherwise available to Buyer shall be deemed incorporated unless expressly set forth in the Seller's Disclosure Schedule; as between Seller and Buyer, the information in the Seller's Disclosure Schedule is binding on Seller and may be used by Buyer to enforce its rights hereunder, provided that nothing in the Seller's Disclosure Schedule creates any representation or warranty not expressly set forth in this Agreement or limits any remedy available to Buyer for fraud or willful misrepresentation; disclosures are made solely for purposes of this Agreement and are not admissions to any third party; and headings or captions in the Seller's Disclosure Schedule are for convenience only and do not affect interpretation.

SECTION 11.15    Expenses.

Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors, accountants and other advisors, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 11.16    Non-Recourse.  No past, present or future director, officer, manager, employee, incorporator, member, partner, stockholder, agent, attorney or representative of the respective parties to this Agreement, in such capacity (any such Person in such capacity, a "No Recourse Party"), shall have any Liability with respect to this Agreement or the transactions contemplated hereby, or with respect to any claim or cause of action that may arise out of this Agreement or the transactions contemplated hereby, or the negotiation, execution or performance of this Agreement or the transactions contemplated hereby; in each case except for any claim or cause of action against a No Recourse Party (x) arising out of or in connection with the fraud, bad faith or willful misconduct of such No Recourse Party, including in connection with this Agreement or any other Transaction Document, or (y) otherwise expressly permitted to be brought against a No Recourse Party pursuant to any other Transaction Document, as applicable.

*[Remainder of page intentionally left blank; signature pages follow]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date first written above.

E. GLUCK GLOBAL LLC

By:_____

 Name: Ouni Mamrout
  Title: Manager

E. GLUCK CORPORATION

By:_____

 Name:
  Title:

Exhibit A

Form of Assignment of Copyrights

Exhibit B

<u>Form of Assignment of Domain Names</u>

Exhibit C

<u>Form of Assignment of Patents</u>

Exhibit D

<u>Form of Assignment of Trademarks</u>

Exhibit E

<u>Form of Assumption Agreement</u>

Exhibit F

Form of Bid Procedures Order

Exhibit G

<u>Form of Bill of Sale</u>

Exhibit H

<u>Seller's Disclosure Schedule</u>