## Exhibit A

## RATIFICATION AND AMENDMENT AGREEMENT

This **RATIFICATION AND AMENDMENT AGREEMENT** (this "*Agreement*"), dated as of November 30, 2025, is by and among **E. GLUCK CORPORATION**, a New York corporation, as a debtor and debtor-in-possession under Chapter 11 of Title 11 of the United States Code, as amended (the "*Bankruptcy Code*") ("*Debtor*"), each lender party hereto (collectively, the "*Lenders*") and **ISRAEL DISCOUNT BANK OF NEW YORK**, as agent for the Lenders (in such capacity, together with its permitted successors in such capacity, "*Agent*").

W I T N E S S E T H :

WHEREAS, Agent and the Lenders entered into a senior secured, asset-based revolving credit facility (the "*Prepetition Facility*") pursuant to which Agent and the Lenders made, and may make, loans and advances and provided, and may provide, other financial accommodations to Debtor as set forth in (i) the Credit and Security Agreement, dated as of March 22, 2021 (as in effect immediately prior to the Ratification Effective Date, the "*Prepetition Credit Agreement*"), by and among Debtor, each Lender party thereto and Agent, and (i) the other Loan Documents (as in effect immediately prior to the Ratification Effective Date and, together with the Prepetition Credit Agreement, the "*Prepetition Loan Documents*");

WHEREAS, Debtor has commenced a case under Chapter 11 of the Bankruptcy Code (the "*Chapter 11 Case*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), and Debtor has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, Debtor has requested that Agent and the Lenders make post-petition loans and advances and provide other financial accommodations to Debtor secured by substantially all the assets and properties of Debtor as set forth in the DIP Order (as defined below) and the DIP Loan Documents and make certain amendments to the Prepetition Credit Agreement, and Agent and the Lenders are willing to do so, subject to (a) entry by the Bankruptcy Court of an Interim DIP Order (as defined below) and (b) the other terms and conditions contained herein; and

WHEREAS, Debtor desires to reaffirm its obligations to Agent and the Lenders pursuant to the Prepetition Loan Documents and acknowledge its continuing liabilities to Agent and the Lenders thereunder in order to induce Agent and the Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Debtor;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, the Lenders, and Debtor mutually covenant, warrant and agree as follows:

1. **Definitions and Interpretation.**

1.1    <u>Definitions</u>. For purposes of this Agreement, all terms used herein which are not otherwise defined herein, including but not limited to, those terms used in the recitals hereto, shall have the respective meanings given thereto in the Prepetition Credit Agreement.

1.2    <u>Additional Definitions</u>. In addition, the following terms, as used in this Agreement, shall have the following meanings:

"***Approved Budget***" means the nine-Week forecast attached as Exhibit B hereto, as the same may be amended, modified, supplemented, extended, renewed, restated or replaced from time to time in accordance with the terms hereof.

"***Availability***" means, with respect to the DIP Facility, the amount determined by Agent, calculated at any date, equal to: (a) the lesser of: (i) the Borrowing Base and (ii) the Maximum Revolving Credit (in each case under clauses (i) or (ii) after giving effect to any applicable Reserves) minus, (b) the amount of all then outstanding and unpaid Obligations.

"***Buyer***" means E. Gluck Global LLC, a Delaware limited liability company.

"***Carve Out***" has the meaning set forth in the DIP Order.

"***Collateral***" means all Collateral (as defined in the Collateral Documents) and all other property of whatever kind and nature pledged or charged as collateral under any Collateral Document.

"***CoMetrics***" means CoMetrics Partners, LLC, a Delaware limited liability company.

"***DIP Collateral***" means all Collateral securing the DIP Obligations, including, without limitation, (a) all Prepetition Collateral, (b) all other assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties, whether prior to or after the Petition Date, (c) all proceeds recovered by or on behalf of Debtor or any trustee of Debtor (whether in the Chapter 11 Case or any subsequent case to which any of the Chapter 11 Case is converted) as a result of transfers or obligations avoided or actions maintained or taken pursuant to Sections 542, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, subject to the entry of the Final DIP Order, (d) all assets of Debtor not otherwise subject to a valid and enforceable Lien in favor of Agent on the Petition Date, subject to the entry of the Interim DIP Order, and (e) to the extent not otherwise included, all proceeds and products of the foregoing; *provided*, that "DIP Collateral" shall not include any Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

"***DIP Commitments***" means the commitments from time to time outstanding under the DIP Facility.

"***DIP Credit Agreement***" means the Prepetition Credit Agreement as ratified, amended, supplemented and otherwise modified by this Agreement, and as may hereafter be amended, supplemented or otherwise modified from time to time.

"***DIP Facility***" means the senior secured, superpriority, priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $29,000,000, subject to the borrowing base, provided to Debtor by Agent and the Lenders pursuant to the DIP Credit Agreement and the other DIP Loan Documents.

"***DIP Lender Advisors***" means, collectively, Otterbourg P.C., as counsel to Agent, and CoMetrics, as Debtor's Chief Restructuring Officer and financial advisor.

"***DIP Loans***" means the loans outstanding under the DIP Facility from time to time.

"***DIP Loan Documents***" means the Prepetition Loan Documents, as ratified, amended, supplemented or otherwise modified by this Agreement or otherwise, and any guarantee, security, intercreditor, and other relevant documentation executed and/or delivered in connection with this Agreement or the DIP Credit Agreement, in each case as may hereafter be amended, supplemented or

otherwise modified from time to time. For the avoidance of doubt, this Agreement shall constitute a DIP Loan Document.

"***DIP Obligations***" means (a) all Prepetition Obligations and (b) all Obligations of Debtor arising under the DIP Facility, whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to this Agreement, the DIP Credit Agreement, the other DIP Loan Documents, a DIP Order, by operation of law or otherwise, and whether incurred by Debtor as principal, surety, endorser, guarantor or otherwise, and including, without limitation, all principal, interest, charges, fees (including, without limitation, letter of credit fees, unused line fees, collateral management fees and online access fees), costs and expenses incurred in connection with any of the foregoing.

"***DIP Order***" means, individually and collectively, the Interim DIP Order and the Final DIP Order.

"***DIP Secured Parties***" means, collectively, Agent, the Lenders and each Affiliate of Agent or a Lender which has entered into a Bank Product Agreement with a Loan Party pursuant to the DIP Credit Agreement.

"***DIP Superpriority Claims***" has the meaning set forth in the DIP Order in effect on the date of determination.

"***Exit Financing***" has the meaning set forth in Section 5.5(c) hereof.

"***Final DIP Order***" means, individually and collectively, the orders of the Bankruptcy Court approving the DIP Facility on a final basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to Agent and the Required Lenders.

"***Interim DIP Order***" means individually and collectively, the orders of the Bankruptcy Court approving the DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to Agent and the Required Lenders, shall authorize and approve, among other matters, (i) the Loan Parties' entry into the DIP Loan Documents, (ii) the making of the DIP Loans (including Swing Loans and the issuance of Letters of Credit under the DIP Credit Agreement), (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the DIP Loan Documents, with respect to the DIP Collateral, (iv) the use of cash collateral solely in accordance with the terms of the DIP Loan Documents, (v) the granting of adequate protection to the Prepetition Secured Parties, and (vi) granting waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code, equities of the case waiver under Section 552 of the Bankruptcy Code, rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and marshaling requirements) and releases in favor of the Prepetition Secured Parties.

"***Licensors***" means the entities set forth in Section 1.01(c) of the Seller's Disclosure Schedule to that certain Asset Purchase Agreement dated as of November [25], 2025 by and among E Gluck and Buyer.

"***Obligations***" means, collectively, all Prepetition Obligations and all DIP Obligations.

"***Permitted Variance***" means, for any Test Period, (A) with respect to Debtor's actual sales, collections and Availability, each being tested separately and not in the aggregate, any Variance which is not less than 90% of the respective amounts set forth in the Approved Budget for sales, collections and Availability during such Test Period and (B) with respect to Debtor's actual disbursements, any Variance which is not more than 110% of the amounts set forth in the Approved Budget for disbursements during such Test Period.

"***Petition Date***" means the date of the commencement of the Chapter 11 Case.

"***Prepetition Obligations***" means all "Obligations" arising under, and as defined in, the Prepetition Facility.

"***Prepetition Secured Parties***" means, collectively, Agent, the Lenders and each Affiliate of Agent or a Lender which has entered into a Bank Product Agreement with a Loan Party pursuant to the Prepetition Credit Agreement.

"***Prepetition Collateral***" means all Collateral securing the Prepetition Obligations.

"***Ratification Effective Date***" means the date, which shall occur as promptly as practical after the entry of the Interim DIP Order by the Bankruptcy Court, on which the conditions precedent set forth in Section 6 hereof shall have been satisfied or waived in accordance with Section 12.10 of the Prepetition Credit Agreement.

"***Required Lenders***" means Lenders holding greater than 50% of the aggregate amount of DIP Commitments and DIP Loans.

"***Sale***" has the meaning set forth in Section 5.5(b) hereof.

"***Test Period***" means (i) initially, the Week ending on December 5, 2025 and (ii) thereafter, each period equal to one Week.

"***Uniform Commercial Code***" or "***UCC***" means the Uniform Commercial Code as in effect from time to time be in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"***Variance***" means, for any Test Period, the difference between Debtor's actual sales, collections, disbursements and Availability for such Test Period, each being tested separately and not in the aggregate, and the respective amounts set forth in the Approved Budget for sales, collections, disbursements and Availability during such Test Period.

"***Week***" means any period of seven consecutive days ending on a Friday.

1.3    Interpretation.

(a)    All references to the term "Borrower" in any of the Prepetition Loan Documents shall be deemed and each such reference is hereby amended to mean and include Debtor, as defined herein, and its successors and assigns (including any trustee or other fiduciary hereafter appointed as Debtor's legal representative, as applicable, or with respect to Debtor the property of the estate of Debtor under the Bankruptcy Code, and its successor upon conclusion of the Chapter 11 Case of Debtor, as the case may be).

(b)    All terms not expressly defined herein which are defined in the UCC shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

(c)    All limits and sublimits set forth in this Agreement and the DIP Credit Agreement, and any formula or other provision to which a limit or sublimit may apply, shall be determined on an aggregate basis considering together both the Prepetition Obligations and the DIP Obligations.

**2.    Amendments to the Prepetition Credit Agreement.** Effective as of the Ratification Effective Date, the Prepetition Credit Agreement is hereby amended in its entirety to delete the stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the double-underlined text

(indicated textually in the same manner as the following example: double-underlined text) as set forth in Exhibit A hereto. All Schedules and Exhibits to the Prepetition Credit Agreement, as in effect immediately prior to the date of this Ratification Agreement, shall constitute Schedules and Exhibits to the DIP Credit Agreement.

**3.  Acknowledgments.**

3.1    Prepetition Obligations. Debtor hereby acknowledges, confirms and agrees that, as of November 28, 2025, Debtor is indebted to Agent and the Lenders in respect of all Prepetition Obligations in the aggregate principal amount of not less than $26,720,670.13 consisting of (a) Loans in an aggregate principal amount of not less than $26,720,670.13, and (b) Letter of Credit Obligations in the amount of $0.00, in each case together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and legal expenses) accrued and owing by Debtor pursuant to the terms of the Prepetition Loan Documents, all of which are unconditionally owing by Debtor to Agent and the Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

3.2    Acknowledgment of Security Interests. Debtor hereby acknowledges, confirms and agrees that upon entry of, and subject to, an Interim DIP Order (and when applicable, the Final DIP Order), and subject to the Carve Out in all respects, Agent, for the benefit of itself and the other Secured Parties, (a) has and shall continue to have valid, enforceable and perfected first priority and senior security interests in and Liens, (i) subject as to priority to those Permitted Liens that have priority by operation of law and (ii) with respect to the claims of the Lenders subject to the Carve Out upon all Collateral heretofore granted to Agent and the Lenders pursuant to the Prepetition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Obligations, (b) has and shall continue to have valid, enforceable and perfected junior priority and subordinate security interests in and Liens, (i) subject as to priority as to those Permitted Liens that have priority by operation of law, and (ii) subject to the Carve Out, and (c) shall have valid and enforceable security interests in and Liens upon all Collateral granted to Agent, for the benefit of itself and the other the Lenders, under the DIP Order or hereunder or under any of the other DIP Loan Documents or otherwise granted to or held by Agent and the Lenders having the priorities set forth in the DIP Loan Documents and the DIP Order, as the case may be, and (i) subject as to priority as to those Permitted Liens that have priority by operation of law, and (ii) subject to the Carve Out, and (iii) any other Liens expressly permitted by the DIP Order that under the terms thereof have priority over the security interests and Liens in favor of the Secured Parties. None of such liens are subject to avoidance, recharacterization, subordination, recovery, attack, effect, counterclaim, defense or claim under the Bankruptcy Code or applicable nonbankruptcy law.

3.3    Binding Effect of Documents. Subject to the entry of the Interim DIP Order (and when applicable, the Final DIP Order) and the terms thereof, Debtor hereby acknowledges, confirms and agrees that: (a) each of the Prepetition Loan Documents to which it is a party was duly executed and delivered to Agent and the Lenders by Debtor and each is in full force and effect as of the date hereof, (b) the agreements and obligations of Debtor contained in the Prepetition Loan Documents constitute the legal, valid and binding obligations of Debtor enforceable against it in accordance with the terms thereof, and Debtor has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) the Secured Parties are and shall be entitled to all of the rights, remedies and benefits provided for in (i) subject to the entry and terms of the DIP Order, the DIP Loan Documents, and (ii) the DIP Order.

3.4    Adoption and Ratification of DIP Facility. Debtor hereby (a) ratifies, restates, assumes, adopts, affirms and confirms all of the terms and conditions of the Prepetition Loan Documents, as amended and supplemented pursuant hereto and the DIP Order, and Debtor agrees to be fully bound as debtor and

debtor-in-possession, as applicable, by the terms of the DIP Loan Documents to which Debtor is a party and (b) agrees to pay all of the Prepetition Obligations in accordance with the terms of such Prepetition Loan Documents, as amended by this Agreement, and in accordance with the DIP Order. All of the Prepetition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Debtor, each as debtor and debtor-in-possession, as applicable, and considered as agreements between Debtor or Guarantors, on the one hand, and Agent and the Lenders, on the other hand.

**4.    Grant of Security Interest for DIP Facility.** As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including, without limitation, the Prepetition Obligations and the DIP Obligations), Debtor hereby grants, pledges and assigns to Agent, for the benefit of itself and the other Secured Parties, and also confirms, reaffirms and restates the prior grant to Agent and the other Secured Parties of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral (including, without limitation, the Prepetition Collateral and the DIP Collateral).

**5.    Additional Representations, Warranties, Covenants and Waivers.** In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Debtor to Agent and the Lenders, whether pursuant to the DIP Loan Documents or otherwise, and not in limitation thereof, pursuant to the DIP Facility, effective upon the satisfaction of the conditions set forth in <u>Section 6</u> for the effectiveness of the DIP Facility, Debtor hereby represents, warrants and covenants to Agent and the Lenders the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of DIP Loans by Agent and the Lenders and the issuance of Letters of Credit by the L/C Issuers:

5.1    <u>DIP Order</u>. The Interim DIP Order (and, following the expiration of the interim financing period defined therein, the Final DIP Order) has been duly entered and (a) has not been vacated, reversed on appeal, or stayed, or modified or amended (other than, in the case of a modification or amendment, as consented to by Agent in its sole discretion), and (b) is not subject to any pending appeal or motion for leave to appeal or other proceeding to set aside any such order or other challenge to the relief provided for in such order, except in each case as consented to by Agent.

5.2    <u>Use of Proceeds</u>. The proceeds of the DIP Loans under the DIP Facility shall be used only for the following purposes: (i) payment of certain prepetition amounts of the type contemplated in the Approved Budget (including prepetition payments to critical vendors identified by the Loan Parties) and solely as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties, which orders shall be in form and substance reasonably satisfactory to Agent and the Required Lenders, (ii) to the extent of the type contemplated in the Approved Budget and in accordance with the terms of the DIP Facility and the Interim DIP Order/Final DIP Order, and (iii) payment of the costs and expenses of administering the Chapter 11 Case (including payments benefiting from the Carve Out) subject to the terms and conditions of the DIP Facility, in each case of the forgoing, solely in accordance with and subject to the credit agreement governing the terms of the DIP Facility, Interim DIP Order and Final DIP Order; *provided*, that, in no event shall the use of such proceeds result in any Variance which is not a Permitted Variance.

5.3     Budget.

(a)     Debtor has prepared and delivered to Agent and the Lenders the Approved Budget which reflects, among other things, Debtor's anticipated sales, collections, disbursements and Availability for each Week during the nine-Week period ending January 30, 2026.

(b)     Beginning on December 10, 2025, and on every Wednesday thereafter, Debtor shall deliver to Agent and the Lenders a report, in form and substance satisfactory to Agent in all respects (each a "***Variance Report***"), setting forth Debtor's actual sales, collections, disbursements and Availability, each being reported separately and not in the aggregate, and in each case for the previous Test Period, and setting forth all of the Variances, as compared to the corresponding amounts for each of such items set forth in the Approved Budget for such Test Period and on a cumulative basis from the beginning of the period covered by the Approved Budget, together with an explanation, in reasonable detail, of (1) all Variances from the Approved Budget for such period and (2) any non-compliance by Debtor with the Permitted Variances for such Test Period. Any Variance which is not a Permitted Variance, and any proposed changes to the Approved Budget (including, without limitation, any extension of the period covered thereby), shall be subject to the prior written consent of Agent and the Required Lenders.

(c)     Each Loan Party hereby acknowledges, confirms and agrees that, unless waived in writing by Agent and the Required Lenders, each of the following events shall constitute an immediate Event of Default under the DIP Credit Agreement and the other DIP Loan Documents: (i) the occurrence of any Variance which is not a Permitted Variance, (ii) the failure of Debtor to deliver any Variance Report as required by this <u>Section 5.3</u>, and (iii) the failure of the Sale to have been consummated within the period covered by the Approved Budget.

(d)     Agent and the Lenders are relying on Debtor's compliance with the Approved Budget in determining to enter into the post-petition financing arrangements provided for herein.

(e)     Notwithstanding any projected amounts set forth in the Approved Budget relating to the costs and expenses of Agent and the other DIP Secured Parties that are reimbursable by the Loan Parties or any other amounts owing by the Loan Parties to Agent and the other DIP Secured Parties (including, without limitation, reasonable attorneys and consulting fees and expenses) in accordance with the DIP Credit Agreement and the other DIP Loan Documents, such projections shall not limit, impair, modify or waive the Loan Parties' obligation to pay the actual amounts due to Agent and/or the other DIP Secured Parties in respect of such costs, expenses and other amounts owing to Agent and the other DIP Secured Parties, in each case, in accordance with the DIP Credit Agreement and the other DIP Loan Documents.

5.4     <u>Waiver of Certain Rights</u>. For purposes of the DIP Facility, each Loan Party hereby agrees that it shall not, and hereby waives any right that it may have to, seek authority (a) to use cash collateral of Agent and the Lenders under Section 363 of the Bankruptcy Code, except to the extent provided in any DIP Order, without the prior written consent of Agent, (b) to obtain post-petition loans or other financial accommodations, other than from Agent and the Lenders not otherwise permitted by the DIP Credit Agreement, as amended by this Agreement, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code, in each case without the prior written consent of Agent, (c) to challenge, contest or otherwise seek to impair or object to the validity, extent, enforceability or priority of Agent's post-petition liens and claims, (d) to challenge the application of any payments or collections received by Agent or the Lenders to the obligations of the Loan Parties as provided for herein, (e) to propose or support a plan of reorganization in the Chapter 11 Case that does not provide for (or does not provide each DIP Lender at its election to receive) the

indefeasible payment in full in cash and satisfaction of all obligations on the effective date of such plan, (f) to surcharge the Collateral pursuant to Section 506(c) of the Bankruptcy Code, or (g) to seek relief under the Bankruptcy Code, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of Agent or any DIP Lender as provided herein, in the DIP Loan Documents or the DIP Order.

5.5    <u>Milestones</u>. Debtor (i) covenants and agrees to satisfy each of the following conditions and (ii) acknowledges, confirms and agrees that the failure to comply with any such condition shall constitute an immediate Event of Default under the DIP Credit Agreement and the other DIP Loan Documents:

(a)    Not later than three (3) days after the Petition Date, Debtor shall have obtained the entry of the Interim DIP Order;

(b)    Not later than seven (7) days after the Petition Date, Debtor shall have filed a motion or pleading (the "***Bid Procedures Motion***"), in each case in form and substance satisfactory to Agent, seeking approval of (i) bidding procedures for the sale of all or substantially all of the Loan Parties' assets in accordance with Section 363 of the Bankruptcy Code (the "***Sale***"), (ii) a stalking horse asset purchase agreement, in form and substance satisfactory to Agent, and (iii) related bid protections;

(c)    Not later than ten (10) days after the Petition Date, Debtor, the stalking horse buyer and the DIP Secured Parties shall have executed a binding commitment letter for the provision of a senior secured asset-based revolving credit facility (the "***Exit Financing***") on terms and conditions mutually acceptable to such parties, and such stalking horse buyer shall have provided Agent with all customary "know-your-customer" information requested by Agent in connection with the proposed Exit Financing;

(d)    Not later than twenty-five (25) days after the Petition Date:

(i)    Debtor shall have obtained the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent (the "***Bid Procedures Order***"), approving bid procedures, including, without limitation, an acceptable form of asset purchase agreement (providing for, among other things, the payment of net sale proceeds, in a minimum amount sufficient to fully repay the Obligations in cash upon the closing of such sale) to be used for the Sale, and providing a bid deadline no later than sixty (60) days after the Petition Date; and

(ii)    Debtor shall have obtained the entry of the Final DIP Order;

(e)    Not later than December 15, 2025, Buyer shall have entered into mutually agreeable license agreements with each of the Licensors on the terms and conditions previously agreed to by Buyer and the Licensors, which terms and conditions shall be acceptable to Agent;

(f)    Not later than February 3, 2026, Debtor shall conduct an auction (the "***Auction***") in accordance with the Bid Procedures Order to select the highest and best bid(s) for the sale of all or substantially all of Debtor's assets in accordance with the Bid Procedures Order, which bid shall provide for, among other things, a minimum cash amount not less than the amount required to satisfy the Obligations owed to Agent and the Lenders in full in cash, and copies of which shall be provided to Agent;

(g)    Not later than February 6, 2026, Debtor shall have obtained the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent (the "***Sale Order***"), approving the Sale and providing that all cash proceeds generated by such Sale, less reasonable out of pocket fees, costs and expenses directly arising from, and required to be paid by the Loan Parties in connection with, such Sale, including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale, in each case pursuant to a retention agreement in form and substance acceptable to

Agent, shall be remitted to Agent for application against, and in permanent reduction of, the Obligations; and

(h)     Not later than seventy-five (75) days after the Petition Date, the closing of the Bankruptcy Court-approved Sale shall have occurred.

5.6     <u>Chief Restructuring Officer</u>. Debtor acknowledges, confirms and agrees that the termination of CoMetrics as Debtor's Chief Restructuring Officer and financial advisor, or the limitation or modification of the powers of CoMetrics in such capacities, as set forth in the engagement letter, dated April 1, 2025, between CoMetrics and Debtor, including, without limitation, with respect to compensation and CoMetrics' ability to communicate freely and directly with Agent, shall constitute an immediate Event of Default under the DIP Credit Agreement and the other DIP Loan Documents.

**6.     Conditions Precedent to Ratification Effective Date.** The effectiveness of this Agreement, and the initial borrowing under the DIP Facility, shall be subject to the satisfaction or waiver (in accordance with Section 12.10 of the Prepetition Credit Agreement) of the following conditions:

(a)     The preparation, authorization and execution of the DIP Loan Documents with respect to the DIP Facility, in form and substance acceptable to the Lenders and Agent;

(b)     Agent and the Lenders shall have received the Approved Budget;

(c)     The delivery of (i) a secretary's (or other officer's) certificate of Debtor and each of the other Loan Parties, dated as of the Ratification Effective Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments; and (ii) a customary closing officer's certificate of the Debtor;

(d)     All premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the DIP Lender Advisors and all other counsel, financial advisors and other professionals of the Lenders and Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Ratification Effective Date) shall have been paid;

(e)     All documentation and other information about the Loan Parties required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations (including without limitation PATRIOT Act and beneficial ownership certificates), as has been reasonably requested in writing by Agent at least ten Business Days prior to the Ratification Effective Date will be provided not later than the date that is three Business Days prior to the Ratification Effective Date;

(f)     Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the DIP Loan Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(g)     Each Uniform Commercial Code financing statement and each intellectual property security agreement required by the DIP Loan Documents to be filed in order to create in favor of Agent a perfected lien on the DIP Collateral having the priorities set forth in the DIP Orders shall have been filed;

(h)     All first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Case (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to Agent and the Required Lenders; and

(i)      There shall be no material misstatements in (or omissions of material facts necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made) the materials previously furnished to Agent and the Lenders by Debtor. Agent shall not have become aware of any material information or other matter that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information).

**7.      Additional Conditions Precedent to DIP Loans.** In addition to the satisfaction of the conditions precedent under Section 6 of this Agreement with respect to the effectiveness of this Agreement and the making of the initial DIP Loans under the DIP Facility, and notwithstanding any approval by Agent and the Required Lenders of any Approved Budget, the obligation of Agent and the Lenders to extend further DIP Loans or Letters of Credit to Debtor pursuant to the DIP Credit Agreement shall be subject to the satisfaction of all of the conditions precedent in Section 6.2 of the DIP Credit Agreement.

**8.      Releases of Claims.**

8.1      Release of Prepetition Claims.

(a)      Upon the earlier of (i) the entry of the Final DIP Order or (ii) the entry of an Order extending the term of the Interim DIP Order beyond thirty (30) calendar days after the date of the entry of the Interim DIP Order, in consideration of the agreements of Agent and the Lenders contained herein and the making of any DIP Loans by Agent and the Lenders, each Loan Party, pursuant to the DIP Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Agent, each DIP Lender and each of their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each DIP Lender and all such other parties being hereinafter referred to collectively as the "***Releasees***" and individually as a "***Releasee***"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "***Prepetition Released Claim***" and collectively, "***Prepetition Released Claims***") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which Debtor, or any of its successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Prepetition Credit Agreement and the other Prepetition Loan Documents.

(b)      Upon the entry of the Final DIP Order, each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Prepetition Released Claim released, remised and discharged by such Loan Party pursuant to this Section 8.1. If any Loan Party violates the foregoing covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.2      Release of DIP Claims. Upon the payment in full of the Obligations (within the meaning of Section 1.2(d) of the Prepetition Credit Agreement), in consideration of the agreements of Agent and the

Lenders contained herein and the making of any DIP Loans by Agent and the Lenders, each Loan Party hereby covenants and agrees to execute and deliver in favor of Agent and the Lenders a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Loan Party violates such covenant, the Loan Parties agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

8.3    Releases Generally.

(a)    Each Loan Party understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)    Each Loan Party understands, acknowledges and agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

**9.    Miscellaneous.**

9.1    Amendments and Waivers. Neither this Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing executed in accordance with the requirements of Section 12.10 of the DIP Credit Agreement.

9.2    Further Assurances. Debtor shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and the Lenders of all the rights and remedies hereunder, under any of the other DIP Loan Documents, any DIP Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and the Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement, any of the other DIP Loan Documents or the DIP Order. Upon the request of Agent, at any time and from time to time, Debtor shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and the Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, registrations, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and the Lenders such instruments evidencing items of Collateral as may be available and requested by Agent.

9.3    Headings. The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Agreement.

9.4    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by telecopier or other electronic transmission of an executed counterpart of a signature page to this Agreement shall be effective as delivery of an original executed counterpart of this Agreement. Agent may

also require that any such documents and signatures delivered by telecopier or other electronic transmission be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier or other electronic transmission.

9.5    Additional Events of Default. The parties hereto acknowledge, confirm and agree that the failure of Debtor to comply with any of the covenants, conditions and agreements by Debtor contained herein shall constitute an immediate Event of Default under the DIP Loan Documents.

9.6    Costs and Expenses. Subject to the terms of the DIP Order, Debtor shall pay to Agent on demand all costs and expenses that Agent pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement and the other DIP Loan Documents and the DIP Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent, or counsel to Agent on behalf of Agent, including without limitation the fees and expenses of any financial advisors; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Agreement, the other DIP Loan Documents, the DIP Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent and the Lenders in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of Debtor under the DIP Loan Documents or the DIP Order that Debtor fails to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including travel, lodging, and meals for inspections of the Collateral and Debtor's operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Case; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations, plus a per diem charge at Agent's then standard rate for Agent's examiners in the field and office (which rate as of the Petition Date is $1,250 per person per day) plus a review fee of $750 per field examination review; (h) [reserved]; (i) in accordance with the terms of this Agreement, the actual charges paid or incurred by Agent if it elects to employ the services of one or more third persons as a consultant or financial advisor during the Chapter 11 Case; (j) the actual charges paid or incurred by Agent if it elects to employ the services of one or more third-persons to perform field examinations, to appraise the Collateral, or any portion thereof, or to assess the Loan Parties' business valuation; and (k) costs and expenses (including attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent and the Lenders, sell or otherwise realize upon the Collateral, and otherwise enforce the provisions of this Agreement, the other DIP Loan Documents and the DIP Order, or to defend any claims made or threatened against Agent or any DIP Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by Debtor. Subject to the terms of the DIP Order, all sums provided for in this Section 9.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the DIP Loan Documents. Subject to the DIP Order, Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any account maintained by Agent with respect to Debtor.

9.7    Effectiveness. This Agreement (except those Sections hereof that by the express terms thereof only become effective upon satisfaction or waiver of the conditions set forth in Section 6) shall

become effective upon the execution hereof by Agent, the Lenders and Debtor; *provided*, that if the Ratification Effective Date shall not occur by the close of business on the date that is two (2) Business Days following the entry of the Interim DIP Order, the obligations of all parties under this Agreement shall terminate.

9.8      <u>DIP Order</u>. In the event of any inconsistency between the terms of the DIP Order and the DIP Loan Documents, the terms of the DIP Order shall control.

9.9      <u>Conflicts</u>. In the event of any conflict between the terms of this Agreement, on the one hand, and the DIP Credit Agreement and the other DIP Loan Documents, on the other, or in the event a matter is addressed in this Agreement but not in the DIP Credit Agreement or the other DIP Loan Documents, the terms of this Agreement shall govern.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**E. GLUCK CORPORATION**, as Debtor

By: _____

Name: _____

Title: _____

**ISRAEL DISCOUNT BANK OF
NEW YORK**, as Agent and sole Lender

By: _____

Name: Frank Mancini

Title: First Vice President

By: _____

Name: Richard Miller

Title: Senior Vice President

*[Signature Page to Ratification and Amendment Agreement (E. Gluck Corporation)]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**E. GLUCK CORPORATION**, as Debtor

By: _____

Name: _____

Title: _____

**ISRAEL DISCOUNT BANK OF
NEW YORK**, as Agent and sole Lender

By: _____
*Frank Mancini*
8AD3E6DC54F8477...

Name: Frank Mancini

Title: First Vice President

By: _____
*Richard Miller*
02DAA0EAC7894F7...

