Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

**Hearing Date: 2/4/26 10:00 a.m.**

*Proposed Counsel to the Debtor*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

**E. GLUCK CORPORATION,**
Tax I.D. No. 13-2907195

Debtor.
------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (MG)

## NOTICE OF FILING OF EXHIBIT - PROPOSED PURCHASE AGREEMENT

**PLEASE TAKE NOTICE** that a hearing on the *Debtor's Motion for Order Approving the Sale of the Debtor's Membership Interest in WITHit Holdings, LLC, Free and Clear af All Liens, Claims and Encumbrances and Termination of Related Executory Contracts* (Docket No. 71) (the "WITHit Sale Motion") will be held before the Honorable Martin Glenn, Chief United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, on **February 4, 2026, at 10:00 a.m., prevailing Eastern Time** (the "Hearing"). Capitalized terms used but not defined herein have the meanings ascribed to them in the WITHit Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that attached hereto is the Membership Unit Purchase Agreement that is Exhibit C to the WITHit Sale Motion.

New York, New York
Dated: January 26, 2026

*/s/ Julie Dyas Goldberg, Esq.*
Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

*Proposed Counsel to the Debtor*

{00356254.1 / 1539-002 }

## Exhibit C

**MEMBERSHIP UNIT PURCHASE AGREEMENT**

**BY AND AMONG**

**E GLUCK CORPORATION, as Seller**

**WIL HOLDINGS LLC, as Buyer**

**AND**

**WITHIT HOLDINGS, LLC, as Company**

**Dated as of January [__] 2026**

# TABLE OF CONTENTS

[RESERVED]

## **EXHIBITS**

Exhibit A        [Escrow Agreement]
Exhibit B        Seller's Wiring Instructions

## **SCHEDULES**

RESERVED

# MEMBERSHIP UNIT PURCHASE AGREEMENT

This Membership Unit Purchase Agreement (this "Agreement") is made and entered into as of January [___], 2026, by and among (i) E. Gluck Corporation, a New York corporation, with its principal place of business at 6015 Little Neck Parkway, Little Neck, New York 11362 ("Seller"), (ii) WITHit Holdings, LLC, a Delaware limited liability company (the "Company"), with its principal place of business at 8683 W. Sahara Avenue, Suite 180, Las Vegas, Nevada 89117, and (iii) WIL Holdings, LLC a Delaware limited liability company, with its principal place of business at 8683 W. Sahara Avenue, Suite 180, Las Vegas, Nevada 89117 (the "Buyer"). Article 11 contains definitions of various capitalized terms used in this Agreement.

# BACKGROUND

A.    The Company was formed pursuant to the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on March 9, 2021.  The Company is in the business of designing and selling many types of products, including, without limitation smartwatches, wearable tech accessories,  mobile phone accessories, reading lights, magnifiers and other types of products and accessories through its wholly owned subsidiaries Sol-Light, LLC, a Nevada limited liability company, and With It Licensing, LLC, a Nevada limited liability company (collectively, the "Business").

B.    Seller owns 5,100,000 Class A membership interest units in the Company (the "Class A Units"), which were issued pursuant to that certain Amended and Restated Limited Liability Company Agreement of WITHit Holdings, LLC, dated March 22, 2021 (the "LLC Agreement").

C.    WIL Holdings, LLC owns 4,508,000 Class B membership interest units in the Company (the "WIL Class B Units") and SLGN Holdings, LLC owns 392,000 Class B membership interest units in the Company (the "SLGN Class B Units", and collectively with the WIL Class B Units, the "Class B Units", and the Class A Units and Class B Units, collectively, the "Membership Units"), which were issued pursuant to the LLC Agreement.

D.    The Seller and the Company are parties to a certain Management Services Agreement, dated March 22, 2021, as amended pursuant to the terms of a certain Agreement dated November 28, 2025 between Seller, Buyer and the Company, among others (the "MSA")

E.    On December 12, 2025, Seller filed a voluntary bankruptcy petition under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code") and its chapter 11 bankruptcy case is pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Chapter 11 Case No. 25-12683 (MG) (the "Bankruptcy Case").

F.    Subject to Bankruptcy Court approval, Seller desires to sell to Buyer and Buyer desires to purchase from Seller all of the Class A Units, subject to the terms and subject to the conditions contained in this Agreement.

## AGREEMENT

In consideration of the respective mutual representations, warranties, covenants, and agreements contained herein, the Parties to this Agreement agree that the foregoing recitals are true, correct and incorporated herein, and further agree as follows:

## ARTICLE 1 – PURCHASE AND SALE OF MEMBERSHIP UNITS; PURCHASE PRICE

1.1     Purchase and Sale of Class A Units.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of the Class A Units, free and clear of all Liens, Claims and Encumbrances, for the Purchase Price.

1.2     Purchase Price.

(a)     Purchase Price Calculation.  The aggregate purchase price for the Class A Units shall be Three Million Six Hundred Thousand Dollars ($3,600,000.00) (the "Purchase Price").

(b)     Payment Mechanics. Buyer shall pay the Purchase Price as follows:

i.     At Closing, Buyer shall pay Seller by wire transfer of immediately available funds, as set forth in the Wire Instructions, the sum of Three Million Dollars ($3,200,000) (the "Closing Payment"); and

ii.     At Closing, Buyer shall remit to Seller's counsel by wire transfer of immediately available funds, as set forth in the Wire Instructions, the sum of Four Hundred Thousand Dollars ($400,000.00), which amount shall be held by Seller's counsel in an interest-bearing account for the purpose of securing the indemnification obligations of Seller in accordance with the terms and conditions of the Escrow Agreement annexed hereto as Exhibit "A" (the "Escrow Reserve").

## ARTICLE 2 – CLOSING

2.1     Closing.  Unless Seller and Buyer otherwise agree in writing to another place, manner, time or date, the Parties shall consummate the Sale Transaction (the "Closing") remotely via the electronic exchange of executed counterpart signatures pages of this Agreement, each other Transaction Document and the required closing deliveries on the first Business Day following the date on which all of the conditions set forth in Article 5 shall have been satisfied or waived (except for any such condition that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such condition at the Closing). Except as otherwise provided in this Agreement, all proceedings to be taken and all documents to be executed at the Closing shall be deemed to have been taken, delivered and executed simultaneously, and no proceeding shall be deemed taken nor documents deemed executed or delivered until all have been taken, delivered, and executed. Closing shall occur on or before February 6, 2026 and be effective as of January 31, 2026 at 11:59 p.m.

2

2.2   <u>Closing Deliveries</u>.

(a)   <u>Deliveries by Seller to the Company</u>.  Prior to or at the Closing, Seller shall deliver to the Company at Buyer's direction:

i.   all of the Company's Books and Records maintained, held or stored by Seller;

ii.   all of the Company's Inventory maintained, held or stored by Seller and the Inventory Schedule referenced in Section 3.10 of this Agreement.  Seller shall be responsible for the cost of delivering the Inventory to the loading dock of the facility where such Inventory is currently stored and Buyer shall be responsible for all costs of transport thereafter;

iii.   all pop-up pedestals, free-standing banners, back-wall banners, table displays and table cloths maintained, held or stored by Seller;

iv.   all of the Company's product designs, CAD files, artwork files, photography assets, product and device samples, and product prototypes maintained held or stored by Seller;

v.   exclusive control and authority over all of the Company's Cash and bank accounts;

vi.   a written report of all of the Company's sales and purchases by SKU for the period January 1, 2025 through the Closing Date;

vii.   written resignations, effective as of the Closing Date, of Adam Gelnick, Michael Kronenberg, and Barbara Weichselbaum from the Board of Managers of the Company;

viii.   exclusive control of all Company digital profiles, including without limitation, social media and/or online directory profiles and all usernames and passwords used in connection with the foregoing;

ix.   exclusive control of all Company's telephone numbers, emails, domains, websites, URLs, and domain names, and all usernames and passwords used in connection with the foregoing;

x.   all information, labels, pictures, and detail contained in the back-end to any Company website;

xi.   all code written for any Company web applications;

xii.   all databases used to power all Company web applications;

3

xiii.    all Company web hosting accounts and relationships and all usernames and passwords used in connection with the foregoing;

xiv.    access and control over all other assets of the Company including tangible personal property owned by the Company and held or stored by Seller;

xv.    all unfulfilled customer orders;

xvi.    a schedule setting forth the identity, items produced by such supplier by SKU and contact information of the suppliers and/or marketing partners of the Company;

xvii.    a schedule setting forth the identity, items purchased by such customer by SKU and contact information of the customers of the Company; and

xviii.    a duly executed assignment to the Company of all rights, title and interests in any refunds or refund claims relating to the payment of any customs, duties, tariffs or similar charges relating to the Business.  Notwithstanding the foregoing, in the event that the Company receives a refund relating to payments of any customs, duties, tariffs or similar charges relating to the Business that were made prior to the Closing, the Company shall deliver fifty one percent (51%) of the net proceeds of any such refund paid to the Company (less all costs and expenses incurred in connection with the claim and the receipt of such refund) within fourteen (14) days of the Company's receipt of such proceeds;

(b)   <u>Deliveries by Seller to Buyer</u>.  Prior to or at the Closing, Seller shall deliver to Buyer:

i.    a duly executed consent to termination of that that certain Management Services Agreement, dated March 22, 2021 by and between WITHit Holdings, LLC, together with its subsidiaries With It Licensing, LLC and Sol-Light, LLC (the "<u>MSA</u>") as of the Closing;

ii.    a duly executed consent to termination of the LLC Agreement as of the Closing;

iii.    written consent of Adam Gelnick, Michael Kronenberg, and Barbara Weichselbaum in their capacity as members of the Board of Managers of the Company to the Third Party Licensed Inventory Sale;

iv.    the duly executed Escrow Agreement;

v.    all Schedules referenced in this Agreement;

vi.    written certification that Seller has delivered to Company and destroyed all of the Company's Confidential Information that otherwise remains in Seller's possession, custody, and control after delivery and destruction of each of

4

the items listed in section 2.2(a); provided, however that Seller may retain copies of accounting records in support of required tax returns;

vii.    such other Third Party consents, customary instruments of transfer, assumption, filings, or documents reasonably requested by Buyer or otherwise required to give effect to the transactions contemplated hereby.

viii.    a certificate of an authorized officer of Seller, as to (i) a copy of a resolutions of the shareholders of Seller authorizing and approving Seller's execution and delivery of this Agreement and the Transaction Documents to which it is a party, and the performance by Seller of its obligations hereunder and thereunder, (ii) incumbency and signatures of the officer of Seller executing the Transaction Documents, and (iii) the delivery and accuracy of all Schedules required pursuant to this Agreement;

ix.    a copy of the Sale Order, as entered by the Bankruptcy Court;

x.    UCC-3 terminations and other customary consents and lien-release documents from Israel Discount Bank.