Name: Richard Miller

Title: Senior Vice President

*[Signature Page to Ratification and Amendment Agreement (E. Gluck Corporation)]*

EXHIBIT A
to
RATIFICATION AND AMENDMENT AGREEMENT

AMENDMENTS TO PREPETITON CREDIT AGREEMENT

*Attached.*

*Exhibit A to Ratification and Amendment Agreement*

# CREDIT AND SECURITY AGREEMENT

**by and between**

**E. Gluck Corporation**

**as Borrower**

**The other Loan Parties party hereto,**

**THE LENDERS FROM TIME TO TIME PARTIES HERETO**
**as Lenders**

**and**

**ISRAEL DISCOUNT BANK OF NEW YORK**
**as Agent**

**Dated: as of March 22, 2021**
**as amended by**
**First Amendment (March 14, 2024)**
**Second Amendment (July 25, 2024)**
**Third Amendment (September 25, 2024)**
**Fourth Amendment (November 14, 2024)**
**Fifth Amendment (January 27, 2025)**
**Sixth Amendment (February 6, 2025)**
**Seventh Amendment (March 31, 2025)**
**Eighth Amendment (April 30, 2025)**
**Ninth Amendment (June 30, 2025)**
**Tenth Amendment (September 15, 2025)**
**Eleventh Amendment (October 15, 2025)**
**Twelfth Amendment (November 17, 2025)**
**and**
**Thirteenth Amendment (November 28, 2025)**
**and**
**Ratification and Amendment Agreement dated as of November 30, 2025**

# TABLE OF CONTENTS

**Page**

**ARTICLE 1. DEFINITIONS** ........................................................................................... 1

    1.1    Defined Terms ......................................................................................... 1
    1.2    Interpretative Provisions ...................................................................... ~~36~~32
    1.3    Accounting Terms ................................................................................ ~~38~~34
    1.4    Rounding .............................................................................................. ~~38~~34
    1.5    Letter of Credit Amounts ..................................................................... ~~38~~35

**ARTICLE 2. CREDIT FACILITY** ............................................................................. ~~38~~35

    2.1    Revolving Loans ................................................................................... ~~38~~35
    2.2    Letters of Credit ................................................................................... ~~39~~35
    2.3    Requests for Borrowings ...................................................................... ~~43~~39
    2.4    [Reserved] ............................................................................................ ~~43~~40
    2.5    Swing Loans. ........................................................................................ ~~43~~40

**ARTICLE 3. INTEREST AND FEES** ........................................................................ ~~44~~41

    3.1    Rates and Payment of Interest .............................................................. ~~44~~41
    3.2    Computation of Interest and Fees ........................................................ ~~45~~41
    3.3    Unused Line Fee ................................................................................... ~~45~~41
    3.4    Letter of Credit Fee .............................................................................. ~~45~~42
    3.5    Termination Fee .................................................................................... ~~45~~42
    3.6    Closing Fee ........................................................................................... ~~46~~42
    3.7    Collateral Management Fee .................................................................. ~~46~~42
    3.8    Online Access Fee ................................................................................ ~~46~~42
    3.9    Reserved. .............................................................................................. ~~46~~42
    3.10   Reserved. .............................................................................................. ~~46~~43
    3.11   Reserved. .............................................................................................. ~~46~~43
    3.12   Increased Costs .................................................................................... ~~46~~43
    3.13   Capital Requirements ........................................................................... ~~46~~43
    3.14   Certificates for Reimbursement ........................................................... ~~47~~43
    3.15   Delay in Requests ................................................................................ ~~47~~43
    3.16   Maximum Interest ................................................................................ ~~47~~44

**ARTICLE 4. PAYMENTS AND ADMINISTRATION** .............................................. ~~47~~44

    4.1    Payments Generally, Allocation of Proceeds ...................................... ~~47~~44
    4.2    Indemnity for Returned Payments ....................................................... ~~49~~46
    4.3    Repayments .......................................................................................... ~~49~~46
    4.4    Prepayments ......................................................................................... ~~49~~46
    4.5    Statements ............................................................................................ ~~50~~46
    4.6    Borrowers' Loan Account; Evidence of Debt ..................................... ~~50~~47
    4.7    Taxes .................................................................................................... ~~50~~47
    4.8    Borrower Agent .................................................................................... ~~51~~48
    4.9    One Obligation ..................................................................................... ~~52~~48
    4.10   Nature and Extent of Each Borrower's Liability ................................. ~~52~~48

~~8387303.9~~8666357.3

**ARTICLE 5. SECURITY INTEREST** .................................................................... ~~54~~51

    5.1    Grant of Security Interest .................................................................. ~~54~~51
    5.2    Financing Statement Filings ............................................................. ~~54~~51

**ARTICLE 6. CONDITIONS PRECEDENT** ............................................................ ~~55~~52

    6.1    Conditions Precedent to Effectiveness of Agreement to Make Initial Loans and
        Letters of Credit ................................................................................ ~~55~~52
    6.2    Conditions Precedent to All Loans and Letters of Credit ................. ~~55~~52

**ARTICLE 7. REPRESENTATIONS AND WARRANTIES** ................................. ~~56~~53

    7.1    Organization; Powers ....................................................................... ~~56~~53
    7.2    Authorization; Enforceability .......................................................... ~~56~~53
    7.3    No Conflicts ..................................................................................... ~~56~~53
    7.4    Governmental Approvals ................................................................. ~~57~~53
    7.5    Financial Statements; No Material Adverse Effect; Solvent ........... ~~57~~53
    7.6    Properties; No Liens ........................................................................ ~~57~~54
    7.7    Litigation ......................................................................................... ~~57~~54
    7.8    Compliance with Laws .................................................................... ~~57~~54
    7.9    Environmental Condition ................................................................. ~~58~~54
    7.10   No Defaults ...................................................................................... ~~58~~55
    7.11   Material Contracts ........................................................................... ~~58~~55
    7.12   Restrictive Agreements ................................................................... ~~58~~55
    7.13   Taxes ............................................................................................... ~~58~~55
    7.14   ERISA .............................................................................................. ~~58~~55
    7.15   Insurance ......................................................................................... ~~59~~55
    7.16   Capitalization and Subsidiaries ...................................................... ~~59~~55
    7.17   Security Interest in Collateral ......................................................... ~~59~~56
    7.18   Brokers ............................................................................................ ~~59~~56
    7.19   Intellectual Property ........................................................................ ~~59~~56
    7.20   Trade Relations ............................................................................... ~~60~~56
    7.21   Labor Relations ............................................................................... ~~60~~56
    7.22   [Reserved.] ...................................................................................... ~~60~~56
    7.23   Margin Regulations, Investment Company Act, Etc ...................... ~~60~~57
    7.24   Anti-Terrorism Laws ....................................................................... ~~60~~57
    7.25   Complete Disclosure ....................................................................... ~~60~~57

**ARTICLE 8. AFFIRMATIVE COVENANTS** ....................................................... ~~60~~57

    8.1    Financial Statements, Borrowing Base Certificate and Other Information ....... ~~60~~57
    8.2    Notices of Material Events .............................................................. ~~60~~57
    8.3    Existence ......................................................................................... ~~61~~58
    8.4    Payment of Obligations ................................................................... ~~61~~58
    8.5    Maintenance of Properties ............................................................... ~~62~~58
    8.6    Compliance with Laws .................................................................... ~~62~~58
    8.7    Insurance ......................................................................................... ~~62~~58
    8.8    Inspection Rights; Field Examinations; Appraisals ........................ ~~62~~59
    8.9    Use of Proceeds .............................................................................. ~~62~~59
    8.10   Cash Management; Collection of Proceeds of Collateral ............... ~~62~~59
    8.11   Additional Collateral; Further Assurances ..................................... ~~63~~60

8.12    End of Fiscal Years; Fiscal Quarters ........................... 6460
8.13    Costs and Expenses ........................................... 6460
8.14    Depository Bank .............................................. 6461
8.15    Anti-Terrorism Laws .......................................... 6461
8.16    Post-Closing ................................................. 65

**ARTICLE 9. NEGATIVE COVENANTS** ....................................... 6561

9.1     Indebtedness ................................................. 6561
9.2     Liens ........................................................ 6561
9.3     Fundamental Changes .......................................... 6562
9.4     Asset Sales .................................................. 6662
9.5     Investments .................................................. 6662
9.6     Transactions with Affiliates ................................. 6662
9.7     Change in Business ........................................... 6662
9.8     Restricted Payments .......................................... 6662
9.9     Restrictive Agreements ....................................... 6663
9.10    Certain Payments of Indebtedness, Etc ........................ 6763
9.11    Amendment of Organization Documents .......................... 6763
9.12    Sale and Leasebacks .......................................... 6763

**ARTICLE 10. FINANCIAL COVENANTS** ............................ 67[RESERVED]    63

10.1    Net Loss ..................................................... 67
10.2    Tangible Net Worth ........................................... 67

**ARTICLE 11. EVENTS OF DEFAULT AND REMEDIES** .......................... 6863

11.1    Events of Default ............................................ 6863
11.2    Remedies ..................................................... 6966

**ARTICLE 12. ASSIGNMENTS AND PARTICIPATIONS; APPOINTMENT OF AGENT;**
**AMENDMENTS AND WAIVERS** .............................................. 7066

12.1    Assignment and Participations ................................ 7067
12.2    Appointment of Agent ......................................... 7268
12.3    Agent's Reliance, Etc ........................................ 7269
12.4    Israel Discount Bank of New York and Affiliates .............. 7370
12.5    Lender Credit Decision ....................................... 7370
12.6    Indemnification .............................................. 7370
12.7    Successor Agent .............................................. 7471
12.8    Setoff and Sharing of Payments ............................... 7471
12.9    Revolving Loans; Swing Loans; Payments; Non-Funding Lenders; Defaulting
        Lenders; Information; Actions in Concert; Protective Advances ... 7572
12.10   Amendments and Waivers ....................................... 7774
12.11   Recovery of Erroneous Payments ............................... 7875

**ARTICLE 13. JURY TRIAL WAIVER; OTHER WAIVERS; CONSENTS; GOVERNING LAW** 7875

13.1    Obligations and Liabilities of Lender ........................ 7875
13.2    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver 7875
13.3    Waiver of Notices ............................................ 7976
13.4    Waiver of Counterclaims ...................................... 8076
13.5    Indemnification .............................................. 8076

**ARTICLE 14. NOTICES; MISCELLANEOUS** ..................................................... ~~80~~77

14.1      Notices ........................................................................................... ~~80~~77
14.2      Partial Invalidity ........................................................................... ~~81~~78
14.3      Successors ...................................................................................... ~~82~~78
14.4      Entire Agreement ........................................................................... ~~82~~79
14.5      USA PATRIOT Act ....................................................................... ~~82~~79
14.6      Keepwell ........................................................................................ ~~82~~79
14.7      Counterparts; Electronic Execution .............................................. ~~83~~79
14.8      Acknowledgment and Consent to Bail-In of EEA Financial Institutions ...... ~~83~~80
14.9      Acknowledgment Regarding Any Supported QFCs ....................... ~~84~~80
14.10    Confidentiality .............................................................................. ~~84~~81
14.11    Release of Liens ............................................................................ ~~85~~81

INDEX
TO
EXHIBITS AND SCHEDULES

Exhibit A              Form of Borrowing Base Certificate
Exhibit B              Form of Compliance Certificate
Exhibit C              Form of Assignment and Assumption Agreement
Exhibit D              Wire Instructions
Exhibit E              Form of Joinder Agreement
Exhibit F-1            Form of Revolving Loan Note
Exhibit F-2            [Reserved]
Exhibit F-3            Form of Swing Loan Note
Exhibit G              Form of Notice of Borrowing
Exhibit H              [Reserved]

Schedule 1.1           Lenders' Commitments
Schedule 1.1A          Commercial Tort Claims
Schedule 1.1B          Transferable Assets
Schedule 6.1           Conditions Precedent to Initial Loans
Schedule 7.7           Litigation
Schedule 7.9           Environmental Matters
Schedule 7.11          Material Contracts
Schedule 7.12          Restrictive Agreements
Schedule 7.15          Insurance
Schedule 7.16          Capitalization and Subsidiaries
Schedule 7.19          Intellectual Property
Schedule 7.21          Labor Relations
Schedule 8.1           Financial and Collateral Reporting
Schedule 8.10          Cash Management
Schedule 9.1           Permitted Indebtedness
Schedule 9.2           Permitted Liens
Schedule 9.5           Permitted Investments

## CREDIT AND SECURITY AGREEMENT

This Credit and Security Agreement dated as of March 22, 2021 is entered into by and among E. Gluck Corporation, a New York corporation ("EGC", and together with any other Person who joins hereto as a Borrower, collectively, the "Borrowers" and each individually, a "Borrower"), the financial institutions or entities from time to time parties to this Agreement (collectively, the "Lenders") and ISRAEL DISCOUNT BANK OF NEW YORK, as agent for the Lenders (in such capacity, the "Agent").

W I T N E S S E T H:

WHEREAS, Borrowers have requested that Agent and Lenders provide a credit facility to Borrowers and Agent and Lenders are willing to provide such credit facility on the terms and conditions set forth herein and in the other Loan Documents (as defined below).

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1.   DEFINITIONS

1.1     Defined Terms.  For purposes of this Agreement, the following terms shall have the respective meanings given to them below, and on and after the Ratification Effective Date, any term not defined herein and defined in the Ratification Agreement shall have its meaning as set forth therein:

"Accounts" means "accounts" as defined in Article 9 of the UCC and includes all present and future rights to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred, or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.

"Acquisition" means the acquisition of the WITHit Investment by EGC, and the other related transactions in connection therewith, pursuant to the Acquisition Agreement.

"Acquisition Agreement" means that certain Unit Purchase Agreement, dated as of March 22, 2021, by and among EGC, as purchaser, WIL Holdings, LLC, as seller, SL Holdings, LLC, as seller, David Nelson, as owner and Phillip Grandinetti, III, as owner.

"Adequate Protection Liens" means, collectively, the adequate protection liens as such liens are defined in the DIP Order.

"Advances" means and includes the Loans and the Letters of Credit.

"Affiliate" means, with respect to a specified Person, any other Person (excluding any Subsidiary) which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power either (a) to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies, whether through the ownership of Equity Interests, by agreement or otherwise.

"Agent" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"Agent Account Balance" means, as of any date, the amount of cash on deposit in a segregated deposit account of EGC maintained with Agent, which account shall initially be Account # 1343574, and which account may be replaced for purposes of this definition by another single account of EGC maintained with Agent to the extent so designated by EGC in writing, with the consent of Agent.

"Agent Payment Account" means, account no. 1343582 of Agent or such other account of Agent as Agent may from time to time designate in writing to Borrowers as the Agent Payment Account for purposes of this Agreement and the other Loan Documents.

"Agreement" means, this Credit and Security Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Allocable Amount" shall have the meaning set forth in Section 4.10(c)(ii).

"Anti-Terrorism Laws" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"Applicable Margin" means with respect to any Advance, the applicable rate of interest set forth in the table below:

|  | Federal Funds Effective Rate Loans | Prime Rate Loans |
|---|---|---|
| **Revolving Loans** | 3.12% | 0.25% |
| **Swing Loans** | 3.12% | 0.25% |

"Approved Budget" shall have the meaning set forth in the Ratification Agreement.

"Assignment Agreement" means an Assignment and Assumption Agreement substantially in the form of Exhibit C.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Product Agreement" means an agreement entered into at any time by any Loan Party with Agent, a Lender or their Affiliates governing the terms and conditions with respect to a Bank Product provided by Agent, a Lender or their Affiliates to such Loan Party.

"Bank Product Obligations" means any obligation or liability of any Loan Party on account of any Bank Product.

"Bank Products" means any one or more of the following types of services or facilities provided to any Loan Party by Agent or a Lender (or an Affiliate of Agent or a Lender): (a) credit cards, debit cards or stored value cards or the processing of payments and other administrative services with respect to credit cards, debit cards or stored value cards or (b) cash management or related services, including (i) the automated clearinghouse transfer of funds for the account of such Loan Party pursuant to agreement or overdraft for any accounts of such Loan Party maintained at Agent or a Lender, (ii) cash management and treasury management services and products, including without limitation controlled disbursement accounts or services, lockboxes, overdrafts, interstate depository network services, and (iii) Hedge Agreements if and to the extent permitted hereunder.

"Bankruptcy Code" means the United States Bankruptcy Code, being Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors. as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Borrower" and "Borrowers" shall have the meanings set forth in the preamble to this Agreement.

"Borrower Agent" shall have the meaning set forth in Section 4.8.

"Borrowing Base" means, at any time of calculation, an amount equal to:

    (a)    Up to Eighty-five percent (85%) multiplied by the Eligible Domestic Accounts; plus

    (b)    Up to Eighty-five percent (85%) multiplied by the Eligible Foreign Accounts; plus

    (c)    Up to the lesser of:

        (i)    the sum of (w) the lesser of (A) up to sixty percent (60%) multiplied by the value of Eligible Domestic Inventory and (B) up to eighty-five percent (85%) of the Net Recovery Percentage multiplied by the value of Eligible Domestic Inventory; plus, (x) the least of (A) up to sixty percent (60%) multiplied by the value of Eligible In-Transit Inventory, (B) up to eighty-five percent (85%) of the Net Recovery Percentage multiplied by the value of Eligible In-Transit Inventory, and (C) $5,000,000, plus (y) the least of (A) up to fifty percent (50%) multiplied by the value of Eligible Hong Kong Inventory (other than movements Inventory), (B) up to eighty-five percent (85%) of the Net Recovery Percentage multiplied by the value of Eligible Hong Kong Inventory (other than movements Inventory) and (C) $2,500,000 (less the amount of clause (z) below) plus (z) the least of (A) up to thirty percent (30%) Eligible Hong Kong Inventory constituting movements Inventory, (B) up to eighty-five percent (85%) of the Net Recovery Percentage) multiplied by the value of Eligible Hong Kong Inventory constituting movements Inventory and (C) $250,000, except, that, until the date that Agent receives the results of an appraisal of Borrowers' Inventory, prepared at least six (6) months after the Closing Date, notwithstanding the foregoing, the advance rate against Eligible Domestic Inventory and Eligible

In-Transit Inventory shall be up to forty-five percent (45%) of the value of Eligible Domestic Inventory or Eligible In-Transit Inventory, as applicable, or

(ii)    (x) for the period commencing on January 28, 2025 and ending on the last day of the Temporary Increase Period, $18,000,000; and (y) at all times thereafter, $15,000,000; plus

(d)    The Temporary Overadvance Amount; plus

(e)    The Trademark Collateral Amount; plus

(f)    One hundred percent (100%) of the cash pledged pursuant to the Pledge Agreement; minus

(g)    Reserves.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit A hereto, as such form, subject to the terms of this Agreement, may from time to time be reasonably modified by Agent, which is duly completed (including all schedules thereto) and executed by a Responsible Officer of Borrower Agent and delivered to Agent.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York, and a day on which Agent is open for the transaction of business.

"Capital Lease Obligations" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date on a balance sheet prepared in accordance with GAAP.

"Carve Out" has the meaning set forth in the DIP Order.

"Cash Dominion Period" means the period (a) commencing on any date on which (i)  the sum of (1) the Agent Account Balance, plus (2) Excess Availability, is less than $1,500,000,  and continuing until the sum of (1) the Agent Account Balance, plus (2) Excess Availability shall have been greater than $1,500,000 for thirty (30) consecutive days, or (b) commencing upon the occurrence of any Event of Default and continuing until such Event of Default shall have been cured or waived.

"Cash Management Bank" shall have the meaning set forth in Section 8.10.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case

pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued, promulgated or implemented.

"Change of Control" means an event or series of events by which: (a) the Permitted Holders shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in EGC representing more than fifty percent (50%) of the combined voting power of all of Equity Interests entitled to vote for members of the board of directors or equivalent governing body of EGC on a fully-diluted basis; (b) during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of EGC cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of such board or equivalent governing body or (iii) whose election or nomination to such board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of such board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of such board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or (c) any Person or two or more Persons (other than the Permitted Holders or their Affiliates) acting in concert shall have acquired, by contract or otherwise, the power to exercise, directly or indirectly, a controlling influence over the management or policies of EGC, or control over the Equity Interests of EGC entitled to vote for members of the board of directors or equivalent governing body of EGC on a fully-diluted basis representing more than fifty percent (50%) of the combined voting power of such securities.

"Chapter 11 Case" means the case under Chapter 11 of the Bankruptcy Code commenced by Debtor which is being administered under the Bankruptcy Code and pending in the Bankruptcy Court.

"Clarity" means Clarity Limited, a Hong Kong corporation, number 0101510, and its permitted successors and assigns.

"Closing Date" means the date on which the conditions specified in Section 6.1 are satisfied or waived in writing by AgentMarch 22, 2021.

"Code" means the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

"Collateral" means and includes all right, title and interest of each Loan Party in all of the following property and assets of such Loan Party, in each case whether now existing or hereafter arising or created and whether now owned or hereafter acquired and wherever located:

    (a)      all Accounts;

    (b)      all Goods, including Equipment, Inventory and Fixtures;

    (c)      all Documents, Instruments and Chattel Paper;

    (d)      all Letters of Credit and Letter-of-Credit Rights;

(e)      all Investment Property;

(f)      all Commercial Tort Claims set forth on Schedule 1.1A hereto;

(g)      all General Intangibles, including, without limitation, all Payment Intangibles and Intellectual Property;

(h)      all Money and all Deposit Accounts;

(i)      all Supporting Obligations;

(j)      all ledger sheets, ledger cards, files, correspondence, Records, books of account, business papers, computers, computer software (owned by any Loan Party or in which it has an interest), computer programs, tapes, disks and documents, including all of such property relating to the Collateral;

(k)      all proceeds and products of the property described in clauses (a) through (j) of this definition, in whatever form. It is the intention of the parties that if Agent shall fail to have a perfected Lien on any particular property or assets of any Loan Party for any reason whatsoever, but the provisions of this Agreement and/or of the other Loan Documents, together with all financing statements and other public filings relating to Liens filed or recorded by Agent against Loan Parties, would be sufficient to create a perfected Lien on any property or assets that such Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the Collateral as original collateral that is the subject of a direct and original grant of a security interest as provided for herein and in the other Loan Documents (and not merely as proceeds (as defined in Article 9 of the Uniform Commercial Code) in which a security interest is created or arises solely pursuant to Section 9-315 of the Uniform Commercial Code). Notwithstanding any of the foregoing, the Collateral shall not include any "Excluded Assets".

"Collateral Access Agreement" means an agreement in writing, in form and substance reasonably satisfactory to Agent, from any lessor of premises to any Loan Party or any other person to whom any Collateral is consigned or who has custody, control or possession of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Agent.

"Collection Account" means the deposit account of any Loan Party identified on Schedule 8.10 as the collection account and such other accounts as may be established after the Closing Date in accordance with the terms of this Agreement used to receive payments on Accounts and proceeds of other Collateral.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary manner of payment for the purchase price of goods or services by any Loan Party in the ordinary course of the business of such Loan Party (and not in the event that such Loan Party fails to make payment).

"Commitment" means, with respect to each Lender, such Lender's Revolving Loan Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate substantially in the form of Exhibit B.

"Control Agreement" means a control agreement, in form and substance reasonably satisfactory to Agent, executed and delivered by any Loan Party, Agent and the applicable securities intermediary (with respect to a securities account) or bank (with respect to a deposit account) with respect to a securities account or deposit account, as the case may be, that is sufficient to perfect the security interests of Agent for the ratable benefit of Agent and the Lenders therein and provides such other rights with respect thereto as Agent for the ratable benefit of Agent and the Lenders require.

"Covered Entity" shall mean (a) each Loan Party, each Loan Party's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 20% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"Credit Facility" means the Advances provided to or for the benefit of Borrowers pursuant to Sections 2.1, 2.2 and 2.5.

"Debtor" means EGC, as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code

"Deed of Undertaking" means one or more deeds of undertaking executed by EGC and Clarity in favor of Agent, for the benefit of the Lenders, as the same may be amended, restated, renewed, extended, supplemented, substituted or otherwise modified from time to time.

"Default" means an act, condition or event which, with notice or passage of time or both, would constitute an Event of Default.

"Default Rate" means, for any Obligation (including, to the extent permitted by law, interest not paid when due), two percent (2%) plus the interest rate otherwise applicable thereto.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Agent and Borrower Agent in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Agent, Issuing Bank, or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two Business Days of the date when due, (b) has notified any Borrower, Agent or Issuing Bank in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by Agent or Borrower, to confirm in writing to Agent and Borrower Agent that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Agent and Borrower Agent), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of any Insolvency Proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii)

become the subject of a Bail-in Action; provided, that, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Borrower Agent, Issuing Bank, and each Lender.

"Deposit Accounts" means, collectively, (a) all "deposit accounts" as such term is defined in the UCC and in any event shall include the LC Collateral Account and all accounts and sub-accounts relating to any of the foregoing accounts and (b) all cash, funds, checks, notes and instruments from time to time on deposit in any of the accounts or sub-accounts described in clause (a) of this definition.

"DIP Loans" shall have the meaning set forth in the Ratification Agreement.

"DIP Obligations" shall have the meaning set forth in the Ratification Agreement.

"DIP Order" shall have the meaning set forth in the Ratification Agreement.

"Dollars" or "U.S. Dollars" means the lawful currency of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EGC" shall have the meaning set forth in the preamble to this Agreement.

"EGC Holdings" means EGC Holdings, LLC, a Delaware limited liability company.

"EGC Holdings Guaranty" means that certain Guaranty Agreement, dated as of the date hereof, made by EGC Holdings in favor of the Agent for the benefit of the Lenders.

"Eligible Accounts" means, collectively: Eligible Domestic Accounts and Eligible Foreign Accounts.

"Eligible Domestic Accounts" means Accounts created by any Borrower that in each case at the time of creation and at all times thereafter satisfy the criteria set forth below as determined by Agent in its Permitted Discretion.  Except as otherwise agreed by Agent, Eligible Accounts shall not include any Account:

(a)      which is not subject to a first priority perfected security interest in favor of Agent for the ratable benefit of Agent and Lenders;

(b)      which is subject to any security interest, lien or other encumbrance other than the security interest and lien of Agent for the ratable benefit of Agent and Lenders and those permitted in clauses (b), (c) and (j) of the definition of the term Permitted Liens and any other liens permitted under this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Agent between the holder of such security interest or lien and Agent;

(c)      which is unpaid more than ninety (90) days after the original due date for it or one hundred twenty (120) days after the date of the original invoice for it, or which has been written off the books of such Person or otherwise designated as uncollectible;

(d)      which is owing by an account debtor for which more than twenty-five percent (25%) of the Accounts owing by such account debtor and its Affiliates are ineligible under clause (c) above;

(e)      which to the extent the aggregate amount of Eligible Accounts owing by such account debtor and its Affiliates to such Loan Party exceeds thirty-five percent (35%) of the aggregate amount of Eligible Accounts except, that, such percentage shall be fifty percent (50%) for each of (i) Walmart, Inc. and its Affiliates, (ii) Amazon.com, Inc. and Affiliates and  (iii) Costco Wholesale Corporation and its Affiliates;

(f)      with respect to which any covenant, representation, or warranty contained in this Agreement or in any other Loan Document has been breached or is untrue;

(g)      which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to Agent in its Permitted Discretion and which has been sent to the account debtor, (iii) represents a progress billing, (iv) is contingent upon such Person's or its Affiliates' completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, (vi) relates to payments of interest or (vii) has been invoiced more than once;

(h)      with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(i)      which is owed by an account debtor that has (i) become the subject of an Insolvency Event or (ii) ceased operation of its business;

(j)      which is owed by any account debtor that has sold all or substantially all its assets (unless such Account has been assumed by a Person that shall have acquired such assets and otherwise satisfies the requirements set forth in this definition);

(k)      which is owed by an account debtor that (i) does not maintain its chief executive office in the United States or Canada or (ii) is not organized under applicable Law of the United States, any State of the United States, Canada, or any Province thereof;

(l)      which is owed in any currency other than Dollars;

(m)      which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the United States or Canada, unless

such Account is backed by credit insurance in form and substance acceptable to Agent and assigned to Agent for the ratable benefit of Agent and the Lenders or a letter of credit in form and substance acceptable to Agent and which has been assigned to and is directly drawable by Agent, or (ii) the government of the United States or Canada, or any department, agency, public corporation, or instrumentality thereof, unless, within thirty (30) days of the request by the Agent, the Federal Assignment of Claims Act of 1940, as amended, or the Financial Administration Act (Canada), as amended, as applicable, and any other steps necessary to perfect the security interest and lien of Agent for the ratable benefit of Agent and Lenders in such Account have been complied with to Agent's satisfaction;

(n)    which is owed by any Affiliate, employee, officer, director or agent of such Loan Party;

(o)    which, for any account debtor, exceeds any credit limit with respect to such account debtor determined by such Loan Party from time to time, and such credit limit is acceptable to Agent in its Permitted Discretion (and otherwise such credit limit as Agent may determine after notice and consultation with such Loan Party), to the extent of such excess;

(p)    which is owed by an account debtor or any Affiliate of such account debtor to which any Borrower is indebted, but only to the extent of such indebtedness, or which is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an account debtor, in each case to the extent thereof;

(q)    which is subject to any counterclaim, deduction, defense, setoff or dispute;

(r)    which is evidenced by or arising under any promissory note, lease, chattel paper, or instrument;

(s)    which is owed by an account debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit such Person to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Person has filed such report or qualified to do business in such jurisdiction;

(t)    with respect to which such Person has made any agreement with the account debtor for any reduction thereof (to the extent of such reduction), other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Person created a new receivable for the unpaid portion of such Account;

(u)    which does not comply in all material respects with the requirements of all applicable Laws and regulations, whether Federal, State or local;

(v)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports to indicate that any Person other than such Person has or has had an ownership interest in such goods, or which indicates any party other than such Person as payee or remittance party;

(w)    which was created on cash on delivery terms;

(x)    which Agent determines in its Permitted Discretion may not be paid by reason of the account debtor's financial condition or inability to pay; or

   (y)  which Agent determines is otherwise unacceptable for any reason whatsoever.

   The criteria for Eligible Domestic Accounts set forth above may be changed and any new criteria for Eligible Domestic Accounts may be established by Agent in the exercise of its Permitted Discretion.  Any Accounts that are not Eligible Domestic Accounts shall nevertheless be part of the Collateral.  In determining the amount of the Account to be included in the Borrowing Base, the face amount of an Account shall be reduced, to the extent not reflected in such face amount, by (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that Borrowers may be obligated to rebate to a customer pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by Borrowers to reduce the amount of such Eligible Domestic Accounts.