(c)    <u>Deliveries by Buyer to Seller</u>.  Prior to or at the Closing, Buyer shall deliver or cause to be delivered to Seller the following:

i.    the Closing Payment;

ii.    the Escrow Payment, which shall be held by Seller's counsel in accordance with the terms of the Escrow Agreement;

iii.    a duly executed consent to termination of the MSA and LLC Agreement, effective as of the Closing;

iv.    a certificate of an authorized officer of Buyer, as to (i) a copy of a resolutions of members of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the Transaction Documents to which it is a party, and the performance by Buyer of its obligations hereunder and thereunder, and (ii) incumbency and signatures of the officer of Buyer executing this Agreement and the Transaction Documents.

v.    the duly executed Escrow Agreement.

## ARTICLE 3 – REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to Buyer as follows:

3.1    <u>Authority; Authorization; Enforceability</u>.

(a)    <u>Authority; Authorization</u>.  Seller has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a

party and, subject to approval of this Agreement by the Bankruptcy Court, to perform its obligations hereunder and under each such other Transaction Document, and to consummate the transactions contemplated by this Agreement and each such other Transaction Document.

(b)    <u>Organization and Good Standing</u>.  Seller is duly organized, validly existing and in good standing under the laws of the State of New York.

(c)    <u>Enforceability</u>.  Subject to approval of this Agreement by the Bankruptcy Court, this Agreement and each such other Transaction Document to which Seller is a party is, or upon its execution and delivery will be, a valid and binding obligation of Seller, enforceable against Seller in accordance with the terms hereof and thereof.

3.2    <u>Claims, Encumbrances and Liens</u>.

(a)    Except as set forth on Schedule 3.2, Seller has not pledged the Class A Units and the Class A Units are not subject to any Liens, Claims, or Encumbrances.  At Closing Seller shall transfer and Buyer shall have good, valid, and marketable title to the Class A Units free and clear of all Liens, Claims, Encumbrances and liabilities of any kind or character.

(b)    Other than as set forth in the LLC Agreement, and as set forth in Schedule 3.2,  Seller is not a party or subject to, and the Class A Units are not subject to, any mortgage, lien, lease, license, permit, agreement, contract, instrument, order, judgment or decree, or any other restriction or right of any kind or character, which would prevent consummation of the transactions contemplated by this Agreement, compliance by such Seller with the terms, conditions and provisions of this Agreement, or which would restrict the ability of Buyer to acquire the Class A Units, or would require the payment of any amount to a third party in connection therewith.

3.3    <u>Non contravention</u>. Subject to approval of this Agreement by the Bankruptcy Court, none of the execution, delivery or performance by the Seller of this Agreement or any other Transaction Document to which the Seller is a party, nor the consummation by Seller of the transactions contemplated hereby or thereby, nor compliance by the Seller with any of the provisions hereof or thereof will (i) conflict with, violate, or result in the violation of, the Organizational Documents of the Company, (ii) violate any Law or Order, in each case applicable to Seller or the Company, or the Company's assets or properties, or (iii) with or without the passage of time or the giving of notice or both, result in the breach of, or constitute a violation, breach or default, or require any consent under, or result in the creation of any Lien upon any property or assets of the Company pursuant to any contract or agreement to which the Company is a party.

3.4    <u>Brokers</u>. Neither Seller nor the Company has retained or been represented by any broker or finder in connection with the transactions contemplated by this Agreement that would cause Buyer or the Company to be liable for the payment of any fee or expense to such broker or finder.

3.5     Capitalization of the Company.  The Class A Units constitute all of the issued and outstanding Class A membership interest units in the Company.  No membership certificates have been issued by the Company to Seller or any other holder of a membership unit in the Company, memorializing the ownership of Membership Units in the Company.  The Class A Units are duly authorized, validly issued, fully paid and nonassessable. No Third Party has any rights to purchase any of the Class A Units and, Seller has not agreed to sell, transfer or otherwise convey any such rights to purchase any of the Class A Units other than as set forth in this Agreement.  There are no agreements relating to the issuance, sale, or transfer of any Membership Units in the Company, other than the Transaction Documents.

3.6     Litigation.   To the Knowledge of Seller, there is no claim, investigation or Proceeding pending, or to the Knowledge of Seller, currently threatened in writing, (a) against the Company or any member of the Board of Managers, officer or director of the Company in their capacity as board member, officer or director of the Company, or affecting any of the Company's properties or assets; or (b) that questions the validity of the Transaction Documents or the right of Seller and the Company to enter into them, or to consummate the transactions contemplated by the Transaction Documents.  There is no claim, investigation or Proceeding commenced by the Company that is pending.

3.7     Accounts Receivable.  All accounts receivable of the Company as of the Closing Date are referenced on Schedule 3.7 (the "Pre-Closing A/R").  All Pre-Closing A/R represent valid obligations arising from bona fide sales actually made or services actually performed in the Ordinary Course of Business and, to the Knowledge of Seller, are not subject to any valid counterclaims, chargebacks, or setoffs except in the ordinary course consistent with the historical payment practices of the Company's customers. All Pre-Closing A/R is owned by the Company free and clear of all Liens.

3.8     Financial Statements; Absence of Changes.

(a)     The unaudited financial statements and balance sheets year ended December 31, 2024 and December 31, 2025 of the Company (collectively, the "Financial Statements") that were delivered to Buyer by Seller in the context of the negotiation of this Agreement, to Seller's Knowledge, present fairly the financial condition and results of operations of the Company as of the dates and for the periods indicated in the Financial Statements in all material respects. The Financial Statements were prepared from the books and records of the Company in accordance with GAAP and consistently applied and maintained throughout the periods indicated, and fairly present in all material respects the financial position and results of operations as of the date thereof and for the periods covered thereby.

(b)     Since December 31, 2024, the Company has not: (i) mortgaged, pledged, or subjected any of the material assets of the Company to any Lien; or (ii) disposed of any material assets or properties of or relating to the Business, except for inventory sold in the Ordinary Course of Business.

3.9     Undisclosed Liabilities; Indebtedness. To the Knowledge of Seller, the Company does not have any liabilities, obligations or commitments of any nature ("Liabilities"), asserted or

unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, except for (i) Liabilities under this Agreement, (ii) the Liabilities referenced on Schedule 3.9, (iii) Liabilities incurred in the Ordinary Course of Business, or (iv) Liabilities reflected in the Company's Financial Statements.

3.10     Inventory.  All Inventory as of the Closing Date is referenced in Schedule 3.10 (the "Inventory Schedule").  The Inventory Schedule sets forth: (i) the number of units of each item of Inventory by SKU, (ii) a description of the Inventory, (iii) the factory first cost and LDP cost for each item of Inventory, (iv) and the reserves reflected in the Company's books and records with respect to each item of Inventory.   Subject to the reserves set forth in Schedule 3.10, all Inventory of the Company as of the Closing Date was acquired and has been maintained in the Ordinary Course of Business; and is of good and merchantable quality; consists substantially of a quality, quantity and condition usable, leasable or saleable in the Ordinary Course of Business, except for obsolete, damages or defective items.   Notwithstanding the foregoing, Seller makes no representation as to whether Inventory is compliant with newer generations of Apple Branded products.  All Inventory is owned by the Company free and clear of all Liens, and no Inventory is held on a consignment basis.

3.11     Real Property

(a)     Other than with respect to the premises located at 8683 W. Sahara Avenue, Suite 180, Las Vegas, Nevada 89117, the Company is not party to any lease, sublease, license or other contractual obligation under which real property is occupied or used by the Company

3.12     Intellectual Property.

(a)     Schedule 3.12(a) contains a complete and correct list of: (i) all Intellectual Property Rights that is subject to any issuance, registration or application by or with any Authority or authorized private registrar in any jurisdiction, including issued patents, registered trademarks, domain names and copyrights, and pending applications for any of the foregoing (the "Registered Company Intellectual Property"), and (ii) all unregistered Intellectual Property Rights and trademarks owned by the Company, licensed by the Company or otherwise used by the Company in connection with the operation the Business.

(b)     All of the Company Owned Intellectual Property which is used in the operation of the Business as currently conducted is owned by the Company, free and clear of any Liens.

(c)     To the Knowledge of Seller, the conduct of the Business as currently conducted by the Company does not infringe, misappropriate or otherwise violate, and has not infringed, misappropriated, or otherwise violated, the Intellectual Property Rights of any other Person.

(d)     To the Knowledge of Seller, no Claims are pending or threatened in writing against the Company by any other Person before any Authority challenging or questioning either the right of the Company to use, or the validity of, any Company Owned Intellectual

Property (other than Claims, challenges, or questions by governmental intellectual property office examiners as part of the application process).

(e)     To the Knowledge of Seller, no other Person has claimed in writing against the Company and continues to claim the right to use in an infringing manner any Company Owned Intellectual Property.

(f)     This Section 3.12 constitutes the sole representation and warranty of Seller under this Agreement with respect to any actual or alleged infringement, misappropriation, or other violation of the Intellectual Property Rights.

(g)     Except as expressly stated above, Seller makes no representation or warranty as to the validity, enforceability, registrability, scope or non-infringement of any Intellectual Property Rights.