   "Eligible Domestic Inventory" means Inventory of any Borrower consisting of finished goods held for resale in the ordinary course of the business of such Loan Party that at all times satisfy the criteria set forth below as determined by Agent in its Permitted Discretion.  Except as otherwise agreed by Agent, Eligible Domestic Inventory shall not include any Inventory:

   (a)  which is not subject to a first priority perfected security interest in favor of Agent for the benefit of Agent and Lenders;

   (b)  which is subject to any security interest, lien or other encumbrance other than the security interest and lien of Agent for the benefit of Agent and Lenders and those permitted in clauses (b), (c), (j) and (m) of the definition of the term Permitted Liens (but as to liens referred to in clauses (j) and (m) only to the extent that Agent has established a Reserve as provided therein) and any other liens permitted under this Agreement that are subject to an intercreditor agreement in form and substance satisfactory to Agent between the holder of such security interest or lien and Agent for the benefit of Agent and Lenders;

   (c)  which is, in Agent's opinion, slow moving, obsolete, unmerchantable, defective, unfit for sale, sale cut off items, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business or unacceptable due to age, type, category and/or quantity;

   (d)  with respect to which any covenant, representation, or warranty contained in this Agreement or any of the other Loan Documents has been breached or is untrue or which does not conform to all standards imposed by any Governmental Authority;

   (e)  in which any Person other than Borrower shall (i) have any direct or indirect ownership, interest or title to such Inventory or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

   (f)  which constitutes raw materials, work-in-process, capitalized labor or freight, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold goods, goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

   (g)  which is not located at premises owned by any Borrower in the United States of America or Canada, except as set forth in clauses (h) and (i) below;

8387303.9 8666357.3

11

(h)        which is located at any premises leased by any Borrower unless (i) the lessor (and its mortgagee, if any) has delivered to Agent a Collateral Access Agreement that Agent has acknowledged in writing is acceptable to it or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by Agent in its Permitted Discretion;

(i)        which is located in any third party warehouse or is in the possession of a bailee or is being processed offsite at a third party location or outside processor and, in any such case, is not evidenced by a warehouse receipt or other document of title, unless (i) such warehouseman or bailee or the owner of such third party location or such outside processor has delivered to Agent a Collateral Access Agreement that Agent has acknowledged in writing is acceptable to it and such other documentation as Agent may require or (ii) a Reserve for rent, charges and other amounts due or to become due with respect to such facility over a three (3) month period has been established by Lender in its Permitted Discretion;

(j)        which is a discontinued product or component thereof and is not immediately usable in a continuing product;

(k)        which is the subject of a consignment by such Person as consignor;

(l)        which contains or bears any Intellectual Property rights licensed to such Person unless Agent is satisfied in its Permitted Discretion that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(m)        which is not reflected in a current perpetual Inventory report of such Person;

(n)        for which reclamation rights have been asserted by the seller;

(o)        which includes Eligible In-Transit Inventory;

(p)        which includes Eligible Hong Kong Inventory; or

(q)        which Agent otherwise determines is unacceptable for any reason whatsoever.

The criteria for Eligible Domestic Inventory set forth above may only be changed and any new criteria for Eligible Inventory may only be established by Agent in the exercise of its Permitted Discretion.  Any Inventory that is not Eligible Domestic Inventory shall nevertheless be part of the Collateral.

"Eligible Foreign Accounts" means Accounts created by any Borrower that in each case at the time of creation and at all times thereafter satisfy the criteria set forth in the definition of Eligible Domestic Accounts other than clause (k) of the definition of Eligible Domestic Accounts; and (b) within one hundred and twenty (120) days following the Closing Date, are insured by credit insurance in form and substance acceptable to Agent and assigned to Agent for the ratable benefit of Agent and the Lenders. The criteria for Eligible Foreign Accounts set forth above may be changed and any new criteria for Eligible Foreign Accounts may be established by Agent in the exercise of its Permitted Discretion.  Any Accounts that are not Eligible Foreign Accounts shall nevertheless be part of the Collateral.

"Eligible Hong Kong Inventory" means finished goods or movements Inventory of any Borrower that (a) at all times satisfies all criteria set forth in the definition of Eligible Domestic Inventory other than clauses (g), (o) and (p) of the definition of Eligible Domestic Inventory; and (b) is located at the Borrower's warehouse at Flat A – B 12/F, Sing Mei Industrial Building, 29 – 37 Kwai Wing Road, Kwai

Chung, N.T. Hong Kong. The criteria for Eligible Hong Kong Inventory set forth above may only be changed and any new criteria for Eligible Hong Kong Inventory may only be established by Agent in the exercise of its Permitted Discretion.    Any Inventory that is not Eligible Hong Kong Inventory shall nevertheless be part of the Collateral.

"Eligible In-Transit Inventory" means those items of Inventory of any Borrower that (a) at all times satisfy the criteria set forth below as determined by Agent in its Permitted Discretion and (b) do not qualify as Eligible Domestic Inventory solely because they are not in a location described in clauses (g), (h), (i) or (o) of the definition of Eligible Domestic Inventory or are in transit among such locations and such Loan Party does not have actual and exclusive possession thereof, but as to which:

(a)    currently is in transit (whether by vessel, air, or land) from a location within the continental United States or Canada to a location described in clauses (g), (h), or (i) of the definition of Eligible Domestic Inventory for less than 90 days after its first having been loaded on the vessel, carrier or other mode of transportation for shipments within the continental United States or Canada;

(b)    title to such Inventory has passed to such Loan Party;

(c)    such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, satisfactory to Lender in its sole reasonable discretion;

(d)    for Inventory in-transit (whether by vessel, air or land) from a location outside the United States, such Inventory either:

(i)    is the subject of a negotiable bill of lading governed by the laws of a state within the United States (x) that is consigned only to such Loan Party or to a customs broker who has executed a tri-party agreement as described in clause (e) below, (y) that is issued by the carrier respecting the subject Inventory, and (z) that is in the possession of Agent or a customs broker who has executed a tri-party agreement as described in clause (e) below (in each case in the continental United States); or

(ii)    is the subject of a negotiable cargo receipt governed by the laws of a state within the United States and is not the subject of a bill of lading (other than a negotiable bill of lading in the possession of Agent or a customs broker who has executed a tri-party agreement as described in clause (e) below) and such negotiable cargo receipt is (x) consigned only to such Loan Party or to a customs broker who has executed a tri-party agreement as described in clause (e) below, (y) that was issued by a consolidator respecting the subject Inventory, and (z) that is in the possession of Agent or a customs broker who has executed a tri-party agreement as described in clause (e) below (in each case in the continental United States);

(e)    for Inventory in transit (whether by vessel, air or land), from a location outside the United States, Agent, such Loan Party, and any customs broker handling any such in-transit Inventory are parties to an agreement, in form and substance acceptable to Agent with respect to such in-transit Inventory and confirming, among other things, that Agent's security interest thereon is first in priority; and

(f)    Borrower Agent has provided a certificate to Agent certifying that, to the best knowledge of Borrowers, such Inventory meets all of Borrowers' representations and warranties contained in the Loan Documents concerning Eligible In-Transit Inventory, that it knows of no reason

why such Inventory would not be accepted by the applicable Borrower and that the shipment as evidenced by the documents conforms to the related order documents.

"Eligible Inventory" means, collectively, Eligible Domestic Inventory, Eligible Hong Kong Inventory and Eligible In-Transit Inventory.

"Environmental Laws" means all Laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters.

"Equipment" means "Equipment" as defined in Article 9 of the UCC and includes now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or leased and including embedded software that is licensed as part of such computer equipment), vehicles, rolling stock, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"Equity Interests" means, with respect to any Person, all of the shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company, or other equity, ownership or profit interests at any time outstanding, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), but excluding any interests in phantom equity plans and any debt security that is convertible into or exchangeable for such shares, and all of the other ownership, economic, or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination, and all certificates evidencing such Equity Interests.

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended or supplemented from time to time and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Pension Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (e) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or Pension Plans or to appoint a trustee to administer any Pension Plan; (f) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal of any Loan Party or any of its ERISA Affiliates from any Pension Plan or Multiemployer Plan; or (g) the receipt by any Loan Party or any

ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party or any ERISA Affiliate of any notice, concerning the imposition upon any Loan Party or any of its ERISA Affiliates of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA, in each case, that has had, or could reasonably be expected to have, aggregate liability to Borrowers in excess of $250,000.

"ESOP" means EGC's employee stock ownership plan, or any successor thereto.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" shall have the meaning set forth in Section 11.1.

"Excess Availability" means the amount, as determined by Agent, calculated at any date, equal to: (a) the lesser of: (i) the Borrowing Base and (ii) the Maximum Revolving Credit (in each case under clauses (i) or (ii) after giving effect to any applicable Reserves) minus the Letter of Credit Obligations, minus, without duplication, (b) the sum of: (i) the amount of all then outstanding and unpaid Obligations, plus (ii) the aggregate amount of all then outstanding and unpaid trade payables and other obligations of Borrowers that are outstanding more than sixty (60) days past due as of the end of the immediately preceding month (other than trade payables or other obligations being contested or disputed by Borrowers in good faith).

"Exchange Act" means the Securities Exchange Act of 1934, as in effect from time to time.

"Excluded Accounts" means the following deposit accounts: (a) those solely used for the purposes of making payments in respect of payroll, taxes and employees' wages and benefits, (b) any zero balance account or any other account with funds on deposit not exceeding $25,000 individually or $100,000 in the aggregate, and (c) trust, escrow or cash collateral accounts.

"Excluded Assets" means:

       (a)      any assets subject to a certificate of title;

       (b)      any assets in which the grant of a pledge or security interest is prohibited by law, rule or regulation;

       (c)      Equity Interests (i) in any Person that is not a wholly-owned Subsidiary if the granting of a security interest in such Equity Interests would be prohibited by the Organization Documents of such Person without third party consent which consent has not been obtained, it being acknowledged that the WITHit Investment is not excluded by this or any other provision herein, and (ii) in excess of 65% of the total outstanding voting Equity Interests of any first tier CFC or FSHCO (provided, that, none of the non-voting Equity Interests in any first tier CFC or FSHCO shall constitute Excluded Assets);

       (d)      any governmental licenses or state or local franchises, charter and authorization, to the extent a security interest in such licenses, franchises, charters or authorizations are prohibited or restricted thereby, but only to the extent, and for so long as, such prohibition or restriction is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC, the Bankruptcy Code or any other applicable Law;

       (e)      Excluded Accounts;

(f)        Transferable Assets;

(g)        assets in circumstances where Agent and Borrower Agent reasonably agree that the cost of obtaining or perfecting a security interest in such assets is excessive in relation to the benefit to Agent and the Lenders of the security to be afforded thereby;

(h)        licenses, instruments, leases and agreements to the extent and so long as such a pledge thereof would violate the terms thereof or violate any law, rule or regulation, but only to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC, the Bankruptcy Code or any other applicable Law;

(i)        any "intent to use" trademark applications;

(j)        any assets to the extent a security interest in such assets would result in material adverse tax consequences as reasonably determined by Borrower Agent and Agent;

(k)        letter of credit rights with a value of less than $100,000 (except to the extent perfection can be accomplished through the filing of a UCC-1 financing statement);

(l)        commercial tort claims with a value of less than $100,000 (except to the extent perfection can be accomplished through the filing of a UCC-1 financing statement);

(m)        any acquired property (including property acquired through acquisition or merger of another entity) if at the time of such acquisition the granting of a security interest therein or the pledge thereof is prohibited by any permitted contract or other permitted agreement binding and relating to such property to the extent and for so long as such contract or other agreement prohibits such security interest or pledge and to the extent such prohibition is not created in contemplation of such acquisition;

(n)        Equity Interests of EGC Holdings, not-for-profit Subsidiaries, captive insurance companies and special purpose entities; and

(o)        (i) any contract, lease, license, permit or agreement of any Loan Party or (ii) any other asset of any Loan Party that is subject to Liens for Capital Lease Obligations or for purchase money Indebtedness or incurred in connection with a Permitted Acquisition (to the extent such Liens are permitted under this Agreement or the Loan Documents), in the case of each of clause (i) and clause (ii) above, to the extent the creation of a Lien on such assets would, under the express terms thereof, (A) result in a breach of the terms thereof or constitute a default thereunder, (B) require the consent, approval, license or authorization of a third party (other than a Loan Party) which has not been obtained (without any obligation of any Loan Party to obtain such  consent, approval, license or authorization) or (C) invalidate such contract, lease, license, permit, agreement, capital lease, purchase money Lien or arrangement or create a right of termination in favor of any third party thereunder (other than a Loan Party), in each case, other than to the extent any such term has been waived by the applicable party (without any obligation of the Loan Parties to obtain such waiver) or would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408, 9-409 or other applicable provisions of the UCC of any relevant jurisdiction or any other applicable Law, provided, that immediately upon the ineffectiveness, lapse or termination of any such express term, such assets shall automatically cease to constitute "Excluded Assets";

provided, that, notwithstanding the foregoing, (I) no such exclusion set forth above shall apply to the extent the prohibition is ineffective under applicable anti-assignment provisions of the UCC or other applicable Law and (II) Excluded Assets shall not include any proceeds in respect of the foregoing to the

extent restrictions on the assignment thereof would be rendered ineffective under applicable provisions of the UCC or other applicable Law.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party of, or the grant by such Guarantor of, a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such related Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" means with respect to Agent, any Lender, Participant, Swing Loan Lender, Issuing Bank or any other recipient of any payment to be made by or on account of any Obligations: (a) Taxes (i) imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Agent, Lender, Participant, Swing Loan Lender, Issuing Bank or other Person being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) any U.S. Federal withholding Taxes imposed under FATCA, (c) U.S. Federal withholding Taxes imposed on amounts payable to or for the account of Agent, Lender, a Participant, a Swing Loan a Lender, or Issuing Bank with respect to an applicable interest in a Revolving Loan or Commitment pursuant to a law in effect on the date on which (i) such Person acquires such interest in the Loan or Commitment or (ii) such Person changes its lending office, except in each case to the extent that, pursuant to Section 4.7, amounts with respect to such Taxes were payable either to such Person's assignor immediately before such Person acquired the applicable interest in a Revolving Loan or Commitment or to such Person immediately before it changed its lending office, and (d) Taxes attributable to such Person's failure to comply with Section 4.7.

"Family Member" means with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, qualified domestic partner, sibling, mother-in-law, father-in-law, son-in-law and daughter-in-law (including adoptive relationships) and any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the greater of: (i) the rate per annum of interest calculated and published on such day by the Federal Reserve Bank of New York (the "NYFRB") as the effective federal funds rate, as determined in such manner as the NYFRB shall set forth on its public website from time to time; and (ii) 0.38%.

"Federal Funds Effective Rate Loans" means any Advance or portion thereof on which interest is payable based on the Federal Funds Effective Rate in accordance with the terms of this Agreement.

"Foreign Subsidiary" shall mean any Subsidiary of any Person that is not organized or incorporated in the United States, any State thereof or the District of Columbia.

"FSHCO" shall mean any direct or indirect Subsidiary of EGC that has no material assets other than equity (including any debt instrument treated as equity for U.S. federal income tax purposes) or equity and debt of one or more direct or indirect Foreign Subsidiaries that are CFCs or intercompany accounts related thereto.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national body exercising such function, such as the European Union or the European Central Bank).

"Guarantors" means, collectively and individually, EGC Holdings and any other Person guaranteeing the Obligations from time to time.

"Guaranty Agreements" means, collectively and individually, each guaranty agreement executed by a Guarantor in favor of Agent, for the benefit of itself and the Lenders, as the same may be modified, amended, supplemented or restated from time to time.

"Guaranty Obligations" means, with respect to any Person, without duplication, any obligations of such Person (other than endorsements in the ordinary course of business of negotiable instruments for deposit or collection) guaranteeing or intended to guarantee any Indebtedness of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting security therefor, (b) to advance or provide funds or other support for the payment or purchase of any such Indebtedness or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, keep-well agreements, maintenance agreements, comfort letters or similar agreements or arrangements) for the benefit of any holder of Indebtedness of such other Person, (c) to lease or purchase property, securities or services primarily for the purpose of assuring the holder of such Indebtedness, or (d) to otherwise assure or hold harmless the holder of such Indebtedness against loss in respect thereof. The amount of any Guaranty Obligation hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum principal amount, if larger) of the Indebtedness in respect of which such Guaranty Obligation is made.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedge Agreement" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Indebtedness" means, with respect to any Person, without duplication, all of the following (whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, or joint or several): (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid or accrued, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person, (e) all obligations of such Person issued or assumed as the deferred purchase price of property or services purchased by such Person, and including, without limitation, customary indemnification, adjustment of purchase price or similar obligations, earn-outs or other similar obligations, (but excluding trade debt and accrued expenses incurred in the ordinary course of business and not overdue by more than ninety (90) days), (f) all obligations of such Person under take-or-pay or similar arrangements or under commodities agreements, (g) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any security interest in, lien or other encumbrance upon, or payable out of the proceeds of production from property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (h) all Guaranty Obligations of such Person with respect to Indebtedness of another Person, (i) the principal portion of all Capital Lease Obligations of such Person, (j) all obligations of such Person under Hedge Agreements, (k) the maximum amount of all standby letters of credit issued or bankers' acceptances facilities created for the account of such Person and, without duplication, all drafts drawn thereunder (to the extent unreimbursed), (l) all preferred Equity Interests issued by such Person and which by the terms thereof could be (at the request of the holders thereof or otherwise) subject to mandatory sinking fund payments, redemption or other acceleration prior to the date which is ninety-one (91) days after the Maturity Date, (m) the principal balance outstanding under any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product and (n) the Indebtedness of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent such Person is liable for such Indebtedness.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Loan Parties under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Insolvency Event" shall mean, with respect to any Person, including without limitation any Lender, such Person or such Person's direct or indirect parent company (a) becomes the subject of a bankruptcy or insolvency proceeding (including any proceeding under Title 11 of the United States Code), or regulatory restrictions, (b) has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it or has called a meeting of its creditors, (c) admits in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (d) with respect to a Lender, such Lender is unable to perform hereunder due to the application of applicable Law, or (e) in the good faith determination of Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment of a type described in clauses (a) or (b), provided, that an Insolvency Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person or such Person's direct or indirect parent company by a Governmental Authority or instrumentality thereof if, and only if, such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the

United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Intangible Assets" means all assets which would be classified as intangible assets under GAAP, including goodwill, patents, trade names, trademarks, copyrights, and franchises; provided, that, no assets belonging to WITHit shall constitute "Intangible Assets".

"Intellectual Property" means any Person's now owned and hereafter arising or acquired: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable Law with respect to such Person's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship; software and contract rights relating to computer software programs, in whatever form created or maintained.

"Intellectual Property Security Agreement" means any copyright security agreement executed and delivered any Loan Party and Agent, any patent security agreement executed and delivered by any Loan Party and Agent, any trademark security agreement executed and delivered by any Loan Party and Agent, in each case, in such form as is satisfactory to Agent.

"Interest Payment Date" means the first Business Day of each calendar month while such Loan is outstanding.

"Interest Rate" means (a) subject to clause (b) of this definition below: (i) as to Prime Rate Loans, a rate equal to the then Applicable Margin for Prime Rate Loans on a per annum basis plus the Prime Rate, and (ii) ) as to Federal Funds Effective Rate Loans, a rate equal to the then Applicable Margin for Federal Funds Effective Rate Loans on a per annum basis plus the Federal Funds Effective Rate, and (b) notwithstanding anything to the contrary contained herein, to the extent provided for herein, the Default Rate.  Agent may, at its option, increase the Interest Rate to the Default Rate for Revolving Loans at any time outstanding in excess of the Borrowing Base (in each case whether or not such excess(es) arise or are made with or without the knowledge or consent of Agent and whether made before or after an Event of Default).

"Inventory" means "inventory" as defined in Article 9 of the UCC and includes all now owned and hereafter existing or acquired goods, wherever located, which (a) are held for sale or lease or to be furnished under a contract of service; (b) are furnished under a contract of service; or (c) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

"Investment" shall have the meaning set forth in Section 9.5.

"Issuing Bank" means (a) Agent in its capacity as the issuer of Letters of Credit under this Agreement and (b) any other Person, which Agent in its discretion shall designate as the issuer of and cause to issue any particular Letter of Credit under this Agreement in place of Agent as issuer.

"Joinder Agreement" means a joinder agreement in substantially the form attached hereto as Exhibit E.

"Law(s)" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Authority, foreign or domestic.

"LC Collateral Account" shall have the meaning set forth in Section 2.2(i).

"Letter of Credit Documents" means, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any collateral security for such obligations.

"Letter of Credit Limit" means $5,000,000.

"Letter of Credit Obligations" means, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, plus, (b) without duplication, the aggregate amount of all drawings under Letters of Credit for which Issuing Bank has not at such time been reimbursed.

"Letter(s) of Credit" means all letters of credit issued by Issuing Bank for the account of any Borrower pursuant to this Agreement, and all amendments, renewals, extensions or replacements thereof.

"Lenders" means the term as defined in the preamble hereto.

"Lien" any mortgage, pledge, hypothecation, assignment (as security), deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest, or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"Loan Documents" means, collectively, this Agreement, each Guaranty Agreement, the Deed of Undertaking and all notes, guarantees, intercreditor agreements and all other agreements, documents and instruments now or at any time hereafter executed and/or delivered by a Loan Party in connection with this Agreement; provided, that, the Loan Documents shall not include Bank Product Agreements.

"Loan Party" or "Loan Parties" means, individually and collectively, Borrowers and the Guarantors; except, that, EGC Holdings and Clarity shall not be Loan Parties hereunder.

"Loans" means the Revolving Loans, and the Swing Loans.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities, results of operations, property or financial condition of the Loan Parties, taken as a whole; (b) the ability of the Loan Parties to perform their obligations, when such obligations are required to be performed under this Agreement or any of the other Loan Documents; (c) the validity or enforceability of this Agreement or any of the other Loan Documents; (d) the rights or remedies of Agent and Lenders

hereunder or (e) the perfection or priority of any security interest or lien in favor of Agent for the ratable benefit of Agent and the Lenders.

"Material Contract" means (a) any contract or other agreement (other than the Loan Documents and Bank Product Agreements), written or oral, of any Loan Party involving monetary liability of or to any Person in an amount in excess of $500,000 on average per fiscal year for the life of such contract (but excluding for this purpose contracts or other agreements for the purchase and sale of goods or services where the other party thereto has no obligation to purchase or sell such goods or services under such contract or other agreement) and (b) any other contract or other agreement (other than the Loan Documents and Bank Product Agreements), whether written or oral, to which any Loan Party is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto has or could reasonably be expected to have a Material Adverse Effect.

"Material Indebtedness" means Indebtedness (other than the Advances or obligations in respect of one or more Bank Product Agreements), of Loan Parties in an aggregate principal amount exceeding $500,000.

"Maturity Date" means ~~February 27, 2026.~~the earliest to occur of (a) the date which is seventy-five (75) days after the Petition Date, (b) the acceleration of the Loans and the termination of the Commitments in accordance with this Agreement, (c) the consummation of the Sale and (d) dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code.

"Maximum Revolving Credit" means, (a) during the period commencing on July 1, 2025 through February 27, 2026, $29,000,000, and (b) at all other times, $25,000,000.

"Maximum Swing Loan Advance Amount" shall mean $2,500,000.

"Maximum Undrawn Amount" shall mean, with respect to any outstanding Letter of Credit as of any date, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Interest Rate" means the maximum non-usurious rate of interest under applicable Federal or state law as in effect from time to time that may be contracted for, taken, reserved, charged or received in respect of the indebtedness of Borrowers to Agent and Lenders, or to the extent that at any time such applicable Law may thereafter permit a higher maximum non-usurious rate of interest, then such higher rate.

"Multiemployer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the immediately preceding six (6) years contributed to by any Loan Party or any ERISA Affiliate or with respect to which such Loan Party or any ERISA Affiliate may incur any liability.

"Net Cash Proceeds" means the aggregate cash proceeds received by any Loan Party in respect of any sale, lease, transfer or other disposition of any assets or properties, or interest in assets and properties or as proceeds of any loans or other financial accommodations provided to it or as proceeds from the issuance and/or sale of any Equity Interests or Indebtedness, in each case net of the reasonable and customary direct costs relating to such sale, lease, transfer or other disposition or loans or other financial accommodation or issuance and/or sale (including, without limitation, legal, accounting and investment banking fees, and sales commissions) and taxes paid or payable as a result thereof and in the

case of a sale of any assets or properties or interest in assets and properties, amounts applied to the repayment of Indebtedness secured by a valid and enforceable lien (other than a lien created under the Loan Documents) on the asset or assets that are the subject of such sale or other disposition required to be repaid in connection with such transaction.

"Net Income" means, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (excluding to the extent included therein (i) any extraordinary, one-time or non-recurring gains and (ii) extraordinary, one-time or non-recurring non-cash losses or charges), and after deducting the Provision for Taxes for such period, all as determined in accordance with GAAP; provided, that, (a) the net income of any Person that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a Subsidiary of such Person; (b) except to the extent included pursuant to the foregoing clause, the net income of any Person accrued prior to the date it becomes a Subsidiary of such Person or is merged into or consolidated with such Person or any of its Subsidiaries or that Person's assets are acquired by such Person or by any of its Subsidiaries shall be excluded; (c) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded.  For the purposes of this definition, net income excludes any gain and non-cash loss together with any related Provision for Taxes for such gain and non-cash loss realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to Sale and Leaseback Transactions) or of any Equity Interests of such Person or a Subsidiary of such Person, and any net income or non-cash loss realized as a result of changes in accounting principles or the application thereof to such Person and any net income realized as the result of the extinguishment of debt.

"Net Recovery Percentage" means the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the applicable Inventory at such time on a net orderly liquidation value basis as set forth in the most recent satisfactory appraisal of such Inventory received by Agent net of operating expenses, liquidation expenses and customary commissions, and (b) the denominator of which is the applicable original cost of the aggregate amount of such Inventory subject to appraisal.

"Net Worth" means, as of any date of determination, the consolidated Stockholders' equity of any Person and its Subsidiaries, determined in accordance with GAAP.

"Ninth Amendment Effective Date" shall have the meaning assigned to such term in the Ninth Amendment to Credit and Security Agreement, dated as of June 30, 2025, by and among Borrower, the Lenders and Agent.

"Non-Funding Lender" means the Lender defined in Section 12.9(a)(ii).

"Notice of Borrowing" means a notice substantially in the form of Exhibit G.

"Obligations" means any and all Advances, Bank Product Obligations and all other obligations, liabilities and indebtedness of every kind, nature and description owing by Loan Parties to Agent, Lenders, Swing Loan Lender and Issuing Bank (or in the case of Bank Product Agreements, Affiliates of Agent, Swing Loan Lender and Lenders), including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under any of

the Loan Documents or the Bank Product Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured. Notwithstanding anything to the contrary contained in the foregoing, the Obligations shall not include any Excluded Swap Obligations.

"Organization Documents" means, with respect to any Person, any charter, articles or certificate of incorporation, certificate of organization, registration or formation, certificate of partnership or limited partnership, bylaws, operating agreement, limited liability company agreement, or partnership agreement of such Person and any and all other applicable documents relating to such Person's formation, organization or entity governance matters (including any shareholders' or equity holders' agreement or voting trust agreement) and specifically includes, without limitation, any certificates of designation for preferred stock or other forms of preferred equity.

"Other Connection Taxes" means with respect to any secured party, Taxes imposed as a result of a present or former connection between such secured party and the jurisdiction imposing such Tax (other than connections arising from such secured party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Advance or Loan Document).

"Other Taxes" means present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies of the United States or any political subdivision thereof or any applicable foreign jurisdiction, and all liabilities with respect thereto, in each case arising from any payment made hereunder or under any of the other Loan Documents or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any of the other Loan Documents, except any Taxes that are Other Connection Taxes with respect to an assignment.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

~~"Payment Conditions" means with respect to any specified transaction, that: (a) on the date of such transaction, no Event of Default shall exist or have occurred and be continuing, and no Event of Default shall occur after giving effect to such transaction, (b) on the date of such transaction, after giving pro forma effect to such transaction, the sum of (i) the Agent Account Balance and (ii) Excess Availability shall not be less than $1,500,000, (c) the Loan Parties shall have had a cumulative Net Income of at least $0 for the last twelve (12) months for which financial statements have been delivered pursuant to clause (b) of Schedule 8.1 annexed hereto, on a pro forma basis as though such proposed transaction and any other material transaction which occurred since the start of such twelve (12) month period, had occurred on the first day of such twelve (12) month period and (d) the Loan Parties shall have had a Tangible Net Worth of at least $25,00,000 as reflected in the most recent financial statements delivered under clause (b) of Schedule 8.1 annexed hereto, on a pro forma basis as though such proposed transaction and any other material transaction which occurred since the date of such financial statements, had occurred immediately on the last day of the period covered by such financial statements.~~

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which any Loan Party sponsors, maintains, or to which any Loan Party or an ERISA Affiliate makes, is making, or is obligated to make contributions, other than a Multiemployer Plan.

"Permitted Acquisitions" shall mean acquisitions of the assets or Equity Interests of another Person (the "Target") so long as:

(a) no Loan Party shall, as a result of or in connection with any such acquisition, assume or incur any direct or contingent liabilities (whether relating to environmental, tax, litigation, or other matters) that could reasonably be expected to result in liability in excess of $250,000 in the aggregate;

(b) on the date of any such acquisition and after giving effect thereto, no Event of Default shall exist or have occurred and be continuing, all of the other Payment Conditions have been satisfied with respect to such acquisition at the time of such acquisition and after giving effect thereto, and the total costs and liabilities (including without limitation, the purchase price for such acquisition, all assumed Indebtedness, all earn out payments, all deferred payments and the value of any other stock or assets transferred, assigned or encumbered with respect to such acquisitions) of such acquisition, together with all acquisitions made at any time that the Payment Conditions are not satisfied, does not exceed $2,500,000 in the aggregate prior to the Maturity Date;

(c) the Target or a material portion of the assets acquired are used or useful in Borrowers' ordinary course of business;

(d) Agent shall have received a first priority Lien (subject to Permitted Liens) in all acquired assets or Equity Interests which do not constitute Excluded Assets, subject to documentation reasonably satisfactory to Agent;

(e) the board of directors (or other comparable governing body) of the Target shall have duly approved the acquisition;

(f) Agent shall have received a quality of earnings report if prepared in connection with such acquisition;

(g) Agent shall have received notice of and a description of the acquisition, and, if requested by Agent and solely to the extent received by or available to the Loan Parties, Agent shall have received: (i) copies of the material acquisition documents, (ii) a pro forma balance sheet and pro forma financial statements, (iii) historical financial statements of the Target, and/or (iv) any diligence memoranda and other third party reports prepared or received by the Loan Parties in connection with such acquisition; and

(h) no assets acquired in any such acquisition shall be included in the Borrowing Base until Agent has received a field examination and/or appraisal of such assets, in form and substance acceptable to Agent.

"Permitted Discretion" means as used in this Agreement with reference to Agent, a determination made in good faith in the exercise of its reasonable business judgment based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.