3.13    Tax Matters.

(a)     The Company has filed all Returns that it was required to file on or before the date hereof (within any applicable extension periods). All such Tax Returns were prepared by a third-party CPA and reviewed by Seller and Buyer, and to the Knowledge of Seller and Buyer, were complete and correct in all material respects, and all Taxes shown to be due and payable on such Tax Returns have been paid.  All Taxes that the Company is required by Law to withhold or collect have been duly withheld or collected and have been timely paid over to the appropriate Authority to the extent due and payable, including without limitation, all sales taxes for all sales prior to the Closing.

(b)     To the Knowledge of Seller, there is no claim or assessment pending or threatened in writing against the Company by any Authority for any alleged deficiency in Taxes.

(c)     Except as provided in Schedule 3.13(c), the Company has not (i) executed a waiver or consent extending any statute of limitations for the assessment or collection of any Taxes that remain outstanding, (ii) applied for a ruling relative to Taxes, or (iii) entered into a closing agreement with respect to Taxes with any Authority.

(d)     Neither the Company nor Seller has been examined and is not currently being examined by the IRS or relevant Authorities for any Taxable Period ending after January 1, 2022. There are no examinations or other Proceedings relating to Taxes of the Company in progress or pending with respect to which the Company has received written notice.

3.14    Insurance.   Schedule 3.14 contains a complete and accurate list, and Seller has delivered to Buyer true and complete copies of: (i) all policies of insurance to which the Company is a party or under which the Company, or any officer or director of any the Company, (in his or her capacity as an officer or director), is covered, and (ii) all pending applications for policies of insurance.  All policies remain in effect as of the Closing Date and Seller has not receive any notice of termination or nonrenewal.

3.15    Employee Matters.

(a)    As of the date of this Agreement, David Nelson, William Devaney and Phillip Grandinetti, III are the only employees of the Company.

(b)    To the Knowledge of Seller, the Company is not delinquent in any payment(s) to any of its employees, consultants or contractors for any wages, salaries, commissions, bonuses, or other direct compensation for any service performed for the Company to the date hereof or amounts required to be reimbursed to such employees, consultants or contractors.

(c)    Except as set forth on Schedule 3.15(c), the Company has no policy, practice, plan or program of paying severance pay or any form of severance compensation in connection with the termination of employment services.

(d)    No employee of the Company other than David Nelson, William Devaney and Phillip Grandinetti, III are enrolled in any employee benefit plan maintained, established or sponsored by the Company, or which the Company participates in or contributes to, which is subject to the ERISA. The Company has complied in all material respects with all applicable Laws for any such employee benefit plan.

(e)    Except as set forth in Schedule 3.15(e), to the Knowledge of the Seller, none of the Company's  personnel or contractors is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any Order, that materially interferes with such employee's or contractor's ability to promote the interest of the Company or that conflicts with the Business.  To the Knowledge of the Seller, neither the execution or delivery of the Transaction Documents, nor the carrying on of the Business by its personnel, nor the conduct of the Business as now conducted, will conflict with or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any contract, covenant or instrument under which any such personnel or contractor is now obligated.

3.16    Compliance with Laws; Permits. To the Knowledge of Seller, except as set forth in Schedule 3.16 or elsewhere in this Agreement, the Company has, in all material respects, complied since March 22, 2021 and is now complying with all Laws applicable to it, the Business, or its properties or assets. To the Knowledge of Seller, the Company has all franchises, permits, licenses and any similar authority necessary for the conduct of the Business as currently conducted, except where the lack of which would not reasonably be expected to have a Material Adverse Effect.  To the Knowledge of Seller, the Company is not in default in any material respect under any such franchises, permits, licenses or other similar authority.  Seller makes no representation or warranty regarding historical compliance with Law except as expressly set forth herein.

3.17    The Company and Seller have not received any written notice alleging that the Company or Seller has failed to comply with any Laws relating to its policies and practices with respect to Personal Information. The Company and Seller have not received any written notice alleging that the Company has failed to comply with any Laws relating to data loss, theft, and breach of security notification obligations.

3.18    Security.  To the Knowledge of Seller, there have been no disruptions in any of the Company's information technology systems that will cause Buyer to be unable to migrate data to Buyer's system.  To the Knowledge of the Seller, in the past twelve (12) months prior to the date hereof, there has been no malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack, or other impairment of the software or systems that has resulted or is reasonably likely to result in material disruption or damage to the Business.  To the Knowledge of the Seller, there have been (i) no material security breaches in the Company's information technology systems, and (ii) there have been no disruptions in any of the Company's information technology systems that materially adversely affected the Company.  The Company has hired an information technology contractor to take commercially reasonable steps to safeguard the confidentiality, availability, security, and integrity of the software or systems, including implementing and maintaining appropriate backup, disaster recovery, and software and hardware support arrangements

3.19    Agreements; Actions.

(a)    Except as set forth on Schedule 3.19, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party or by which it is bound that are in each case existing as of the date hereof that involve (i) obligations (contingent or otherwise) of, or payments to, the Company in excess of $25,000 in the aggregate for the fiscal year ending December 31, 2026, (ii) the license of any software, patent, copyright, trademark, trade secret or other proprietary right to or from the Company (other than commercially available, off the shelf software licensed to the Company or non-exclusive licenses entered into by the Company in the Ordinary Course of Business) or (iii) the grant of rights to manufacture, produce, assemble, license, market, or sell the Company's products to any other Person that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products (excluding, for the avoidance of doubt, contracts or transactions with subcontracts or agents acting at the direction of the Company entered into in the Ordinary Course of Business).

(b)    Except as required or permitted in this Agreement, as stated in the Financial Statements, or as set forth on the schedule provided by Seller to Buyer, the Company has not since January 1, 2024 (i) incurred any indebtedness for money borrowed or incurred any other liabilities individually in excess of $25,000 or in excess of $50,000 in the aggregate, (ii) made any loans or advances to any Person, or (iii) sold, exchanged or otherwise disposed of any of its assets or rights other than inventory sold in the Ordinary Course of Business

3.20    Governmental Consents and Filings.  Subject for the approval of this Agreement by the Bankruptcy Court, to the Knowledge of Seller, no consent, approval, Order or authorization of, or registration, qualification, designation, declaration or filing with, any Authority is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement.

3.21    Pre-Paid Expenses.  Schedule 3.21 sets forth a list of all pre-paid expenses as of the Closing Date (the "Pre-Paid Expenses").  All Pre-Paid Expenses were paid by the Company in the ordinary course of business of the Company.

3.22    Title to Assets.  The Company has good and valid title to, a valid leasehold interest in or a valid license to use all of its assets, free and clear of all Liens.  To Seller's Knowledge, all tangible Company assets are in good operating condition and repair (subject to normal wear and tear).

3.23    Environmental and Safety Matters.

(a)    Since March 22, 2021, the Company has not received a claim or request for information regarding any actual or alleged violation of any environmental and safety requirements.

(b)    The Company has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed any Person to, or released any hazardous substance or, to the Company's Knowledge, owned or operated any facility or property which is or has been contaminated by any hazardous substance, so as to give rise to any Liabilities pursuant to any environmental and safety requirements.

(c)    No environmental audits, reports or assessments have been performed by or on behalf of the Company.

3.24    Absence of Certain Developments.  Since December 31, 2024, (i) there has occurred no fact, event or circumstance that has had a Material Adverse Effect, and (ii) except for any actions required by this Agreement or the other Transaction Documents, the Company has conducted the Business in the Ordinary Course of Business and the Company has not:

(a)    suffered any damage, destruction or casualty loss exceeding $25,000 in the aggregate, whether or not covered by insurance, or experienced any material change in the amount and scope of insurance coverage; or

(b)    agreed in a legally binding manner to do the foregoing.

3.25    Accuracy of Diligence Materials.  To the Knowledge of Seller, all written information regarding the Company furnished or made available to Buyer and its Representatives is true and accurate in all material respects.

3.26    No Other Representations and Warranties. Except for the representations and warranties contained in this Article 3 (including the related portions of the Schedules), none of Seller, the Company or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or the Company, or as to the future revenue, profitability or success of the Company, warranty of merchantability, non-infringement, fitness for a particular purpose, condition of assets, or any other matter with respect to the Company, the Business, the Class A Units, or any representation or warranty arising from statute or otherwise in law.

12

3.27    No Forward Looking Representations.  Seller's representations and warranties shall not, and are not intended to, constitute, directly or indirectly, and representation or warranty concerning (i) the future financial performance of the Company, (ii) the continued existence or renewal of any customer, supplier, licensor, or other business relationship, or (iii) the prospects, projections or forecasts of the Business.

### ARTICLE 4 – REPRESENTATIONS AND WARRANTIES OF THE BUYER

Buyer hereby represents and warrants to Seller as follows:

4.1    Organization and Standing.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware. Buyer is not in default under or in violation of its Organizational Documents.

4.2    Authority; Authorization; Enforceability.

(a)    Authority; Authorization.  Buyer has the requisite limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform its obligations hereunder and under each such other Transaction Document, and to consummate the transactions contemplated by this Agreement and each such other Transaction Document.  The execution, delivery, and performance by Buyer of this Agreement and each other Transaction Document to which it is a party and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary limited liability company action on the part of Buyer.

(b)    Enforceability.  This Agreement and each such other Transaction Document to which Buyer is a party is, or upon its execution and delivery will be, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with the terms hereof and thereof.

4.3    Non contravention. Neither the execution, delivery or performance by Buyer of this Agreement or any other Transaction Document to which Buyer is a party, nor the consummation by Buyer of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof will (i) violate, or result in the violation of, the Organizational Documents of Buyer, or (ii) violate any Law or Order , in each case applicable to Buyer or its assets or properties, except, in each case, where the violation would not reasonably be expected to have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement.

4.4    Approvals; Claims or Proceedings.  No permit, authorization, consent, or approval of, any third party or any Authority is necessary for the consummation by Buyer of the transactions contemplated hereby.  There are no actions, suits, Claims or Proceedings which are pending or, to the Knowledge of Buyer, threatened against Buyer and there are no outstanding Orders against Buyer, or any of its assets or properties, which prohibit or enjoin the consummation of, or adversely affect Buyer's ability to timely consummate, the transactions contemplated hereby.