"Permitted Dispositions" means each of the following:

(a) sales and leasing of Inventory in the ordinary course of business;

(b) the sale or other disposition of used, worn-out, obsolete machinery, equipment and interests in real property or machinery, equipment and interests in real property no longer used or useful in the conduct of the business of Borrowers;

(c) the sale of Accounts in connection with the collection or compromise thereof in the ordinary course of business;

(d) the issuance of Equity Interests of any Loan Party consisting of common stock pursuant to an employee stock option or grant or similar equity plan or 401(k) plans of any Loan Party for the benefit of its employees, directors and consultants; provided, that, in no event shall a Loan Party be required to issue, or shall a Loan Party issue, Equity Interests pursuant to such stock plans or 401(k) plans which would result in a Change of Control or other Default or Event of Default;

(e) the abandonment or other disposition of Intellectual Property that is not material and is no longer used or useful in any material respect in the business of Borrowers and does not appear on is or otherwise not affixed to or incorporated in any Inventory or necessary in connection with the Records or have any material value;

(f) any transfer of property or assets, or issuance of Equity Interests, that is a Restricted Payment permitted under Section 9.8, or Permitted Investment permitted under Section 9.5 or a Sale and Leaseback Transaction permitted under Section 9.12;

(g) the transfer of cash for the payment of Indebtedness to the extent such payments are permitted hereunder, for the payment of other payables in the ordinary course of the business of the Loan Parties and to make payments in connection with any other transaction not prohibited hereunder;

(h) sales or other dispositions of assets of Borrowers not otherwise subject to the provisions set forth in this definition, provided, that, as to any such sale or other disposition, each of the following conditions is satisfied: (i) not less than seventy five percent (75%) of the consideration to be received by Borrowers shall be paid or payable in cash or cash equivalents and shall be paid contemporaneously with consummation of the transaction; (ii) the consideration paid or payable shall be in an amount not less than the fair market value of the property disposed of; (iii) such transaction does not involve the sale or other disposition of any Accounts or Inventory which are given credit in the Borrowing Base whose value exceeds $50,000; (iv) the Net Cash Proceeds of Accounts and Inventory which are given credit in the Borrowing Base any such sale or other disposition, shall be applied to the Obligations (without permanent reduction thereof); and (v) as of the date of any such sale or other disposition, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(i) the transfer or other disposition of Transferable Assets; provided, that, no more than 30 and no less than 10 days prior to any Asset Disposition of any Transferable Assets, Borrowers shall provide Agent with a balance sheet prepared by a certified public accountant on a *pro forma* basis after giving effect to the transfer of the applicable Transferable Assets confirming that, on such *pro forma* basis, Borrowers are in compliance with the Tangible Net Worth covenant set forth in Section 10.2 of this Agreement;

(j) the transfer of assets from one Loan Party to another Loan Party;

(k) the disposition of cash equivalents;

(l) non-exclusive licensing or sublicensing of Intellectual Property in the ordinary course of business;

(m) sales or other dispositions of assets of Borrowers not otherwise subject to the provisions set forth in this definition; provided, that, (A) the aggregate value of the assets subject to such dispositions does not exceed $250,000 during any fiscal year of the Loan Parties and (B) the Net Cash Proceeds of Accounts and Inventory which are given credit in the Borrowing Base any such sale or other disposition, shall be applied to the Obligations (without permanent reduction thereof); and

(n) liquidations or dissolutions of any Subsidiary of a Borrower if the Person that owns such Subsidiary determines in good faith that such liquidation or dissolution is not materially disadvantageous to the Lenders.

"Permitted Holders" means: (a) (1) Barbara Weichselbaum, (2) Sidney Gluck, (3) Rose Friedman, (b) after the completion by Agent of background investigations and "KYC" and other regulatory reviews of any such Family Member proposed to be a Permitted Holder, the results of which shall be satisfactory to Agent any Family Member of the foregoing Persons listed in clauses (a)(1) through (a)(3) and (c) the ESOP.

"Permitted Indebtedness" means:

(a) the Obligations (excluding Obligations under Hedge Agreements permitted pursuant to clause (c) below);

(b) Indebtedness (including Capital Lease Obligations) arising after the Closing Date to the extent secured by security interests in Equipment and mortgages on Real Property acquired after the Closing Date in an aggregate outstanding principal amount not to exceed $500,000 at any time; provided, that, (i) such security interests and mortgages do not apply to any property of any Loan Party other than specific items of Equipment or Real Property and (ii) the Indebtedness secured thereby does not exceed the cost of the applicable Equipment or Real Property, as the case may be;

(c) Indebtedness of Borrowers entered into in the ordinary course of business pursuant to a Hedge Agreement; provided, that, (i) such arrangements are not for speculative purposes, and (ii) such Indebtedness shall be unsecured, except to the extent such Indebtedness constitutes part of the Obligations arising under or pursuant to Hedge Agreements with Agent or Lenders (or their respective Affiliates) that are secured under the terms of this Agreement;

(d) Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, that, such Indebtedness is extinguished within five (5) Business Days of incurrence;

(e) Guaranty Obligations in respect of Indebtedness to the extent that such Indebtedness is otherwise permitted pursuant to this definition of Permitted Indebtedness;

(f) Indebtedness of Borrowers in respect of bid, payment and performance bonds, customs bonds, surety bonds, appeal bonds, workers' compensation claims, unemployment insurance,

health, disability and other employee benefits or property, casualty or liability insurance, or guarantees of the foregoing types of Indebtedness, in the ordinary course of business;

(g) Refinancing Indebtedness;

(h) the Indebtedness set forth in Schedule 9.1 that is not otherwise permitted by the other clauses of this definition;

(i) intercompany Indebtedness amongst the Loan Parties or owed by a Loan Party to a Subsidiary; provided, that, (i) such Indebtedness shall be unsecured, and (ii) any such Indebtedness owed by a Loan Party to a Subsidiary that is not a Loan Party shall be subordinated to the Obligations on terms and conditions reasonably satisfactory to Agent;

(j) Indebtedness of any Person that becomes a Loan Party after the Closing Date and any Indebtedness assumed in connection with a Permitted Acquisition; provided, that, such Indebtedness exists at the time such Person becomes a Loan Party or the time of such Permitted Acquisition and such Indebtedness is not created in contemplation of or in connection with such Person becoming a Loan Party or such Permitted Acquisition;

(k) Indebtedness consisting of the financing of insurance premiums;

(l) Indebtedness representing deferred compensation to directors, officers, employees, members of management and consultants of the Loan Parties in the ordinary course of business

(m) Indebtedness arising from agreements of the Loan Parties providing for indemnification, adjustment of purchase, deferred compensation or acquisition price or similar obligations (including earn outs), in each case, incurred or assumed in connection with any Permitted Acquisition, other Investments or any disposition not prohibited by this Agreement;

(n) Indebtedness pursuant to corporate and employee credit card programs incurred in the ordinary course of business; and

(o) any other Indebtedness not otherwise permitted under the foregoing clauses in an aggregate outstanding amount not to exceed $500,000 at any time.

"Permitted Investments" means each of the following:

(a) Investments consisting of Accounts owing to Borrowers if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms;

(b) the endorsement of instruments for collection or deposit in the ordinary course of business;

(c) Investments in cash or cash equivalents;

(d) deposits of cash for leases, utilities, worker's compensation and similar matters in the ordinary course of business;

(e) obligations under Hedge Agreements permitted under clause (c) of the definition of Permitted Indebtedness;

(f) payroll, travel, commission and similar advances to cover matters that in good faith are expected at the time of such advances to be treated as expenses for accounting purposes in accordance with GAAP and that are made in the ordinary course of business;

(g) loans and advances by Borrowers to directors, officers and employees of Borrowers in the ordinary course of business for bona fide (including, without limitation, in connection with the purchase of Equity Interests by such directors, officers and employees) business purposes in a principal amount not in excess of $250,000 in the aggregate at any one time outstanding;

(h) stock or obligations issued to Borrowers by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to Borrowers in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person;

(i) obligations of account debtors to Borrowers arising from Accounts that are past due evidenced by a promissory note made by such account debtor payable to Borrowers;

(j) Investments consisting of loans and advances set forth on Schedule 9.5 that are not otherwise permitted by the other clauses of this definition

(k) Investments made by a Loan Party in any other Loan Party;

(l) Investments by any Loan Party in Equity Interests in Persons who become Loan Parties in connection with such Investment in connection with a Permitted Acquisition;

(m) Prepayments made in the ordinary course of business;

(n) Investments of any Person existing at the time such Person becomes a Loan Party or consolidates or merges with a Loan Party in connection with a Permitted Acquisition so long as such Investments were not made in contemplation of such Person becoming a Loan Party or of such merger;

(o) Investments received in connection with a disposition of assets permitted by clause (h) of the definition of "Permitted Disposition";

(p) Permitted Acquisitions;

(q) Investments with (x) the proceeds of equity contributions received by EGC or (y) the proceeds of the issuance of Equity Interests of EGC, that do not constitute Indebtedness;

(r) Investments made by assigning or contributing Transferable Assets; provided, that, no more than 30 and no less than 10 days prior to any Asset Disposition of any Transferable Assets, Borrowers shall provide Agent with a balance sheet prepared by a certified public accountant on a *pro forma* basis after giving effect to the transfer of the applicable Transferable Assets confirming that, on such *pro forma* basis, Borrowers are in compliance with the Tangible Net Worth covenant set forth in Section 10.2 of this Agreement;

(s) any other Investments, so long as the Payment Conditions shall have been satisfied with respect to any such Investment and no Cash Dominion Period is then in effect; and

~~(t) other Investments by any Loan Party in an aggregate amount not to exceed $250,000 at any one time outstanding; so long as on the date of any such Investment and after giving effect thereto, no Event of Default shall exist or have occurred and be continuing.~~

"Permitted Liens" means:

(a)    the security interests and liens of Agent for the ratable benefit of Agent and Lenders and the rights of setoff of Agent and Lenders provided for herein or under applicable Law;

(b)    liens securing the payment of Taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the applicable Loan Party, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(c)    non-consensual statutory liens (other than liens arising under ERISA or securing the payment of taxes) arising in the ordinary course of Loan Parties' business that do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's suppliers', repairmen's and mechanics' liens, to the extent: (i) such liens do not in the aggregate materially detract from the value of the property of Loan Parties and do not materially impair the use thereof in the operation of Loan Parties, (ii) such liens secure Indebtedness which is not overdue or is fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to the applicable Loan Party, in each case prior to the commencement of foreclosure or other similar proceedings, which proceedings (or orders entered in connection with such proceeding) have the effect of preventing the forfeiture or sale of the property subject to any such lien and with respect to which adequate reserves have been set aside on its books in accordance with GAAP;

(d)    zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of Loan Parties as presently conducted thereon or materially impair the value or marketability of the Real Property which may be subject thereto;

~~(e) security interests in Equipment and Real Property arising after the Closing Date to secure Indebtedness permitted under clause (b) of the definition of Permitted Indebtedness, whether such Indebtedness is assumed or incurred by a Loan Party;~~

(e)    [reserved];

(f)    pledges and deposits of cash by Loan Parties in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits;

(g)    pledges and deposits of cash by Loan Parties to secure (i) the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business or (ii) payment and performance bonds, customs bonds, surety bonds, appeal bonds in each case in the ordinary course of business;

(h)　　liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof and (ii) equipment or other materials which are not owned by a Loan Party located on the premises of a Loan Party (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and the precautionary UCC financing statement filings in respect thereof;

(i)　　statutory or common law liens or rights of setoff of depository banks with respect to funds of Loan Parties at such banks to secure fees and charges in connection with returned items or the standard fees and charges of such banks in connection with the Deposit Accounts maintained by a Loan Party at such banks (but not any other Indebtedness or obligations);

(j)　　judgments and other similar liens arising in connection with court proceedings that do not constitute an Event of Default, provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, (iii) a stay of enforcement of any such liens is in effect and (iv) Agent may establish a Reserve with respect thereto;

(k)　　leases or subleases of Real Property granted by Loan Parties in the ordinary course of business to any Person so long as any such leases or subleases do not interfere in any material respect with the ordinary conduct of the business of Loan Parties as presently conducted thereon;

(l)　　liens on goods in favor of customs and revenue authorities arising as a matter of law to secure custom duties in connection with the importation of such goods;

(m)　　the security interests and liens set forth on Schedule 9.2 which are not otherwise permitted under the other clauses of this definition and any security interests and liens to secure Refinancing Indebtedness of the Indebtedness secured by such security interests and liens to the extent permitted under the definition of Refinancing Indebtedness;

(n)　　other Liens incidental to the conduct of any Loan Party's business or the ownership of its property and assets which were not incurred in connection with the borrowing of money or the obtaining of advances or credit, and which do not in the aggregate materially detract from Agent's or Lenders' rights in and to the Collateral or the value of any Loan Party's property or assets or which do not materially impair the use thereof in the operation of any Loan Party's business;

(o)　　any Lien existing on any property or asset prior to the acquisition thereof by any Loan Party or existing on any property or asset of any Person that becomes a Loan Party after the date hereof prior to the time such Person becomes a Loan Party; provided, that (i) such Lien does not extend to the property of any Person other than the Person acquired or formed to make such acquisition and the subsidiaries of such Person (and the Equity Interests in such Person), except that individual financings otherwise permitted to be secured hereunder provided by one (1) Person (or its Affiliates) may be cross collateralized to other such financings provided by such Person (or its Affiliates), and (ii) such Lien is not created in contemplation of or in connection with such acquisition or assumption;

(p)　　any interest or title of a lessor, sublessor, licensor or sublicensee under any leases, subleases, licenses or sublicenses entered into by a Loan Party in the ordinary course of business;

(q)　　~~Liens (i) solely on any cash earnest money deposits or Permitted Investments made by a Loan Party in connection with any letter of intent or purchase agreement with respect to any~~

31

Permitted Acquisition or other Investment permitted hereunder and (ii) consisting of an agreement to dispose of any property in a Permitted Disposition;[reserved];

(r)      Liens on Equity Interests in joint ventures that are otherwise permitted hereunder securing obligations of such joint venture, as applicable and customary rights of first refusal and tag, drag and similar rights in joint venture agreements entered into in the ordinary course of business; and

(s)      Liens encumbering any Transferable Assets in favor of Morgan Stanley to secure the Liquidity Access Line described on Schedule 9.1.

"Permitted Payments" means each of the following:

(a) a Restricted Payment made by one Loan Party to another Loan Party;

(b) a Restricted Payment made by EGC to any parent of EGC to pay professional fees, franchise, excise and similar Taxes and other ordinary course of business operating expenses incurred by such parent solely in its capacity as a parent of EGC not to exceed $50,000 in the aggregate in any fiscal year, plus any costs and expenses incurred with respect to preparing and delivering the financial statements, reports and other deliverables required under Section 8.1;

(c) a Restricted Payment made with (x) the proceeds of equity contributions received by EGC or (y) the proceeds of the issuance of Equity Interests of EGC that do not constitute Indebtedness;

(d) repurchases or optional redemptions of Equity Interests issued by EGC or any direct or indirect parent thereof to directors, officers, employees and consultants, so long as (i) the aggregate amount of such repurchases and redemptions shall not exceed $250,000 in any fiscal year plus any repurchases, redemptions or other Restricted Payments legally required pursuant to the terms of the ESOP and (ii) on the date of any such repurchase or redemption, no Event of Default shall exist or have occurred and be continuing;

(e) Restricted Payments consisting of Transferable Assets; provided, that, no more than 30 and no less than 10 days prior to any Asset Disposition of any Transferable Assets, Borrowers shall provide Agent with a balance sheet prepared by a certified public accountant on a *pro forma* basis after giving effect to the transfer of the applicable Transferable Assets confirming that, on such *pro forma* basis, Borrowers are in compliance with the Tangible Net Worth covenant set forth in Section 10.2 of this Agreement;

(f) Restricted Payments consisting of the Equity Interests of EGC Holdings; and

(g) Restricted Payments not otherwise described above, so long as the Payment Conditions shall have been satisfied with respect to each such Restricted Payment and no Cash Dominion Period is then in effect.

"Person" or "person" means any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

"Pension Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which any Borrower sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or

in the case of a Multiemployer Plan has made contributions at any time during the immediately preceding six (6) plan years or with respect to which such Loan Party may incur liability.

"Petition Date" shall have the meaning set forth in the Ratification Agreement.

"Pledge Agreement" means that certain Collateral Assignment and Pledge of Time Deposit, dated as of March 27, 2025, made by Borrower in favor of Agent.

"Prepetition Obligations" shall have the meaning set forth in the Ratification Agreement.

"Prime Rate" means, for any day, a fluctuating rate per annum equal to the rate of interest in effect for such day as publicly announced from time to time by Agent as its "prime rate," whether or not such prime rate is the best rate available at it.  The "prime rate" is a rate set by Agent based upon various factors and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in such rate announced by Agent shall take effect at the opening of business on the day specified in the public announcement of such change. Notwithstanding anything to the contrary set forth herein, in no event shall the Prime Rate be less than 3.25%.

"Prime Rate Loans" means any Advances or portion thereof on which interest is payable based on the Prime Rate in accordance with the terms of this Agreement.

"Pro Rata Share" means with respect to all matters relating to any Lender having a Revolving Loan Commitment, such Lender's Revolving Loan Commitment Percentage.

"Protective Advances" shall have the meaning set forth in Section 12.9(g).

"Provision for Taxes" means an amount equal to all taxes imposed on or measured by net income, whether Federal, State, county or local, and whether foreign or domestic, that are paid.

"Qualified Assignee" means (a) Agent, any Lender, any Affiliate of Agent or any Lender and, with respect to any Lender that is an investment fund that invests in commercial loans, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor, and (b) means any Person (other than a natural person) that is or will be engaged in making, purchasing, holding or investing in one or more debt securities, bank loans, other commercial loans, or other similar extensions of credit in the ordinary course of business, and which Person either: (i) is administered, managed, advised or underwritten by (1) a Lender or Agent, (2) an Affiliate of a Lender or Agent, or (3) an entity or an Affiliate of an entity that administers, manages, advises or underwrites a Lender; or (ii) purchases, holds or invests in, or was formed for the purpose of purchasing, holding or investing in, one or more debt securities, bank loans, other commercial loans, or other similar extensions of credit originated by (a) a Lender or (b) an Affiliate of a Lender or Agent; provided, that no Person determined by Agent to be acting in the capacity of a vulture fund or distressed debt purchaser shall be a Qualified Assignee, and no Person or Affiliate of such Person (other than a Person that is already a Lender) holding Indebtedness subordinated to the Obligations of Loan Parties to Agent and Lenders or holding any Equity Interests issued by a Loan Party shall be a "Qualified Assignee".

"Qualified ECP Loan Party" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant guaranty, keepwell, or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations

promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Ratification Agreement" means, that certain Ratification and Amendment Agreement, dated as of November 30, 2025, by and among Agent, the Lenders and Debtor, as the same now exists and as may be hereafter amended, modified, supplemented, extended or renewed.

"Ratification Effective Date" has the meaning set forth in the Ratification Agreement.

"Real Property" means all now owned and hereafter acquired real property of a Loan Party, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

"Records" means all present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any account debtor, together with the tapes, disks, diskettes and other data and software storage media and devices, file cabinets or containers in or on which the foregoing are stored (including any rights with respect to the foregoing maintained with or by any other Person).

"Refinanced Obligations" shall have the meaning assigned to such term in the definition of "Refinancing Indebtedness".

"Refinancing Indebtedness" means Indebtedness of Borrowers arising after the Closing Date issued in exchange for, or the proceeds of which are used to extend, refinance, replace or substitute for other Indebtedness (such extended, refinanced, replaced or substituted Indebtedness, the "Refinanced Obligations") to the extent permitted hereunder; provided, that: (a) Agent shall have received not less than five (5) Business Days' prior written notice of the intention to incur such Indebtedness, which notice shall set forth in reasonable detail reasonably satisfactory to Agent the amount of such Indebtedness, the schedule of repayments and maturity date with respect thereto and such other information with respect thereto as Agent may reasonably request; (b) the principal amount of such Refinancing Indebtedness shall not exceed the principal amount of the Refinanced Obligations (plus the amount of reasonable refinancing fees and expenses incurred in connection therewith), any prepayment premiums and any accrued interest on account thereof; (c) such Indebtedness shall have a final maturity that is no earlier than the final maturity of the Refinanced Obligations; (d) such Indebtedness shall have a Weighted Average Life to Maturity not less than the Weighted Average Life to Maturity of the Refinanced Obligations; (e) such Indebtedness shall rank in right of payment no more senior than, and be subordinated (if subordinated) to the Obligations on terms no less favorable to Borrowers than the Refinanced Obligations; (f) if the Refinanced Obligations or any guarantees thereof are unsecured, such Indebtedness and any guarantees thereof shall be unsecured; (g) if the Refinanced Obligations or any guarantees thereof are secured, such Indebtedness and any guarantees thereof shall be secured in all material respects by substantially the same or less collateral as secured such Refinanced Obligations or any guarantees thereof; (h) if the Refinanced Obligations or any guarantees thereof are secured, the liens to secure such Indebtedness shall not have a priority more senior than the liens securing the Refinanced Obligations and if subordinated to any other liens on such property, shall be subordinated to Agent's security interests; (i) if the Refinanced Obligations or any guarantees thereof are subordinated to any Indebtedness of Borrowers other than the Obligations, such Refinancing Indebtedness and any guarantees thereof shall be subordinated to the Obligations on terms (including intercreditor terms) no less favorable to Agent and Lenders; (j) the obligors in respect of the Refinanced Obligations immediately prior to such refinancing, refunding, extending, renewing or replacing thereof shall be the only obligors on such Indebtedness; and (k) the terms and conditions (excluding as to pricing, premiums and optional

prepayment or redemption provisions) of any such Indebtedness, taken as a whole, are not more restrictive with respect to Borrowers, as reasonably determined by Borrowers in good faith, than the terms and conditions of the Refinanced Obligations.

"Register" shall have the meaning set forth in Section 12.1.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Reportable Compliance Event" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

"Required Lenders" means the shall mean Lenders (not including Swing Loan Lender (in its capacity as such Swing Loan Lender) or any Defaulting Lender) holding at least fifty-one percent (51%)] of either (a) the aggregate of the Revolving Commitment Amounts of all Lenders (excluding any Defaulting Lender), or (b) after the termination of all commitments of Lenders hereunder, the sum of (x) the outstanding Revolving Advances, Swing Loans, plus the aggregate amount of outstanding Letter of Credit Obligations; provided, however, if there are fewer than three (3) Lenders, Required Lenders shall mean all Lenders (excluding any Defaulting Lender).

"Rescindable Amount" shall have the meaning set forth in Section 4.10(f).

"Reserves" means as of any date of determination, such amounts as Agent may from time to time establish and revise in its Permitted Discretion reducing the amount of Revolving Loans and Letters of Credit which would otherwise be available to Borrowers under the lending formula(s) provided for herein:  (a) to reflect events, conditions, contingencies or risks which, as determined by Agent in its Permitted Discretion, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations, its value or the amount that might be received by Agent from the sale or other disposition or realization upon such Collateral, or (ii) the assets or business of Borrowers or (iii) the security interests and other rights of Agent in the Collateral (including the enforceability, perfection and priority thereof) or (b) to reflect Agent's good faith belief that any collateral report or financial information furnished by or on behalf of Borrowers to Agent is or may have been incomplete, inaccurate or misleading in any material respect or (c) in respect of any Default or an Event of Default; or (d) to reflect the extent that Borrower's bad debt write-downs, discounts, returns, promotions, credits, credit memos and other cash reductions with respect to Accounts exceed 5.0% of the gross face amount of such Accounts, as calculated on a trailing twelve month basis; ~~provided, that in no event shall Agent establish reserves for such dilution during the first six (6) months following the Closing Date~~ or (e) to reflect all amounts owing by a Borrower to any freight forwarder, customs broker or other Person who possesses any Collateral or could assert a Lien on any Collateral as reflected as a percentage of Inventory value in the most recent Inventory appraisal accepted by Agent~~; provided, that in no event shall Agent establish reserves for such amounts owing to any freight forwarder, customs broker or other such Person during the first six (6) months following the Closing Date~~ or (f) the Carve Out or (g) any unpaid administrative expense claims of the Borrower or other priority claims in the Chapter 11 Case that, in Agent's determination, may require payment prior to the payment in full of all Obligations.  To the extent that such Reserve is in respect of amounts that may be

payable to third parties Agent may, at its option, deduct such Reserve from the Maximum Revolving Credit at any time that such limit is less than the amount of the Borrowing Base.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer, or assistant treasurer of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any (a) dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of a Loan Party, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to a Loan Party's stockholders, partners or members (or any equivalent Person), or payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire any Equity Interests of a Loan Party, or any setting apart of funds or property for any of the foregoing, and (b) the payment by a Loan Party of any management, advisory or consulting fee to any Person or the payment of any extraordinary salary, bonus or other form of compensation to any Person who is directly or indirectly a significant partner, shareholder, owner or executive officer of any such Person, to the extent such extraordinary salary, bonus or other form of compensation is not included in the corporate overhead of Loan Parties.

"Revolving Loan Commitment" shall mean, as to any Lender, the obligation of such Lender (if applicable), to make Revolving Loans and participate in Swing Loans and Letters of Credit, in an aggregate principal and/or face amount not to exceed the Revolving Loan Commitment Amount (if any) of such Lender.

"Revolving Loan Commitment Amount" shall mean, (i) as to any Lender other than a New Lender, the Revolving Loan Commitment amount (if any) set forth below opposite such Lender's name on Schedule 1.1 or in the Assignment Agreement pursuant to which such Lender became a party hereto after the Closing Date and (ii) as to any Lender that is a New Lender, the Revolving Loan Commitment amount provided for in the joinder signed by such New Lender under Section 2.4(a)(x), in each case as the same may be adjusted upon any increase by such Lender pursuant to Section 2.4, or any Assignment Agreement by or to such Lender pursuant to Section 12.1.

"Revolving Loan Commitment Percentage" shall mean, (i) as to any Lender other than a New Lender, the Revolving Loan Commitment percentage (if any) set forth below opposite such Lender's name on Schedule 1.1 or in the Assignment Agreement pursuant to which such Lender became a party hereto and (ii) as to any Lender that is a New Lender, the Revolving Loan Commitment Percentage provided for in the joinder signed by such New Lender under Section 2.4(a)(x), in each case as the same may be adjusted upon any increase in the Maximum Revolving Credit pursuant to Section 2.4, or any assignment by or to such Lender pursuant to Section 12.1.

"Revolving Loan Notes" shall have the meaning as defined in Section 2.1.

"Revolving Loans" means loans now or hereafter made by Lenders on a revolving basis pursuant to the Credit Facility (involving advances, repayments and readvances) as set forth in Section 2.1.

"Sale" shall have the meaning set forth in the Ratification Agreement.

"Sale and Leaseback Transaction" shall have the meaning set forth in Section 9.12.

"Sanctioned Country" shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

"Sanctioned Person" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

"Settlement Date" shall have the meaning as defined in Section 12.9(a)(ii).

"Solvent" means, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business, and (b) the assets and properties of such Person at a fair valuation (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities computed at the amount which, such person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

"Specified Cash Collateral" means the amount of cash deposited into Borrower's account no. 30000125309 on or about the Ninth Amendment Effective Date and pledged to Agent pursuant to the Pledge Agreement. For the avoidance of doubt, the Specified Cash Collateral shall not include any amounts deposited in such account prior to the Ninth Amendment Effective Date.

"Specified Loan Party" means a Loan Party that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 4.10).

"Standby Letter of Credit" means all Letters of Credit other than Commercial Letters of Credit.

"Stockholder" means, with respect to any Person, each holder of Equity Interests of such Person.

"Subordinated Debt" means any Indebtedness of a Loan Party that is subject to, and subordinate in right of payment to, the right of Agent for the ratable benefit of Agent and Lenders to receive payment in full of all of the Obligations and is otherwise on terms (including maturity, interest, fees, repayment, covenants and subordination) satisfactory to Agent.

"Subordination Agreements" means, collectively and individually, any subordination agreement executed after the Closing Date relating to Subordinated Debt, in form and substance reasonably satisfactory to Agent, as the same may be modified or amended from time to time.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Equity Interests or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Equity Interests of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other

controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swing Loan Lender" shall mean Israel Discount Bank of New York, in its capacity as lender of the Swing Loans.

"Swing Loan Note" shall mean the promissory note described in Section 2.5(a).

"Swing Loans" shall mean the Advances made pursuant to Section 2.5.

"Tangible Net Worth" means, for Loan Parties, on a consolidated basis, as of any date, the sum of, without duplication, (a) the Net Worth of such Loan Parties, plus (b) Subordinated Indebtedness, less (c) Intangible Assets, less (d) Indebtedness due to Loan Parties from their Affiliates, all calculated in accordance with GAAP.

~~"Target" shall have the meaning assigned to such term in the definition of "Permitted Acquisitions".~~

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Temporary Increase Period" means the period commencing on November 14, 2024 through February 27, 2026.

"Temporary Overadvance Amount" means, during the period commencing on October 15, 2025 and ending on February 27, 2026, an amount equal to $8,000,000.

"Termination Date" means the earlier of (a) the Maturity Date or (b) the date on which the Lenders' agreement to make Advances shall have terminated pursuant to this Agreement.

"Trademark Collateral Amount" means the Value of the "Armitron" trademark (US Registration Number 1020482), so long as such trademark shall be owned by Borrower free and clear of all Liens except Permitted Liens. For the avoidance of doubt, the Value of such trademark as of the Twelfth Amendment Effective Date shall be $1,500,000.

"Transferable Assets" means those assets set forth on Schedule 1.1B.

~~"Twelfth Amendment" means that certain Twelfth Amendment to Credit and Security Agreement, dated as of November 17, 2025, by and among Borrower, the Lenders and Agent.~~

~~"Twelfth Amendment Effective Date" shall have the meaning set forth in the Twelfth Amendment.~~

"UCC" means the Uniform Commercial Code as in effect in the State of New York and any successor statute, as in effect from time to time (except that terms used herein which are not otherwise defined herein and defined in the Uniform Commercial Code as in effect in the State of New York on the Closing Date shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Agent may otherwise determine).

"Value" or "value" means, the lower of (a) cost computed on a first-in first-out basis in accordance with GAAP or (b) market value; provided, that, for purposes of the calculation of the Borrowing Base, (i) the Value of the Inventory shall not include: (A) the portion of the value of Inventory equal to the profit earned by any Affiliate on the sale thereof to Borrowers or (B) write-ups or write-downs in value with respect to currency exchange rates, (ii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and consistent with the most recent appraisal of the Inventory received and accepted by Agent prior to the Closing Date, if any, and (iii) the Value of any Intellectual Property shall be an amount determined by Agent in its sole discretion.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the then outstanding principal amount of such Indebtedness into (b) the total of the product obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment.

"WITHit" means WITHit Holdings, LLC, a Delaware limited liability company and its Subsidiaries.

"WITHit Investment" means 100% of the Class A Units of WITHit.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2    Interpretative Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    General.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, supplemented, extended, renewed, restated or replaced (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.  An Event of Default shall exist or continue or be continuing until such Event of Default is waived in

accordance with Section 12.10 or is cured. Loan Parties shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Agent or Lenders or Issuing Bank under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Reference to a Loan Party's "knowledge" or similar concept means actual knowledge of a Responsible Officer, or knowledge that a Responsible Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

(b)    UCC Terms. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that, to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

(c)    Time References. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including"; provided, that, with respect to a computation of fees or interest payable to Agent for the ratable benefit of Agent and Lenders, such period shall in any event consist of at least one full day.