4.5     Brokers.  Buyer has not retained or been represented by any broker or finder in connection with the transactions contemplated by this Agreement that would cause Seller or the Company to be liable for the payment of any fee or expense to such broker or finder.

4.6     Intellectual Property of Seller.  Buyer agrees that upon Closing, shall not assert any rights in or to the Intellectual Property Rights of Seller referenced in Schedule 4.6.

4.7     Sufficiency of Funds. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

4.8     No Other Representations and Warranties. Except for the representations and warranties contained in this Article 4, none of Buyer or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Buyer, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE 5 – CONDITIONS TO CLOSING

5.1     Conditions to Each Party's Obligations. The respective obligations of each Party to consummate the transactions contemplated hereby are subject to the satisfaction (or waiver by Buyer, on the one hand, and Seller, on the other hand) at or before the Closing of the following conditions precedent:

(a)     Legal Restraints. No Law or Order shall be in effect that restrains, enjoins, makes illegal or prohibits the consummation of the Sale Transaction (any such Law or Order, a "Legal Restraint").

(b)     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered an order approving this Agreement and authorizing Seller to consummate the Sale Transaction and such order shall either be final and non-appealable or shall contain a waiver under Federal Rule of Bankruptcy Procedure 6004(h).

5.2     Conditions to Obligations of Buyer.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction (or waiver by Buyer) at or before the Closing of the following conditions precedent:

(a)     Accuracy of Seller's Representations and Warranties. The representations and warranties of Seller contained in this Agreement shall be true and correct as of the date of this Agreement and as of the Closing Date with the same effect as if made at and as of such date (except to the extent such representations and warranties specifically related to an earlier date, in which case such representations and warranties will be true and correct as of such earlier date).

(b)     Covenants and Agreements of Seller. The Company and Seller will have performed and complied in all material respects with all of their respective covenants and

14

agreements required to be performed or complied with by them under this Agreement at or prior to the Closing Date.

(c)    <u>Seller Deliverables</u>. Seller shall have delivered, or caused to be delivered, to the Company or Buyer, as applicable, all deliverables required pursuant to <u>Sections 2.2(a) and 2.2(b)</u>.

(d)    <u>Accounting</u>. Seller shall complete all accounting functions for the Company for the 2025 tax year and for the 2026 tax year through the Closing Date (the "<u>Stub Period</u>") that Seller has historically provided to Company pursuant to the terms of the MSA, including without limitation, all sales tax reporting, and IRS Form 1099 reporting.

(e)    <u>No MAE</u>. There shall not have occurred any event, circumstance, or occurrence that, individually or in combination with any other event, circumstance or occurrence, has had or would reasonably be expected to have a Material Adverse Effect.

(f)    <u>Consents</u>.    Buyer shall have received consents to the transactions contemplated by this Agreement from the following licensors and customers: (i) Walmart - Electronics Department, (ii) Walmart - Jewelry Department, (iii) Walmart.com, (iv) Sam's Club, (v) Target Corp., (vi) The H.D. Lee Company, Inc., and (vii) Wrangler Apparel Corp.

5.3    <u>Conditions to Obligations of Seller</u>.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction at or before the Closing of the following conditions precedent:

(a)    <u>Accuracy of Buyer's Representations and Warranties</u>. The representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date with the same effect as if made at and as of such date (except to the extent such representations and warranties specifically related to an earlier date, in which case such representations and warranties will be true and correct in all material respects as of such earlier date).

(b)    <u>Covenants and Agreement of Buyer</u>. Buyer will have performed and complied in all material respects with all of its respective covenants and agreements required to be performed or complied with by it under this Agreement at or prior to the Closing Date.

(c)    <u>Buyer Deliverables</u>. Buyer shall have delivered, or caused to be delivered, to Seller all deliverables required pursuant to <u>Section 2.2(c)</u>.

5.4    <u>Frustration of Closing Conditions</u>.  No Party may rely on the failure of any condition set forth in <u>Section 5.1</u>, <u>Section 5.2,</u> or <u>Section 5.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to materially comply with any provisions of this Agreement.

## ARTICLE 6 – CERTAIN AGREEMENTS

6.1    <u>Conduct of the Company</u>.    Seller covenants and agrees that, except as otherwise approved in writing by Buyer, during the period commencing on the date hereof and ending on the Closing Date, the Company will, and Seller will cause the Company to use commercially reasonable efforts to, conduct the Business in the Ordinary Course of Business, in compliance in all respects with applicable Law; provided that nothing contained in this Agreement shall give Buyer, directly or indirectly, the right to control or direct in any manner the operations of the Company prior to the consummation of the transactions contemplated hereby.    Without limiting the forgoing, and notwithstanding the MSA, from and after the date hereof through Closing, Seller will work diligently and fully cooperate with the Buyer to facilitate the Seller's transfer of the Company's Inventory, Books and Records, operating systems, and business operations to the Company, as directed by the Buyer.

6.2    <u>Further Assurances</u>.    The Parties hereto shall promptly execute and deliver any and all other instruments, documents or information and take further action required to be delivered pursuant to, or reasonably necessary or proper in order to give effect to, the terms and provisions of this Agreement and to transition control of the operation of the Company to Buyer.

6.3    <u>MSA Modification.</u>    The Parties hereby agree that the Initial Term of the MSA shall expire as of 5:00 pm EST on February 6, 2026.    Notwithstanding the foregoing, in the event that the closing of the  sale of substantially all of Seller's asset as contemplated in Seller's *Motion for Orders (i) Scheduling Hearing to Consider (a) Sale of Substantially All of the Debtor's Non-Withit Assets, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers; and (b) Assumption and Assignment of Executory Contracts; (ii) Scheduling Hearing to Consider Approval of (A) Break-Up Fee/Expense Reimbursement and (B) Bidding Procedures For the Conduct of an Auction and Entering Order Thereon; (iii) Fixing A Cure Claims Bar Date With Respect to the Assumption and Assignment of Executory Contracts; (iv) Fixing Manner and Notice of Sale Hearing; (v) Authorizing the Debtor to Sell Assets, Free and Clear f All Liens, Claims Aand Encumbrances, Subject to Higher and Better Offers; and (vi) Authorizing Assumption and Assignment of Executory Contracts*, filed at Docket No. 8 in seller's Bankruptcy Case (the "<u>Non-WITHit Asset Sale</u>"), does not occur on or before February 6, 2026, the Initial Term shall, upon delivery of written notice to Seller by Buyer, be extended until the actual closing date of the Non-WITHit Asset Sale.

6.4    <u>Business Records</u>.    Buyer acknowledges that the business records of the Company relating to its operations before Closing will be acquired by Buyer in connection with the consummation of the transactions contemplated hereby, and that Seller may from time to time require access to or copies of such records.    Buyer agrees that upon reasonable prior notice from Seller, it will, during normal business hours, provide or cause to be provided to Seller access to or copies of business records prepared before Closing. Buyer agrees that it will not (and will cause each of its Affiliates, including the Company, not to), within six years after the Closing Date, destroy any material business records of the Company prepared before the Closing.

6.5     Tax Matters.

(a)     Preparation of 2025 Tax Returns.  The Seller will, at Company's expense, prepare or cause to be prepared all Income Tax Returns for the Company for the year ended December 31, 2025.

(b)     Preparation of 2026 Tax Returns.  The Buyer agrees that they will use the close the books method to allocate any pre-closing income to the Seller.

(c)     Cooperation.  Each Party will, and each Party will cause its applicable Affiliates to, promptly cooperate in all reasonable respects with respect to Tax matters and provide one another with such information and access to the Company's books and records as is reasonably requested to enable the requesting Party to complete and file all Tax Returns it may be required to file with respect to the Company, to respond to Tax audits, inquiries or other Tax Proceedings and to otherwise satisfy Tax requirements.  Such cooperation also will include promptly forwarding copies of (i) relevant Tax notices, forms or other communications received from or sent to any Authority and (ii) reasonably requested copies of all relevant Tax Returns together with accompanying schedules and related workpapers, documents relating to rulings, audits or other Tax determinations by any Authority and records concerning the ownership and Tax basis of property.  The Party preparing any Pre-Closing Tax Returns will deliver such completed, but unfiled, Tax Returns to the other Party for its review and comment at least thirty (30) days prior to the due date of such Tax Returns as extended.  Buyer, the Company and Seller agree to consult with each other and to resolve in good faith any timely-raised issue arising as a result of the review of such Pre-Closing Tax Returns to permit the filing of such Tax Returns as promptly as possible but in no case later than the due date of such Tax Returns.

(d)     Transfer Taxes.  Notwithstanding the other terms of this Section 6.5, Buyer will pay all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement which are not exempted by the Sale Order or by Section 1146(a) of the Bankruptcy Code (collectively, "Transfer Taxes"), and the Parties will cooperate in timely making all filings, returns, reports and forms as may be required to comply with the provisions of applicable Law relating thereto.  Seller and Buyer shall use their respective best efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Transfer Taxes

(e)     Amending Tax Returns.  The Company cannot elect out of the centralized partnership audit regime and therefore cannot file an amended 1065 and agrees that the Company will not agree to any Pre-Closing Tax Period changes without Seller written consent, which consent shall not be unreasonably withheld or delayed.

6.6     Confidentiality. Each party hereto shall (and shall cause each of its Affiliates and Representatives to) treat and hold as confidential and not disclose to any Third Party the Confidential Information, refrain from using any of the Confidential Information except in

connection with this Agreement or in connection with any Proceeding. If either party (or any Affiliate or Representative of such party) is requested or required by any Proceeding to disclose any Confidential Information, such party shall notify the other party promptly in writing of the request or requirement so that the other party may seek an appropriate protective order or waive compliance with the provisions of this <u>Section 6.6</u>. If, in the absence of a protective order or the receipt of a waiver hereunder, the party under compulsion to disclose Confidential Information (or Affiliate or Representative thereof) is, upon the advice of counsel, required to disclose any Confidential Information, Seller (or the applicable Affiliate or Representative) may disclose the Confidential Information; <u>provided</u>, <u>however</u>, that such party (or the applicable Affiliate or Representative) shall (i) use commercially reasonable efforts to obtain, at the reasonable request and expense of the other party, a protective order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as such other party shall designate and (ii) disclose only such portion of the Confidential Information as is strictly required by Law.