(d)    Payment in Full. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean (i) the payment in full in cash of the principal and accrued and unpaid interest with respect to all Advances, (ii) the payment in full of all fees, charges and expenses that have accrued and are unpaid regardless of whether payment has been demanded or are otherwise due, (iii) the delivery to Agent of cash collateral, or at Agent's option, the delivery to Agent of a letter of credit payable to Agent for the ratable benefit of Agent, Issuing Bank and Lenders issued by a bank acceptable to Agent and in form and substance satisfactory to Agent, in either case in respect of (A) the outstanding Letter of Credit Obligations not to exceed one hundred five percent (105%) of such amount, (A) Bank Product Obligations (or, at the option of Agent and Lenders, the termination of the applicable Bank Product or cash management arrangements and the payment in full in cash of the Bank Product Obligations due and payable in connection with such termination), (B) continuing obligations of Agent under Control Agreements and (C) other contingent Obligations for which a claim or demand for payment has been made at such time or in respect of matters or circumstances known to Agent at the time, and which are reasonably expected to result in any loss, cost, damage or expense (including attorneys' fees and legal expenses) to Agent for which Agent would be entitled to indemnification by Loan Parties hereunder and (iv) the termination of the Commitments of Agent and Lenders and the financing arrangements provided by Agent and Lenders to Borrowers hereunder.

(e)    Borrower. All references to the terms "Borrower," "Borrowers," "Loan Party" and "Loan Parties" in this Agreement and the other Loan Documents shall be deemed and each such reference is hereby amended to mean and include (as applicable) the Debtor (as defined herein), and its successors and assigns (including any trustee or other fiduciary hereafter appointed as any Debtor's legal representative, as applicable, or with respect to any Debtor the property of the estate of such Debtor whether under Chapter 11 of the Bankruptcy Code or any subsequent Chapter 7 case or cases and its successor upon conclusion of the Chapter 11 Case of such Debtor, as the case may be).

(f)    Collateral. All references to the term "Collateral" in this Agreement or the other Loan Documents, or any other term referring to the security for the Prepetition Obligations, shall be

deemed, and each such reference is hereby amended to mean, collectively, the Prepetition Collateral and the DIP Collateral.

(g)      Agreement. All references to the term "Agreement" in the Prepetition Credit Agreement or the term "Credit Agreement" in the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean the Agreement, and as ratified, assumed and adopted by Debtor pursuant to the terms of the Ratification Agreement and the DIP Order.

(h)      Loan Documents. All references to the term "Loan Documents" in this Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, the Ratification Agreement and all of the Prepetition Loan Documents, as ratified, assumed and adopted by Debtor pursuant to the terms of the Ratification Agreement, as amended and supplemented thereby, and the DIP Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(i)      Material Adverse Effect. All references to the term "Material Adverse Effect," "material adverse effect" or "material adverse change" in this Agreement, the Ratification Agreement or the other Loan Documents shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that the commencement of the Chapter 11 Case or any sale or other liquidation of any, all or substantially all of Debtors' assets in such Chapter 11 Case in accordance with the terms of the DIP Order or the Ratification Agreement shall not, individually or collectively, constitute a Material Adverse Effect.

(j)      Obligations.  All references to the term "Obligations" in this Agreement, the Ratification Agreement and the other Loan Documents shall be deemed, and each such reference is hereby amended, to mean both the Prepetition Obligations and the DIP Obligations.

     1.3      Accounting Terms. Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of EGC delivered to Agent; provided, that, in the event of any change in GAAP after the Closing Date that affects any covenant in Section 10, Borrower Agent may by notice to Agent, or Agent may by notice to Borrower Agent require that such covenants be calculated in accordance with GAAP as in effect, and as applied by EGC immediately before the applicable change in GAAP became effective, until either the notice from the applicable party is withdrawn or such covenant is amended in a manner satisfactory to Loan Parties and Agent. Borrower Agent shall deliver to Agent at the same time as the delivery of any financial statements given in accordance with the provisions of Section 8.1 and Schedule 8.1 (i) a description in reasonable detail of any material change in the application of accounting principles employed in the preparation of such financial statements from those applied in the most recently preceding monthly, quarterly or annual financial statements and (ii) a reasonable estimate of the effect on the financial statements on account of such changes in application. Notwithstanding anything to the contrary contained herein, (i) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under the Statement of Financial Accounting Standards No. 159 (or any similar accounting principle) permitting a Person to value its financial liabilities or Indebtedness at the fair value thereof, and (ii) the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is (A) unqualified, and (B) does not include any explanation, supplemental comment, or other comment concerning the ability of the applicable Person to continue as a going concern or concerning the scope of the audit.

1.4    Rounding.  Any financial ratios required to be maintained by Loan Parties pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5    Letter of Credit Amounts.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the maximum amount for which it may be honored in effect at such time; provided, that, with respect to any Letter of Credit that, by its terms, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

## ARTICLE 2.   CREDIT FACILITY

2.1    Revolving Loans.

(a)    Revolving Loans.

(i)    Subject to, and upon the terms and conditions contained herein, each Lender agrees to make Revolving Loans to Borrower Agent from time to time during the term of this Agreement in an amount not to exceed such Lender's Revolving Loan Commitment Percentage of such Revolving Loans.  The pro rata share of the Revolving Loan of any Lender shall not at any time exceed its Revolving Loan Commitment.  The obligations of each Lender hereunder shall be several and not joint.  Until the Termination Date, after giving effect to such Revolving Loans, the aggregate principal amount of Revolving Loans plus Letter of Credit Obligations outstanding plus the outstanding amount of Swing Loans shall not exceed the lesser of (A) the Borrowing Base at such time and (B) the Maximum Revolving Credit.  Subject to the terms and conditions of this Agreement, Borrowers may from time to time borrow, prepay and reborrow Revolving Loans.

(ii)    Borrowers shall execute and deliver to each Lender a Revolving Loan Note to evidence the Revolving Loan Commitment of such Lender.  Each Revolving Loan Note shall be in the principal amount of the Revolving Loan Commitment of the applicable Lender, dated the Closing Date and substantially in the form of Exhibit F-1 (each, a "Revolving Loan Note" and collectively, the "Revolving Loan Notes").  Each Revolving Loan Note shall represent the obligation of Borrowers to pay the amount of the applicable Lender's Revolving Loan Commitment or, if less, such Lender's Pro Rata Share of the aggregate unpaid principal amount of all Revolving Loans to Borrowers, together with interest thereon as prescribed in Section 3.1.

(b)    [Reserved].

2.2    Letters of Credit.

(a)    General.  Subject to, and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of Borrower Agent, Agent agrees to arrange for Issuing Bank to issue, for the account of Borrowers, one or more Letters of Credit, containing terms and conditions acceptable to Agent and Issuing Bank.

(b)    Notice of Issuance, Amendment, Renewal, Extension. Borrower Agent shall give Agent and Issuing Bank three (3) Business Days' prior written notice of Borrower Agent's request for the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of

Credit).  Such notice shall be irrevocable and shall specify (i) the original face amount of the Letter of Credit requested (or identify the Letter of Credit to be amended, renewed or extended), (ii) the effective date (which date shall be a Business Day and in no event shall be a date less than ten (10) days prior to the end of the then current term of this Agreement) of issuance of such requested Letter of Credit (or such amendment, renewal or extension), (iii) whether such Letter of Credit may be drawn in a single or in partial draws, (iv) the date on which such requested Letter of Credit is to expire, (v) the purpose for which such Letter of Credit is to be issued, (vi) the name and address of the beneficiary of the requested Letter of Credit, (vii) such other information as shall be necessary to enable Issuing Bank to prepare, amend, renew or extend such Letter of Credit and (viii) if requested by Issuing Bank or Agent, Borrowers shall have delivered to Issuing Bank with respect thereto at such times and in such manner as Issuing Bank may require, an application, in form and substance satisfactory to Issuing Bank and Agent, for the issuance of the Letter of Credit and such other Letter of Credit Documents as may be required pursuant to the terms thereof.  If requested by the Issuing Bank, Borrowers shall attach to the request the proposed terms of the Letter of Credit.  In no event shall a Letter of Credit be issued, amended, renewed or extended unless the forms and terms of the proposed Letter of Credit (as amended, renewed or extended, as the case may be) is satisfactory to Agent and Issuing Bank.  The renewal or extension of, or increase in the amount of, any Letter of Credit shall, for purposes of this Agreement, be treated in all respects the same as the issuance of a new Letter of Credit hereunder.

(c)    Certain Conditions.  In addition to being subject to the satisfaction of the applicable conditions precedent contained in Article 6 and the other terms and conditions contained herein, a Letter of Credit shall be issued, amended, renewed or extended only if (and on issuance, amendment, renewal or extension of each Letter of Credit, Borrowers shall be deemed to represent and warrant that) immediately after giving effect to such issuance, amendment, renewal or extension:  (i) no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that Issuing Bank refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit, (ii) except as otherwise expressly permitted hereunder, after giving effect to the issuance, amendment, renewal or extension of such Letter of Credit, the Letter of Credit Obligations shall not exceed the Letter of Credit Limit, and (iii) after giving effect to the issuance, amendment, renewal or extension of any such Letter of Credit, (A) the aggregate principal amount of the Revolving Loans, Swing Loans and Letter of Credit Obligations outstanding shall not exceed the lesser of the Borrowing Base at such time or the Maximum Revolving Credit.  Promptly after the delivery of any Letter of Credit or amendment to a Letter of Credit, Issuing Bank will also deliver to Borrower Agent and Agent a true and complete copy of such Letter of Credit or amendment.  Except in Agent's discretion, the amount of all outstanding Letter of Credit Obligations shall not at any time exceed the Letter of Credit Limit.

(d)    Expiration.  Each Standby Letter of Credit shall expire at or prior to the earlier of (i) twelve (12) months after the date of the issuance of such Standby Letter of Credit (or in the case of any renewal or extension thereof, twelve (12) months after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date, provided, that, (A) any Standby Letter of credit with a one year tenor may provide for automatic renewal or extension thereof for additional one year periods (which in no event shall extend beyond the date referred to in clause (ii) above) so long as such Standby Letter of Credit permits Issuing Bank to prevent any such extension at least once in each twelve-month period (commencing with the date of issuance of such Standby Letter of Credit) by giving prior notice to the beneficiary thereof within a time period during such twelve-month period to be agreed upon at the time such Standby Letter of Credit is issued and (B) if Issuing Bank and Agent each consent, the expiration date on any Standby Letter of Credit may extend beyond the date referred to in clause (ii)

above.  Each Commercial Letter of Credit shall expire on the earlier of one hundred eighty (180) days after such Commercial Letter of Credit's date of issuance, renewal or extension (as applicable) or the date five (5) Business Days prior to the Maturity Date.

   (e) <u>Reimbursement</u>.  If Issuing Bank shall make any payment in respect of a Letter of Credit, Borrowers shall reimburse Issuing Bank by paying to Agent an amount equal to such payment by Issuing Bank not later than 12:00 p.m. on the date that such payment by Issuing Bank is made, if Borrower Agent shall have received notice of such payment by Issuing Bank prior to 10:00 a.m. on such date, or, if such notice shall not have been received by Borrower Agent prior to such time on such date, then not later than 12:00 p.m. on (i) the Business Day that Borrower Agent receives such notice, if such notice is received prior to 10:00 a.m., on the day of receipt, or (ii) the Business Day immediately following the day that Borrower Agent receives such notice, if such notice is not received prior to such time on the day of receipt; <u>provided</u>, <u>that</u>, each drawing under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by Borrower Agent to Agent for a Prime Rate Loan in the amount of such drawing or other amount then due, and shall be made by Agent as a Revolving Loan in an equivalent amount with the proceeds payable to Issuing Bank, and, to the extent so financed, Borrowers' obligation to make such payment shall be discharged and replaced by the resulting Revolving Loan.

   (f) <u>Obligations Absolute</u>.  The obligations of Borrowers to pay Letter of Credit Obligations and the obligations of Agent to make payments to Issuing Bank with respect to Letters of Credit shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever, notwithstanding the occurrence or continuance of any Default, Event of Default, the failure to satisfy any other condition set forth in <u>Article 6</u> or any other event or circumstance, and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>Section 2.2</u>, constitute a legal or equitable discharge of, or provide a right of setoff against, Borrowers' obligations hereunder.  Agent and Issuing Bank shall not have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of Issuing Bank; <u>provided</u>, <u>that</u>, the foregoing shall not be construed to excuse Issuing Bank from liability to Borrowers to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by Borrowers to the extent permitted by applicable Law) suffered by Borrowers that are caused by Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of Issuing Bank (as determined pursuant to a final, non-appealable order of a court of competent jurisdiction), Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, Issuing Bank may, in its discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make

payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

    (g)    <u>Disbursement Procedures</u>. Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Issuing Bank shall promptly notify Agent and Borrower Agent by telephone (confirmed by facsimile or otherwise as Borrower Agent and Issuing Bank may agree) of such demand for payment and whether Issuing Bank has made or will make any payment in respect thereof; <u>provided</u>, <u>that</u>, any failure to give or delay in giving such notice shall not relieve Borrowers of their obligation to reimburse Issuing Bank and Agent with respect to any such payment.

    (h)    <u>Interim Interest</u>. If Issuing Bank shall make any payment in respect of a Letter of Credit, or otherwise be owed any amounts in respect thereof, then, unless Borrowers shall reimburse Issuing Bank for such payment or other amount in full on the date such payment is made or amount due, the unpaid amount thereof shall bear interest, for each day from and including the date such payment is made or amount due but excluding the date that Borrowers reimburse such payment or other amount, at the rate per annum then applicable to Prime Rate Loans. Interest accrued pursuant to this clause shall be for the account of Issuing Bank, except that interest accrued on and after the date of payment by Agent pursuant to <u>Section 2.2(e)</u> to reimburse Issuing Bank shall be for the account of Agent to the extent of such payment, and shall be payable on demand or, if no demand has been made, on the date on which Borrowers reimburse such payment in full.

    (i)    <u>Cash Collateralization</u>. If any Event of Default shall occur and be continuing, on the Business Day that Borrower Agent receives notice from Agent demanding the deposit of cash collateral pursuant to this clause, Borrowers shall deposit in an account with Agent, in the name and for the benefit of Issuing Bank (the "<u>LC Collateral Account</u>"), an amount in cash equal to one hundred five percent (105%) of the amount of the Letter of Credit Obligations as of such date <u>plus</u> accrued and unpaid interest thereon; <u>provided</u>, <u>that</u> the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to Borrowers described in <u>Section 11.1(e)</u> or <u>Section 11.1(f)</u>.  Such deposit shall be held by Agent as collateral for the payment and performance of the Obligations.  Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account and each Loan Party hereby grants Agent a security interest in the LC Collateral Account.  Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of Agent and at Borrowers' risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account.  Monies in the LC Collateral Account shall be applied by Agent for Letter of Credit Obligations and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of Borrowers for the Letter of Credit Obligations at such time or, if the maturity of the Revolving Loans has been accelerated, be applied to satisfy other Obligations.

    (j)    <u>Indemnification</u>.  Each Loan Party shall indemnify and hold Agent and Issuing Bank harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which Agent or Issuing Bank may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by Agent or Issuing Bank or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence or willful misconduct of Agent or Issuing Bank, as the case may be, as determined pursuant to a final non-appealable order of a court of competent jurisdiction.  Each Loan Party assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder.  Each Loan

Party hereby releases and holds Agent and Issuing Bank harmless from and against any acts, waivers, errors, delays or omissions with respect to or relating to any Letter of Credit, except for the gross negligence or willful misconduct of Agent or Issuing Bank, as the case may be, as determined pursuant to a final, non-appealable order of a court of competent jurisdiction. The provisions of this Section 2.2 shall survive the payment of Obligations and the termination of this Agreement.

(k)     Account Party. Each Loan Party hereby irrevocably authorizes and directs Issuing Bank to name the applicable Borrower as the account party therein and to deliver to Agent all instruments, documents and other writings and property received by Issuing Bank pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto. Nothing contained herein shall be deemed or construed to grant Borrowers any right or authority to pledge the credit of Agent or any Lender in any manner. Borrowers shall be bound by any reasonable interpretation made in good faith by Agent, or Issuing Bank under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of Borrower Agent. In connection with Inventory purchased pursuant to any Letter of Credit, Borrowers shall, at Agent's prior written request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest that upon Agent's prior written request, such items are to be delivered to Agent and/or subject to Agent's order, and if they shall come into Borrowers' possession, to deliver them, upon Agent's prior written request, to Agent in their original form. Except as otherwise provided herein, Agent shall not exercise such right to request such items unless a Default or Event of Default shall exist or have occurred and be continuing. Except as Agent may otherwise specify, Borrowers shall designate Issuing Bank with respect to a Letter of Credit as the consignee on all bills of lading and other negotiable and non-negotiable documents under such Letter of Credit.

(l)     Notwithstanding anything to the contrary contained in the Prepetition Credit Agreement or the other Prepetition Loan Documents, any issued and undrawn Letters of Credit under the Prepetition Credit Agreement as of the Petition Date shall be deemed to be Letters of Credit under the DIP Facility. On and after the Ratification Effective Date, (i) unless otherwise agreed to in Issuing Bank's sole discretion, Issuing Bank shall have no obligation to issue any new Letters of Credit under the DIP Credit Agreement or the Ratification Agreement or increase the amount of such existing Letters of Credit issued and outstanding as of the Petition Date and (ii) if Issuing Bank makes a payment under a Letter of Credit, the amount of such payment shall immediately and automatically be made as and be deemed to be a DIP Loan. All Letter of Credit payments made in the Chapter 11 Case shall be deemed to be DIP Loans under the DIP Credit Agreement, and Debtor's obligation to reimburse the amount of such payments to Issuing Bank shall be automatically converted into an obligation to pay the resulting DIP Loan.

2.3     Requests for Borrowings.

(a)     To request a Revolving Loan, Borrower Agent shall notify Agent of such request by telephone or written request as set forth below not later than 12:00 p.m. (New York time) on the same Business Day as the date of the proposed Revolving Loan. Each such telephonic request shall be irrevocable and to the extent required by Lender, shall be confirmed promptly by hand delivery or facsimile or other electronic transmission to Lender of a Notice of Borrowing signed by a Responsible Officer of Borrower Agent. Each such telephonic and written request shall specify the following information:

(i)        the aggregate amount of such Revolving Loan;

(ii)       the date of such Revolving Loan, which shall be a Business Day;

(iii)      whether such Revolving Loan shall be a Prime Rate Loan or a Federal Funds Effective Rate Loan; and

(iv)      the Deposit Account of Borrower Agent specified on Schedule 8.10 or any other account with Agent that shall be specified in a written notice signed by a Responsible Officer of Borrower Agent and delivered to and approved by Agent (such approval not to be unreasonably withheld).

(b)      All Revolving Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, Borrowers when deposited to the credit of Borrowers or otherwise disbursed or established in accordance with the instructions of Borrowers or in accordance with the terms and conditions of this Agreement.  Except in Agent's discretion, or as otherwise provided herein, the aggregate amount of the Revolving Loans, Swing Loans and the Letter of Credit Obligations outstanding at any time shall not exceed the lesser of the Maximum Revolving Credit and the Borrowing Base.

2.4      [Reserved].

2.5      Swing Loans.

(a)      Subject to the terms and conditions set forth in this Agreement, and in order to minimize the transfer of funds between Lenders and Agent for administrative convenience, Agent, Lenders holding Revolving Loan Commitments and Swing Loan Lender agree that in order to facilitate the administration of this Agreement, Swing Loan Lender may, at its election and option made in its sole discretion cancelable at any time for any reason whatsoever, make swing loan advances ("Swing Loans") available to Borrowers as provided for in this Section 2.5 at any time or from time to time after the Closing Date to, but not including, the Termination Date, in an aggregate principal amount up to but not in excess of the Maximum Swing Loan Advance Amount, provided, that at any time the Revolving Loans plus Letter of Credit Obligations outstanding plus the outstanding amount of Swing Loans shall not exceed an amount equal to the lesser of (i) the Maximum Revolving Credit and (ii) the Borrowing Base. All Swing Loans shall be Prime Rate Loans only.  Borrowers may borrow (at the option and election of Swing Loan Lender), repay and reborrow (at the option and election of Swing Loan Lender) Swing Loans and Swing Loan Lender may make Swing Loans as provided in this Section 2.5 during the period between Settlement Dates.  All Swing Loans shall be evidenced by a secured promissory note (the "Swing Loan Note") substantially in the form attached hereto as Exhibit F-3.  Swing Loan Lender's agreement to make Swing Loans under this Agreement is cancelable at any time for any reason whatsoever and the making of Swing Loans by Swing Loan Lender from time to time shall not create any duty or obligation, or establish any course of conduct, pursuant to which Swing Loan Lender shall thereafter be obligated to make Swing Loans in the future.  Any unpaid principal balance of Swing Loans and all accrued interest will be due and payable on the Termination Date.

(b)      Upon either (i) any request by Borrower Agent for a Revolving Loan made pursuant to Section 2.1(a) or (ii) the occurrence of any deemed request by Borrowers for a Revolving Loan pursuant to the provisions of this Agreement, Swing Loan Lender may elect, in its sole discretion, to have such request or deemed request treated as a request for a Swing Loan, and may advance same day funds to Borrowers as a Swing Loan; provided, that, notwithstanding anything to the contrary provided for herein, Swing Loan Lender may not make Swing Loans if Swing Loan Lender has been notified by

Agent or by Required Lenders that one or more of the applicable conditions set forth in <u>Section 6.2</u> have not been satisfied or the Revolving Loan Commitments have been terminated for any reason.

(c)     Upon the making of a Swing Loan (whether before or after the occurrence of a Default or an Event of Default and regardless of whether a Settlement has been requested with respect to such Swing Loan), each Lender holding a Revolving Loan Commitment shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from Swing Loan Lender, without recourse or warranty, an undivided interest and participation in such Swing Loan in proportion to its Revolving Loan Commitment Percentage.  Swing Loan Lender or Agent may, at any time, require the Lenders holding Revolving Commitments to fund such participations by means of a Settlement as provided for in <u>Section 2.5(d)</u>.  From and after the date, if any, on which any Lender holding a Revolving Commitment is required to fund, and funds, its participation in any Swing Loans purchased hereunder, Agent shall promptly distribute to such Lender its Revolving Commitment Percentage of all payments of principal and interest and all proceeds of Collateral received by Agent in respect of such Swing Loan; <u>provided</u>, <u>that</u>, no Lender holding a Revolving Commitment shall be obligated in any event to make Revolving Advances in an amount in excess of its Revolving Commitment Amount <u>minus</u> its Participation Commitment (taking into account any reallocations under <u>Section 12.9(a)(i))</u> of the Maximum Undrawn Amount of all outstanding Letters of Credit.

## ARTICLE 3.   INTEREST AND FEES

3.1     <u>Rates and Payment of Interest</u>.

(a)     All Obligations (including, to the extent permitted by law, interest not paid when due) shall bear interest at the following rates: (i) with respect to Prime Rate Loans, at a rate per annum equal to the Prime Rate <u>plus</u> the Applicable Margin, and (ii) with respect to Federal Funds Effective Loans, at a rate per annum equal to the Federal Funds Effective Rate <u>plus</u> the Applicable Margin, except as otherwise provided in this <u>Article 3</u>.  At any time an Event of Default exists or has occurred and is continuing, Obligations shall bear interest at the Default Rate (whether before or after any judgment).

(b)     Interest shall accrue from the date a Loan is made or Obligation is incurred or payable until paid in full by Borrowers.  If a Loan is repaid on the same day made, one day's interest shall accrue.  Interest accrued on the Loans shall be due and payable in arrears, (i) on each Interest Payment Date applicable to such Loans, and (ii) on the Termination Date.  Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on the earlier of the first day of the month after incurred or demand or the Termination Date.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand.

(c)     Notwithstanding anything to the contrary set forth herein, for any given calendar quarter, Borrowers may only designate that the Obligations bear interest based on a single interest rate during such calendar quarter, <u>i.e.</u>, the Prime Rate or the Federal Funds Effective Rate.  The Borrowers may change such interest rate designation in a succeeding calendar quarter by giving Agent not less than five (5) Business Days' written notice prior to the first day of such succeeding calendar quarter after which the Obligations shall bear interest based on the interest so designated for such calendar quarter.  If Borrower does not change the interest designation for any calendar quarter, the Obligations shall bear interest based on the same interest rate utilized during the previous calendar quarter.

3.2     <u>Computation of Interest and Fees</u>.

(a)    Interest and fees calculated on a per annum basis shall be calculated on the basis of three hundred sixty-five (365) or three hundred sixty-six (366) day year, as applicable, and actual days elapsed.  The interest rate shall increase or decrease effective on the date any change in the Prime Rate or the Federal Funds Effective Rate, as applicable, and by an amount equal to each increase or decrease in the Prime Rate or the Federal Funds Effective Rate, as applicable).  Each determination by Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.

(b)    [Reserved]

(c)    [Reserved]

3.3    <u>Unused Line Fee</u>.  Borrowers shall pay to Agent for the ratable benefit of Agent and Lenders an unused line fee on a monthly basis at a rate equal to one quarter of one percent (0.25%) (on a per annum basis) <u>multiplied by</u> the amount by which the Maximum Revolving Credit exceeds the average daily principal balance of the outstanding Revolving Loans <u>plus</u> Swing Loans <u>plus</u> the Maximum Undrawn Amount of all outstanding Letters of Credit during the immediately preceding calendar month (or part thereof) so long as any Obligations are outstanding.  Such fees shall be payable on the first day of each month in arrears.

3.4    <u>Letter of Credit Fee</u>.  Borrowers shall pay to Agent, in the case of Standby Letters of Credit, a monthly fee at a rate equal to two percent (2%) (on a per annum basis) <u>multiplied by</u> the average daily outstanding balance of Standby Letters of Credit, and in the case of Commercial Letters of Credit, monthly a fee at a rate equal to one-quarter of one percent (0.25%) (on a per annum basis) <u>multiplied by</u> the average daily outstanding balance of Commercial Letters of Credit, in each case for the immediately preceding calendar month (or part thereof), payable in arrears as of the first day of each calendar month, computed for each day from the date of issuance to the date of expiration, provided, that, Borrowers shall, at Agent's option, pay such fees at a rate two percent (2.00%) greater than the highest rate above on such average daily maximum amount for: (A) the period from and after the date of termination or non-renewal of this Agreement until Agent has received payment in full of all Obligations (notwithstanding entry of a judgment against Borrowers) and (B) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing as determined by Agent.  The obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement.   In addition to the letter of credit fees provided above, Borrowers shall pay to Issuing Bank for its own account the letter of credit fronting fee of one-quarter of one percent (0.25%) per annum and the other customary charges from time to time of Issuing Bank with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

3.5    <u>Termination Fee</u>.  If Borrowers prepay the Advances and reduce or terminate the Credit Facility, whether voluntarily or involuntarily and whether before or after acceleration of the Obligations, or if the Credit Facility is otherwise terminated, Borrowers shall pay to Agent, for the benefit of Lenders as liquidated damages and compensation for the costs of being prepared to make funds available hereunder, an amount equal to the Applicable Percentage (as defined below) <u>multiplied by</u> the amount of the reduction of the Revolving Loan Commitment.  As used herein, the term "<u>Applicable Percentage</u>" shall mean one half of one percent (0.50%), in the case of a prepayment on or prior to the first anniversary of the Closing Date.  Each Loan Party agrees that the Applicable Percentage is a reasonable calculation of Lenders' lost profits in view of the difficulties and impracticality of determining actual damages resulting from the prepayment of the applicable Advances and an early termination of the Revolving Loan Commitments.

3.6    Closing Fee.  Borrowers shall pay to Agent for the ratable benefit of the Lenders, a closing fee in an amount equal to $62,500.  The entire closing fee shall be deemed fully earned by Agent and Lenders and shall be due and payable in full on the Closing Date.

3.7    Collateral Management Fee.    Borrower shall pay to Agent a monthly collateral management fee in the amount of $750, for each calendar month (or part thereof), which collateral management fee shall be payable monthly in advance beginning on the Closing Date and on the first day of calendar month thereafter in advance.  The collateral management fee shall be deemed fully earned by Agent on the first day of each calendar month and shall be due and payable in full on that date.

3.8    Online Access Fee.  The Borrowers shall pay to Agent, for Agent's account, a monthly online access fee in the amount of $125 per month (the "Online Access Fee").  The Online Access Fee shall be deemed fully earned by Agent on the first day of each calendar month and shall be due and payable in full on that date.

3.9    Reserved.

3.10    Reserved.

3.11    Reserved.

3.12    Increased Costs. If any Change in Law shall: (a) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender or any Issuing Bank; (b) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or (c) impose on any Lender or any Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein; and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, such Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, Issuing Bank or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Issuing Bank or other Recipient, the Borrowers will pay to such Lender, Issuing Bank or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, Issuing Bank or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

3.13    Capital Requirements. If any Lender or Issuing Bank determines that any Change in Law affecting such Lender or Issuing Bank or any lending office of such Lender or such Lender's or Issuing Bank's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit or Swing Loans held by, such Lender, or the Letters of Credit issued by any Issuing Bank, to a level below that which such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or Issuing Bank's holding company with respect to capital adequacy), then

from time to time the Borrowers will pay to such Lender or Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or Issuing Bank or such Lender's or Issuing Bank's holding company for any such reduction suffered.

3.14    Certificates for Reimbursement. A certificate of Agent, Lenders, Swing Loan Lender or Issuing Bank setting forth the amount or amounts necessary to compensate Agent, Lenders, Swing Loan Lender or Issuing Bank or their holding companies, as the case may be, as specified in Sections 3.9, 3.10, or 3.11 and delivered to Borrower Agent shall be conclusive absent manifest error. Borrowers shall pay Agent, Lenders, Swing Loan Lender or Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) days after receipt thereof.

3.15    Delay in Requests. Failure or delay on the part of Agent, Lenders, Swing Loan Lender or Issuing Bank to demand compensation pursuant to Sections 3.9, 3.10, or 3.11 shall not constitute a waiver of Agent's, Lenders', Swing Loan Lender's or Issuing Bank's right to demand such compensation, provided, that Borrowers shall not be required to compensate Agent, Lenders, Swing Loan Lender or Issuing Bank pursuant to this Section 3.14 for any increased costs incurred or reductions occurring more than one hundred eighty (180) days prior to the date that Agent, Lenders, Swing Loan Lender or Issuing Bank, as the case may be, becomes aware of the event giving rise to Agent's, Lenders', Swing Loan Lender's or Issuing Bank's claim for compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the one hundred eighty (180) day period referred to above shall be extended to include the period of retroactive effect thereof).

3.16    Maximum Interest. Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, in no event whatsoever shall the aggregate of all amounts that are contracted for, charged or received by Agent, Lenders or Swing Loan Lender pursuant to the terms of this Agreement or any of the other Loan Documents and that are deemed interest under applicable Law exceed the Maximum Interest Rate (including, to the extent applicable, the provisions of Section 5197 of the Revised Statutes of the United States of America as amended, 12 U.S.C. Section 85, as amended). In the event any interest is charged or received in excess of the Maximum Interest Rate ("Excess"), each Loan Party acknowledges and stipulates that any such charge or receipt shall be the result of an accident and bona fide error, and that any Excess received by Agent, Lender or Swing Loan Lender shall be applied, first, to the payment of the then outstanding and unpaid principal hereunder; second, to the payment of the other Obligations then outstanding and unpaid; and third, returned to Borrowers. All monies paid to Agent, Lender and Swing Loan Lender hereunder or under any of the other Loan Documents, whether at maturity or by prepayment, shall be subject to any rebate of unearned interest as and to the extent required by applicable Law.