6.7    <u>Mutual Non-Disparagement</u>.  Each Party agrees, and shall cause its shareholders, members, officers, directors to agree, and will use best efforts to cause their employees to agree, that they shall refrain from making any false, negative, critical or disparaging statements, implied or expressed, concerning the other Parties and their respective officers, directors, employees, stockholders, agents and affiliates, in any manner likely to be harmful to them or their business, business reputation or personal reputation.

6.8    <u>Bankruptcy Court Approval</u>.  The Parties will work cooperatively and in good faith to promptly prepare and file a motion seeking entry of an order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code, on shortened notice, approving this Agreement and authorizing Seller to consummate the Sale Transaction as a private sale transaction.

6.9    <u>No Distributions Prior to Closing</u>. The Parties agree that the Company shall not make any distributions on account of any of the Membership Units prior to the Closing.

## ARTICLE 7 – TERMINATION

7.1    <u>Termination Rights</u>.  This Agreement may be terminated at any time prior to the Closing:

    (a)    by the mutual written consent of Seller and Buyer;

    (b)    by Buyer by written notice to Seller if: Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in <u>Article 5</u>;

    (c)    by Seller by written notice to Buyer if: Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer

pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article 5;

(d)    by Buyer or Seller by written notice to the other in the event that:

(i)    there shall be any Legal Restraint that has become final and non-appealable; or

(ii)    the Bankruptcy Court enters an order that denies approval of this Agreement or that does not authorize Seller to consummate the Sale Transaction as a private sale; and/or

(iii)    Closing shall not have occurred on or prior to February 27, 2026; provided, however, that the right to terminate this Agreement under this Section 7.1(d)(iii) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date.

7.2    Effect of Termination. In the event of the termination of this Agreement in accordance with this Article 7, this Agreement shall become void and there shall be no liability on the part of any Party except:

(a)    that the obligations set forth in this Article 7, Section 6.6, Section 6.7, Article 8, and Article 9 shall survive termination and remain in full force and effect; and

(b)    that nothing herein shall relieve any Party from liability for any uncured material breach of any provision hereof occurring prior to such termination.

## ARTICLE 8 – REMEDIES FOR BREACH OF THIS AGREEMENT

8.1    Survival. Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is three (3) years from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the later of three (3) years or the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

8.2    Indemnification.

(a)    Regarding Seller. Subject to the terms and conditions set forth herein, Seller shall indemnify and hold harmless Buyer Indemnitees from and against any Damages which any such Buyer Indemnitee shall suffer, sustain, or become subject to, to the extent proximately caused by:

(i)       any inaccuracy in or breach by Seller of any representation or warranty contained in Article 3; provided that such inaccuracy or breach by Seller was unknown to Buyer as of the date of this Agreement; or

(ii)      the breach by Seller of any of Seller's covenants or agreements contained in this Agreement which are to be performed after the Closing.

(b)      Regarding Buyer.  Subject to the terms and conditions set forth herein, Buyer and, after the Closing, the Company, jointly and severally, shall indemnify and hold harmless Seller Indemnitees from and against any Damages which any such Seller Indemnitee shall suffer, sustain, or become subject to, to the extent proximately caused by:

(i)       any inaccuracy in or breach by Buyer of any representation or warranty made by Buyer in Article 4; provided that such inaccuracy or breach by Buyer was unknown to Seller as of the date of this Agreement; or

(ii)      the breach by Buyer of any of Buyer's covenants or agreements contained in this Agreement or the breach by the Company of any of the Company's covenants or agreements contained in this Agreement which are to be performed after the Closing.

8.3      Third Party Claims.  If a Proceeding is initiated by any Third Party against any Person (a "Third Party Claim") entitled to seek indemnification under this Article 8 (an "Indemnified Party"), and if such Indemnified Party intends to seek indemnification with respect thereto under this Article 8, such Indemnified Party shall promptly, after receipt of written notice of such Proceeding, provide written notice of such Proceeding to the party or parties from whom the Indemnified Party intends to seek indemnification (the "Responsible Party"), which notice shall describe such Proceeding in reasonable detail and the amount thereof (if known and quantifiable); provided, that the failure to so notify a Responsible Party shall not relieve such Responsible Party of its obligations hereunder unless and to the extent the Responsible Party shall be actually and materially prejudiced by such failure to so notify.  A Responsible Party shall be entitled to participate in the defense of such Proceeding giving rise to an Indemnified Party's claim for indemnification at such Responsible Party's expense, and at its option (subject to the limitations set forth below) shall be entitled to assume the defense thereof by appointing a reputable counsel reasonably acceptable to the Indemnified Party to be the lead counsel in connection with such defense within thirty (30) days of its receipt of notice of the Proceeding; provided, that (a) the Indemnified Party shall be entitled to participate in the defense of such claim, the Responsible Party shall not be entitled to assume control of such defense if (i) the claim for indemnification relates to or arises in connection with any criminal Proceeding, action, indictment, allegation or investigation involving the other party, (ii) such claim seeks an injunction or equitable relief against the Indemnified Party, (iii) a conflict of interest exists between the Responsible Party and the Indemnified Party, or (iv) the Responsible Party failed or is failing to vigorously prosecute or defend such claim; (b) if the Responsible Party shall control the defense of any such claim, the Responsible Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of a Proceeding or ceasing to defend such Proceeding if, pursuant to, or as a result of, such settlement or cessation, injunctive or other equitable relief will be imposed against

the Indemnified Party or if such settlement does not expressly and unconditionally release the Indemnified Party from all Liabilities with respect to the claim that gave rise to the Proceeding; and (c) if the Indemnified Party shall control the defense of any such claim, the Responsible Party shall not be bound by any compromise or settlement effected without the Responsible Party's prior written consent, which consent may not be unreasonably withheld or delayed.

8.4     Direct Claims. Any claim by an Indemnified Party on account of Damages that does not result from a Third-Party Claim (a "Direct Claim") shall be asserted by the Indemnified Party giving the Responsible Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Responsible Party of its indemnification obligations, except and only to the extent that the Responsible Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Damages that has been or may be sustained by the Indemnified Party. The Responsible Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim. During such 30-day period, the Indemnified Party shall allow the Responsible Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Responsible Party's investigation by giving such information and assistance (including access to the Indemnified Party's premises and personnel and the right to examine and copy any accounts, documents or records) as the Responsible Party or any of its professional advisors may reasonably request. If the Responsible Party does not so respond within such 30-day period, the Responsible Party shall be deemed to have rejected such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

8.5     Exclusive Remedies. Subject to and except for Section 8.6, the parties acknowledge and agree that from and after Closing their sole and exclusive remedy with respect to any and all claims (other than claims of fraud or intentional misconduct) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article 8, subject to the limitations set forth in Section 8.7. In furtherance of the foregoing, except with respect to Section 8.6, each party hereby waives, from and after Closing, to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this Article 8. Nothing in this Section 8.5 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to 8.6 or to pursue a claim of fraud or intentional misconduct.

8.6     Specific Performance. Each Party acknowledges and agrees that each other Party will be damaged irreparably if this Agreement is not performed in accordance with its terms or otherwise is breached and that a Party will be entitled to seek an injunction and other equitable relief (without posting any bond or other security) to prevent breaches hereof and to enforce

21

specifically this Agreement and its terms in addition to any other remedy to which such Party may be entitled hereunder.

8.7    Certain Limitations. The indemnification provided for in Section 8.2 shall be subject to the following limitations:

(a)    With respect to any claim as to which the Indemnified Party may be entitled to indemnification under Section 8.2(a)(i) or Section 8.2(b)(i), as the case may be, the Responsible Party shall not be liable for any of the following Damages (each, an "Excluded Loss"):

(i)  Damages that result from actions or omissions of the Company or Seller that are consistent with the Ordinary Course of Business of the Company.

(b)    Payments by a Responsible Party pursuant to under Section 8.2(a) or Section 8.2(b)(i) and 8.2(b)(ii) in respect of any Damages shall be limited to the amount of any liability or damage that remains after deducting therefrom any insurance proceeds and any indemnity, contribution or other similar payment received or reasonably expected to be received by the Indemnified Party (or the Company) in respect of any such claim. The Indemnified Party shall use its commercially reasonable efforts to recover under insurance policies or indemnity, contribution, or other similar agreements for any Damages prior to seeking indemnification under this Agreement.

(c)    Each Indemnified Party shall take, and cause its Affiliates to take, all reasonable steps to mitigate any Damages upon becoming aware of any event or circumstance that would be reasonably expected to, or does, give rise thereto, including incurring costs only to the minimum extent necessary to remedy the breach that gives rise to such Damages.

(d)    For the avoidance of doubt, the limitations of liability and damages set forth in this Section 8.7 shall not apply to any Damages resulting from Seller's fraud or intentional misconduct.

(e)    Buyer acknowledges and agrees that Seller shall not be liable for any Losses or other Damages to the extent arising out of, relating to, or resulting from any breach of any representation, warranty, covenant, or agreement of Seller in this Agreement if, prior to the Closing, Buyer or any of its Representatives had Knowledge of such breach.

## ARTICLE 9 - RELEASES

(a)    Effective as of the Closing, in consideration of the covenants, agreements, and undertakings of the Parties hereunder, each Party, on behalf of itself and its respective present and former parents, subsidiaries, affiliates, officers, directors, shareholders, members, employees, successors, and assigns (collectively, "Releasors") hereby releases, waives, and forever discharges the other Party and its respective present and former, direct and indirect, parents, subsidiaries, affiliates, employees, officers, directors, shareholders, members, agents, representatives, employees, permitted successors, and permitted assigns

(collectively, "Releasees") of and from any and all actions, causes of action, suits, losses, liabilities, rights, debts, dues, sums of money, accounts, reckonings, obligations, costs, expenses, liens, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands, of every kind and nature whatsoever, whether now known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, in law, admiralty, or equity (collectively, "Released Claims"), which any of such Releasors ever had, now have, or hereafter can, shall, or may have against any of such Releasees for, upon, or by reason of any matter, cause, or thing whatsoever from the beginning of time through the date of the Closing, including without limitation, all causes of action arising under the Bankruptcy Code.