**ARTICLE 4.    PAYMENTS AND ADMINISTRATION**

4.1    Payments Generally, Allocation of Proceeds.

(a)    All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available funds, not later than 2:00 P.M. New York time on the due date. Any payment after such time shall be deemed made on the next Business Day. If any payment is due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. All Obligations shall be payable to the Agent Payment Account or such other place as Agent may designate in writing to Borrowers from time to time.

(b)    Subject to the other terms and conditions contained herein, Agent and Lenders shall apply payments received or collected from Borrowers or for the account of Borrowers (including the monetary proceeds of collections or of realization upon any Collateral) as follows:

(i)    First, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of Agent in connection with enforcing its rights and the rights of Lenders under this Agreement and the other Loan Documents, and any Protective Advances funded by Agent with respect to the Collateral under or pursuant to the terms of this Agreement;

(ii)    Second, to payment of any fees owed to Agent;

(iii)    Third, ratably, to the payment of all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) of each of the Lenders to the extent owing to such Lender pursuant to the terms of this Agreement;

(iv)    Fourth, to the payment of all of the Obligations consisting of accrued interest on account of the Swing Loans;

(v)    Fifth, to the payment of the outstanding principal amount of the Obligations consisting of Swing Loans;

(vi)    Sixth, to the payment of all Obligations arising under this Agreement and the other Loan Documents consisting of fees and accrued interest (other than interest in respect of Swing Loans paid pursuant to clause Fourth above);

(vii)    Seventh, to the payment of the outstanding principal amount of the Obligations (other than principal in respect of Swing Loans paid pursuant to clause Fifth above) arising under this Agreement (including Bank Products) (including the payment or cash collateralization of any Letter of Credit Obligations in accordance with Section 11.2(b));

(viii)    Eighth, to all other Obligations arising under this Agreement which shall have become due and payable and not repaid pursuant to clauses "First" through "Seventh" above;

(ix)    Ninth, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus.

All references to the term "ratably" as used in this Section 4.1 means pro rata on the basis of the amount owing to any one Person in relationship to the amounts owing to all Persons of the same category of Obligations within the same level of priority.

(c)    Notwithstanding Section 4.1(b) or anything else to the contrary contained in this Agreement or any of the other Loan Documents, Agent and Lenders shall apply payments received or collected from Borrowers or for the account of Borrowers (including the monetary proceeds of collections or of realization upon any Collateral) first, to the Prepetition Obligations until such Prepetition Obligations are paid and satisfied in full and, second, to the DIP Obligations until such DIP Obligations are paid and satisfied in full.

(d)    (c) Notwithstanding anything to the contrary contained in this Agreement, to the extent Borrowers use any proceeds of the Revolving Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Revolving Loans and Letter of Credit Obligations that were not used for such purposes and second to the

Obligations arising from Revolving Loans and Letter of Credit Obligations the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which such Loan Party acquired such rights in or the use of such Collateral.

(e)    (d)  At the election of Agent, all payments of principal, interest, fees, expenses and other amounts payable under the Loan Documents may be paid from the proceeds of Revolving Loans made hereunder whether made following a request by Borrower Agent or a deemed request as provided in this Section 4.1 or may be deducted from any deposit account of Borrowers maintained with Agent and Lenders.  Borrowers are hereby irrevocably deemed to request that, and authorizes Agent and Lenders to (i) make a Revolving Loan for the purpose of paying each payment of principal, interest, fees, expenses and other amounts as it becomes due hereunder or under any other Loan Document and agrees that all such amounts charged shall constitute Revolving Loans and (ii) charge any deposit account of Borrowers maintained with Agent or the Lenders for each payment of principal, interest, fees, expenses and other amounts due hereunder or under any other Loan Document.  Agent shall be entitled to charge the loan account of Borrowers that it maintains for any sum due and payable by Borrowers to Agent and Lenders hereunder or under any of the other Loan Documents.

(f)    (e)  For purposes of calculating the amount of the Revolving Loans available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the Business Day of receipt by Lenders of immediately available funds in the Agent Payment Account provided, that such payments and notice thereof are received in accordance with Agent's usual and customary practices as in effect from time to time and within sufficient time to credit the applicable loan account on such day, and if not, then on the next Business Day.  For purposes of calculating interest only, credit for proceeds shall be given no earlier than one (1) Business Day after deposit is made into the Agent Payment Account and shall be conditional upon final payment of the deposited item.  Each Loan Party hereby agrees not to remit any monies to any lockbox, deposit any monies into the Agent Payment Account, or otherwise permit any monies to be deposited into such account or commingled with other funds in such account, except proceeds of the Collateral.

4.2    Indemnity for Returned Payments.  If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Agent, Lenders or Issuing Bank are required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Agent, Lenders or Issuing Bank.  Borrowers shall be liable to pay to Agent and Lenders, and each Loan Party does hereby agree to indemnify and hold Agent, Lenders and Issuing Bank harmless for the amount of any payments or proceeds surrendered or returned.   This Section 4.2 shall remain effective notwithstanding any contrary action which may be taken by Agent, Lenders or Issuing Bank in reliance upon such payment or proceeds.  The preceding two sentences of this Section 4.2 shall survive the payment of the Obligations and the termination of this Agreement.

4.3    Repayments.  All Loans shall be due and payable in full on the Maturity Date, unless payment is sooner required hereunder.  All Obligations other than Revolving Loans, including Letter of Credit Obligations and fees and reimbursement for expenses, shall be paid by Borrowers as provided herein and in the other Loan Documents or, if no payment date is specified, on demand.  Borrowers shall make payment in full of the Obligations on the Maturity Date or any other effective date of termination of the Commitments.

4.4    Prepayments.

(a)      Voluntary Prepayment. Subject to the payment of the Termination Fee, Borrowers may prepay the principal of any Revolving Loan, in whole or in part.

(b)      Mandatory Prepayment of Revolving Loan. In the event that (i) the aggregate principal amount of the Revolving Loans and the Letter of Credit Obligations outstanding at any time the lesser of (i) the Maximum Revolving Credit or (ii) the Borrowing Base (it being understood and agreed that any such event shall not limit, waive or otherwise affect any rights of Agent or Lenders in such circumstances or on any future occasions), Borrowers shall immediately repay to Agent and Lenders the entire amount of any such excess(es) for which payment is demanded without premium or penalty on such excess amount.

4.5      Statements.  Agent shall render to Borrower Agent each month a statement setting forth the balance in Borrowers' loan account(s) maintained by Agent for Borrowers pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses.  Each such statement shall be subject to subsequent adjustment by Agent but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and conclusively binding upon Borrowers as an account stated except to the extent that Agent receives a written notice from Borrower Agent of any specific exceptions of Borrowers thereto within thirty (30) days after the date such statement has been received by Borrower Agent.  Until such time as Agent shall have rendered to Borrower Agent a written statement as provided above, the balance in Borrowers' loan account(s) shall be presumptive evidence of the amounts due and owing to Agent and Lenders by Borrowers, absent manifest error.

4.6      Borrowers' Loan Account; Evidence of Debt.  Agent shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations, including the amounts of the Loans made by it and each repayment and prepayment in respect thereof, including the amounts of principal and interest payable and paid to Agent and Lenders from time to time hereunder.  Any such records shall be presumptively correct, absent manifest error, provided, that, the failure to make any entry or any error in such records, shall not affect any of the Obligations in respect of any applicable Loans.  Lenders may request that Loans made by them be evidenced by a promissory note.  In such event, Borrowers shall execute and deliver to Agent a promissory note payable to the order of such Lender (or, if requested by a Lender, to such Lender and its registered assigns) and in a form approved by Agent.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

4.7      Taxes.

(a)      Withholding of Taxes; Gross-Up. Any and all payments by or on account of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by Loan Parties shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 4.7) Agent, Lenders, Swing Loan Lender, Issuing Bank or any Participant, as the case may be, receive an amount equal to the sum they would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes by Loan Parties. Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of Agent timely reimburse it for, Other Taxes.

(c)    Evidence of Payments. As soon as practicable after any payment of Taxes by a Loan Party to a Governmental Authority pursuant to this Section 4.7, Loan Parties shall deliver to Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Agent.

(d)    Indemnification by Loan Parties. Each Loan Party shall indemnify Agent, Lenders, Swing Loan Lender and Issuing Bank within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 4.7) payable or paid by Agent, Lenders, Swing Loan Lender and Issuing Bank or required to be withheld or deducted from a payment to Agent, Lenders, Swing Loan Lender and Issuing Bank and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrower Agent by Agent shall be conclusive absent manifest error.

(e)    Treatment of Certain Refunds. If Agent determines, in its sole discretion, exercised in good faith, that Agent or Lenders have received a refund of any Taxes as to which they has been indemnified pursuant to this Section 4.7 (including by the payment of additional amounts pursuant to this Section 4.7), they shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.7 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of Agent or Lenders and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of Agent, shall repay to Agent, Lenders, Swing Loan Lender and Issuing Bank the amount paid over pursuant to this Section 4.7(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Agent, Lenders, Swing Loan Lender or Issuing Bank are required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 4.7(e), in no event will Agent, Lenders, Swing Loan Lender and Issuing Bank be required to pay any amount to an indemnifying party pursuant to this Section 4.7 the payment of which would place Agent, Lenders, Swing Loan Lender and Issuing Bank in a less favorable net after-Tax position than Agent and Lenders would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 4.7(e) shall not be construed to require Agent, Lenders, Swing Loan Lender and Issuing Bank to make available their Tax returns (or any other information relating to its Taxes that they deem confidential) to the indemnifying party or any other Person.

(f)    Survival. Each party's obligations under this Section 4.7 shall survive the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(g)    Tax Treatment. Solely for purposes of determining withholding Taxes imposed under FATCA, from and after the Closing Date, Borrowers and the Lender shall treat the Revolving Loans as not qualifying as a "grandfathered obligation" within the meaning of Treasury Regulation Section 1.1471-2(b)(2)(i).

4.8    Borrower Agent. Each Loan Party hereby designates EGC ("Borrower Agent") as its representative and agent for all purposes under the Loan Documents, including requests for and receipt of Loans and Letters of Credit, designation of interest rates, delivery or receipt of communications, delivery of Borrowing Base Certificates and financial information and reports, payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Lender. Borrower Agent hereby accepts such appointment. Agent and Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any Notice of Borrowing) delivered by Borrower Agent on behalf of any Loan Party. Agent may give any notice or communication with a Borrower hereunder to Borrower Agent on behalf of such Loan Party. Agent shall have the right, in its discretion, to deal exclusively with Borrower Agent for all purposes under the Loan Documents. Each Loan Party agrees that any notice, election, communication, delivery, representation, agreement, action, omission or undertaking by Borrower Agent hereunder shall be binding upon and enforceable against such Loan Party.

4.9    One Obligation. The Advances and the other Obligations shall constitute one general obligation and are secured by Agent's Lien on all Collateral; provided, that, that Agent and Lenders shall be deemed to be creditors of, and the holder of separate claims against, each Loan Party to the extent of any Obligations jointly or severally owed by such Loan Party.

4.10    Nature and Extent of Each Borrower's Liability.

(a)    Joint and Several Liability. Each Loan Party agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Agent on behalf of itself and the Lenders the prompt payment and performance of, all Obligations, except its Excluded Swap Obligations. Each Loan Party agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and performance and not of collection, that such obligations shall not be discharged until payment in full of the Obligations, and that such obligations are absolute and unconditional, irrespective of (i) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (ii) the absence of any action to enforce this Agreement (including this Section 4.10) or any other Loan Document, or any waiver, consent or indulgence of any kind by Agent with respect thereto; (iii) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Agent in respect thereof (including the release of any security or guaranty); (iv) the insolvency of any Obligor; (v) any election by Agent in a case or proceeding under the Bankruptcy Code for the application of Section 1111(b)(2) of the Bankruptcy Code; (vi) any borrowing or grant of a Lien by any other Loan Party, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (vii) the disallowance of any claims of Agent or any Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (viii) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except payment in full of the Obligations.

(b)    Waivers.

(i)    Each Loan Party expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Agent to marshal assets or to proceed against any Obligor, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Loan Party. Each Loan Party waives all defenses available to a surety, guarantor or accommodation co-obligor other than payment in full of

Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of Obligations as long as it is a Loan Party. It is agreed among each Loan Party, Agent and each Lender that the provisions of this Section 4.10 are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Lenders would decline to make Loans and issue or cause to be issued by Issuing Bank any Letters of Credit. Each Loan Party acknowledges that its guaranty pursuant to this Section 4.10 is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(ii)    Agent may, in its discretion, pursue such rights and remedies as it deems appropriate, including realization upon Collateral or any Real Property by judicial foreclosure or nonjudicial sale or enforcement, without affecting any rights and remedies under this Section 4.10. If, in taking any action in connection with the exercise of any rights or remedies, Agent shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Loan Party or other Person, whether because of any applicable Laws pertaining to "election of remedies" or otherwise, each Loan Party consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Loan Party might otherwise have had. Any election of remedies that results in denial or impairment of the right of Agent to seek a deficiency judgment against any Loan Party shall not impair any other Loan Party's obligation to pay the full amount of the Obligations. Each Loan Party waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure with respect to any security for Obligations, even though that election of remedies destroys such Loan Party's rights of subrogation against any other Person. Agent may bid Obligations, in whole or part, at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid by Agent but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section 4.10, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which Agent might otherwise be entitled but for such bidding at any such sale.

(c)    Extent of Liability; Contribution.

(i)    Notwithstanding anything herein to the contrary, each Loan Party's liability under this Section 4.10 shall not exceed the greater of (A) all amounts for which such Loan Party is primarily liable, as described in clause (iii) below, and (B) such Loan Party's Allocable Amount (as defined below).

(ii)    If any Loan Party makes a payment under this Section 4.10 of any Obligations (other than amounts for which such Loan Party is primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments previously or concurrently made by any other Loan Party, exceeds the amount that such Loan Party would otherwise have paid if each Loan Party had paid the aggregate Obligations satisfied by such Guarantor Payments in the same proportion that such Loan Party's Allocable Amount bore to the total Allocable Amounts of all Loan Parties, then such Loan Party shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Loan Party for the amount of such excess, ratably based on their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. The "Allocable Amount" for any Loan Party shall be the maximum amount that could then be recovered from such Loan Party under this Section 4.10 without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

(iii)    Section 4.10(c)(i) shall not limit the liability of any Loan Party to pay or guarantee Loans made directly or indirectly to it (including Loans advanced hereunder to any other Person and then re-loaned or otherwise transferred to, or for the benefit of, such Loan Party), Letter of Credit Obligations relating to Letters of Credit issued to support its business, Bank Products incurred to support its business, and all accrued interest, fees, expenses and other related Obligations with respect thereto, for which such Loan Party shall be primarily liable for all purposes hereunder. Agent shall have the right, at any time in its discretion, to condition Loans and Letters of Credit upon a separate calculation of borrowing availability for each Borrower and to restrict the disbursement and use of Loans and Letters of Credit to a Borrower based on that calculation.

(iv)    Each Obligor that is a Qualified ECP Loan Party when its guaranty of or grant of Lien as security for a Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Specified Obligor with respect to such Swap Obligation as may be needed by such Specified Obligor from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Loan Party's obligations and undertakings under this Section 4.10 voidable under any applicable fraudulent transfer or conveyance act). The obligations and undertakings of each Qualified ECP Loan Party under this Section 4.10 shall remain in full force and effect until payment in full of all Obligations. Each Obligor intends this Section 4.10 to constitute, and this Section 4.10 shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

(d)    Joint Enterprise. Each Loan Party has requested that Agent and Lenders make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically. Borrowers' business is a mutual and collective enterprise, and the successful operation of each Borrower is dependent upon the successful performance of the integrated group. Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the facility, all to their mutual advantage. Borrowers acknowledge that Agent and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Loan Parties and at Loan Parties' request.

(e)    Subordination. Each Loan Party hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Obligor, howsoever arising, to the payment in full of its Obligations.

(f)    Payments by Borrower; Presumptions by ~~Administrative~~ Agent.  Unless the Agent shall have received notice from the Borrower Agent prior to the date on which any payment is due to the Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  With respect to any payment that the Agent makes for the account of the Lenders hereunder as to which the Agent determines (which determination shall be conclusive absent manifest error) that any of the following applies (such payment referred to as the "Rescindable Amount"): (1) the Borrowers have not in fact made such payment; (2) the Agent has made a payment in excess of the amount so paid by the Borrowers (whether or not then owed); or (3) the Agent has for any reason otherwise erroneously made such payment; then each of the Lenders severally agrees to repay to the  Agent forthwith on demand the Rescindable Amount so distributed to such Lender, in immediately available funds with interest thereon,

for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation. A notice of the Agent to any Lender or the Borrower Agent with respect to any amount owing under this clause (f) shall be conclusive, absent manifest error.

## ARTICLE 5.  SECURITY INTEREST

5.1    Grant of Security Interest.  As collateral security for the payment and performance in full of all of the Obligations, each Loan Party hereby pledges and grants to Agent, for the ratable benefit of Agent and the Lenders, a lien on and security interest in and to all of the right, title and interest of such Loan Party in, to and under all of the Collateral.

5.2    Financing Statement Filings.

(a)    Each Loan Party hereby irrevocably authorizes Agent at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including, without limitation, (i) whether such Loan Party is an organization, the type of organization and any organizational identification number issued to such Loan Party, (ii) a description of the Collateral as "all assets of the Debtor, wherever located, whether now owned or hereafter acquired" or words of similar effect and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates.  Each Loan Party agrees to provide all information described in the immediately preceding sentence to Agent promptly upon request.

(b)    Each Loan Party hereby further authorizes Agent to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any United States state or other country) this Agreement, each Intellectual Property Security Agreement, and other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by such Loan Party hereunder, without the signature of such Loan Party where permitted by law, and naming such Loan Party as debtor, and Agent as secured party.

(c)    Each Loan Party hereby further authorizes Agent at any time and from time to time, with respect to all motor vehicles covered by a certificate of title law of any state, to file in any relevant jurisdiction with the registrar of motor vehicles or other appropriate Governmental Authority in such jurisdiction an application or other document requesting the notation or other indication of the security interest created hereunder on such certificate of title.

(d)    Each Loan Party hereby ratifies its prior authorization for Agent to file in any relevant jurisdiction any financing statements or amendments thereto relating to the Collateral if filed prior to the Closing Date.

## ARTICLE 6.  CONDITIONS PRECEDENT

6.1    Conditions Precedent to Effectiveness of Agreement to Make Initial Loans and Letters of Credit.  The agreement of Lenders to make the Loans and of Issuing Bank to issue Letters of Credit shall

become effective upon the satisfaction, or waiver, immediately prior to or concurrently therewith of each of the conditions precedent set forth on Schedule 6.1.

6.2    Conditions Precedent to All Loans and Letters of Credit.  The obligation of Lenders to make the Loans, including the initial Loans, or of Issuing Bank to issue Letters of Credit is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making of each Loan or the issuance of each Letter of Credit of each of the following conditions precedent:

(a)    All representations and warranties contained herein and in the other Loan Documents that are qualified as to materiality or Material Adverse Effect shall be true and correct and the representations and warranties that are not so qualified shall be true and correct in all material respects, in each case with the same effect as though such representations and warranties had been made on and as of the date of the making of each Loan or providing each Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and correct to the extent required hereunder or under the other Loan Documents on and as of such earlier date).

(b)    As of the date of any Loan or the issuance, amendment, renewal, or extension of any Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no Default or Event of Default shall exist or have occurred and be continuing.

(c)    Agent shall have received a request for Loan or Letter of Credit (or for the amendment, renewal, or extension thereof) in accordance with the requirements of this Agreement.

(d)    As of the date of any Loan or the issuance, amendment, renewal, or extension of Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, no event, condition or circumstance that has or individually or in the aggregate could reasonably be expected to have a Material Adverse Effect shall have occurred.

(e)    As of the date of any Loan or the issuance, amendment, renewal, or extension of any Letter of Credit, as applicable, or the use of the proceeds thereof, and after giving effect to any of the foregoing, the aggregate principal amount of the Revolving Loans shall not exceed the lesser of (i) the Maximum Revolving Credit or (ii) the Borrowing Base.

Each request for a Loan or the issuance, amendment, renewal, or extension of a Letter of Credit submitted by Borrower Agent shall be deemed to be a representation and warranty by Borrowers that the conditions specified in Section 6.2 have been satisfied on and as of the date of the applicable Loan or issuance, amendment, renewal, or extension of the applicable Letter of Credit.  The making of any Loan or the issuance, amendment, renewal, or extension of a Letter of Credit shall not be deemed a modification or waiver by Agent or Lenders of any of the terms of this Agreement or any Default or Event of Default.

## ARTICLE 7.  REPRESENTATIONS AND WARRANTIES

Each Loan Party hereby represents and warrants to Agent, each Lender and Issuing Bank the following:

7.1    Organization; Powers.  Each Loan Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business, and is in good standing in, every

jurisdiction where such qualification is required, where the failure to so qualify would reasonably be expected to result in a Material Adverse Effect.

       7.2    <u>Authorization; Enforceability</u>.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary organizational actions and, if required, actions by holders of its Equity Interests.  Each Loan Document to which a Loan Party is a party has been duly executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

       7.3    <u>No Conflicts</u>.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party do not and will not (a) violate any material provision of Federal, State, or local law or regulation applicable to any Loan Party, the Organization Documents of any Loan Party, or any order, judgment, or decree of any court or other Governmental Authority binding on any Loan Party or its property, (b) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any Material Contract of any Loan Party where any such conflict, breach or default could individually or in the aggregate reasonably be expected to have a Material Adverse Effect, (c) result in the creation or imposition of, or require or give rise to any obligation to grant, any Lien, security interest, charge or other encumbrance upon any property of any Loan Party, other than Permitted Liens, or (d) as of the Closing Date, require any approval of any holder of Equity Interests of any Loan Party or any approval or consent of any Person under any Material Contract of any Loan Party, other than consents or approvals that have been obtained and that are still in force and effect and except, in the case of Material Contracts, for consents or approvals, the failure to obtain could not individually or in the aggregate reasonably be expected to cause a Material Adverse Effect.

       7.4    <u>Governmental Approvals</u>.  The execution, delivery, and performance by each Loan Party of the Loan Documents to which such Loan Party is a party and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent, or approval of, or notice to, or other action with or by, any Governmental Authority, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered to Agent for filing or recordation, as of the Closing Date.

       7.5    <u>Financial Statements; No Material Adverse Effect; Solvent</u>.  The consolidated and consolidating balance sheets, and related statements of income, cash flow and shareholders' equity, of EGC that have been and are hereafter delivered to Agent, have been prepared in accordance with GAAP (except, in the case of unaudited financial statements, for the lack of footnotes and being subject to year-end audit adjustments) and present fairly in all material respects, the financial condition of any Loan Party as of the date thereof and results of operations for the period then ended.  Since January 31, 2021, no event, circumstance, or change has occurred that has or could reasonably be expected to have a Material Adverse Effect with respect to any Loan Party.  No financial statement delivered to Agent at any time contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make such statement not materially misleading.  Projections delivered to Agent have been prepared in light of the past operations of the businesses of the Loan Parties and are based upon estimates and assumptions stated therein, all of which Loan Parties believe to be reasonable and fair in light of the then current conditions and current facts and reflect the good faith and reasonable estimates of Loan Parties of the future financial performance of Loan Parties and of the other information projected therein for the periods set forth therein, as of the date such Projections were furnished to the Agent and as of the Closing Date.  The  Loan Parties, taken as a whole, are Solvent and will continue to be Solvent after the

creation of the Obligations, the security interests of Agent and the other transaction contemplated hereunder.

7.6     Properties; No Liens.  Except to the extent that would not reasonably be expected to result in a Material Adverse Effect, each Loan Party has (a) good, sufficient and legal title to (in the case of fee interests in Real Property), (b) valid leasehold interests in (in the case of leasehold interests in real or personal property), and (c) good and marketable title to (in the case of all other personal property), all of its assets reflected in its most recent financial statements delivered pursuant to Section 8.1 and Schedule 8.1, in each case except for assets disposed of since the date of such financial statements to the extent permitted hereby.  All of such assets are free and clear of Liens except for Permitted Liens.

7.7     Litigation.  Except as set forth on Schedule 7.7, there are no actions, suits, proceedings or investigations pending or, to best of Loan Parties' knowledge, threatened against any Loan Party, or its business or assets, in excess of $250,000 and that (a) relate to any Loan Documents or transactions with the Lenders or their Affiliates contemplated thereby or (b) either individually or in the aggregate has had or could reasonably be expected to have a Material Adverse Effect.

7.8     Compliance with Laws.  Each Loan Party is in compliance with the requirements of all applicable Laws, rules, regulations, executive orders or codes (including Environmental Laws) and all final judgments, orders, writs, injunctions, decrees, rules or regulations of any court or any Governmental Authority, in each case where the failure to comply individually or in the aggregate has or could reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of material noncompliance issued to a Loan Party under any applicable Laws, rules, regulations, executive orders or codes, which, in each case, has had or could reasonably be expected to have a Material Adverse Effect.  No Inventory has been produced in violation of the Federal Labor Standards Act of 1938.

7.9     Environmental Condition.  Except as set forth on Schedule 7.9, (a) no Loan Party's assets have been used by any Loan Party, or by previous owners or operators in the disposal of, or to produce, store, handle, treat, release, or transport, any Hazardous Materials, where such disposal, production, storage, handling, treatment, release or transport was in violation, in any material respect, of any applicable Environmental Law, (b) no Loan Party's assets have been designated or identified in any manner pursuant to any environmental protection statute as a Hazardous Materials disposal site, (c) no Loan Party has received notice that a security interest, Lien or other encumbrance arising under any Environmental Law has attached to any assets of any Loan Party, and (d) no Loan Party or its assets are subject to any outstanding written order, consent decree, or settlement agreement with any Person relating to any Environmental Law or liability thereunder that, in each case, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.

7.10     No Defaults.  No Default or Event of Default has occurred and is continuing.

7.11     Material Contracts.  Schedule 7.11 sets forth all Material Contracts to which each Loan Party is a party or is bound as of the Closing Date.  Each Loan Party has delivered true, correct and complete copies of such Material Contracts that are in effect as of the Closing Date to Agent on or before the Closing Date.  No Loan Party is in breach or in default in any material respect under any Material Contract and no Loan Party has received any notice of the intention of any other party thereto to terminate any Material Contract, which breach, default or termination could reasonably be expected to result in liability to the Borrowers in excess of $500,000.

7.12     Restrictive Agreements.  Except as set forth on Schedule 7.12, as of the Closing Date, no Loan Party is party or subject to any agreement or other arrangement that prohibits, restricts or imposes

any condition upon (a) the ability of any Loan Party to create, incur or permit to exist any security interest, Lien or other encumbrance on the Collateral, or (b) the ability of any Loan Party to pay dividends or other distributions with respect to any of its Equity Interests (other than Equity Interests of EGC) or to make or repay loans or advances to any Loan Party or to guarantee Indebtedness or to transfer assets.

7.13    Taxes.  Each Loan Party has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which the applicable Loan Party has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.  No tax Liens have been filed (except to the extent constituting Permitted Liens) and no material claims are being asserted with respect to any such Taxes.

7.14    ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to have a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Pension Plan, and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Pension Plans, in each case, except to the extent that could not reasonably be expected to result in liability to the Borrowers in excess of $250,000.

7.15    Insurance.  Schedule 7.15 sets forth a description of all insurance maintained by or on behalf of each Loan Party as of the Closing Date.  As of the Closing Date, all premiums in respect of such insurance have been paid.  Each Loan Party maintains with financially sound and reputable insurance companies, insurance on all of its property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations, including errors and omissions policies.

7.16    Capitalization and Subsidiaries.  Schedule 7.16 (as may be updated by the Borrowers from time to time) sets forth (a) a correct and complete list of the name and relationship to each Loan Party of each Subsidiary, (b) a true and complete listing of each class of each Loan Party's authorized Equity Interests, all of which issued shares are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified on Schedule 7.16, and (c) the type of entity of each Loan Party and each Subsidiary.  There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

7.17    Security Interest in Collateral.  This Agreement creates legal and valid security interests in all of the Collateral in favor of Agent for the benefit of Agent and Lenders, and such security interests constitute perfected and continuing security interests on the Collateral, securing the Obligations, enforceable against any Loan Party and having priority over all other security interests, Liens or other encumbrances on the Collateral except (a) Permitted Liens, to the extent any such Permitted Liens would have priority over the security interests of Agent for the benefit of Agent and Lenders pursuant to any applicable Law or agreement, (b) security interests perfected only by possession or the notation of the security interest on the certificate of title with respect thereto to the extent Agent for the benefit of Agent

and Lenders has not obtained or does not maintain possession of such Collateral or has not had its security interest noted on the certificate of title, (c) security interests that will be perfected upon the filing of financing statements or similar instruments with the appropriate agencies or following such other appropriate action to be taken by the Agent, which, in each case, have been authorized by the Loan Parties hereunder and (d) security interests the perfection of which is not required hereunder.

7.18    Brokers.  There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents, other than fees payable to East Wind Advisors LLC, which fees are the sole responsibility of Borrowers.

7.19    Intellectual Property (i) each Loan Party owns, or is licensed to use, all material Intellectual Property necessary to its business as currently conducted, a correct and complete list of which as of the Closing Date is set forth on Schedule 7.19, and the use thereof by Loan Parties does not infringe on the rights of any other Person, and (ii) except as set forth on Schedule 7.19 (as may be updated by the Borrowers from time to time), each Loan Party's rights thereto are not subject to any licensing agreement or similar arrangement.  No material trademark, servicemark, copyright or other material Intellectual Property at any time used by a Loan Party which is owned by another person, or owned by any Loan Party subject to any security interest, Lien or other encumbrance in favor of any person other than Agent, is affixed to or incorporated in any Eligible Inventory, except (a) to the extent permitted under the terms of the license agreements listed on Schedule 7.19 (as may be updated by the Borrowers from time to time)  and (b) to the extent the sale of Inventory to which such Intellectual Property is affixed or incorporated is permitted to be sold by a Loan Party under applicable Law (including the United States Copyright Act of 1976).

7.20    Trade Relations.  There exists no actual or threatened termination, limitation or modification of any business relationship between any Loan Party and any customer or supplier, or any group of customers or suppliers, who individually or in the aggregate are material to the business of any Loan Party and which could reasonably be expected to result in a Material Adverse Effect.  There exists no condition or circumstance that could reasonably be expected to impair the ability of any Loan Party to conduct its business at any time hereafter in substantially the same manner as conducted on the Closing Date, which could reasonably be expected to result in a Material Adverse Effect.

7.21    Labor Relations.  Except as described on Schedule 7.21 (as may be updated by the Borrowers from time to time), no Loan Party is party to or bound by any collective bargaining agreement or management agreement.  There are no material grievances, disputes or controversies with any union or other organization of any Loan Party's employees or any threatened strikes, work stoppages or demands for collective bargaining that could reasonably be expected to result in a Material Adverse Effect.

7.22    [Reserved.]

7.23    Margin Regulations, Investment Company Act, Etc.  No Loan Party is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No proceeds of Loans or Letters of Credit will be used by any Loan Party to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.  No Loan Party is (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940, or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other applicable Law regarding its authority to incur Indebtedness.