(b)     Notwithstanding anything to the contrary contained herein, the Released Claims shall not include (i) any Claims relating to rights and obligations preserved by, created by, or otherwise arising out of this Agreement (including without limitation, any surviving indemnification obligations under the Agreement, (ii) any Management Services Fees (as defined in the MSA) owed by the Company to Seller pursuant to the terms of the MSA for the months of  November and December 2025 and January and February 2026, (iii) any royalties owed by Seller to the Company arising from sales during the month of November 2025 of the Company's licensed products to Walmart, pursuant to the terms of a certain Licensing Agreement, dated as of January 31, 2025, between Seller, the Company and Buyer, among others, (iv) amounts due and payable by Seller to the Company pursuant to the LLC Agreement in connection with Seller's sale of Seller Licensed Products and other wearable tech accessory merchandise prior to Closing, or (v) obligations of the Company and its subsidiary, Sol-Light LLC under that certain Negotiable Promissory Note, issued by the Company and Sol-Light LLC to Buyer on November 26, 2025.

(c)     Each Party, on behalf of itself and each of its respective Releasors, understands that it may later discover Claims or facts that may be different than, or in addition to, those that it or any other Releasor now knows or believes to exist regarding the subject matter of the release contained in this Article 9, and which, if known at the time of signing this Agreement, may have materially affected this Agreement and such Party's decision to enter into it and grant the release contained in this Article 9. Nevertheless, the Releasors intend to fully, finally and forever settle and release all Released Claims that now exist, may exist or previously existed, as set forth in the release contained in this Article 9, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the release of the Released Claims given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasors hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts.

## ARTICLE 10 – MISCELLANEOUS

10.1     <u>Post-Closing Acknowledgements</u>.

(a)  The Parties hereby acknowledge and agree that, as of the Closing Date, the Seller, its Members, and their respective Affiliates shall have no right, title, or interest in, and no authority to market, distribute, or sell, any product under the WITHit brand and the Company, its Members, and their respective Affiliates shall have no right, title, or interest in, and no authority to market, distribute, or sell, any product that Seller has the right to sell pursuant to the license agreements set forth in Schedule 10.1(a) (collectively, the "<u>Seller Licensed Products</u>"). The Parties further acknowledge and agree that, as of the Closing Date, neither the Company, its members, nor any of their respective Affiliates shall be entitled to receive any commissions, fees, royalties, or other compensation of any nature in connection with the sale of Seller Licensed Products by Seller after the Closing Date.

(b)  The Parties hereby acknowledge and agree that, as of the Closing Date, the Seller, its Members, and their respective Affiliates shall have no right, title, or interest in, and no authority to market, distribute, or sell, any product that the Company has the right to sell pursuant to the license agreements set forth on Schedule 10.1(b) (collectively, the "<u>Company Licensed Products</u>"). The Parties further acknowledge and agree that, as of the Closing Date, neither the Seller, its members, nor any of their respective Affiliates shall be entitled to receive any commissions, fees, royalties, or other compensation of any nature in connection with the sale of Company Licensed Products by Seller after the Closing Date.

(c)  The Parties hereby acknowledge, represent, and warrant that, upon Closing, the LLC Agreement shall be deemed terminated and shall be of no further force or effect.

(d)  The Parties hereby acknowledge and agree that, upon the termination of the LLC Agreement, no Party shall be subject to any restriction, limitation, or prohibition contained in the LLC Agreement with respect to conducting business with any customer, client, or other third party, in any product category or line of business, in any geographic territory worldwide, whether or not such business activities are competitive with the business of the Company, Seller, Buyer, or any of their respective Affiliates. For the avoidance of doubt, nothing in this Agreement shall be construed to impose any non-compete, non-solicitation, or similar restrictive covenant on any Party following the Closing Date, except as may be expressly set forth elsewhere in this Agreement.

10.1     <u>Notices</u>.  All notices, demands, and other communications hereunder shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt by nonautomatic means, whether electronic or otherwise), (b) when sent by email (provided no automated undeliverable response is received), or (c) one (1) Business Day after the day sent by an internationally recognized overnight courier (with written confirmation of receipt), in each case, at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party under this <u>Section 10.1</u>):

24

If to Seller:

E. Gluck Corporation
6015 Little Neck Parkway
Little Neck, New York 11362
Attn: Barbara Weichselbaum and Adam Gelnick
Email: [add email addresses]

with a copy sent contemporaneously to:

Halperin Battaglia Benzija, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Attn: Alan Halperin and Julie Goldberg
Email: ahalperin@halperinlw.net; jgoldberg@halperinlaw.net

If to Buyer, or to the Company at any time after the Closing, to:

WIL Holdings, LLC
8683 W. Sahara Avenue, Suite 180
Las Vegas, Nevada 89117
Attn: David Nelson, Phillip Grandinetti, III and William Devaney
E-mail: [add email addresses]

with a copy sent contemporaneously to:

Klestadt Winters Jureller Southard & Stevens LLP
200 West 41st Street, 17th Floor
New York, NY 10036
Attention: Ian Winters, Esq.
Email: iwinters@klestadt.com

10.2    Entire Agreement.    This Agreement, including the Schedules, and the other Transaction Documents, between Buyer and Seller constitute the entire agreement among the Parties hereto with respect to the transactions contemplated hereby and supersede all prior agreements, understandings, negotiations and discussions, both written and oral, among the Parties hereto with respect thereto.

10.3    Amendment and Waiver.    Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by Seller and Buyer, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

10.4    Benefits; Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns.  Except as set forth below, neither this Agreement nor the obligations of any Party hereunder shall be assignable or transferable by such Party without the prior written consent of the other Parties hereto; provided, however, that Buyer and, after the Closing, the Company shall each have the right to assign any of its rights under this Agreement to any of its Affiliates of equal or greater creditworthiness as Buyer.

10.5    No Third-Party Beneficiary.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than Buyer, Buyer Indemnitees, the Company, Seller, Seller Indemnitees or their respective successors, heirs, personal representatives or permitted assigns, any rights, or remedies under or by reason of this Agreement.

10.6    Severability.  It is the desire and intent of the Parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

10.7    Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with the preparation, execution and consummation of this Agreement and of the transactions contemplated hereby.

10.8    Counterparts and Delivery.  This Agreement may be executed in any number of counterparts and by the several Parties hereto in separate counterparts, and delivered by facsimile or other means of electronic transmission (including .PDF), each of which shall be deemed to be one and the same instrument and an original document.

10.9    Duties.  Any and all duties and obligations which any Party hereto may have to any other Party hereto with respect to or in connection with the Class A Units , this Agreement or the transactions contemplated hereby are limited to those specifically set forth in this Agreement. Neither the duties nor obligations of any Party hereto, nor the rights of any Party hereto, shall be expanded beyond the terms of this Agreement on the basis of any legal or equitable principle or on any other basis whatsoever.

10.10   Governing Law; Waiver of Jury Trial.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF

THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR
CONFLICTING PROVISION OR RULE. EACH PARTY HERETO HEREBY IRREVOCABLY
AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT SUCH PARTY MAY
LEGALLY AND EFFECTIVELY DO SO, TRIAL BY JURY IN ANY SUIT, ACTION OR
PROCEEDING ARISING HEREUNDER.

10.11    Disputes.

(a)    Applicability. Any claim or controversy arising out of or relating to this
Agreement, the documents referenced herein, or the transactions contemplated hereby and
thereby (each, a "Dispute") shall be resolved exclusively as set forth in this Section 10.11.

(b)    Negotiation. First, the Parties shall attempt to resolve any Dispute by
informal, good faith negotiation between the signatories of this Agreement. Any final
decision mutually agreed to in writing by the Parties will be conclusive and binding on the
Parties. If the Parties fail to resolve a Dispute within ten (10) days after the first negotiation
meeting with respect to such Dispute, either Party may submit the Dispute for resolution
by the Bankruptcy Court.

(c)    ANY DISPUTES SHALL BE INSTITUTED EXCLUSIVELY IN THE
UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK,
AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE
JURISDICTION OF SUCH COURT IN ANY SUCH DISPUTE. SERVICE OF
PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH
PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF
PROCESS FOR ANY DISPUTE BROUGHT IN ANY SUCH COURT. THE PARTIES
IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE
LAYING OF VENUE OF ANY DISPUTE IN SUCH COURT AND IRREVOCABLY
WAIVE AND AGREE NOT TO PLEAD OR CLAIM THAT ANY DISPUTE BROUGHT
IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

10.12    Disclosure Schedules. A disclosure made by the Company or Seller in any Section
of this Agreement or any of the Schedules (or subparts thereof) attached hereto (the "Schedules")
shall be deemed, for all purposes of this Agreement, to have been made with respect to all such
other Sections of this Agreement and all such other Schedules (or subparts thereof) if the
applicability of such disclosure is reasonably apparent, notwithstanding any cross-references
(which are included solely as a matter of convenience) or lack of an exception or a Schedule
reference in any representation or warranty. Information reflected in the Schedules is not
necessarily limited to matters required by this Agreement to be reflected in the Schedules. Such
additional information is set for informational purposes and does not necessarily include other
matters of a similar nature.  Disclosure of such additional information shall not be deemed to
constitute an acknowledgment that such information is required to be disclosed and disclosure of
such information shall not be deemed to enlarge or enhance any of the representations or warranties
in this Agreement or otherwise alter in any way the terms of this Agreement. Inclusion of
information in the Schedules shall not be construed as an admission that such information is
material to the Business, assets, liabilities, financial position, operations, or results of operations
of the Company.  Any summary or description of any Proceeding, Law, contract, or other

document contained in the Schedules is qualified in its entirety by the full text of such Proceeding, Law, contract, or other document. From time to time prior to the Closing, each party shall have the right (but not the obligation) to supplement or amend the Schedules hereto with respect to any matter.