7.24     Anti-Terrorism Laws. Each Loan Party represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

7.25     Complete Disclosure. No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading, when taken as a whole, as and when made.  There is no fact or circumstance that a Loan Party has failed to disclose to Agent in writing that has, or could reasonably be expected to have, a Material Adverse Effect.

## ARTICLE 8.   AFFIRMATIVE COVENANTS

8.1     Financial Statements, Borrowing Base Certificate and Other Information.  Loan Parties (a) will deliver to Agent each of the financial statements, reports, and other items set forth on Schedule 8.1 no later than the dates specified therein, (b) maintain a system of accounting that enables Loan Parties to produce financial statements in accordance with GAAP, and (c) will (i) keep a reporting system that shows all additions, sales, claims, returns, and allowances with respect to its sales, and (ii) maintain its billing systems and practices substantially as in effect as of the Closing Date and shall only make material modifications thereto with notice to Agent.

8.2     Notices of Material Events.  Borrower Agent will, upon obtaining knowledge thereof, promptly notify Agent in writing of:

(a)     the occurrence of any Default or Event of Default;

(b)     any matter that has had, or could reasonably be expected to have, a Material Adverse Effect;

(c)     any material breach or non-performance of, or any material default under, a Material Contract or with respect to Material Indebtedness;

(d)     any dispute, litigation, investigation, proceeding or suspension between any Loan Party and any Governmental Authority or the commencement of, or any material development in, any litigation or proceeding affecting a Loan Party, including pursuant to any applicable Environmental Laws, that could reasonably be expected to result in liability to the Borrowers in excess of $250,000.

(e)     the occurrence of any ERISA Event;

(f)     any material change in accounting policies or financial reporting practices of Loan Parties;

(g)     any change in any Loan Party's senior executive officers;

(h)     the discharge by any Loan Party of its independent accountants or any withdrawal or resignation by such accountants;

(i)     any collective bargaining agreement or other labor contract to which any Loan Party becomes a party, or the application for the certification of a collective bargaining agent;

(j)     the filing of any Lien for material unpaid Taxes against any Loan Party;

(k)     any loss, damage, or destruction to, or commencement of any action or proceeding for the taking under eminent domain, condemnation or similar proceeding, of Collateral in excess of $250,000, whether or not covered by insurance.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of Borrower Agent setting forth details of the occurrence referred to therein and stating what action Loan Parties have taken and propose to take with respect thereto.

8.3     <u>Existence</u>.  EGC will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence. Except where the failure to do so could not reasonably be expected to have a Material Adverse Effect, each Loan Party will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, Intellectual Property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted.

8.4     <u>Payment of Obligations</u>.   Each Loan Party will pay or discharge all Material Indebtedness and all other material liabilities and obligations, including material Taxes, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the applicable Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, <u>that</u>, each Loan Party will remit withholding Taxes and other payroll Taxes to the appropriate Governmental Authority as and when claimed to be due, notwithstanding the foregoing exceptions.

8.5     <u>Maintenance of Properties</u>.  Each Loan Party will keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

8.6     <u>Compliance with Laws</u>.   Each Loan Party will (a) comply with all Laws, rules, regulations, licenses, approvals and orders applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority applicable to it or its property (including without limitation Environmental Laws) and (b) perform in all material respects its obligations under Material Contracts to which it is a party in each case, where the failure to do so, individually or in the aggregate, has or could reasonably be expected to have a Material Adverse Effect.

8.7     <u>Insurance</u>.  Each Loan Party will maintain with financially sound and reputable carriers insurance in such amounts (with no greater risk retention) and against such risks and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  Loan Parties will from time to time upon Agent's request furnish to Agent information in reasonable detail as to the insurance so maintained.

8.8     <u>Inspection Rights; Field Examinations; Appraisals</u>.  Upon the request of Agent, the Loan Parties will permit Agent or a firm engaged by Agent for such purpose to (a) conduct field examinations, including, without limitation, with respect to the Borrowers' practices in the calculation of the Borrowing Base and the assets included in the Borrowing Base and related financial information such as, but not

limited to, sales, gross margins, payables, accruals and reserves; it being acknowledged that absent the occurrence of an Event of Default, Agent shall conduct no more than two field examinations per annum and, after the occurrence of an Event of Default, there shall be no such limitation, in either case, upon reasonable prior notice and at reasonable times during normal business hours and (b) conduct appraisals of the Collateral. Upon the request of Agent, Loan Parties will permit representatives and other professionals (including investment bankers, consultants, accountants, and lawyers) engaged by Agent for such purpose to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and accountants, all at the expense of Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired.

8.9    Use of Proceeds.    ~~Borrowers~~Debtor shall use the proceeds of the ~~initial Loans and Letters of Credit hereunder only for: (a) the Acquisition and any related costs, expenses and fees, (b) payments to each of the persons listed in the disbursement direction letter furnished by Borrowers to Agent on or about the Closing Date and (c) costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents. All other Loans made or Letters of Credit shall be used by Borrowers only for general operating, working capital and other corporate purposes of Borrowers not otherwise prohibited by the terms of the Organization Documents of Borrowers or hereunder.~~DIP Loans under the DIP Facility only for the purposes set forth in Section 5.2 of the Ratification Agreement.

8.10    Cash Management; Collection of Proceeds of Collateral.

(a)    The Loan Parties shall establish and maintain, at their expense, Deposit Accounts and cash management services of a type and on terms, and with the banks, set forth on Schedule 8.10 and, subject to Section 8.10(b), such other banks as Loan Parties may hereafter select (such other banks, together with the banks set forth on Schedule 8.10, collectively, the "Cash Management Banks" and individually, a "Cash Management Bank"). Subject to Section 8.16, each Loan Party shall deliver, or cause to be delivered to Agent, a Control Agreement with respect to each Loan Party's Deposit Accounts duly authorized, executed and delivered by each Cash Management Bank where a Deposit Account is maintained, the applicable Loan Party and Agent; provided, that, Loan Parties shall not be required to deliver a Control Agreement with a Cash Management Bank as to any Excluded Account. Except as otherwise agreed to by the Agent, each such Control Agreement shall provide, among other matters, that (i) the Cash Management Bank will comply with any instructions originated by Agent directing the disposition of the funds in each applicable Deposit Account without further consent by the applicable Loan Party, (ii) the Cash Management Bank waives, subordinates, or agrees not to exercise any rights of setoff or recoupment or any other claim against each applicable Deposit Account other than for payment of its service fees and other charges directly related to the administration of such Deposit Account and for returned checks or other items of payment, and (iii) upon the instruction of Agent (a "Notice of Exclusive Control"), the Cash Management Bank will forward by daily sweep all amounts in each applicable Deposit Account to the Agent Payment Account. Agent agrees not to issue a Notice of Exclusive Control with respect to the Deposit Accounts unless a Cash Dominion Period has occurred and is continuing. Subject to Section 8.16, Loan Parties shall direct all account debtors or other obligors in respect of any amounts payable to Loan Parties to make payment of all such amounts to a Deposit Account that is subject to a Control Agreement. Each Loan Party and its respective employees, agents and Subsidiaries shall, acting as trustee for Agent, receive, as the property of Agent for the benefit of Agent and Lenders, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts or other Collateral which come into its possession or under its control and, promptly upon receipt thereof, shall deposit or cause the same to be deposited in a Deposit

Account that is subject to a Control Agreement, or remit the same or cause the same to be remitted, in kind, to Agent.

(b)    So long as no Default or Event of Default exists or has occurred and is continuing, upon not less than five (5) Business Days' prior written notice to Agent, Loan Parties may amend Schedule 8.10 to add or replace a Deposit Account or Cash Management Bank and shall upon such addition or replacement provide to Agent an amended Schedule 8.10; provided, that, (i) such prospective Cash Management Bank shall be reasonably satisfactory to Agent, and (ii) prior to the time of the opening of such Deposit Account the applicable Loan Party and such prospective Cash Management Bank shall have executed and delivered to Agent a Control Agreement. Each Loan Party shall close any of its Deposit Accounts (other than Excluded Accounts) (and establish replacement Deposit Accounts in accordance with the foregoing sentence) as promptly as practicable and in any event within forty-five (45) days after notice from Agent that the operating performance, funds transfer, or availability procedures or performance of the Cash Management Bank with respect to Deposit Accounts or Agent's liability under any Control Agreement with such Cash Management Bank is no longer satisfactory to Agent in Agent's Permitted Discretion.

8.11    Additional Collateral; Further Assurances.

(a)    In the case of the formation or acquisition by any Loan Party of any wholly-owned Subsidiary after the Closing Date, as to any such Subsidiary, within thirty (30) days of such formation or acquisition, (i) each Loan Party shall cause such Subsidiary to execute and deliver to Agent, in form and substance satisfactory to Agent, a Joinder Agreement to the Loan Documents in order to make such Subsidiary a party to this Agreement as a borrower or guarantor as determined by Agent in its Permitted Discretion and shall cause it to execute and deliver a guarantee and such other agreements, documents or instruments and to deliver other consents, waivers, acknowledgments and other agreements from third persons which Agent may deem reasonably necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the assets of such Subsidiary and the Equity Interests of each Loan Party in such Subsidiary, corporate resolutions and other organization and authorizing documents of such Person, and opinions of counsel reasonably satisfactory to Agent with respect to such Person and (ii) each Loan Party shall execute and deliver to Agent, a pledge and security agreement, in form and substance reasonably satisfactory to Agent, granting to Agent for the benefit of Agent and Lenders a pledge of and first priority Lien on all of the issued and outstanding shares of Equity Interests of any such Subsidiary, such other agreements, documents and instruments as Agent may require in connection with the documents referred to above, including, but not limited to, supplements and amendments hereto, corporate resolutions and other organization and authorizing documents and favorable opinions of counsel to such person.

(b)    Without limiting the foregoing, unless otherwise agreed to by Agent, each Loan Party will, and will cause each wholly-owned Subsidiary (other than EGC Holdings) to, execute and deliver, or cause to be executed and delivered, to Agent such documents, agreements and instruments, and take or cause to be taken such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents and such other actions or deliveries of the type required by Section 6.1, as applicable), which Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the security interests and Liens created or intended to be created hereunder, all in form and substance reasonably satisfactory to Agent and at the expense of Borrowers.

8.12     End of Fiscal Years; Fiscal Quarters.  Each Loan Party shall, for financial reporting purposes, cause its fiscal year to end on August 31 of each year, and fiscal quarters to end on the last day of each of February, May, August and November of each year.

8.13     Costs and Expenses.  Borrowers shall pay to Agent on demand all reasonable costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Agent's, for the benefit of Agent and Lenders, rights in the Collateral, this Agreement, the other Loan Documents and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into, including: (a) all costs and expenses of filing or recording (including UCC financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable), (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, together with Agent's customary charges and fees with respect thereto; (c) customary charges, fees, or expenses charged by Issuing Bank in connection with any Letter of Credit; (d) actual costs and expenses of preserving and protecting the Collateral; (e) actual costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and Liens of Agent in the Collateral, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Loan Documents or defending any claims made or threatened against Agent and Lenders arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations, plus a per diem charge at Agent's then standard rate for Agent's examiners in the field and office (which rate as of the Closing Date is $1,250 per person per day) plus a review fee of $750 per field examination review; and (g) the reasonable fees and disbursements of counsel (including legal assistants) to Agent in connection with any of the foregoing.

8.14     Depository Bank.  Borrowers shall use their commercially reasonable efforts to promptly move their existing banking arrangements to Israel Discount Bank of New York and, thereafter, maintain Israel Discount Bank of New York as their principal depository bank, including for the maintenance of all operating, collection, disbursement and other deposit accounts and as their principal Cash Management Bank.

8.15     Anti-Terrorism Laws. Each Loan Party covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered Entity shall comply with all Anti-Terrorism Laws and (v) Borrower Agent shall promptly notify the Agent in writing upon the occurrence of a Reportable Compliance Event.

~~8.16  Post-Closing. Notwithstanding anything to the contrary herein, the Loan Parties shall not be required to take any of the following actions or deliver any of the following items, prior to the dates set forth below:~~

~~(a) On or prior to the date that is thirty (30) days following the Closing Date (or such later date as the Agent may agree to in its sole discretion), EGC shall deliver to the Agent endorsements naming Agent for the benefit of Agent and Lenders as lender loss payee or additional insured, as applicable, relating to EGC's insurance policies, in each case, as required pursuant to Section 8.7 of this Agreement;~~

~~(b) As soon as possible, but no later than five (5) Business Days after the Closing Date (or such later date as the Agent may reasonably agree), EGC and Clarity shall execute and deliver the Deed of Undertaking in favor of Agent, in form and substance reasonably acceptable to Agent, together with such supporting and related documents, opinion (to be delivered by Agent's counsel) and agreements as reasonably required by Agent and its counsel; provided that, until execution and delivery of the foregoing, none of Borrowers' inventory located in Hong Kong shall be eligible for borrowing purposes hereunder;~~

~~(c) As soon as possible, but no later than fifteen (15) Business Days after the Closing Date (or such later date as the Agent may reasonably agree), a Control Agreement executed by Borrowers, Bank of America, N.A. and Agent, in form and substance reasonably satisfactory to Agent, with respect to Borrowers' operating accounts maintained with Bank of America, N.A.~~

## ARTICLE 9.  NEGATIVE COVENANTS

9.1    <u>Indebtedness</u>.  Loan Parties shall not, and shall not permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), ~~the~~ any Indebtedness ~~of any other Person~~, except ~~for the Permitted Indebtedness~~ as provided in the DIP Order and the Approved Budget.

9.2    <u>Liens</u>.  Loan Parties shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, Lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or Lien with respect to any such assets or properties, except ~~Permitted Liens.~~ (a) Liens existing on the Petition Date which constituted Permitted Liens under the Prepetition Credit Agreement and the other Prepetition Loan Documents to the extent such Liens were legal, valid, binding, enforceable and non-avoidable as of the Petition Date, and are not otherwise subject to any defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, (b) the Adequate Protection Liens, and (c) Liens on the Collateral in respect of the Carve Out.

9.3    <u>Fundamental Changes.</u>  No Loan Party shall, directly or indirectly:

(a)    (i) change its name or conduct business under any fictitious name; (ii) change its tax, charter or other organizational identification number or (iii) change its form or state of organization, in the case of the foregoing <u>subclauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> above, without (x) giving written notice to Agent at least thirty (30) days prior to any such change and (y) cooperating with Agent to take all steps necessary for Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Loan Party and in the Equity Interests of such Loan Party; or

(b)    (i) suspend operations, wind up, liquidate or dissolve or (ii) merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions; <u>provided</u>, <u>that</u>, so long as the applicable Loan Party or Loan Parties provide Agent with thirty days' notice prior to such occurrence, (A) a Loan Party may merge with a Person if EGC (or such other Loan

Party if EGC is not a party to such merger) is the surviving Person, (B) any Loan Party may sell, transfer, lease or otherwise dispose of all or substantially all of its assets to any other Loan Party, (C) any Loan Party (other than EGC) may liquidate or dissolve so long as any assets and operation of such Loan Party are distributed to any other Loan Party.

9.4    Asset Sales.  Loan Parties shall not sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of any Equity Interests (other than Equity Interests of EGC) or any of its assets to any other Person, except for Permitted Dispositions.

9.5    Investments.  Loan Parties shall not, directly or indirectly, purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary immediately prior to such merger) any Equity Interests, evidences of indebtedness or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any capital contribution or other investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit or all or a substantial part of the assets or property of any other Person (whether through purchase of assets, merger or otherwise), or form or acquire any Subsidiaries, or agree to do any of the foregoing (each of the foregoing an "Investment"), except Permitted Investments as provided in the DIP Order and the Approved Budget.

9.6    Transactions with Affiliates.  Loan Parties shall not, and shall not permit any Subsidiary to, directly or indirectly, purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliates of any Loan Party, except pursuant to the reasonable requirements of Loan Parties' business and upon fair and reasonable terms no less favorable to Loan Parties than Loan Parties would obtain in a comparable arm's length transaction with an unaffiliated person, except for the following: (a) any employment or compensation arrangement or agreement, employee benefit plan or arrangement, officer or director indemnification agreement or any similar arrangement or other compensation arrangement entered into by Loan Parties in the ordinary course of business and payments, issuance of securities or awards pursuant thereto, and including the grant of stock options, restricted stock, stock appreciation rights, phantom stock awards or similar rights to employees and directors in each case approved by the board of directors or equivalent governing body of Loan Parties, (b) Restricted Payments permitted under Section 9.8, (c) transactions among the Loan Parties not involving any other Affiliate, (d) any issuances of Equity Interests or contributions to capital not otherwise prohibited hereunder and (e) the Management Services Agreement, by and among WITHit and EGC, dated as of March 22, 2021 as provided in the DIP Order and the Approved Budget.

9.7    Change in Business.  Loan Parties shall not engage in any business other than the business of Loan Parties on the Closing Date and any business reasonably related, ancillary or complimentary to the business in which Loan Parties are engaged on the Closing Date.

9.8    Restricted Payments. Loan Parties shall not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment other than Permitted Payments, except as provided in the DIP Order and the Approved Budget.

9.9    Restrictive Agreements.  Loan Parties shall not, directly, or indirectly, create or otherwise cause or suffer to exist any agreement or other arrangement that prohibits, restricts or imposes any condition on the ability of Loan Parties to pay dividends or make other distributions to other Loan Parties or pay any Obligations hereunder or pay Indebtedness owed to other Loan Parties or make loans or advances to other Loan Parties or grant security interests in or Liens on any of their assets to the Agent or transfer any of their assets to other Loan Parties, except (a) such an agreement or other arrangement that is in effect on the Closing Date, (b) such an agreement or other arrangement that relates to secured

~~Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness, (c) customary restrictions on assignment in leases and other contracts, (d) restrictions or conditions imposed by law or by this Agreement or any other Loan Document, (e) customary restrictions and conditions contained in agreements relating to a Permitted Disposition pending such disposition, provided such restrictions and conditions apply only to the assets to be disposed of or (f) such other agreements or arrangements specifically permitted hereunder or otherwise agreed to in writing by Agent.~~as provided in the DIP Order and the Approved Budget.

9.10    Certain Payments of Indebtedness, Etc.  Loan Parties shall not make or agree to make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Material Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Material Indebtedness, except~~: (a) payment of the Obligations; (b) payment of regularly scheduled principal and interest payments, and other mandatory payments, as and when due in respect of any Permitted Indebtedness, other than payments in respect of Subordinated Debt prohibited by the subordination provisions thereof; (c) payments in respect of Permitted Indebtedness in each case with proceeds of Refinancing Indebtedness with respect thereto to the extent permitted under the definition of Permitted Indebtedness; (d) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted under Section 9.4; (e) payments made at a time when the Payment Conditions are satisfied and no Cash Dominion Period is in effect; and (f) payments of Indebtedness pursuant to corporate and employee credit card programs incurred in the ordinary course of business.~~ as provided in the DIP Order and the Approved Budget.

9.11    Amendment of Organization Documents.  Loan Parties shall not amend, modify or waive any of the terms of its Organization Documents except for amendments, modifications or other changes that do not materially adversely affect the interests of Agent and Lenders.

9.12    Sale and Leasebacks.  Loan Parties shall not enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except ~~for any such sale of any fixed or capital assets by Loan Parties that is made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within ninety (90) days after any Loan Party acquires or completes the construction of such fixed or capital asset and the obligations of such Loan Party under such lease constitute Permitted Indebtedness.~~as provided in the DIP Order and the Approved Budget.

**ARTICLE 10.** ~~**FINANCIAL COVENANTS**~~**[RESERVED]**

~~10.1 Net Loss.  Loan Parties shall not have a negative Net Income (i.e., a net loss) for any fiscal year as reflected on any annual financial statement delivered pursuant to clause (a) of Schedule 8.1 annexed hereto.~~

~~10.2 Tangible Net Worth.  Loan Parties shall have Tangible Net Worth of not less than $25,000,000 as reflected on any annual financial statement delivered pursuant to clause (a) of Schedule 8.1 annexed hereto.~~

## ARTICLE 11.  EVENTS OF DEFAULT AND REMEDIES

11.1    <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events is referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a)    (i) Any Borrower fails to (x) make any principal payment hereunder when due or (y) pay interest, fees, or any of the other Obligations within three (3) Business Days of becoming due, or (ii) any Loan Party fails to perform any of the covenants contained in <u>Sections 2.1</u>, <u>2.2</u>, <u>8.1</u>, <u>8.2</u>, <u>8.7</u>, <u>8.10</u>, <u>9</u> and <u>10</u>, or (iii) any Loan Party fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Loan Documents other than those described in <u>Sections 11.1(a)(i)</u> and <u>11.1(a)(ii)</u> above and such failure shall continue for thirty (30) days after the earlier of delivery of written notice of such failure or neglect from Agent to Borrower Agent or actual knowledge of such failure or neglect by the Borrower Agent; <u>provided</u>, <u>that</u>, such thirty (30) day period shall not apply in the case of any failure to observe any such covenant which is not capable of being cured at all or within such thirty (30) day period or which has been the subject of a prior failure within a three (3) month period;

(b)    any representation, warranty or statement of fact made by any Loan Party to Agent and Lenders in this Agreement, the other Loan Documents or any other written agreement, schedule, confirmatory assignment or otherwise that are qualified as to materiality or Material Adverse Effect shall when made or deemed made be incorrect, false or misleading and any other such representation, warranty or statement of fact made by such Loan Party to Agent shall when made or deemed made be incorrect, false or misleading in any material respect;

(c)    (i) any judgment for the payment of money is rendered against any Loan Party in excess of $250,000 in the aggregate (to the extent not covered by independent third party insurance where the insurer has not declined or disputed coverage) and shall remain undischarged or unvacated for a period in excess of sixty (60) consecutive days or execution shall at any time not be effectively stayed, or (ii) or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against such Loan Party with respect to any of the Collateral having a value in excess of $250,000, which judgments or judicial orders, in any such case, are not stayed, on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

(d)    any Loan Party makes an assignment for the benefit of creditors or makes or sends notice of a bulk transfer;

(e)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against any Loan Party or all or any part of its properties and such petition or application is not dismissed within sixty (60) days after the date of its filing or any Loan Party shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(f)    a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or equity) is filed by any Loan Party or for all or any part of its property;

(g)    (x) any default in respect of any Material Contract or Material Indebtedness, which default continues for more than the applicable cure period contained in the subject agreement, if

any, with respect thereto, if, as a result thereof, the counterparty to such Material Contract has terminated such Material Contract (and such termination could reasonably be expected to result in liability to the Borrowers in excess of $500,000) or a lender with respect to such Material Indebtedness may accelerate the repayment of such Material Indebtedness or (y) the subordination provisions contained in any agreement related to any Subordinated Debt shall cease to be in full force and effect or to give Agent for the benefit of Agent and Lenders the rights, powers and privileges purported to be created thereby;

(h)    any material provision of this Agreement or of any of the other Loan Documents shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Agent and Lenders) in accordance with its terms, or any such party shall challenge the enforceability of this Agreement or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision of this Agreement or of any of the other Loan Documents has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Loan Documents shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(i)    an ERISA Event shall occur which results in or could be expected to result in liability of any Loan Party in an aggregate amount in excess of $250,000;

(j)    any Loan Party shall be prohibited or otherwise restrained from generally conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction; ~~and~~

(k)    any Change of Control~~.~~;

(l)    the occurrence of any condition or event which permits Agent or any Lender to exercise any of the remedies set forth in the DIP Order, including, without limitation, any "Event of Default" (as defined in any DIP Order);

(m)    the termination or non-renewal of any Loan Document as provided for in any DIP Order;

(n)    Debtor suspends or discontinues all or any material part of its business, or is enjoined by any court or governmental agency from continuing to conduct all or any material part of its business, or a trustee or examiner with expanded powers is appointed for Debtor or any of its properties;

(o)    any act, condition or event occurring after the Petition Date that, in Agent's sole discretion, has or could reasonably expect to have a Material Adverse Effect;

(p)    conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(q)    dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(r)    the grant of a lien on or other interest in any property of Debtor, other than a Lien permitted by any DIP Order, which is superior to or ranks in parity with Agent's Lien upon the Collateral;

(s)     the grant of an administrative expense claim in the Chapter 11 Case which is superior to or ranks in parity with the rights of Agent or any Lender (other than administrative expense claims permitted by any DIP Order or the Ratification Agreement);

(t)     the failure of Debtor to comply with any DIP Order or the Ratification Agreement, or any DIP Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent;

(u)     the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(v)     the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(w)     the filing of a plan of reorganization or liquidation by or on behalf of Debtor which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by Agent;

(x)     the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case which does not provide for payment in full of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein, unless otherwise consented to by Agent;

(y)     the filing of a motion by Debtor that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any Lender) any costs or expenses of preserving or disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise);

(z)     a motion is filed that is not dismissed within ten (10) days after the filing thereof that seeks to take possession of any of the assets (other than Debtor's membership interest in WITHit Holdings, LLC) or business of Debtor;

(aa)     a motion is filed that is not dismissed within ten (10) days after the filing thereof that seeks to prohibit the Debtor from selling any of its Inventory, Equipment or other assets (other than Debtor's membership interest in WITHit Holdings, LLC);

(bb)     the occurrence of any Variance which is not a Permitted Variance;

(cc)     the failure of Debtor to deliver any Variance Report as required by Section 5.3 of the Ratification; and

(dd)     the failure of the Sale to have been consummated within the period covered by the Approved Budget.

11.2    Remedies.

(a)     At any time an Event of Default exists or has occurred and is continuing, and after the applicable cure period, if any, has passed, Agent and the Lenders shall have all rights and remedies provided in this Agreement, the other Loan Documents, the UCC and other applicable Law, all of which rights and remedies may be exercised without notice to or consent by Borrowers, except as such notice or consent is expressly provided for hereunder or required by applicable Law.  All rights, remedies and powers granted to Agent and Lenders hereunder, under any of the other Loan Documents, the UCC or other applicable Law, are cumulative, not exclusive and enforceable, in Agent's and Lenders'

discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by Borrowers of this Agreement or any of the other Loan Documents. Agent may (and at the written request of the Required Lenders shall) at any time or times an Event of Default exists or has occurred and is continuing, proceed directly against Borrowers to collect the Obligations without prior recourse to the Collateral.

(b)    Without limiting the generality of the foregoing, at any time an Event of Default exists or has occurred and is continuing, and after the applicable cure period, if any, has passed, Agent may (and at the written request of the Required Lenders shall) (i) accelerate the payment of all Obligations and demand immediate payment thereof to Agent and Lenders (provided, that, upon the occurrence of any Event of Default described in Sections 11.1(e) and 11.1(f), all Obligations shall automatically become immediately due and payable), (ii) terminate the commitment of Lenders to make Revolving Loans or arrange Letters of Credit hereunder whereupon the obligation of Lenders to make any Revolving Loan and of Issuing Bank to issue, amend, renew, or extend any Letter of Credit shall immediately terminate (provided, that, upon the occurrence of any Event of Default described in Sections 11.1(e) and 11.1(f), the commitments and any other obligation of Agent, Lenders or Issuing Bank hereunder shall automatically terminate), require Borrowers to provide cash collateral to Agent to be used to secure and fund the reimbursement obligations to Issuing Bank in connection with any Letter of Credit Obligations in an amount equal to one hundred five percent (105%) of the amount of the Letter of Credit Obligations, (iii) cease making Revolving Loans or arranging for Letters of Credit or reduce the lending formulas or amounts of Revolving Loans and Letters of Credit available to Borrowers and/or (iv) establish such Reserves as Agent determines, without limitation or restriction, notwithstanding anything to the contrary contained herein.

**ARTICLE 12.   ASSIGNMENTS AND PARTICIPATIONS; APPOINTMENT OF AGENT; AMENDMENTS AND WAIVERS**

12.1    Assignment and Participations.

(a)    Subject to the terms of this Section 12.1, any Lender may make an assignment to a Qualified Assignee of, or sell Participations in, at any time or times, the Loan Documents, Advances and any Commitment or any portion thereof or interest therein, including any Lender's rights, title, interests, remedies, powers or duties thereunder. Any assignment by a Lender shall: (i) require the consent of Agent (which consent shall not be unreasonably withheld or delayed with respect to a Qualified Assignee) and the execution of an Assignment Agreement in form and substance reasonably satisfactory to, and acknowledged by, Agent; (ii) be conditioned on such assignee Lender representing to the assigning Lender and Agent that it is purchasing the applicable Loans to be assigned to it for its own account, for investment purposes and not with a view to the distribution thereof; (iii) after giving effect to any such partial assignment the assignee Lender shall have Commitments in an amount at least equal to One Million Dollars ($1,000,000) and the assignor Lender shall have Commitments in an amount at least equal to One Million Dollars ($1,000,000); (iv) with respect to any assignment of the Loan Documents, the Commitments and any applicable Advances, be for a ratable portion of the assigning Lender's interest in the applicable Commitment Amount and the applicable Advances; (v) include a payment to Agent of an assignment fee of Three Thousand Five Hundred Dollars ($3,500) by assignee Lender; (vi) so long as no Event of Default has occurred and is continuing, require the consent of Borrower Agent, which shall not be unreasonably withheld or delayed; provided, that, no such consent shall be required for an assignment to a Qualified Assignee; and (vii) unless such assignment is to an Affiliate of such Lender, Lender shall give notice to the other Lenders of any intent to assign and such other Lenders shall be permitted to purchase such assignment on terms agreed to by assignor Lender and assignee Lender. After the occurrence of an Event of Default, any Lender may make an assignment to a non-Qualified Assignee

with the consent of Agent.  If more than one Lender wishes to purchase Advances or Commitments from the assigning Lender, such assignments to Lenders will be allocated on a pro-rata basis.  In the case of an assignment by a Lender under this Section 12.1, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as all other Lenders hereunder.  The assigning Lender shall be relieved of its obligations hereunder with respect to its Commitments or assigned portion thereof from and after the date of such assignment.  Each Loan Party hereby acknowledges and agrees that any assignment shall give rise to a direct obligation of such Loan Party to the assignee and that the assignee shall be considered to be a "Lender".  In all instances, each Lender's agreement to make Loans hereunder shall be several and not joint and shall be limited to such Lender's Pro Rata Share of the applicable Commitment.  In the event Agent or any Lender assigns or otherwise transfers all or any part of the Obligations, Agent or any such Lender shall so notify Borrower Agent and Borrowers shall, upon the request of Agent or such Lender, execute new Notes in exchange for the Notes, if any, being assigned.  Notwithstanding the foregoing provisions of this Section 12.1(a), any Lender may at any time pledge the Obligations held by it and such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank; provided, that no such pledge to a Federal Reserve Bank shall release such Lender from such Lender's obligations hereunder or under any other Loan Document.  The Agent shall maintain at its address referred to in Section 14.1(a) a copy of each Assignment Agreement delivered to and accepted by it and a register of the recordation of the names and addresses of the Lenders and the Commitments, and principal amounts thereunder owing to, each Lender from time to time (the "Register").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and Borrowers, Agent and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(b)    Each Loan Party acknowledges that in the regular course of commercial banking business one or more Lenders may at any time and from time to time sell participating interests in the Advances to Participants.  Each Participant may exercise all rights of payment (including rights of set-off) with respect to the portion of such Advances held by it or other Obligations payable hereunder as fully as if such Participant were the direct holder thereof provided that (i) Loan Parties shall not be required to pay to any Participant more than the amount which it would have been required to pay to Lender which granted an interest in its Advances or other Obligations payable hereunder to such Participant had such Lender retained such interest in the Advances hereunder or other Obligations payable hereunder unless the sale of the participation to such Participant is made with Borrower Agent's prior written consent, and (ii) in no event shall Loan Parties be required to pay any such amount arising from the same circumstances and with respect to the same Advances or other Obligations payable hereunder to both such Lender and such Participant.  Each Loan Party hereby grants to any Participant a continuing security interest in any deposits, moneys or other property actually or constructively held by such Participant as security for the Participant's interest in the Advances.  Any Participation by a Lender of all or any part of its Commitment shall be made with the understanding that all amounts payable by Borrowers hereunder shall be determined as if that Lender had not sold such Participation, and that the holder of any such Participation shall not be entitled to require such Lender to take or omit to take any action hereunder except actions directly affecting (i) any reduction in the principal amount of, or interest rate or fees payable with respect to, any Loan in which such holder participates, (ii) any extension of the scheduled amortization of the principal amount of any Loan in which such holder participates or the final maturity date thereof, and (iii) any release of all or substantially all of the Collateral (other than in accordance with the terms of this Agreement or the other Loan Documents).  Solely for purposes of Section 12.8 (Setoff and Sharing of Payments), Section 3.11 (Increased Cost), Section 4.7 (Taxes), and Section 13.5 (Indemnification), each Loan Party acknowledges and agrees that a Participation shall give rise to a direct obligation of Borrowers to the Participant and the Participant shall be considered to be a "Lender".  Except as set forth in the preceding sentence Borrowers shall not have any obligation or duty

to any Participant.  Neither Agent nor any Lender (other than the Lender selling a Participation) shall have any duty to any Participant and may continue to deal solely with the Lender selling a Participation as if no such sale had occurred.