10.13    <u>Late payments; Interest</u>. Any amounts due hereunder and not timely paid shall accrue pre and post-judgment interest at the maximum rate permitted by law.

10.14    <u>Cross-Default</u>. To the extent any other agreement between the Parties executed contemporaneously with this Agreement contains a cross-default provision pointing to this Agreement, a default or breach under said other agreement shall be deemed a default and breach under this Agreement; any qualifier on the basis of materiality or Material Adverse Effect, in this Agreement, shall be disregarded.

## ARTICLE 11 – DEFINITIONS

11.1    <u>Defined Terms</u>.  In addition to terms defined elsewhere in this Agreement, the following terms when utilized in this Agreement, unless the context otherwise requires, shall have the meanings indicated, which meanings shall be equally applicable to both the singular and plural forms of such terms:

"<u>Affiliate</u>" means, as to any specified Person, each other Person directly or indirectly controlling or controlled by or under common control with the specified Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or otherwise.

"<u>Agreement</u>" is defined in the preamble of this Agreement.

"<u>Authority(ies)</u>" means any federal, state, local or foreign governmental regulatory agency, commission, bureau, authority, court, or arbitration tribunal.

"<u>Bankruptcy Case</u>" is defined in the Background section of this Agreement.

"<u>Bankruptcy Code</u>" is defined in the Background section of this Agreement.

"<u>Bankruptcy Court</u>" is defined in the Background section of this Agreement.

"<u>Books and Records</u>" means all tangible and electronically stored books and records, including without limitation, sales records, purchasing records, inventory records, files, licenses, contracts, documents, financial records, price lists, bills, accounting, tax records, internal records, databases, information systems, operating manuals, customer and supplier contact lists, invoices, advertising and marketing materials, files, artwork, and other similar items pertaining to the Business.

"<u>Business</u>" is defined in the Background section of this Agreement.

28

"Business Day(s)" means any day, other than a Saturday or Sunday and other than a day that banks in the State of New York are generally authorized or required by applicable Law to be closed.

"Buyer" is defined in the preamble of this Agreement.

"Buyer Indemnitee(s)" means Buyer and, following the Closing, the Company and its managers, officers, employees and Affiliates, and successors and permitted assigns, as the case may be.

"Cash" means the cash and cash equivalents of the Company, including marketable securities, short term investments, and any cash deposits.

"Claim" shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Class A Units" is defined in the Background section of this Agreement.

"Class B Units" is defined in the Background section of this Agreement.

"Closing" is defined in Section 2.1 of this Agreement.

"Closing Date" means the date on which the Closing occurs.

"Closing Payment" is defined in Section 1.2(b) of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Company" is defined in the preamble of this Agreement.

"Company Owned Intellectual Property" means all Intellectual Property Rights owned or purported to be owned by the Company, including the Registered Company Intellectual Property.

"Confidential Information" means all non-public, proprietary, or confidential information of a Party or of the Company disclosed before, on, or after the Effective Date, including but not limited to any trade secrets, in oral, visual, written, electronic, or other tangible or intangible form, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and other materials prepared by any Person or any of its Representatives that contain, are based on, or otherwise reflect, to any degree, any of the foregoing; provided, however, that Confidential Information does not include any information that: (a) is or becomes generally available to the public other than as a result of a breach of applicable confidentiality obligations or this Agreement; (b) is obtained on a non-confidential basis from a third party that was not legally or contractually restricted from disclosing such information; (c) as established by documentary evidence, was independently developed by a Person without using any Confidential Information. Confidential

Information also specifically includes this Agreement and all discussions of the Parties relating hereto.

"Damages" means all damages, liabilities, deficiencies, claims, demands, awards, judgments, penalties, interest, costs, losses, expenses, and fees (including court costs and reasonable attorneys' fees and expenses).

"Direct Claim" is defined in Section 8.4 of this Agreement.

"Encumbrance" means any right, interest, or restriction on use of any asset held by any Person.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Financial Statements" is defined in Section 3.8(a) of this Agreement.

"Income Tax" means any Tax based upon or measured by gross or net receipts of gross or net income (including any Tax in the nature of minimum taxes, tax preference items and alternative minimum taxes) and including any obligation arising pursuant to the application of Treasury Regulation section 1.1502-6 or any similar provision of any applicable Law regarding any Tax (but, for the avoidance of doubt, not including any sales, use, stamp, duty, value added, business, goods and services, property, transfer, recording, documentary, conveyancing or similar Tax).

"Indebtedness" as applied to any Person means (without duplication) (a) indebtedness of such Person for borrowed money evidenced by bonds, debentures, notes or other similar instruments or debt securities, (b) all obligations under leases which have been or must be, in accordance with the Company's accounting practices, recorded as capital leases in respect of which such Person is liable as lessee, (c) any liability of such Person in respect of letters of credit (but only to the extent such letter of credit has been drawn upon), other than any standby letter of credit or liability related to any accounts payable, and (d) all interest, fees, prepayment premiums and other expenses owed with respect to the indebtedness referred to above.

"Responsible Party" is defined in Section 8.3 of this Agreement.

"Intellectual Property Rights" means to the extent owned by the Company, all (i) industrial designs, patents, patent applications and patent disclosures together with all reissues, continuations, continuations-in-part, divisionals, revisions, extensions or reexaminations thereof, (ii) trademarks, service marks, trade dress, trade names, brands, slogans, logos, together with all translations, adaptations, derivations, and combinations of the foregoing, and all applications, registrations, and renewals in connection therewith, together with all of the goodwill associated with the foregoing (collectively, "Marks"), (iii) copyrights and other works of authorship, and moral rights, and all applications, registrations, and renewals in connection therewith and the good will associated with the Business relating thereto, (iv) software (including source code and object code, tools, data, databases and documentation thereof), (v) trade secrets, confidential information, know-how, inventions, proprietary processes and methods, customer lists, mailing lists, business plans and other proprietary information, (vi) mask works and registrations and applications for

30

registration thereof, (vii) all domain names, Internet domain name registrations and applications for registration thereof; (viii) all documentation related to any of the foregoing; and (ix) copies and tangible embodiments of any of the foregoing, in whatever form or medium.

"Inventory" means all finished goods, inventory, raw materials, work in process, samples, mock-ups, supplies, shipping materials, packaging materials owned by the Company or related to the Business of the Company.

"IRS" means the Internal Revenue Service.

"Knowledge of Buyer" means the actual knowledge of David Nelson, Phillip Grandinetti, III, and William Devaney.

"Knowledge of Seller" means the actual knowledge of Seller's Chief Financial Officer - Adam Gelnick, Seller's Chief Executive Officer - Barbara Weichselbaum, or Seller's Chief Restructuring Officer, Gary Herwitz.

"Law" means any law, statute, rule, regulation, or ordinance enacted, adopted, issued, or promulgated by any Authority, in each case in effect as of the Effective Date.

"Liabilities" is defined in Section 3.9 of this Agreement.

"Lien" means any mortgage, lien, pledge, charge, or other security interest.

"Legal Restraint" is defined in Section 5.1(a) of this Agreement.

"LLC Agreement" is defined in the Background of this Agreement.

"Marks" is defined within the defined term "Intellectual Property Rights".

"Material Adverse Effect" means any change or effect that is materially adverse to the financial condition or results of operations of the Company or on the ability of the Company to timely consummate the transactions contemplated hereby; provided, however, that none of the following shall, directly or indirectly, be deemed to constitute, and none of the following (or the effects thereof) shall be taken into account in determining whether there has been, a Material Adverse Effect: (a) any adverse change, event, development, or effect arising from or relating to (i) general business or economic conditions, or the industries in which the Company operates, (ii) national or international political or social conditions, including any hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, including upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States, (iii) financial, banking, or securities markets (including any disruption thereof and any decline in the price of any security or any market index), (iv) epidemic, pandemics (including

the COVID-19 pandemic), (v) changes in generally accepted accounting principles in the jurisdictions in which the Company operates, (vi) changes in Laws, (vii) the negotiation, execution and delivery of this Agreement, the identity or business plans of Buyer or its Affiliates, or the announcement or consummation of the transactions contemplated hereby, including any impact thereof on relationships, contractual or otherwise, with customers, suppliers, distributors, partners or employees, (viii) the fact that the Company fails to meet internal budgets, plans or forecasts, or (ix) the taking of any action contemplated by this Agreement and the other agreements contemplated hereby, or required under any material contract or applicable Law, except, in the case of clauses (a)(i), (a)(ii), (a)(iii) or (a)(iv), to the extent the Company is disproportionately impacted by such changes, development or events in comparison to other Persons in the industry in which it operates, (b) any event, occurrence, or circumstance with respect to which Buyer has Knowledge as of the date hereof, (c) any adverse change in or effect on the Business that is timely cured by the Company or Seller, and (d) any natural or man-made disaster or acts of God, or other *force majeure* events.

"Membership Units" is defined in the Background section of this Agreement.

"MSA" is defined in Section 2.2(c)(v) of this Agreement.

"Non-WITHit Asset Sale" is defined in Section 6.3 of this Agreement.

"Order" means any judgment, writ, decree, injunction, rule, order, decision, settlement, decree, ruling or assessment of any arbitrator or Authority.

"Ordinary Course of Business" means the ordinary course of business consistent with the past custom and practice of the Company.

"Organizational Documents" means (a) the articles or certificate of incorporation and the bylaws of a corporation, (b) the certificate of formation or articles of organization and the operating or limited liability company agreement of a limited liability company, (c) the partnership agreement and any statement of partnership of a general partnership, (d) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (e) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person and (f) any amendment to or restatement of any of the foregoing.

"Party" or "Parties" means any Person who is a party to this Agreement.

"Person" means any natural person, corporation, limited liability company, unincorporated organization, partnership, association, joint-stock company, joint venture, other entity, trust or government, or any agency or political subdivision of any government.

"Personal Information" is defined in Section 3.17 of this Agreement.

"Pre-Closing A/R" is defined in Section 3.7 of this Agreement.

"Pre-Closing Taxes" means all Taxes of the Company with respect to any Pre-Closing Tax Period.

"Pre-Closing Tax Returns" is defined in Section 6.7(a) of this Agreement.