(c)    Except as expressly provided in this Section 12.1, no Lender shall, as between Borrowers and that Lender, or Agent and that Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment, transfer or negotiation of, or granting Participation in, all or any part of any Loans, the Notes or other Obligations owed to such Lender.

(d)    Borrowers shall assist any Lender permitted to sell assignments or Participations under this Section 12.1 as reasonably required to enable the assigning or selling Lender to effect any such assignment or Participation, including the execution and delivery of any and all agreements, notes and other documents and instruments as shall be requested and, if requested by Agent, the preparation of informational materials for, and the Participation of management in meetings with, potential assignees or Participants.  Borrowers shall certify the correctness, completeness and accuracy of all descriptions of Borrowers and their affairs contained in any selling materials provided by them and all other information provided by them and included in such materials, except that any projections delivered by Borrowers shall only be certified by Borrowers as having been prepared by Borrowers based upon any estimates or assumptions stated therein which Borrowers believed to be reasonable and fair in light of the conditions and facts then known to Borrowers and that such projections reflected Borrowers' good faith and reasonable estimates of the future financial performance of Borrowers and of the other information projected therein for the periods set forth therein.

(e)    Any Lender may furnish any information concerning Loan Parties in the possession of such Lender from time to time to assignees and Participants (including prospective assignees and Participants).

12.2    Appointment of Agent.  Israel Discount Bank of New York is hereby appointed to act on behalf of all Lenders as Agent under this Agreement and the other Loan Documents.  The provisions of this Section 12.2 are solely for the benefit of Agent and Lenders and neither any Loan Party nor any other Person shall have any rights as a third party beneficiary of any of the provisions of this Agreement. In performing its functions and duties under this Agreement and the other Loan Documents, Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Loan Party or any other Person. Agent shall have no duties or responsibilities except for those expressly set forth in this Agreement and the other Loan Documents.  The duties of Agent shall be mechanical and administrative in nature and Agent shall not have, or be deemed to have, by reason of this Agreement, any other Loan Document or otherwise a fiduciary relationship in respect of any Lender.  Except as expressly set forth in this Agreement and the other Loan Documents, Agent shall not have any duty to disclose, and shall not be liable for failure to disclose, any information relating to any Loan Party or any of their Subsidiaries or any account debtor of any Loan Party that is communicated to or obtained by Israel Discount Bank of New York in any capacity.  Neither Agent nor any of its Affiliates nor any of their respective officers, directors, employees, agents or representatives shall be liable to any Lender for any action taken or omitted to be taken by it hereunder or under any other Loan Document, or in connection herewith or therewith, provided, that Agent may be liable for damages caused by its or their own gross negligence or willful misconduct.

If Agent shall request instructions from Required Lenders or all affected Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, then Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Required Lenders or all affected Lenders, as the case may be,

and Agent shall not incur liability to any Person by reason of so refraining.  Agent shall be fully justified in failing or refusing to take any action hereunder or under any other Loan Document (a) if such action would, in the opinion of Agent, be contrary to law or the terms of this Agreement or any other Loan Document, (b) if such action would, in the opinion of Agent, expose Agent to liability under any Environmental Law (as such term is defined in the Environmental Agreement) or (c) if Agent shall not first be indemnified to its satisfaction against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of Required Lenders or all affected Lenders, as applicable.

12.3     <u>Agent's Reliance, Etc</u>.  Neither Agent nor any of its Affiliates nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except that Agent or its Affiliates, as applicable, may be liable for damages caused by its or their own gross negligence or willful misconduct.  Without limiting the generality of the foregoing, Agent:  (a)  may treat the payee of any Note as the holder thereof until Agent receives written notice of the assignment or transfer thereof signed by such payee and in form reasonably satisfactory to Agent; (b) may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts; (c) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (d) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of Borrowers or any Guarantor or to inspect the Collateral (including the books and records) of Borrowers or any Guarantor; (e) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (f) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate or other instrument or writing (which may be by facsimile or e-mail) believed by it to be genuine and signed or sent by the proper party or parties.

12.4     <u>Israel Discount Bank of New York and Affiliates</u>.  With respect to its Commitments hereunder, Israel Discount Bank of New York shall have the same rights and powers under this Agreement and the other Loan Documents as any other Lender and may exercise the same as though it were not Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include Israel Discount Bank of New York in its individual capacity.  Israel Discount Bank of New York and its Affiliates may lend money to, invest in, and generally engage in any kind of business with, any Loan Party, any of their Affiliates and any Person who may do business with or own securities of any Loan Party or any such Affiliate, all as if Israel Discount Bank of New York were not Agent and without any duty to account therefor to Lenders.  Israel Discount Bank of New York and its Affiliates may accept fees and other consideration from any Loan Party for services in connection with this Agreement or otherwise without having to account for the same to Lenders.  Each Lender acknowledges the potential conflict of interest between Israel Discount Bank of New York as a Lender holding disproportionate interests in the Loans and Israel Discount Bank of New York as Agent.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.  Furthermore, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, Participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, Participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the

"CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Borrowers, their Affiliates or their agents, the other Loan Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws.

12.5    <u>Lender Credit Decision</u>.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the financial statements referred to in <u>Section 7.5</u> and <u>Section 8.1</u> and such other documents and information as it has deemed appropriate, made its own credit and financial analysis of each Loan Party and its own decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.  Each Lender acknowledges the potential conflict of interest of each other Lender as a result of Lenders holding disproportionate interests in the Loans, and expressly consents to, and waives any claim based upon, such conflict of interest.

12.6    <u>Indemnification</u>.  Lenders agree to indemnify Agent (to the extent not reimbursed by Loan Parties and without limiting the obligations of Borrower hereunder), ratably according to their respective Pro Rata Shares, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, fees, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted to be taken by Agent in connection therewith; <u>provided</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, fees, expenses or disbursements resulting from Agent's gross negligence or willful misconduct. Without limiting the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including reasonable counsel fees) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that Agent is not reimbursed for such expenses by Borrowers.

12.7    <u>Successor Agent</u>.  Agent may resign at any time by giving not less than 30 days' prior written notice thereof to Lenders and Borrower Agent.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Agent.  If no successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the resigning Agent's giving notice of resignation, then the resigning Agent may, on behalf of Lenders, appoint a successor Agent, which shall be a Lender, if a Lender is willing to accept such appointment, or otherwise shall be a commercial bank or financial institution or a subsidiary of a commercial bank or financial institution if such commercial bank or financial institution is organized under the laws of the United States of America or of any State thereof and has a combined capital and surplus of at least $300,000,000.  If no successor Agent has been appointed pursuant to the foregoing, within 30 days after the date such notice of resignation was given by the resigning Agent, such resignation shall become effective and the Required Lenders shall thereafter perform all the duties of Agent hereunder until such time, if any, as the Required Lenders appoint a successor Agent as provided above.  Any successor Agent appointed by Required Lenders hereunder shall be subject to the approval of Borrower Agent, such approval not to be unreasonably withheld or delayed; <u>provided</u>, that such approval shall not be required if a Default or an Event of Default has occurred and is continuing.   Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning Agent.  Upon the earlier

of the acceptance of any appointment as Agent hereunder by a successor Agent or the effective date of the resigning Agent's resignation, the resigning Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents, except that any indemnity rights or other rights in favor of such resigning Agent shall continue. After any resigning Agent's resignation hereunder, the provisions of this Section 12 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as Agent under this Agreement and the other Loan Documents.

12.8    Setoff and Sharing of Payments. In addition to any rights now or hereafter granted under applicable Law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default and subject to Section 12.9(f), each Lender is hereby authorized at any time or from time to time, without notice to Loan Parties or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of any Loan Party (regardless of whether such balances are then due to any Loan Party) and any other properties or assets at any time held or owing by that Lender or that holder to or for the credit or for the account of any Loan Party against and on account of any of the Obligations that are not paid when due. Any Lender exercising a right of setoff or otherwise receiving any payment on account of the Obligations in excess of its Pro Rata Share thereof shall purchase for cash (and the other Lenders or holders shall sell) such Participations in each such other Lender's or holder's Pro Rata Share of the Obligations as would be necessary to cause such Lender to share the amount so offset or otherwise received with each other Lender or holder in accordance with their respective Pro Rata Shares (other than offset rights exercised by any Lender with respect to Section 3.11 (Increased Cost), Section 4.7 (Taxes), Section 13.5 (Indemnification)). Each Loan Party agrees, to the fullest extent permitted by law, that (a) any Lender may exercise its right to offset with respect to amounts in excess of its Pro Rata Share of the Obligations and may sell Participations in such amounts of offset to other Lenders and holders and (b) any Lender so purchasing a Participation in any Loans made or other Obligations held by other Lenders or holders may exercise all rights of offset, bankers' lien, counterclaim or similar rights with respect to such Participation as fully as if such Lender or holder were a direct holder of such Advances and the other Obligations in the amount of such Participation. Notwithstanding the foregoing, if all or any portion of the offset amount or payment otherwise received is thereafter recovered from the Lender that has exercised the right of offset, the purchase of Participations by that Lender shall be rescinded and the purchase price restored together with interest at such rate, if any, as such Lender is required to pay to any Loan Party or such other Person, without setoff, counterclaim or deduction of any kind.

12.9    Revolving Loans; Swing Loans; Payments; Non-Funding Lenders; Defaulting Lenders; Information; Actions in Concert; Protective Advances.

(a)    Revolving Loans; Swing Loans; Payments.

(i)    Each Lender shall make the amount of such Lender's Pro Rata Share of each Revolving Loan available to Agent in same day funds by wire transfer to Agent's account as set forth in Exhibit D not later than 2:00 p.m. (New York time) on the earlier of (1) the requested borrowing date or (2) each Settlement Date. After receipt of such wire transfers (or, in Agent's sole discretion, before receipt of such wire transfers), subject to the terms of this Agreement, Agent shall make the requested Revolving Loan to Borrowers on the borrowing date set forth in the applicable Notice of Borrowing. All payments by each Lender shall be made without setoff, counterclaim or deduction of any kind. Each borrowing of Swing Loans shall be advanced by Swing Loan Lender alone.

(ii)    On the second Business Day of each calendar week or more frequently at Agent's election (each, a "Settlement Date"), Agent shall advise each Lender by telephone, electronic mail, or telecopy of the amount of such Lender's Pro Rata Share of Revolving Loans not funded by such

Lender since the previous Settlement Date, if any, and of principal, interest and fees paid for the benefit of Lenders with respect to the Obligations.  Provided that each Lender has funded all payments or Revolving Loans required to be made by it and has purchased all Participations required to be purchased by it under this Agreement and the other Loan Documents as of such Settlement Date, Agent shall pay to each Lender such Lender's Pro Rata Share of principal, interest and fees paid by Borrowers since the previous Settlement Date for the benefit of such Lender on the Revolving Loans held by it.  To the extent that any Lender (a "Non-Funding Lender") has failed to fund all such payments and Revolving Loans or failed to fund the purchase of all such Participations, Agent shall be entitled to set off the funding shortfall against that Non-Funding Lender's Pro Rata Share of all payments received from Borrowers.  Such payments shall be made by wire transfer to such Lender's account (as specified by such Lender in Exhibit D or the applicable Assignment Agreement) not later than 2:00 p.m. (New York time) on each Settlement Date.

(b)      Availability of Lenders' Pro Rata Share.  Each Lender's obligation to make its Pro Rata Share of each Revolving Loan shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right that such Lender may have against Agent, Borrowers or any other Person for any reason whatsoever, (B) the occurrence or continuance of any Default or Event of Default, (C) any inability of Borrowers to satisfy the conditions precedent to borrowing set forth in this Agreement at any time or (D) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.  If such Pro Rata Share is not, in fact, paid to Agent by such Lender when due, Agent will be entitled to recover such amount on demand from such Lender.  If any Lender fails to pay the amount of its Pro Rata Share forthwith upon Agent's demand, Agent shall promptly notify Borrower Agent and Borrowers shall immediately repay such amount to Agent.   Nothing in this Section 12.9(b) or elsewhere in this Agreement or the other Loan Documents shall be deemed to require Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrowers may have against any Lender as a result of any default by such Lender hereunder.  To the extent that Agent advances funds to Borrowers on behalf of any Lender and is not reimbursed therefor on the same Business Day as such Revolving Loan is made, Agent shall be entitled to retain for its account all interest accrued on such Revolving Loan until reimbursed by the applicable Lender.

(c)      Return of Payments.

(i)      If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from Borrowers and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind.

(ii)      If Agent determines at any time that any amount received by Agent under this Agreement must be returned to Borrowers or paid to any other Person in connection with any Insolvency Event or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Loan Document, Agent will not be required to distribute any portion thereof to any Lender.  In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to Borrowers or such other Person

(d)      Non-Funding Lenders; Defaulting Lenders.

(i)      The failure of any Non-Funding Lender to make any Revolving Loan or any payment required by it hereunder shall not relieve any other Lender (each such other Lender, an

"Other Lender") of its obligations to make such Revolving Loan or purchase such Participation on such date, but neither any Other Lender nor Agent shall be responsible for the failure of any Non-Funding Lender to make a Revolving Loan, purchase a Participation or make any other payment required hereunder.

(ii)    Notwithstanding anything set forth herein to the contrary, a Defaulting Lender shall not have any voting or consent rights under or with respect to any Loan Document or constitute a "Lender" (or be included in the calculation of "Required Lenders" hereunder) for any voting or consent rights under or with respect to any Loan Document. At Borrower Agent's request, Agent or a Person reasonably acceptable to Agent shall have the right with Agent's consent and in Agent's sole discretion (but shall have no obligation) to purchase from any Defaulting Lender, and each Defaulting Lender agrees that it shall, at Agent's request, sell and assign to Agent or such Person, all of the Commitments of that Defaulting Lender for an amount equal to the principal balance of all Loans held by such Defaulting Lender and all accrued interest and fees with respect thereto through the date of sale, such purchase and sale to be consummated pursuant to an executed Assignment Agreement. Notwithstanding anything herein to the contrary, with respect to a Lender that is a Defaulting Lender, Agent may, but shall not be obligated to, obtain a substitute Lender and execute an Assignment on behalf of such Defaulting Lender at any time with three (3) Business Days' prior notice to such Defaulting Lender (unless notice is not practicable under the circumstances) and cause such Lender's Loans and Commitments to be sold and assigned, in whole or in part, at par.

(e)    Dissemination of Information.  Agent shall use reasonable efforts to provide Lenders with any notice of Default or Event of Default received by Agent from, or delivered by Agent to, Borrower Agent, with notice of any Event of Default of which Agent has actually become aware and with notice of any action taken by Agent following any Event of Default; provided, that Agent shall not be liable to any Lender for any failure to do so, except to the extent that such failure is attributable to Agent's gross negligence or willful misconduct.  Lenders acknowledge that Borrowers are required to provide financial statements, collateral reports and other information to Lenders in accordance with Section 8.1 and agree that Agent shall have no duty to provide the same to Lenders.

(f)    Actions in Concert.  Anything in this Agreement to the contrary notwithstanding, each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Notes (including exercising any rights of setoff) without first obtaining the prior written consent of Agent and Required Lenders as applicable, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of Agent or Required Lenders, as applicable, in accordance with the terms of this Agreement.

(g)    Agent is hereby authorized by Loan Parties and Lenders, at any time in Agent's sole discretion, regardless of (i) the existence of a Default or an Event of Default, (ii) whether any of the other applicable conditions precedent set forth in Section 6.2 have not been satisfied or the commitments of Lenders to make Revolving Loans hereunder have been terminated for any reason, or (iii) any other contrary provision of this Agreement, to make Revolving Loans to Borrowers on behalf of Lenders which Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to any Loan Party pursuant to the terms of this Agreement (the "Protective Advances"); provided, that the Protective Advances made hereunder shall not exceed $2,500,000 in the aggregate and provided, further that at any time after giving effect to any such Protective Advances, the outstanding Revolving Loans, Swing Loans and Letter of Credit Obligations do not exceed the Maximum Revolving Credit.  Lenders holding the Revolving Loan Commitments shall be obligated to fund such Protective Advances and effect a

settlement with Agent therefor upon demand of Agent in accordance with their respective Revolving Loan Commitment Percentages. To the extent any Protective Advances are not actually funded by the other Lenders as provided for in this Section 12.9(g), any such Protective Advances funded by Agent shall be deemed to be Revolving Loans made by and owing to Agent, and Agent shall be entitled to all rights (including accrual of interest) and remedies of a Lender holding a Revolving Loan Commitment under this Agreement and the other Loan Documents with respect to such Revolving Loans.

12.10    Amendments and Waivers.

(a)    Loan Parties (to the extent a Loan Party is party to the applicable Loan Document) and, with the written consent of the Required Lenders, Agent may, from time to time, enter into written (but not oral) amendments, supplements or modifications hereto for the purpose of adding any provisions to this Agreement, the Notes or any other Loan Documents or changing in any manner the rights of the Lenders or of any other party hereunder or thereunder, and with the consent of the Required Lenders, Agent may execute and deliver to Loan Parties a written instrument waiving, on such terms and conditions as Agent or the Required Lenders may specify in such instrument, any of the requirements of this Agreement, the Notes or any other Loan Document; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) extend either the Maturity Date or the maturity of any Note or any installment thereof, or reduce the principal amount thereof, or change the rate or extend the time of payment of interest thereon, or change the amount or extend the time of payment of any fee payable to all of the Lenders hereunder, or change the amount of any Lender's commitment to grant Revolving Loans, or amend, modify or waive any provision of Section 8.1, Article 11 or this Section 12.10, or reduce the percentage specified in the definition of Required Lenders or modify the definition of Borrowing Base, Eligible Accounts or Eligible Inventory, or consent to the assignment or transfer by Borrowers of any of their rights and obligations under this Agreement, or release all or substantially all of the Collateral, in each case without the written consent of all the Lenders, (ii) amend, modify or waive any provision of Article 12 without the written consent of Agent or (iii) amend, modify or waive any provision requiring the consent of all of the Lenders, without the written consent of all of the Lenders.

(b)    Any such written waiver and any such written amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon Borrowers, the Lenders, Agent and all future holders of the Notes. In the case of any waiver, Borrowers, the Lenders and Agent shall be restored to their former position and rights hereunder and under the outstanding Notes, and any Default or Event of Default waived shall be deemed to be cured and not continuing; provided, however, no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereto. An Event of Default shall be deemed to be continuing unless waived by Agent or the requisite number of Lenders in accordance with this Section 12.10.

12.11    Recovery of Erroneous Payments. Without limitation of any other provision in this Agreement, if at any time the Agent makes a payment hereunder in error to any Lender, whether or not in respect of an Obligation due and owing by the Borrowers at such time, where such payment is a Rescindable Amount, then in any such event, each Lender receiving a Rescindable Amount severally agrees to repay to the Agent forthwith on demand the Rescindable Amount received by such Lender in immediately available funds in the currency so received, with interest thereon, for each day from and including the date such Rescindable Amount is received by it to but excluding the date of payment to the Agent, at the greater of the Federal Funds Rate and a rate determined by the Agent in accordance with banking industry rules on interbank compensation. Each Lender irrevocably waives any and all defenses, including any "discharge for value" (under which a creditor might otherwise claim a right to retain funds mistakenly paid by a third party in respect of a debt owed by another) or similar defense to its obligation

to return any Rescindable Amount.  The Agent shall inform each Lender promptly upon determining that any payment made to such Lender comprised, in whole or in part, a Rescindable Amount.

## ARTICLE 13.  JURY TRIAL WAIVER; OTHER WAIVERS; CONSENTS; GOVERNING LAW

13.1   <u>Obligations and Liabilities of Lender</u>.  Neither Agent nor the Lenders shall be deemed to have assumed any liability or responsibility to Loan Parties or any other Person for the correctness, validity or genuineness of any instruments or documents that may be released or endorsed to a Loan Party by Agent and/or the Lenders (which shall automatically be deemed to be without recourse to the Lenders in any event), or for the existence, character, quantity, quality, condition, value or delivery of any goods purporting to be represented by any such documents; and Agent and the Lenders, by accepting such Lien on the Collateral, or by releasing any Lien on the Collateral, shall not be deemed to have assumed any obligation or liability to any supplier or account debtor or to any other Person, and each Loan Party agrees to indemnify and defend Agent and the Lenders and hold them harmless in respect to any claim or proceeding arising out of any matter referred to in this <u>Section 13.1</u>.

13.2   <u>Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver</u>.

(a)   The validity, interpretation and enforcement of this Agreement and the other Loan Documents (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflicts of law or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

(b)   Each Loan Party, Issuing Bank, Agent, and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, whichever Agent may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Loan Documents or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Loan Documents or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Agent shall have the right to bring any action or proceeding against any Loan Party or its property in the courts of any other jurisdiction which Agent deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against any Loan Party or its or their property).

(c)   Each Loan Party hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Agent's option, by service upon a Loan Party in any other manner provided under the rules of any such courts.

(d)   LOAN PARTIES, ISSUING BANK, AGENT, AND LENDERS EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN

CONTRACT, TORT, EQUITY OR OTHERWISE.  LOAN PARTIES, ISSUING BANK, AGENT, AND LENDERS EACH HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT LOAN PARTIES, ISSUING BANK, AGENT, OR LENDERS MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)      Agent and Lenders shall not have any liability to any Loan Party (whether in tort, contract, equity or otherwise) for losses suffered by any Loan Party in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Agent, Lenders and Issuing Bank, that the losses were the result of its acts or omissions constituting gross negligence or willful misconduct.  Each Loan Party:  (i) certifies that neither Agent, Lenders, Issuing Bank, nor any representative, agent or attorney acting for or on behalf Agent, Lenders or Issuing Bank has represented, expressly or otherwise, that Agent, Lenders and Issuing Bank would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Loan Documents and (ii) acknowledges that in entering into this Agreement and the other Loan Documents, Agent, Lenders and Issuing Bank are relying upon, among other things, the waivers and certifications set forth in this Section 13.2 and elsewhere herein and therein.

13.3    Waiver of Notices.  Each Loan Party hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein or required by applicable Law and cannot be waived thereunder.  No notice to or demand on any Loan Party which Agent may elect to give shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances.

13.4    Waiver of Counterclaims.  Each Loan Party waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

13.5    Indemnification.  Each Loan Party shall indemnify and hold Agent, Lenders, Swing Loan Lender and Issuing Bank, and their respective officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, penalties, liabilities, costs or expenses (including attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Loan Documents, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except Loan Parties shall not have any obligation under this Section 13.5 to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of Loan Parties as to any other Indemnitee).  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Loan Parties shall pay the maximum portion which it is permitted to pay under applicable Law to Agent and

Lenders in satisfaction of indemnified matters under this Section.  To the extent permitted by applicable Law, Loan Parties shall not assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Loan Documents or any undertaking or transaction contemplated hereby.  No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Loan Documents or the transactions contemplated hereby or thereby.  All amounts due under this <u>Section 13.5</u> shall be payable upon demand. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## ARTICLE 14.   NOTICES; MISCELLANEOUS

14.1    <u>Notices</u>.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone or electronic method of transmission (and subject in each case to <u>clause (c)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

|  |  |
|---|---|
| If to Borrowers: | E. Gluck Corporation<br>60-15 Little Neck Parkway<br>Little Neck, New York 11362<br>Attention: Adam Gelnick<br>Telephone No.: 718-482-2708<br>Email: agelnick@egluck.com |
| with a copy to: (which shall not constitute notice) | ~~Vinson & Elkins~~Halperin Battaglia Benzija, LLP<br>40 Wall Street, 37th Floor<br>~~1114 6th Ave., 32nd Floor~~<br>New York, NY ~~10036~~10005<br>Attention: ~~Tzvi Werzberger~~Julie Dyas Goldberg, Esq.<br>~~Telephone No.:  212-237-0068~~<br>~~Email: twerzberger@velaw.com~~<br>Direct: (917) 442-0354<br>Fax: (212) 765-0964<br>E-mail: jgoldberg@halperinlaw.net |
| If to Agent or Lenders: | Israel Discount Bank of New York<br>~~511 Fifth~~1114 Avenue of the Americas<br>New York, NY ~~10017-4997~~10036<br>Attention: Frank Mancini<br>Telephone No.: ~~212-551-8556~~212-551-8014<br>Telecopy No. 212-986-4786<br>Email:<br>~~bsolomon@IDBNY~~FMancini@idbny.com |

|  | Otterbourg P.C. |
|---|---|
| with a copy to: (which shall not constitute notice) | 230 Park Avenue<br>New York, NY 10169<br>Attention: Richard L Stehl, Esq.<br>Telephone No.: 212-661-9100<br>Telecopy No.: 212-682-6104<br>Email: rstehl@otterbourg.com |

Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

(b)     All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided, that if not given during normal business hours of the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through an electronic method of transmission to the extent provided in clause (c) below shall be effective as provided in such clause.

(c)     Notices and other communications to Agent hereunder may be delivered or furnished by e-mail or any internet or extranet-based site providing for access to data protected by passcodes or other security systems approved by Agent for such purpose and in each case to the extent that Agent may approve pursuant to procedures approved by Agent; provided, that the foregoing shall not apply to notices pursuant to Article 2 or Section 8.2 or such other notices as Agent may specifically hereafter agree. Unless otherwise specified by Agent, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or extranet-based site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided, that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

14.2    Partial Invalidity.   If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable Law.

14.3    Successors.   This Agreement, the other Loan Documents and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Agent, Lenders and Loan Parties and their respective successors and assigns, except that Loan Parties may not assign their rights under this Agreement, the other Loan Documents and any other document referred to herein or therein without the prior written consent of each Lender. Any such purported assignment without such express prior written consent shall be void. The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of Loan Parties, Agent and Lenders with respect to the transactions contemplated hereby and

there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.

14.4      Entire Agreement.  This Agreement, the other Loan Documents, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter contained in this Agreement and the other Loan Documents between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter of this Agreement, whether oral or written. In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

14.5      USA PATRIOT Act.

(a)      Agent hereby notifies Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of each Loan Party and other information that will allow Agent to identify such person in accordance with the Act  and any other applicable Law.  Loan Parties are hereby advised that any Loans hereunder are subject to satisfactory results of such verification.

(b)      Each Lender or assignee or Participant of a Lender that is not incorporated under the laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

(c)      The USA PATRIOT Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, each Lender may from time to time request, and each Loan Party shall provide to such Lender, such Loan Party's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the USA PATRIOT Act and any other Anti-Terrorism Law.

14.6      Keepwell. Each Qualified ECP Loan Party hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to guaranty and otherwise honor all of its Obligations in respect of Swap Obligations (provided, however, that each Qualified ECP Loan Party shall only be liable under this Section 14.6 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 14.6, or otherwise under the Loan Documents, as it relates to such other Loan Party, voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Loan Party under this Section 14.6 shall remain in full force and effect until a discharge of the Obligations. Each Qualified ECP Loan Party intends that this Section 14.6 constitute, and this Section 14.6 shall be deemed to

constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

14.7    <u>Counterparts; Electronic Execution</u>.    This Agreement and each of the other Loan Documents, and any notices delivered under this Agreement or other Loan Document, may be executed by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, state enactments of the Uniform Electronic Transactions Act, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature.  Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Agent reserves the right, in its sole discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement or any other Loan Document or on any notice delivered to Agent under this Agreement or any other Loan Document.  This Agreement, each other Loan Document, and any notices delivered under this Agreement or other Loan Document, may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument. Delivery of an executed counterpart of a signature page of this Agreement, each other Loan Document and any notices will be as effective as delivery of a manually executed counterpart of the Agreement, other Loan Document or notice.  Any party delivering an executed counterpart of this Agreement or other Loan Document by electronic mail or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement and such other Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.8    <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions</u>    Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

14.9    <u>Acknowledgment Regarding Any Supported QFCs</u>    To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other

agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States): In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

14.10    Confidentiality Each of the Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, its auditors and to its Affiliates (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Affiliates (including any self-regulatory authority), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or (ii) any actual or prospective party  (or its Affiliates) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder (it being understood that the list of Disqualified Institutions may be disclosed to any assignee or Participant in reliance on this clause (f)), (g) on a confidential basis to (i) any rating agency in connection with rating any Loan Party or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Borrowers or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Agent, any Lender or any of their respective Affiliates on a non-confidential basis from a source other than the Borrower who did not acquire such information as a result of a breach of this Section.  In addition, the Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agent and the Lenders in connection with the administration of this Agreement and the other Loan Documents.

14.11    Release of Liens. The Lenders irrevocably authorize the Agent, and the Agent agrees, (i) to release any Lien on any property granted to or held by the it under this Agreement or any Loan

Document (x) upon termination of this Agreement, the termination of all Commitments, the expiration or termination of all Letters of Credit and the payment in full of all Obligations or (y) that is (A) owned by, or is an Equity Interest in, a Loan Party that ceases to be a Loan Party as a result of a transaction permitted hereunder in accordance with the terms hereof or (B) disposed of as part of or in connection with any Permitted Disposition under this Agreement or any of the Loan Documents and (ii) release any Loan Party from its obligations as a Loan Party hereunder and under the Loan Documents if such Person ceases to be a wholly-owned Subsidiary of EGC as a result of a transaction permitted hereunder (including the disposition of the Equity Interests of such Loan Party).  In each case, any expenses of the Agent incurred with a release of Liens or a Loan Party in connection with the foregoing shall be reimbursable by the Borrowers subject to <u>Section 8.13</u> of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]