"Pre-Closing Tax Period" means any Tax period ending on or before the Closing Date.

"Pre-Paid Expenses" has the meaning set forth in Section 3.23 of this Agreement.

"Proceeding" means any arbitration, audit, hearing, litigation, proceeding or suit, in each case that is commenced, brought, conducted, or heard by or before, or otherwise involving, any Authority or arbitrator.

"Purchase Price" is defined in Section 1.2 of this Agreement.

"Real Property Leases" is defined in Section 3.13(a) of this Agreement.

"Registered Company Intellectual Property" is defined in Section 3.14(a) of this Agreement.

"Representative(s)" of Seller, the Company or Buyer shall mean such Person's respective officers, managers, directors, employees, partners, investment bankers, consultants, attorneys, accountants, agents, and other representatives.

"Responsible Party" is defined in Section 8.3 of this Agreement.

"Sale Transaction" means Buyer's purchase of the Class A Units from Seller pursuant to the terms and conditions of this Agreement.

"Schedules" is defined in Section 10.12 of this Agreement.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" is defined in the preamble of this Agreement.

"Seller Indemnitee(s)" means Seller, Seller's Affiliates (other than the Company after the Closing), heirs, executors, successors and permitted assigns.

"SLGN Class B Units" is defined in the Background section of this Agreement.

"Tax Claim" means (a) any inquiries, assessments, proceedings or similar events with respect to Income Taxes of the Company for which Seller may be required to reimburse or indemnify Buyer pursuant to this Agreement or (b) any voluntary contact with any Tax authority relating to Income Taxes of the Company for any Pre-Closing Tax Period.

"<u>Tax Return(s)</u>" means any return, declaration (including any declaration of estimated Taxes), report, claim for refund, or information return or statement relating to Taxes with respect to any income, assets, or properties of the Company, including any schedule or attachment thereto.

"<u>Taxable Period(s)</u>" means any taxable year or any other period that is treated as a taxable year (or other period, or portion thereof, in the case of a Tax imposed with respect to such other period, *e.g.*, a quarter) with respect to which any Tax may be imposed under any applicable Law.

"<u>Tax Statement</u>" is defined in <u>Section 6.7(e)</u> of this Agreement.

"<u>Taxes</u>" means (a) all federal, state, local and foreign taxes (including income or profits taxes, premium taxes, excise taxes, sales taxes, use taxes, gross receipts taxes, franchise taxes, ad valorem taxes, severance taxes, capital levy taxes, transfer taxes, value added taxes, employment and payroll-related taxes, property taxes, business license taxes, occupation taxes, import duties and other governmental charges and assessments), of any kind whatsoever, including interest, additions to tax and penalties with respect thereto, (b) liability for any such items described in clause (a) that is imposed by reason of U.S. Treasury Regulation §1.1502-6 or similar provisions of Law and (c) liability for any such items described in clause (a) imposed on any transferee or indemnitor, by contract or otherwise.

"<u>Third Party</u>" means any Person that is not a Party, including without limitation, any purchaser of any of the Debtor's assets other than Buyer.

"<u>Third Party Claim</u>" is defined in <u>Section 8.4(a)</u> of this Agreement.

"<u>Transaction Document(s)</u>" means this Agreement, the Escrow Agreement, and any other documentation entered into in connection with this Agreement or otherwise executed between the Parties contemporaneously with this Agreement.

"<u>WIL Class B Units</u>" is defined in the Background section of this Agreement.

"<u>Wire Instructions</u>" means Seller's wire instructions attached as <u>Exhibit "B"</u> hereto, or such other instructions provided to Buyer by Seller in writing.

10.2    <u>Interpretation</u>.  As used in this Agreement, the word "<u>including</u>" means without limitation, the word "<u>or</u>" is not exclusive and the words "<u>herein</u>," "<u>hereof</u>," "<u>hereby</u>," "<u>hereto</u>," "<u>hereunder</u>" and the like refer to this Agreement as a whole.  Each defined term used in this Agreement shall have a comparable meaning when used in its plural or singular form.  Unless the context otherwise requires, references herein: (a) to Articles, Sections, Exhibits and Schedules mean the Articles and Sections of and the Exhibits and Schedules attached to this Agreement,

(b) to an agreement, instrument or document means such agreement, instrument or document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and not prohibited by this Agreement and (c) to a statute means such statute as amended from time to time and includes any successor legislation thereto.  The headings and captions used in this Agreement, in any Schedule or Exhibit hereto, in the table of contents or in any index hereto are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement or any Schedule or Exhibit hereto, and all provisions of this Agreement and the Schedules and Exhibits hereto shall be enforced and construed as if no caption or heading had been used herein or therein. Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement (or, in the absence of any ascribed meaning, the meaning customarily ascribed to any such term in the Company's industry or in general commercial usage).  The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  All references to dollars (or the symbol "$") contained herein shall be deemed to refer to United States dollars.

**[SIGNATURES ARE ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**BUYER:**

WIL HOLDINGS, LLC

By:_____
Name:  William Devaney
Title: Member


By:_____
Name: David Nelson
Title: Manager and Member


By:_____
Name: Phillip Grandinetti, III
Title: Member


**SELLER:**

E. GLUCK CORPORATION

By:_____
Name: Barbara Weichselbaum
Title: Chief Executive Officer


By:_____
Name: Adam Gelnick
Title: Chief Financial Officer


**COMPANY:**

WITHIT HOLDINGS, LLC

By:_____
Name: Barbara Weichselbaum
Title: Manager


By:_____
Name: Adam Gelnick
Title: Manager


By:_____
Name: William Devaney
Title: Manager


By:_____
Name: David Nelson
Title: Manager


By:_____
Name: Phillip Grandinetti, III
Title: Manager


**CONSENTED TO:**

SLGN Holdings, LLC

By:_____
Name: David Nelson
Title: Manager and Member


*Membership Unit Purchase Agreement*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**BUYER:**                                                    **COMPANY:**

WIL HOLDINGS, LLC                                 WITHIT HOLDINGS, LLC

By:_____
Name:  William Devaney                             By:_____
Title: Member                                            Name: Barbara Weichselbaum
                                                             Title: Manager


By:_____
Name: David Nelson
Title: Manager and Member                        By:_____
                                                             Name: Adam Gelnick
                                                             Title: Manager


By:_____
Name: Phillip Grandinetti, III
Title: Member                                            By:_____
                                                             Name: William Devaney
                                                             Title: Manager


**SELLER:**

E. GLUCK CORPORATION                          By:_____
                                                             Name: David Nelson
By:_____                             Title: Manager
Name: Barbara Weichselbaum
Title: Chief Executive Officer


By:_____                             By:_____
Name: Adam Gelnick                                 Name: Phillip Grandinetti, III
Title: Chief Financial Officer                       Title: Manager


**CONSENTED TO:**

SLGN Holdings, LLC

By:_____
Name: David Nelson
Title: Manager and Member

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**BUYER:**

WIL HOLDINGS, LLC

By:_____
Name: William Devaney
Title: Member


By:_____
Name: David Nelson
Title: Manager and Member


By:_____
Name: Phillip Grandinetti, III
Title: Member


**SELLER:**

E. GLUCK CORPORATION

By:_____
Name: Barbara Weichselbaum
Title: Chief Executive Officer


By:_____
Name: Adam Gelnick
Title: Chief Financial Officer


**COMPANY:**

WITHIT HOLDINGS, LLC

By:_____
Name: Barbara Weichselbaum
Title: Manager


By:_____
Name: Adam Gelnick
Title: Manager


By:_____
Name: William Devaney
Title: Manager


By:_____
Name: David Nelson
Title: Manager


By:_____
Name: Phillip Grandinetti, III
Title: Manager


**CONSENTED TO:**

SLGN Holdings, LLC

By:_____
Name: David Nelson
Title: Manager and Member


*Membership Unit Purchase Agreement*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**BUYER:**

WIL HOLDINGS, LLC

By:_____
Name:  William Devaney
Title: Member


By:_____
Name: David Nelson
Title: Manager and Member


By:_____
Name: Phillip Grandinetti, III
Title: Member


**SELLER:**

E. GLUCK CORPORATION

By:_____
Name: Barbara Weichselbaum
Title: Chief Executive Officer


By:_____
Name: Adam Gelnick
Title: Chief Financial Officer


**COMPANY:**

WITHIT HOLDINGS, LLC

By:_____
Name: Barbara Weichselbaum
Title: Manager


By:_____
Name: Adam Gelnick
Title: Manager


By:_____
Name: William Devaney
Title: Manager


By:_____
Name: David Nelson
Title: Manager


By:_____
Name: Phillip Grandinetti, III
Title: Manager


**CONSENTED TO:**

SLGN Holdings, LLC

By:_____
Name: David Nelson
Title: Manager and Member


*Membership Unit Purchase Agreement*

IN WITNESS WHEREOF, the Parties hereto have each executed and delivered this Agreement as of the day and year first above written.

**BUYER:**                                                    **COMPANY:**

WIL HOLDINGS, LLC                                    WITHIT HOLDINGS, LLC

By:_____
Name: William Devaney                            By:_____
Title: Member                                          Name: Barbara Weichselbaum
                                                            Title: Manager


By:_____
Name: David Nelson
Title: Manager and Member                       By:_____
                                                            Name: Adam Gelnick
                                                            Title: Manager


By:_____
Name: Phillip Grandinetti, III
Title: Member                                          By:_____
                                                            Name: William Devaney
                                                            Title: Manager


**SELLER:**

E. GLUCK CORPORATION                          By:_____
                                                            Name: David Nelson
By:_____                     Title: Manager
Name: Barbara Weichselbaum
Title: Chief Executive Officer

By:_____                     By:_____
Name: Adam Gelnick                                 Name: Phillip Grandinetti, III
Title: Chief Financial Officer                       Title: Manager


**CONSENTED TO:**

SLGN Holdings, LLC

By:_____
Name: David Nelson
Title: Manager and Member

# EXHIBIT A

## Escrow Agreement

*[See attached]*

**EXHIBIT B**

**Seller's Wiring Instructions**

***[See attached]***