UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:

                                                        Chapter 11 Case

**E. GLUCK CORPORATION,**                   Case No. 25-12683 (MG)

                                  Debtor.

-------------------------------------------------------------x

## COMBINED DISCLOSURE STATEMENT AND
## JOINT LIQUIDATING PLAN OF E. GLUCK CORPORATION

**HALPERIN BATTAGLIA BENZIJA, LLP**
Alan D. Halperin, Esq. (ahalperin@halperinlaw.net)
Julie Dyas Goldberg, Esq. (jgoldberg@halperinlaw.net)
40 Wall Street, 37th Floor
New York, New York 10005
Phone:  (212) 765-9100

*Counsel to the Debtor and Debtor in Possession*

   - and -

**PORZIO, BROMBERG & NEWMAN, P.C.**
1675 Broadway
Suite 1810
New York, NY 10019
(646) 348-6723
Brett S. Moore, Esq. (BSMoore@pbnlaw.com)
Robert M Schechter, Esq (RMSchechter@pbnlaw.com)
Jenny Zhou, Esq. (JZhou@pbnlaw.com) (pro hac vice)

*Counsel to the Official Committee of Unsecured Creditors*

{00357013.3 / 1539-002 }

E. Gluck Corporation ("E. Gluck" or the "Debtor"), along with the Official Committee of Unsecured Creditors ("Committee"), respectfully submits this combined disclosure statement and plan of liquidation (the "Plan and Disclosure Statement" or the "Plan") pursuant to sections 1125 and 1129 of Title 11 of the United States Code and the Procedural Guidelines for Combined Disclosure Statement and Chapter 11 Plan of the Bankruptcy Court for the Southern District of New York dated May 31, 2024 (the "Guidelines").

**PLEASE READ THIS COMBINED PLAN AND DISCLOSURE STATEMENT CAREFULLY. THIS DOCUMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS PART OF THIS COMBINED DOCUMENT. THE DEBTOR AND THE COMMITTEE BELIEVE THAT ACCEPTANCE OF THE PROPOSED PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR.**

**I.**

**<u>DESCRIPTION OF THE PLAN AND DISCLOSURE STATEMENT</u>**

The purpose of this Plan and Disclosure Statement is to provide creditors and equity holders of the Debtor with adequate information to enable them to make an informed judgment concerning the method by which the Debtor plans to liquidate and emerge from bankruptcy. The Plan contains the exclusive and final statement of the rights of the Debtor, its creditors, equity holders and other interested parties, and sets forth what (if anything) each of those groups will receive and how they will receive it. It is strongly recommended that the Plan and Disclosure Statement be read in its entirety. **IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND DISCLOSURE STATEMENT, IT WILL BECOME BINDING ON THE DEBTOR, ALL CREDITORS, EQUITY HOLDERS AND OTHER INTERESTED PARTIES.**

You are also urged to read the contents of the Plan and Disclosure Statement in order to determine what rights you may have to vote on or object to the method by which the Debtor plans to reorganize. Particular attention should be directed to the provisions of the Plan and Disclosure Statement affecting or impairing your rights as they existed before and as of the commencement of this bankruptcy case. Please note, however, that this document cannot tell you everything about your rights. For instance, this Plan and Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest. You are encouraged to consult with your lawyers and/or advisors as you review and consider the Plan and Disclosure Statement to enable you to obtain more specific advice on how the Debtor's proposed actions will affect you.

Creditors whose claims are impaired have the right to vote to accept or reject the Plan and Disclosure Statement. Generally speaking, a claim or interest is impaired if the legal, contractual or equitable rights of the holder of the claim or interest is altered by the Plan. A class of creditors

accepts the Plan when creditors in that class holding two-thirds in dollar amount of such class and more than one-half in number of the claims in such class who submit completed ballots vote to accept the Plan.

In this case, the Plan and Disclosure Statement contains three (3) classes of claims and one (1) class of interests.  The Plan impairs holders of Claims in Classes 3 holders of Class 4 Interests.  Class 4 Interests receive no distribution under the Plan, and holders of Class 4 Interests are deemed to reject the Plan.  **Votes shall be solicited from Class 3 only.**

The Plan is primarily funded from the post-petition sale of substantially all of the Debtor's assets. During the pendency of the Chapter 11 case, the Debtor undertook and effectuated two (2) asset sales, which, together represent sales of substantially all of the assets of the Debtor, except for certain discrete assets that were excluded from the sales and are described more fully herein. Pursuant to the Debtor's *Motion for Order to Consider Sale of Substantially All of the Debtor's Non-WITHit Assets, Free and Clear of all Liens, Claims and Encumbrances, Subject to Higher and Better Offers* [Docket No. 8], which was granted by the Bankruptcy Court pursuant to that certain *Order Approving the Sale of Substantially All of the Debtor's Non-WITHit Assets, Free and Clear of all Liens, Claims and Encumbrances* [Docket No. 90], the Debtor sold substantially all of its legacy business, including its proprietary Armitron and Torgoen brands as well as certain of its licensed brands, including Anne Klein and Steve Madden, to a newly formed limited liability company by the name of E. Gluck Holdings LLC.  E. Gluck Holdings LLC is owned by industry leader in fashion accessory products and brand management, American Exchange Group.

Pursuant to the Debtor's *Motion for Order Authorizing the Sale of the Debtor's Membership Interest in WITHit Holdings LLC, Free and Clear of all Liens, Claims and Encumbrances* [Docket No. 71], which was granted by the Bankruptcy Court pursuant to that certain *Order Authorizing the Sale of the Debtor's Membership Interest in WITHit Holdings LLC* [Docket No. 91], the Debtor sold its majority membership interest in WITHit Holdings LLC to the company's founders. Together, the sales satisfied all of the Debtor's secured debt, including its pre-petition banking facility with Israel Discount Bank of New York and the Debtor's post-petition financing facility, and yielded additional cash proceeds that will be available to creditors under this Plan and Disclosure Statement, if approved.

Upon the occurrence of the Effective Date, if approved, the Plan will satisfy all Administrative Claims and Priority Claims and will provide a recovery to holders of General Unsecured Claims, on the terms described herein.  As the Debtor's assets have been transferred to purchasers under the above-referenced sales, this is a liquidating plan whereby the Debtor's remaining assets will be transferred to a grantor trust for the benefit of unsecured creditors, equity will be dissolved, and the estate fully wound down.

**IN THE OPINION OF THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN IS LIKELY TO BE ACHIEVED IF THE DEBTOR IS LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.  ACCORDINGLY, THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS BELIEVE THAT CONFIRMATION OF**

{00357013.3 / 1539-002 }

**THE PLAN AND DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF THE DEBTOR'S CREDITORS AND INTEREST HOLDERS AND RECOMMENDS THAT VOTING CREDITORS ACCEPT THE PLAN.**

The following materials are included with this Plan and Disclosure Statement, which will be sent to all holders of Class 3 General Unsecured Claims as part of the solicitation package:

1.      A copy of an order (the "Order") that establishes: (a) the date by which objections to confirmation of the Plan and Disclosure Statement must be served and filed; (b) the date by which all votes with respect to the Plan and Disclosure Statement must be cast; (c) the date of the hearing in the Bankruptcy Court to consider final approval of and confirmation of the Plan and Disclosure Statement; and (d) other relevant information;
2.      A notice for Confirmation Hearing, and
3.      A Ballot for holders of Claims in Class 3 to vote with respect to the Plan and Disclosure Statement.

As stated in the Order, the Bankruptcy Court has scheduled a hearing to consider (i) the adequacy of the disclosures in this Plan and Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Plan and Disclosure Statement pursuant to section 1129 of the Bankruptcy Code for [June __, 2026 at __:00 _.m.] (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date at the Confirmation Hearing or the filing of a notice of adjournment with the Bankruptcy Court.

Holders of Claims and interests, as well as other parties in interest, may attend the Confirmation Hearing.  Objections, if any, to the adequacy of the information contained in the Plan and Disclosure Statement and/or confirmation of the Plan and Disclosure Statement must be in writing and filed with the Bankruptcy Court and served, so as to be received no later than 4:00 p.m. on [May 27, 2026] upon all of the following parties:

>               Halperin Battaglia Benzija, LLP
>               Counsel to the Debtor
>               40 Wall Street, 37th Floor
>               New York, New York 10005
>               Attn:   Alan D. Halperin, Esq. (ahalperin@halperinlaw.net)
>                       Julie Dyas Goldberg, Esq. (jgoldberg@halperinlaw.net)
>
>                       -and-
>
>               Porzio, Bromberg & Newman, P.C.
>               Counsel to the Official Committee of Unsecured Creditors
>               1675 Broadway, Suite 1810
>               New York, NY 10019
>               Brett S. Moore, Esq. (BSMoore@pbnlaw.com)

{00357013.3 / 1539-002 }

Robert M Schechter, Esq (RMSchechter@pbnlaw.com)
Jenny Zhou, Esq. (JZhou@pbnlaw.com)

-and-

The Office of the United States Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn:   Tara Tiantian, Esq.

All Ballots must be completed in full and signed, in order to be counted in the tabulation of the votes, and must be received no later than 4:00 p.m. on [May 27, 2026] by:

Halperin Battaglia Benzija, LLP
Counsel to the Debtor
40 Wall Street, 37th Floor
New York, New York 10005
Attn:   Julie Dyas Goldberg, Esq. (jgoldberg@halperinlaw.net)

This document contains, among other things, a description of the assets, liabilities and affairs of the Debtor, a description and analysis of the plan by which the Debtor intends to liquidate (the "Plan"), and an analysis of alternatives to the Plan.

### A.   Representations/Limitations

**NO PERSON IS AUTHORIZED BY THE DEBTOR OR THE COMMITTEE IN CONNECTION WITH THE PLAN AND DISCLOSURE STATEMENT OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DOCUMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR OR THE COMMITTEE.**

**THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTOR AND COMMITTEE IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THE DEBTOR AND COMMITTEE AS OF THE DATE HEREOF.  ALTHOUGH THE DEBTOR AND COMMITTEE USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED.**

**THE STATEMENTS CONTAINED IN THIS PLAN AND DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS PLAN AND DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THIS DOCUMENT AND THE**

{00357013.3 / 1539-002 }

5

**DATE THE MATERIALS RELIED UPON IN PREPARATION OF THIS PLAN AND DISCLOSURE STATEMENT WERE COMPILED.**

**THE DEBTOR AND THE COMMITTEE BELIEVES THAT THIS PLAN AND DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.**

**THIS DOCUMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR.**

**FAILURE BY A CREDITOR OR INTEREST HOLDER TO TIMELY CAST A BALLOT OR FILE AN OBJECTION TO CONFIRMATION OF THE PLAN AND DISCLOSURE STATEMENT IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER AND THE BANKRUPTCY CODE SHALL CONSTITUTE AN AGREEMENT BY SILENCE TO ACCEPT THE TERMS CONTAINED IN THE PLAN AND DISCLOSURE STATEMENT.**

**THIS PLAN AND DISCLOSURE STATEMENT PROVIDES FOR INJUNCTIVE RELIEF AS TO THE DEBTOR.  THE PERMANENT INJUNCTIONS SET FORTH IN THE PLAN AND DISCLOSURE STATEMENT WILL APPLY TO HOLDERS OF ANY CLAIM, INTEREST, LIEN, ENCUMBRANCE OR DEBT, WHETHER SECURED OR UNSECURED, GRANTED PRIORITY STATUS, INCLUDING PRIORITY TAX (FEDERAL OR STATE), NON-PRIORITY UNSECURED CLAIM OR ANY INTEREST IN THE DEBTOR.  CREDITORS AND INTEREST HOLDERS WILL BE BOUND BY THIS INJUNCTIVE PROVISION UNLESS CREDITORS TIMELY FILE OBJECTIONS IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN THE DISCLOSURE STATEMENT ORDER OR HEREIN AND APPEAR AT THE CONFIRMATION HEARING, TO PROSECUTE ANY OBJECTION AND THE BANKRUPTCY COURT UPHOLDS SUCH OBJECTION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS URGE ALL HOLDERS OF CLAIMS TO ACCEPT THE PLAN.**

### B. *Definitions*

Certain of the capitalized terms used in the Plan and Disclosure Statement are defined in the first section in which the terms appear.  In addition, the following defined terms have the meanings ascribed to them below.

{00357013.3 / 1539-002 }

"<u>Administrative Expense Bar Date</u>" means [July __, 2026], the deadline set by the Bankruptcy Court for an the filing of an Administrative Expense Claim for the period from December 1, 2025 through and including the date of which the Plan and Disclosure Statement shall be confirmed.

"<u>Administrative Expense Claim</u>" means any right to payment for actual and necessary costs and expenses of preserving the Debtor's estate under section 503(b) and 507(a)(2) of the Bankruptcy Code, including but not limited to (i) Professional Fee Claims, (ii) Court costs and U.S. Trustee fees, and (iii) Claims arising under section 503(b)(9) of the Bankruptcy Code.

"<u>Allowed Claim</u>" means any Claim, proof of which was timely filed, or if no proof of Claim was filed, which is listed by the Debtor in its Schedules as liquidated in amount and not disputed or contingent, and in either case, as to which (i) no objection has been made, or (ii) an objection has been made and the Claim has been allowed, in whole or in in part, by a Final Order.

"<u>Available Cash</u>" means the estate's cash on hand and the net proceeds derived, heretofore or hereafter, from the liquidation of all other assets of the Debtor, together with the interest earned thereon.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as the same may be amended from time to time.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

"<u>BTS Litigation</u>" means the Debtor's plaintiff litigation against BTS and affiliates, as described more fully in Article III of this Plan and Disclosure Statement.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"<u>Claims Objection Deadline</u>" means the date that is 180 days from the entry of the Confirmation Order, subject to further extension by the Bankruptcy Court for cause.

"<u>Committee</u>" means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee on December 23, 2025 [Docket No. 44].

"<u>Confirmation Order</u>" means the Order of the Bankruptcy Court confirming this Plan and Disclosure Statement pursuant to Section 1129 of the Bankruptcy Code.

"<u>Cure Claim Objection Deadline</u>" has the meaning ascribed to it in Section VI, below.

"<u>Cure Claim Objection</u>" has the meaning ascribed to it in Section VI, below.

"DIP Lender" means the lender(s) under the DIP Loan approved by the Bankruptcy Court by Final Order dated January 15, 2026 [Docket No. 64].

"DIP Loan" means the post-petition secured loan provided to the Debtor by the DIP Lender, as authorized by the Bankruptcy Court by Final Order dated January 15, 2026 [Docket No. 64].

"DIP Motion" has the meaning given in Article III, below.

"Disputed Claim" means any Claim, or portion of a Claim, that (i) is listed on the Schedules as unliquidated, disputed and/or contingent, and for which no proof of claim in a liquidated and non-contingent amount has been timely filed, or (ii) is the subject of an objection or request for estimation filed by the Debtor or any other party in interest and which objection has not been withdrawn, or overruled by Final Order.

"Effective Date" means the date on which both of the following have occurred: (i) the Confirmation Order has been entered and has become final and non-appealable; and (ii) the conditions to the Effective Date have been satisfied.

"Equity Interests" means all equity interests in the Debtor, including but not limited to all issued, unissued, authorized or outstanding shares or membership interests and any warrants, options or contractual rights to purchase or acquire such interests at any time.

"Executory Contract" means any unexpired executory contract or lease existing as of or after the Petition Date between the Debtor and any other Person or Persons, that has not expired or terminated pursuant to its terms.

"Final Order" means an order of the Bankruptcy Court or any Court of competent jurisdiction authorized to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, move for reargument or rehearing or petition for certiorari has expired and as to which no appeal, proceeding for reargument or rehearing or petition for certiorari is then pending.

"Hedgehog Investment" means the Debtor's equity interest in Hedgehog as described more fully in Article III of this Plan and Disclosure Statement.

"Liquidation Trust" means the trust established pursuant to the Liquidation Trust Agreement. With respect to any action required or permitted to be taken by the Liquidation Trust, the term includes the Liquidation Trustee or any other person or entity authorized to take such action in accordance with the Liquidation Trust Agreement. In the event of any conflict between the terms of this Plan and Disclosure Statement and the terms of the Liquidation Trust Agreement, the terms of the Liquidation Trust Agreement control.

"Liquidation Trust Agreement" means that certain agreement made by and among the Debtor, as depositor of the Liquidation Trust Assets, and the Liquidation Trustee, establishing and delineating the terms and conditions of the Liquidation Trust.

"Liquidation Trust Assets" means all assets held from time to time by the Liquidation Trust, the proceeds of which shall be distributed to the holders of the Liquidation Trust Interests after payment in full of the Liquidation Trust Expenses and any other obligations to the extent set forth in this Plan and Disclosure Statement or the Liquidation Trust Agreement, including the Hedgehog interest, the BTS Litigation, proceeds of the Retained Causes of Action, and all remaining Cash and property of the estate.

"Liquidation Trustee" means the Person selected by the Committee to serve as the trustee of the Liquidation Trust, or any of his successors.

"Liquidation Trust Expenses" means the costs, expenses, or other obligations incurred, payable or owed by the Liquidation Trust from and after the Effective Date, including the reasonable fees, costs, and expenses of the Liquidation Trustee and his or her attorneys and other professionals, relating to, among other things, the implementation of the Plan and the administration of the Liquidation Trust.

"Liquidation Trust Interests" means the beneficial interests in the Liquidation Trust distributed to holders of allowed Class 3 Claims on account of allowed General Unsecured Claims as set forth in Article V of this Plan and Disclosure Statement.

"Other Priority Claim" means a Claim that is entitled to priority in payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim.

"Other Secured Claim" means a Claim that is secured by any assets of the Debtor, other than the Claim of the DIP Lender.

"Oversight Committee" means the post-Effective Date committee appointed by the Committee that shall be initially comprised of (a) _____, (b) _____, and (c) _____, which Oversight Committee shall act in the best interests of all beneficiaries of the Liquidation Trust in accordance with the Liquidation Trust Agreement.

"Person" means any natural person, partnership, company, corporation or entity.

"Petition Date" means December 1, 2025, the date on which the Debtor filed its Petition under Chapter 11 of the Bankruptcy Code.

"Priority Tax Claim" means a Claim that is entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claim" means all Claims for compensation and reimbursement of expenses by any professional Person employed in this Chapter 11 case pursuant to section 327, 328, 329, 330, 331 or 363 of the Bankruptcy Code.

"Professional Fee Bar Date" means the date that is forty-five (45) days after the Effective Date.

"Pro Rata" means the proportion that an Allowed Claim in a class bears to the total amount of Allowed Claims in the same class.

"Plan Supplement" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time through the Effective Date in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed two (2) weeks prior to the Plan Objection Deadline by the Debtor, including the following: (1) the Schedule of Assumed Executory Contracts and Unexpired Leases; (2) the Schedule of Retained Causes of Action; and (3) the Liquidating Trust Agreement.

"Retained Causes of Action" means those Causes of Action indicated on the Schedule of Retained Causes of Action, to be filed as a Plan Supplement, which may be amended from time to time and shall vest in the Liquidating Trust on the Effective Date.

"Sale Transactions" means the Legacy Sale and/or the WITHit Sale, as appropriate.

"Schedules" means the schedules of assets and liabilities, executory contracts and unexpired leases and the statement of financial affairs (as the same may be amended from time to time) filed by the Debtor pursuant to section 521 of the Bankruptcy Code and the Bankruptcy Rules.

"Tax Code" means the Internal Revenue Code of 1986, as the same may be amended.

"Unclaimed Distribution" means a distribution on account of an Allowed Claim that is unclaimed (or if a check, not cashed or deposited) as of ninety (90) days after the date on which the distribution is made.

## II.

## BACKGROUND AND DISCLOSURES

### A. The Debtor's Pre-Petition Business

E. Gluck was incorporated in 1977 under the name Terry Watch Corporation.  Its Certificate of Organization was amended and restated on or about June 29, 1988 and is a privately held New York Corporation in good standing.  The Barbara Weichselbaum 2022 Family Trust, the Sidney Gluck 2023 Family Trust and The Rose Friedman 2022 Irrevocable Trust each own 33.3% of the common shares of the Debtor.

E. Gluck was in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Prepetition, its proprietary anchor was Armitron, a longstanding name in the U.S. watch market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others. At its peak, the company generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores. Beyond the

domestic market, E. Gluck also built international distribution through third-party distributors and maintained a meaningful presence in travel retail, including duty-free and cruise channels.

E. Gluck's business model rested on a durable combination of long-term brand licenses, strong proprietary positioning, a broad and healthy SKU variety, high-quality products and deep retail relationships, all supported by an in-house team capable of delivering design, production and distribution at scale. For many years, this mix created a stable and profitable foundation. Yet, in recent years, management recognized that traditional watches were a mature, slow-growth category, increasingly pressured by shifts in consumer behavior and the rise of smart devices. To diversify and with the goal of positioning the company for future growth, E. Gluck acquired a majority interest in WITHit Holdings, LLC ("WITHit"), a company specializing in reading accessories and smartwatch and wearable-tech accessories. The strategic goal was for WITHit to extend E. Gluck's reach into faster-growing product categories, leverage E. Gluck's retail distribution muscle and create a hedge against the long-term decline of conventional watch demand due to, among other reasons, the advent and increased market share of smart devices.

Unfortunately, the acquisition of WITHit did not deliver the benefits that management anticipated. The expectation was that smartwatch accessories, and the broader category of wearables, would provide a meaningful growth engine to offset the gradual decline in traditional watch demand. However, in practice, the category proved more fragmented, competitive and difficult to scale than projected. Integration challenges, overlapping costs and slower-than-expected consumer adoption all contributed to results that fell materially short of the original business forecasts.  The end result was that not only were the anticipated synergies unrealized, but forecasted growth related to WITHit's legacy business failed to materialize such that sales even trended downward from pre-merger periods.

At the same time, external factors compounded the challenge. The COVID-19 pandemic disrupted supply chains, tightened retail ordering, and shifted consumer demand patterns. Tariffs and freight costs spiked, further eroding already thin margins. Retail partners across channels became more aggressive in managing their own inventories, often leaning on suppliers to absorb costs and risks. Meanwhile, the traditional watch category faced mounting structural headwinds as smart devices captured a larger share of consumer attention and spending.

The cumulative effect was a company burdened by fixed costs and new obligations from the WITHit acquisition that were not offset by the anticipated increases in revenue, all while E. Gluck's core revenue and profitability came under sustained pressure from macroeconomic shocks and long-term shifts in the consumer marketplace, all of which culminated in the Debtor's inability to sustain its business in its prepetition form.

### B. Pre-Petition Financing Arrangements

For a number of years preceding the Petition Date, the Debtor obtained loans and other financial accommodations from Israel Discount Bank of New York ("IDB"), evidenced by, among other things, a certain loan agreement, notes and security agreement (collectively, the "Prepetition Credit Agreement"). As of the Petition Date, IDB was owed approximately $27 million under the Prepetition Credit Agreement.  Repayment was secured by substantially all of the assets of the Debtor.  IDB properly

{00357013.3 / 1539-002 }

11

perfected its liens contemporaneous with extending credit under the Prepetition Credit Agreement and the lender's liens were not subject to challenge during the pendency of the Chapter 11 case.

### III.

### THE CHAPTER 11 CASE

#### A. *Commencement of Bankruptcy Case*

On December 1, 2025, the Debtor filed its petition under Chapter 11 of the Bankruptcy Code. The case was docketed as case number 25-12683 and assigned to Chief Judge Martin Glenn. The Debtor continues to administer its assets as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On December 23, 2025, the Office of the United States Trustee filed a Notice of Appointment of Official Committee of Unsecured Creditors, appointing W&Y (ASIA) Co. Ltd., Great Progress H.K. (Holdings) Limited, Bridgestone Watch Limited, Yi Feng Watch Co. Ltd. and Youngs Watch Company Limited to the Committee [Docket No. 44].

#### B. *The DIP Financing Facility*

The company's cash needs for the post-petition period were set forth in the budget attached to the Debtor's motion to approve post-petition secured financing (the "DIP Motion").[1] The DIP Motion provided for a senior secured, superpriority revolving credit facility (the "DIP Facility") in the aggregate amount not to exceed $29 million, inclusive of the roll-up of the amounts due under the Prepetition Credit Agreement. The Debtor's estate did not incur additional fees or an increased interest rate on account of the DIP Facility. Interest on advances under the note accrued at the rate of prime plus 0.25% as to prime rate loans and the federal funds effective rate plus 3.12% as to federal funds effective rate Loans. The DIP Loan Documents did not impose a commitment fee, but required reimbursement of the reasonable fees and expenses of the Lender's professional fees, payable in accordance with the budget. The DIP Facility matured on the earliest to occur of (a) the date which is seventy-five days after the Petition Date, (b) the acceleration of the loans, (c) the consummation of the legacy sale and (d) dismissal of the Chapter 11 case or conversion of the case to one under Chapter 7 of the Bankruptcy Code.

The DIP Facility granted the lender a valid first priority, senior security interest in, and liens on all assets of the Debtor and other property acquired and/or created by the Debtor from and after the Petition Date, subject to a carve-out. The DIP Facility included a customary superpriority administrative claim, a carve-out for the payment of U.S. Trustee fees, court costs and professional fees, events of default and indemnification provision.

Given the Debtor's financial position and its inability to meet its obligations without post-petition financing, combined with the DIP Lender serving as the only viable source of funding, the Bankruptcy Court approved the DIP Facility as being in the best interests of the Debtor and its estate on both an interim and final basis [Docket No. 64].

---

[1] Capitalized terms used but not defined in this section have the meanings ascribed to them in the DIP Motion.

{00357013.3 / 1539-002 }

### C. "First Day" Motions

The Debtor sought other relief of the Bankruptcy Court in motions filed on the Petition Date and heard by the Bankruptcy Court shortly thereafter, in addition to the DIP Motion.  The Debtor made a *Motion of the Debtor for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing (I) Use of Existing Business Forms and Records; (II) Limited Maintenance of Existing Corporate Bank Accounts; and (III) Maintenance of Cash Management System*, which relief was granted by the Bankruptcy Court by Final Order dated December 22, 2025 [Docket No. 43]. The Debtor also sought relief pursuant to its *Motion of the Debtor for an Order Authorizing Payment of Pre-Petition Accrued Employee Wages, Salaries, Expenses and Related Taxes and Payment of Employee Benefits*, which relief was granted by the Bankruptcy Court by Final Order dated December 22, 2025 [Docket No. 40].  The Debtor also requested relief pursuant to its *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363 and 503(b)(1) of the Bankruptcy Code Authorizing the Debtor to Honor Certain Pre-Petition Policies and Obligations to Customers*, which was granted by the Bankruptcy Court by Order dated December 22, 2025 [Docket No. 41]. (D.I. 88).  Finally, the Debtor sought relief pursuant to its *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363(b) and 507(a)(8) of the Bankruptcy Code Authorizing Payment of Certain Pre-Petition Sales, Use and Trust Fund Taxes and Related Obligations*.  This relief was granted by the Bankruptcy Court by Final Order dated December 22, 2025 [Docket No. 42].

Though "first day" relief was not requested for the following, shortly after the Petition Date, the Debtor sought retention of its bankruptcy counsel by its *Application for Entry of an Order Authorizing the Retention of Halperin Battaglia Benzija, LLP as Bankruptcy Counsel to the Debtor Nunc Pro Tunc to the Petition Date*, which was approved by Order dated January 27, 2026 [Docket No. 79].  The Debtor further sought retention of its Chief Restructuring Officer by its *Application to Employ CoMetrics Partners, LLC as Chief Restructuring Officer*, which was granted by Order dated January 27, 2025 [Docket No. 81], as well as its *Application to Employ East Wind Securities, LLC as Investment Banker to the Debtor*, which was granted by Order dated January 27, 2025 [Docket No. 81].

### D. The "Legacy Sale"

Prior to the Petition Date Prepetition, the Debtor engaged CoMetrics as its Chief Restructuring Officer and East Wind Securities, LLC as its Investment Banker and worked closely with both sets of professionals to identify a strategic or financial investor for the business and/or an acquirer for all or a portion of the assets.  The Debtor and its professionals identified approximately sixty-five (65) targets then solicited formal expressions of interest from 11 of the candidates, including strategic buyers, private equity firms and other investors.   After extensive dialog and diligence, the Debtor received two formal offers to serve as a floor bid for the Debtor's assets, both of which required a structure involving approval of a sale pursuant to Section 363 of the Bankruptcy Code.  The marketing efforts continued on a rolling basis through the Petition Date many additional parties were approached during this thorough canvassing of the market.

The Debtor was fortunate to be able to secure the stalking horse bid of E. Gluck Holdings, LLC (the "Legacy Buyer") and propose a floor offer for the non-WITHit assets with a form of asset purchase agreement as of the Petition Date (the "Legacy Sale").  The Bankruptcy Court entered its Order

Scheduling Hearing on the Legacy Sale on December 3, 2025 [Docket No. 21] and subsequently entered its *Order Approving (A) Break-up Fee/Expense Reimbursement, (B) Bidding Procedures for the Conduct of an Auction, and (C) Fixing Manner and Notice of Sale Hearing and Cure Claims Bar Date for Non-Debtor Counterparties to Executory Contracts and Unexpired Leases* (the "Bid Procedures Order") [Docket No. 39] on December 22, 2025.  Definitions used in this section have the meaning ascribed to them in the Bid Procedures Order.

Ultimately, after a fulsome marketing process, establishment of the Bid Procedures and passage of the Alternative Bid Deadline, the Legacy Buyer made the highest and best offer to acquire the non-WITHit assets of the Debtor and business on a going concern basis.  The Buyer is an industry leader in the licensed apparel and consumer goods business and offered reasonable assurance of future performance to the Debtor's licensors and a fair and reasonable offer memorialized in the Sale Agreement.  The Bankruptcy Court approved the Legacy Sale by Order entered on February 4, 2026 (the "Legacy Sale Order") [Docket No. 90], and the Legacy Sale closed on February 13, 2026.

The Legacy Sale satisfied the Debtor's DIP Loan, but for certain amounts by which the estate was over formula as to its Approved Budget.  However, when combined with the WITHit Sale, discussed below, the Debtor was able to satisfy the DIP Loan in full at closing on the Legacy Sale and secure releases of all liens from the DIP Lender.  As the DIP Lender was the only party with a lien in substantially all of the Debtor's assets, satisfaction of the DIP Facility poised the Debtor to propose this Plan and Disclosure Statement for the benefit of creditors and its estate. In connection with the mechanics of the sale closings, approximately $800,000 of proceeds is currently being held in temporary escrow.

### E.  The WITHit Sale

Though the Legacy Sale was proposed contemporaneously with the Petition Date, the Debtor subsequently sought entry of an Order approving a private sale of the Debtor's fifty-one percent (51%) membership interest in WITHit Holdings, LLC (the "*WITHit Interest*") to WITHit's founding members (the "Founders")  who, collectively, owned the remaining forty-nine percent (49%).  In furtherance of the Debtor's efforts to maximize the value of its assets for the benefit of its estate and creditors, the Debtor proposed to sell its membership interests on an expedited timeframe and by private sale, free and clear of all liens, claims and encumbrances (the "WITHit Sale").

The Debtor and its professionals found that it was necessary for the Debtor and its estate to tether the timeframe of the WITHit Sale to the Legacy Sale due to overhead such as rent on its warehouse, payroll, costs of EDI software systems, etc. that could not be borne by the Debtor's estate once the Legacy Sale had closed.  While the Legacy Sale was undoubtedly the larger and more material group of assets to generate value for the estate, the Debtor used its early days in Chapter 11 to consider how to best maximize the value of its majority interest in WITHit.

WITHit had been acquired by the Debtor from the Founders in 2021.  WITHit had always been a closely-held joint-venture with a strong personal services component.  Accordingly, WITHit's Amended and Restated Limited Liability Company Agreement dated as of March 22, 2021 (the "LLC Agreement") afforded all members the ability to prohibit material transfers of its membership interests.  There were other limitations on transfer as well, including the inability to transfer any

{00357013.3 / 1539-002 }

membership interests to a competitor, the requirement to extend rights of first offer, as well as put-rights, drag-along and tag-along rights when a relevant transaction is contemplated. Additionally, the Operating Agreement prohibited the majority member or any affiliate of the majority member from competing with WITHit in the wearable/jewelry category. As the Debtor's majority membership interest in WITHit was a non-marketable asset, the options were to sell the WITHit Interests to the Founders or to force a liquidation.

Ultimately, the Debtor negotiated to sell its majority membership interests to the Founders under the terms of that certain Majority Unit Purchase Agreement (the "MUPA"), which the Debtor believes provided substantially more value for the asset than liquidation. The MUPA yielded a purchase price of approximately $3.6 million, subject to certain adjustments, and after satisfaction of the DIP Facility, more than three-quarters of this amount remained in the estate to fund the final stages of administration of the Chapter 11 case and provide for recoveries under this Plan and Disclosure Statement.

The WITHit Sale was approved by the Bankruptcy Court by Order dated February 4, 2026 [Docket No. 91] and the transaction closed on February 11, 2026.

### F. Other Assets of the Estate

***BT Supplies West, Inc.***

An additional asset that is property of the Debtor's estate and was not subject to the Legacy Sale or the WITHit Sale is a plaintiff-side litigation against a BT Supplies West, Inc. ("BTS") and its principals, Ruben Azrak and Steven Jacob Odzer (the "Principals"). Leading into 2020, BTS was a small janitorial supplies company whose business multiplied exponentially at the onset of the COVID-19 pandemic as cleaning supply companies were in unprecedented demand. BTS was in need of additional warehouse and logistics capacity at a time when the Debtor needed warehouse volume for cost rationalization, given the global economic shutdown. Contemporaneously, BTS needed funding to aid in purchasing it its new volume levels and, at the time, the Debtor had non-operating liquidity available. The Debtor and BTS entered into a series of transactions involving both a loan from the Debtor to BTS, a guaranty of the loan by the Principals, and a services agreement whereby the Debtor provided warehouse support to BTS.

The applicable Loan and Security Agreement is dated June 10, 2020 in support of that certain Secured Term Note in the amount of three million dollars ($3,000,000). Under the terms of the loan documents, BTS promised to pay the Debtor the full principal of the loan and all interest accrued thereon on or before June 10, 2021 and BTS was required to pay consecutive monthly installments of interest only, commencing July 1, 2020 and continuing on the first business day of each month thereafter. The loan was guaranteed by the Principals.

BTS made certain interest payments and repayments on principal, took additional principal loans and ultimately then defaulted on its payment obligations. In February 2022, the parties entered into a payment plan and forbearance agreement confirming that $2.1 million in principal and additional amounts in interest were due and owing. Defendants again defaulted. Litigation as to the loan, the guaranty and asserted defenses are pending in New York Supreme Court, Queens County, IA Part 7

{00357013.3 / 1539-002 }

15

Commercial Division Part D, Index No. 727098/2024 (the "Litigation"). The Debtor believes that an amount in excess of $3.4 million is due to the estate, and of that amount at least $2.1 million is principal.

The Debtor believes there are assets to satisfy some or all of the amounts due to the estate if the Principals' guaranty is enforced in the course of the Litigation. The BTS Litigation is specifically preserved as part of the Liquidating Trust Assets. If successful, this asset could substantially increase recoveries to general unsecured creditors in this Chapter 11 case.

*HedgeHog*

The estate also owns an equity investment in a company called Hedgehog eCommerce Corporation ("Hedgehog"). Hedgehog is a direct to consumer e-commerce holding company that acquires distressed revenue brands. Online materials state that Hedgehog is backed by principals of ThredUp, Land End, Kayak, Italic and Drizly, among others. The Debtor acquired a small amount of warrants in Hedgehog through its prior business relationship with a company called Felix Gray, to whom it provided warehousing and logistics support.

Hedgehog has most recently focused its business around one single brand called Baboon to the Moon. It is uncertain whether Hedgehog will operate long-term and whether the Debtor's investment has any value that can be liquidated for the benefit of the estate and its creditors. Under this Plan, the Hedgehog interest is specifically reserved as part of the Liquidating Trust Assets.

## G. Rejection of Certain Leases

The Debtor filed a motion [Docket No. 102] to reject certain leases and related relief. The Debtor has determined that the Rejected Contracts are unnecessary and burdensome to the Debtor's estate, confer no value in connection with the Debtor's limited remaining operations or the sale process, and should be rejected. The Bankruptcy Court entered an Order rejecting the Rejected Contracts on March 31, 2006 [Docket No. 120].

### *H. Debtor's Schedules and the Establishment of the Claims Bar Date*

On December 14, 2025, the Debtor filed its Schedules and Statement of Financial Affairs [Docket Nos. 28 & 29]. The Schedules were amended various times during the pendency of the Chapter 11 case [see Docket Nos. 34 & 54]. The Schedules set forth the various Claims against E. Gluck's estate as well as other information pertaining to transactions to which the Debtor was a party prior to the Petition Date.

By motion dated January 29, 2026, the Debtor asked the Bankruptcy Court to set a deadline, known as a "bar date," and related procedures for the filing of Claims by any person wishing to assert a pre-petition Claim against E. Gluck. By Order dated February 4, 2026, the Bankruptcy Court set a deadline of March 30, 2026 for parties other than governmental entities to file proofs of Claim (the "General Bar Date"), and set a deadline of May 30, 2026 for governmental entities.

As of the date of this Plan and Disclosure Statement, the General Bar Date has passed and the proofs of claim are under review and analysis. The Debtor's Schedules indicate that there are approximately $9 million in undisputed prepetition Claims and such amount is likely to increase due to passage of the Bar Date, particularly in light of various rejection damage Claims that may be validly asserted.

The Claims against the estate are already being reviewed by the Debtor, and some will be subject to objection. The Debtor does not believe there are a material amount of Priority Claims, including Priority Tax Claims, but notes that the bar date for the Claims of governmental entities (including Priority Tax Claims) has not yet passed. In general, the Debtor expects to continue paying all of its administrative Claims in the ordinary course through the Effective Date.

### IV.

### SUMMARY OF TREATMENT OF CLAIMS/INTERESTS AND ESTIMATED RECOVERIES

### *A. Introduction*

The formulation of a chapter 11 plan is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in a debtor's estate. A chapter 11 plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of the debtor's assets. In either event, upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and equity holders, and the prior obligations owed by the debtor to such parties are compromised and exchanged for the treatments specified in the plan. If all classes of claims and equity interests accept a plan, the Bankruptcy Court may confirm the plan if the Bankruptcy Court independently determines that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a

particular class vote in favor of a chapter 11 plan in order for the Bankruptcy Court to determine that the class has accepted the plan.  Rather, a class of claims will be deemed to have accepted the plan if the Bankruptcy Court determines that the plan has been accepted by more than a majority in number and at least two-thirds in amount of those claims **actually voting** in such class.  Only the holders of claims who complete and return their ballots will be counted as either accepting or rejecting the plan.

The Debtor believes that the Plan and Disclosure Statement has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Debtor's classification of Claims or Interests and that the Court may find that a different classification is required for the Plan and Disclosure Statement to be confirmed. If such a situation develops, the Debtor intends, in accordance with the terms of the Plan and Disclosure Statement, to make such permissible modifications to the Plan and Disclosure Statement as may be necessary to permit its confirmation. Any such reclassification could adversely affect holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan and Disclosure Statement.

**EXCEPT AS SET FORTH IN THE PLAN AND DISCLOSURE STATEMENT, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN AND DISCLOSURE STATEMENT BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN AND DISCLOSURE STATEMENT'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

In addition, classes of claims or equity interests that are not "impaired" under a chapter 11 plan are conclusively presumed to have accepted the plan under § 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote.  Conversely, classes of claims or equity interests that are not to receive or retain any property under the plan are conclusively deemed to have rejected the plan under § 1126(g) of the Bankruptcy Code and are also, therefore, not entitled to vote.

Class 3 and Class 4 are impaired under the Plan.  Because holders of Class 4 Equity Interests will not receive or retain any property under the Plan on account of those Equity Interests, the holders of Class 4 Equity Interests are deemed to reject the Plan and Disclosure Statement and did not receive ballots.  Holders of Claims in Class 3 were entitled to vote on this Plan and Disclosure Statement.

In addition, two types of Claims, Administrative Expense Claims and Priority Tax Claims, are addressed by the Plan, but are not in Classes.  This is because the treatment of these types of Claims is dictated by the Bankruptcy Code.

### B.  Summary of Debtor's Plan to Reorganize

The following chart provides a summary of treatment of each class of Claims (other than Administrative Claims and Priority Tax Claims) and an estimates of the recoveries of each class.

{00357013.3 / 1539-002 }

The treatment provided in this chart is for informational purposes only.

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 –Secured Claims | $0 | Unimpaired - not entitled to vote – deemed to accept | Obligation unaltered by the Plan except on consent. |
| Class 2 – Priority Claims | $0 | Unimpaired – not entitled to vote – deemed to accept | 100% |
| Class 3 – General Unsecured Claims | $14,000,000 | Impaired – entitled to vote | Estimated to be 10-20% |
| Class 4 – Equity Interests | n/a | Impaired – deemed to reject – not entitled to vote | None |

### C. *Treatment of Fees of the United States Trustee, Administrative Expense Claims and Priority Tax Claims*

**U.S. Trustee Fees**.  There are fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6), which constitute a non-classified category of Claims. All such statutory fees, to the extent due and unpaid as of the Confirmation Date, shall be paid by the Debtor within seven (7) business days after the Effective Date. The Debtor shall also file any pre-Confirmation monthly operating reports not filed as of the Confirmation Hearing in accordance with the guidelines of the United States Trustee. The United States Trustee shall not be required to file an Administrative Claim in these Chapter 11 Cases and shall not be deemed to provide any release under the Plan.

**Administrative Expense Claims**. Except for statutory fees, each holder of an allowed Administrative Expense Claim shall receive cash in an amount equal to any unpaid portion of such Allowed Administrative Expense Claim within seven (7) business days after the later of (i) the Effective Date or (ii) the date that such Claim is allowed, unless the holder of that allowed Administrative Expense Claim and the estate agree to different treatment.  Except for Professional Fee Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Expense Claims must be Filed and served on the Debtor or the Liquidating Trustee (as applicable) and their counsel by no later than the Administrative Expense Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date. The burden of proof for the allowance of Administrative Expense Claims remains on the Holder of the Administrative Expense Claims.

{00357013.3 / 1539-002 }

**Professional Fee Claims.** These are the Administrative Expense Claims of the Debtor's and Committee's attorneys, the Debtor's Chief Restructuring Officer, and the Committee's financial advisors for fees and expenses that accrued during the Chapter 11 case. The payment of Professional Fee Claims can only be made on a final basis after the Bankruptcy Court has allowed such fees upon application of each professional firm.

All final applications for payment of Professional Fee Claims for the period through and including the Effective Date shall be filed with the Bankruptcy Court on or before the Professional Fee Bar Date, and served on the parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders issued by the Bankruptcy Court. It is estimated that Professional Fee Claims will, collectively, total approximately $675,000, for services rendered to the estate. That estimate is net of all pre-petition retainers and amounts funded pursuant to the funded professional fee carve-out in connection with the DIP Loan.

**Priority Tax Claims.** Each holder of an allowed Priority Tax Claim shall receive, in full satisfaction of such allowed Priority Tax Claim, (a) payment in cash equal to the unpaid portion of such allowed Priority Tax Claim (as determined in accordance with Section 1129(a)(9)(C)), within seven (7) business days after the later of (i) the Effective Date or (ii) the date that such Priority Tax Claim is allowed, (b) payment in cash equal to the unpaid portion of such allowed Priority Tax Claim in equal annual installments, with payment in full to be made within five (5) years of the Petition Date, or (c) in a lesser amount and upon a schedule agreed to by the Debtor or the estate, as applicable, and the holder of the allowed Priority Tax Claim.

### D. Classification and Treatment of All Other Claims/Equity Interests

#### 1. Class 1 –Secured Claims

Class 1 consists of allowed secured Claims, which are unimpaired by the Plan. The Debtor does not believe there are any allowed secured Claims against the estate. However, if such Claims materialize, holders of Claims in Class 1 are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an allowed Class 1 Claim agrees to a less favorable or different treatment, on, or as soon as is reasonably practicable after the Effective Date or the date such Claim becomes an Allowed Claim, each holder of a Class 1 Claim shall receive the collateral securing such Claim.

#### 2. Class 2 –Priority Claims

Class 2 consists of Claims arising under § 507(a) of the Bankruptcy Code; provided, however, that Claims arising under § 507(a)(8), *i.e.* priority tax Claims shall not be part of Class 2 Claims as such priority tax Claims are unclassified. Class 2 Claims, if any, are unimpaired by the Plan. Holders of Claims in Class 2 are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an allowed Class 2 Claim agrees to a less favorable or different

{00357013.3 / 1539-002 }

treatment, on, or as soon as is reasonably practicable after the Effective Date or the date such Claim becomes an Allowed Claim, each holder of a Class 2 Claim shall receive cash in the amount of such Claim.

### 3.   Class 3 – General Unsecured Claims

Class 3 consists of all general unsecured Claims, which are impaired by the Plan.  Each holder of an allowed Class 3 Claim is entitled to vote to accept or reject the Plan.

As soon as is practicable after the Effective Date, each holder of a Class 3 General Unsecured Claim shall receive its pro rata share of Liquidation Trust Interests, which shall entitle such holder to its pro rata share of Liquidation Trust Assets.

### 4.   Class 4 - Equity Interests

Class 4 consists of all Equity Interests, which are impaired by the Plan.  Because holders of Equity Interests will receive no distribution under the Plan on account of such interests, holders of Class 4 Equity Interests are deemed to have voted to reject the Plan and are not entitled to vote to accept or reject the Plan.  Equity Interests shall be cancelled by entry of the Confirmation Order.

### V.

### <u>IMPLEMENTATION OF PLAN AND DISTRIBUTIONS</u>

### A.  *Post-Effective Date Dissolution*

From and after the Effective Date, the Debtor (i) for all purposes shall be deemed to have dissolved and withdrawn its business operations from any state or country in which it was previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to File any document, pay any sum or take any other action, in order to effectuate such dissolution and withdrawal, (ii) shall be deemed to have cancelled pursuant to the Plan all of the Equity Interests; (iii)  the board of directors of shall be disbanded and each director and officer deemed to resign without the need for any further action by the Debtor, directors, or officers.

The entry of the Confirmation Order shall constitute authorization for the Debtor to take or cause to be taken all actions (including, if applicable, corporate actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan to wind down the estate on the Effective Date, including, without limitation, filing certificates of dissolution or cancellation (and any analogous documents) with applicable governmental authorities, terminating registrations and qualifications to do business, cancelling tax identification numbers, closing bank accounts, and completing any remaining corporate, tax, or regulatory filings required to fully wind up the Debtor's affairs. All such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation.

{00357013.3 / 1539-002 }

### B.  *Means for Implementation of the Plan*

This Plan and Disclosure Statement provides for the following on the Effective Date: (a) the Liquidation Trust shall be formed to dispose of substantially all of the assets of the Debtor and distribute the net proceeds thereof to holders of Allowed Claims; (b) the Liquidation Trustee shall be entitled to pursue litigation, waive, settle and compromise all causes of action, and to collect any other amounts owed to or collectible by the Debtor's estate to maximize recoveries to creditors.

Notwithstanding the forgoing, the Liquidating Trustee shall be authorized to require the holder of an Allowed Claim complete the appropriate IRS Form W-8 or W-9 as applicable to the holder of each Allowed Claim as a condition to the receipt of distribution.  Notwithstanding any other provision herein, each holder of an Allowed Claim that is to receive a distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by such holder by any governmental unit and no distribution shall be made unless and until such holder has made arrangements to comply with its tax withholding and reporting requirements.  If, within forty-five (45) days after the Liquidating Trustee's initial written request to a holder of an Allowed Claim for a properly completed IRS Form W-8, W-9, or other required tax documentation (sent to such holder's last known address as reflected in the Debtor's books and records), such holder fails to provide the requested documentation, the Liquidating Trustee shall be authorized to remove such Claim from the distribution schedules and treat such Claim as disallowed for purposes of distributions under the Plan.

### C.  *Title to Assets*

On the Effective Date, all assets of the Debtor will be transferred to the Liquidation Trust. Thereafter, the Debtor will have no assets of any kind.  All assets transferred to the Liquidation Trust shall be transferred free and clear of all liens, claims and encumbrances of creditors and holders of equity interests.

### D.  *The Debtor's Corporate Affairs*

The Plan and Disclosure Statement will be implemented by establishing a Liquidation Trust, appointing a Liquidation Trustee, and making distributions by the Liquidation Trust in accordance with the Plan.  The entry of the Confirmation Order shall constitute authorization for the Debtor and the Liquidation Trustee, as applicable, to take, or cause to be taken, all actions necessary or appropriate to implement all provisions of, and to consummate, the Plan and Disclosure Statement prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule or regulation.

### E.  *Power and Authority of the Liquidation Trustee Post-Effective Date*

Prior to the Effective Date, the Debtor shall execute the Liquidation Trust Agreement. The Liquidation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to

{00357013.3 / 1539-002 }

22

ensure the continued treatment of the Liquidation Trust as a grantor trust.

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purpose of maximizing the value of the Liquidation Trust Assets and effectuating distributions to creditors consistent with the Plan and Disclosure Statement. The Liquidation Trust is intended to qualify as a liquidating trust pursuant to United States Treasury Regulation Article 301.7701-4(d) and IRS Revenue Procedure 94-45, 1994-2 C.B. 124, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidation purpose of the Liquidation Trust.

On the Effective Date, the Liquidation Trust Assets shall vest automatically in the Liquidation Trust. The transfer of the Liquidation Trust Assets to the Liquidation Trust shall be

made for the benefit and on behalf of the beneficiaries of the Liquidation Trust. The assets comprising the Liquidation Trust Assets will be treated for tax purposes as being transferred by the Debtor to the beneficiaries of the Liquidation Trust pursuant to the Plan in exchange for their Allowed Claims and then by the beneficiaries of the Liquidation Trust to the Liquidation Trust in exchange for the Liquidation Trust Interests. The beneficiaries of the Liquidation Trust shall be treated as the grantors and owners of the Liquidation Trust. Upon the transfer of the Liquidation Trust Assets, the Liquidation Trust shall succeed to all of the Debtor's rights, title, and interest in the Liquidation Trust Assets, and the Debtor will have no further interest in or with respect to the Liquidation Trust Assets. In accordance with the Liquidating Trust Agreement, on the Effective Date, the Debtor shall provide to the Liquidating Trustee timely access to the books and records relating to the Liquidating Trust Assets, in a form accessible and viewable by the Liquidating Trustee.

On and after the Effective Date, all Causes of Action (including any Avoidance Actions and D&O Causes of Action), whether known or unknown, contingent or noncontingent, matured or unmatured, existing or hereafter arising, in law or equity, that are owned by or vested in the Debtor or its estate shall vest in the Liquidation Trust. The Liquidating Trustee shall have the sole and exclusive authority and standing to investigate, commence, prosecute, settle, compromise, withdraw, or otherwise resolve any such Causes of Action in any court or other forum without further order of the Bankruptcy Court, except as otherwise provided in the Plan or the Liquidation Trust Agreement.

In pursuing any causes of action, the Liquidation Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code and shall succeed to the Debtor's rights with respect to the periods in which any of the causes of action may be brought under section 546 of the Bankruptcy Code. The Liquidation Trust Agreement will require consistent valuation of the Liquidation Trust Assets by the Liquidation Trustee and the beneficiaries of the Liquidation Trust for all U.S. federal and other income tax and reporting purposes. The Liquidation Trust will not be permitted to receive or retain cash in excess of a reasonable amount to meet Claims and contingent liabilities or to maintain the value of the Liquidation Trust Assets.

In connection with the prosecution of the causes of action, any attorney-client privilege, work-product privilege, joint interest privilege or other privilege or immunity attaching to any

{00357013.3 / 1539-002 }

23

prepetition and/or pre-Effective Date documents or communications relating to the causes of action shall be transferred to and shall vest in the Liquidation Trust. The Liquidation Trust's receipt of such privileges or immunities associated with the causes of action shall not operate as a waiver of those privileges or immunities possessed or retained by the Debtor, nor shall it operate to eliminate the rights of any co-defendant to any applicable joint privilege or immunity. The Liquidation Trust shall also be vested with the Debtor's rights, as such rights existed prior to the Effective Date, to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004. The Liquidation Trust, however, shall not be considered a successor of any Debtor and shall not assume any obligations of the Debtor other than those expressly provided for by the Plan and Disclosure Statement and the Liquidation Trust Agreement.

Except as otherwise ordered by the Bankruptcy Court, the Liquidation Trust Expenses on or after the Effective Date shall be paid in the ordinary course of business in accordance with the Liquidation Trust Agreement without further order of the Bankruptcy Court and without notice to any other party.   The interests in the Liquidation Trust are not intended to constitute "securities." To the extent such interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act or other applicable law. If the Liquidation Trustee determines that the Liquidation Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act, or other applicable law, then the Liquidation Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the SEC to the extent required by applicable law.

The existence of the Liquidation Trust and the authority of the Liquidation Trustee will commence as of the Effective Date and will remain and continue in full force and effect until the date on which: (a) all material Liquidation Trust Assets are liquidated and/or monetized in accordance with the Plan; *provided*, *however,* for the avoidance of doubt, that the Liquidation Trustee shall not be required to pursue any causes of action or take any other action that the Liquidation Trustee determines, in his discretion, is not likely to yield sufficient additional proceeds to justify further pursuit or action; (b) the funds in the Liquidation Trust have been distributed in accordance with the Plan; and (c) the order closing the Chapter 11 case is a Final Order.

To the extent that the terms of the Plan with respect to the Liquidation Trust are inconsistent with the terms set forth in the Liquidation Trust Agreement, then the terms of the Liquidation Trust Agreement shall govern.

**This Plan shall be interpreted so as to afford, for the benefit of all holders of Allowed Claims, the greatest opportunity for maximum recovery by the Liquidation Trustee on the Liquidation Trust Assets.**

### F. The Liquidation Trustee

On the Effective Date, the Liquidation Trustee shall have all the rights and powers set forth in the Liquidation Trust Agreement, including the right to (1) effect all actions and execute all agreements, instruments, and other documents necessary to implement the provisions of the Liquidation Trust Agreement; (2) administer the Liquidation Trust Assets, including prosecuting, settling, abandoning, or compromising any causes of action; and (3) employ and compensate professionals and other agents.

For the avoidance of doubt, upon the occurrence of the Effective Date, the Liquidation Trustee shall automatically be granted, have, and be vested with exclusive standing and authority to: (i) bring and prosecute any cause of action in a court of competent jurisdiction; and (ii) negotiate, settle, waive, or otherwise resolve any causes of action. For the further avoidance of doubt, upon the Effective Date, the Liquidation Trustee shall automatically be: granted and have the right to control any and all privileges and protections on behalf of the Debtor and the estate with respect to all applicable causes of action and assets of the Debtor, including without limitation all electronically stored data or information. Nothing in this Plan and Disclosure Statement shall require the Liquidation Trustee to prosecute or pursue any causes of action.

The Liquidation Trustee shall, subject to the terms of the Liquidation Trust Agreement, including consulting with the Oversight Committee as described more fully therein, have the power to make all decisions with respect to the Liquidation Trust Assets, including prosecution, negotiation, waiver, and/or settlement of any causes of action. Unless otherwise provided in the Plan and Disclosure Statement, the Confirmation Order or the Liquidation Trust Agreement, the duties and powers of the Liquidation Trustee shall include the following, without need of further Court approval:

(i)   To implement this Plan, including any other powers necessary or incidental thereto;

(ii)   To exercise all power and authority that may be exercised, to commence, pursue, abandon, and/or settle all proceedings (including the power to continue any actions and proceedings that may have been commenced by the Debtor prior to the Effective Date) that may be commenced;

(iii)   To maintain and use the Debtor's existing accounts and/or to close any such accounts and transfer all amounts therein to one or more accounts in accordance with the Plan, or to invest some or all of the funds that would otherwise be deposited into such accounts in allowed investments under applicable non-bankruptcy law;

(iv)   To make distributions to holders of Allowed Claims, and take other actions required under or consistent with the Plan, including the maintenance of appropriate reserves, in the name of the Debtor or the Liquidation Trust;

(v)   To use, manage, sell, lease, license, abandon, convert to cash, and/or otherwise dispose of the Liquidation Trust Assets for the purpose of making distributions and fully consummating the Plan;

(vi)   To prosecute objections to Claims and compromise, settle, and/or litigate any such Claims;

(vii)   To investigate and prosecute any and all causes of action and compromise, settle, waive, and/or litigate any causes of action;

(viii)   To prepare and file tax returns for the Liquidation Trust to the extent required by law;

(ix)   To employ and compensate any and all such professionals and agents as the Liquidation Trustee, in his or her sole discretion, deems reasonably necessary to perform his or her duties under the Plan and Disclosure Statement, without further order of the Bankruptcy Court;

(x)   To satisfy and pay all expenses of the Liquidation Trust;

(xi)   To participate in or file any post-Effective Date motion(s) to amend or modify this Plan or the Liquidation Trust Agreement, or any appeal(s) of the Confirmation Order;

(xii)   To participate in or file any action to enforce or interpret this Plan and Disclosure Statement;

(xiii)   To bind the Liquidation Trust; and

(xiv)   To take all other actions not inconsistent with the provisions of the Plan and Disclosure Statement that the Liquidation Trustee deems reasonably necessary or desirable in connection with the administration or implementation of the Plan, including filing all motions, pleadings, reports, and other documents in connection with the administration and closing of the Chapter 11 case.

### G.  *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtor, including but not limited to, any actions specifically enumerated in the Schedule of Retained Causes of Action, that are not otherwise transferred or sold pursuant to the Sale Transactions or distributed pursuant to the Plan, whether arising before or after the Petition Date, and the Liquidating Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any

indication that the Liquidating Trustee will not pursue any and all available Causes of Action of the Debtor against it.

**Except as otherwise expressly provided in the Plan and Disclosure Statement, any and all claims and causes of action of the Debtor and the estate are preserved under the Plan.**

### H.  *Claims Objection Deadline*

The Liquidation Trustee shall file and serve any objection to Claims no later than the Claims Objection Deadline; provided, however, that the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Liquidation Trustee, for cause.

### I.  *Unclaimed Distributions and Minimum Distribution*

Distributions to holders of Allowed Claims shall be made at the address set forth on the respective proof of claim filed by such holder or at the address reflected on the Schedules if no proof of claim was filed.  If a distribution is returned to the Liquidation Trustee as undeliverable, no further distribution shall be made to such holder.  Any cash or other unclaimed property distributed by the Liquidation Trust shall revert to the Liquidation Trust if it is not claimed within three (3) months of such distribution, including, without limitation, failure of a holder of a Claim to cash a distribution check and no further distribution shall be made to such holder unless upon agreement by the Liquidating Trustee.

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim. Unless otherwise specifically provided for in the Plan or the Confirmation Order, no holder of any Claim will be entitled to allowance of, or to receive any payment on account of, any penalty arising with respect to or in connection with such Claim and any such penalty shall be deemed disallowed and expunged.

Such undistributed amount may instead be used in accordance with the administration of the Plan and the Liquidating Trust Expenses.

### J.  **Remaining Cash**

Following final distribution of all Allowed Claims (or otherwise satisfied in accordance with the Plan) and all Liquidating Trust Expenses and other obligations of the estate and the Liquidating Trust have been satisfied or adequately reserved for, any remaining Cash or other residual assets of the estate or the Liquidating Trust (the "Residual Cash") may, in the discretion of the Liquidating Trustee, be donated to one or more charitable organizations. Any such charitable organization(s) shall be selected by the Liquidating Trustee in good faith and, to the extent practicable, shall qualify as tax-exempt organizations under section 501(c)(3) of the Internal Revenue Code. The Liquidating Trustee shall have no liability to any party for the selection of such charitable organization(s) or the amount of any such donation.

**VI.**

{00357013.3 / 1539-002 }

## CONFIRMATION REQUIREMENTS AND EFFECT OF CONFIRMATION

### A. Alternate Plan

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  However, the additional costs, including, among other things, additional professional fees or asserted substantial contribution Claims, which could constitute administrative Claims against the estate, may be so significant that one or more parties could request that the Chapter 11 case be converted to one under Chapter 7. Accordingly, the Debtor believes that the Plan and Disclosure Statement enables creditors to realize the very best return under the circumstances.

### B. Best Interests Test and Liquidation Analysis

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Claim or interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less that the value such holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.  A hypothetical Chapter 7 liquidation analysis is attached hereto as **Exhibit A**.  Because the Debtor has consummated the Legacy Sale and the WITHit Sale, it has little in the way of "hard" assets and the value of any distributions if the Debtor's Chapter 11 case were converted to a case under Chapter 7 would be less than the value of distributions under the Plan.  There are several reasons for this. Conversion to Chapter 7 would require the appointment of a Chapter 7 trustee, and such trustee's likely retention of new professionals.  The "learning curve" that the trustee and the new professionals would face comes with additional costs to the estate and with a delay in time compared to the distributions under the Plan.  Additionally, a Chapter 7 trustee would be entitled to statutory fees relating to distributions of the already monetized assets made to creditors.  Accordingly, the Debtor believes that the "best interests" test of Bankruptcy Code Section 1129 is satisfied.

### C. Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Based on the Debtor's analysis and their existing cash on hand, the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Plan and Disclosure Statement. The Plan provides for the liquidation or distribution of all of the Debtor's Assets. Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor and the liquidation pursuant to the Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code. Because distributions will be made initially only to the extent of existing assets, the Debtor believes the Plan is feasible.

### D. No Unfair Discrimination

A chapter 11 plan "does not discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to the legal rights of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its Claims or interests.  The Debtor and the Committee

believes that under the Plan all impaired classes of Claims and interests are treated in a manner that is consistent with the treatment of other classes of Claims and interests that are similarly situated, if any, and no class of Claims or interests will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims and allowed interests in such class. Accordingly, the Plan does not discriminate unfairly as to any impaired class of Claims or interests.

### E.  Bar Date for Professional Fee Claims

Professionals or other entities asserting a fee Claim for services rendered before the Effective Date must file and serve their final fee applications on the Debtor (or, if post-Confirmation, on the Liquidation Trustee) and such other entities as may be designated by the Bankruptcy Rules, the Local Bankruptcy Rules and the Confirmation Order on or before the Professional Fee Bar Date.

### F.  Treatment of Executory Contracts – Deemed Rejected

On the Effective Date, the Debtor will be conclusively deemed to have rejected all executory contracts and/or unexpired leases, except for those expressly assumed by motion before the date of the order confirming the Plan and Disclosure Statement.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Legacy Sale and the WITHit Sale or this Plan, and payment of any Cures relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured creditor holding a Claim that arose before the bankruptcy was filed. All employment policies and employment agreements, and all compensation and benefits plans, policies, and programs of the Debtor applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, Executory Contracts under this Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code. Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtor during the Chapter 11 case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

**The deadline for filing a proof of claim based on a claim arising from the rejection of an executory contract is thirty (30) days after the Effective Date. Any claim based on the rejection of an executory contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.**

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions herein.

### G. Post-Effective Date Dissolution of Creditors' Committee

The Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. On the Effective Date, the Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 case and this Plan and Disclosure Statement and its implementation, and the retention or employment of the Committee's attorneys and other agents shall terminate as of the Effective Date; *provided, however*, that following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: filing and prosecuting applications for (x) allowance of compensation for professional services rendered and reimbursement of expenses incurred; or (y) reimbursement of expenses of members of the Committee.

### H. Release of Liens

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the terms of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtor and their successors and assigns.

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the date such Holder has been satisfied in full pursuant to the Plan, such Holder (or the agent for such Holder) shall take any and all steps requested by the Liquidating Trustee that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidating Trustee shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

### I. *Effect of Confirmation of the Plan and Disclosure Statement*

The Confirmation Order will be the final determination of the rights of all claimants and interest holders to participate in the distributions under the Plan, whether or not (a) a proof of claim or interest is filed, (b) such Claim or interest is allowed, or (c) the holder of such Claim or interest has accepted the Plan and Disclosure Statement.

### J. *Injunction*

On the Effective Date, except as otherwise provided in the Plan and Disclosure Statement or the Confirmation Order, all persons shall be deemed to be bound by the Plan, including all holders of Claims or interests, whether or not listed on the Schedules, or listed on the Schedules as disputed, unliquidated or contingent, whether or not they file proofs of claim or interest by the applicable Bar Date. Subject to the limitations set forth below, all persons will be prohibited from:

a) commencing or continuing any suit, action or other proceeding of any kind or nature or employing any process against the Debtor, the estate, the Debtor's assets, or to interfere with the consummation or implementation of this Plan, or the distributions to be made hereunder, including to collect, recover, or offset any discharged Debt or Claim to the extent sections 1141(d) and 524(a) apply,

b) commencing or continuing any suit, action, or other proceeding, or employing any process, to collect, recover, or offset such discharged Debt or Claim as a personal liability of the Debtor, or from enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means any judgment, award, decree, or order against the Debtor or the Debtor's property Claim with respect to any Debt or Claim that is discharged pursuant to the Plan and the Bankruptcy Code,

c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien against the Debtor, the estate or the Debtor's assets, other than as contemplated by the Plan,

d) except as provided herein, asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any obligation due the Debtor, the estate or the Debtor's assets, for a Claim arising against the Debtor, and

e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan. For the avoidance of doubt, nothing herein releases or enjoins any claim or cause of action that is independent of any Claim against the Debtor and asserted solely against a non-Debtor, except to the limited extent such action seeks to impose derivative liability for a Claim against the Debtor or to obtain or control property transferred under the Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtor, the Liquidating Trustee, and their respective affiliates, employees, advisors, officers and directors, or agents.

## K. Exculpation

From and after the Effective Date, to the extent permitted under section 1125(e) of the Bankruptcy Code, the Debtor and the estate, the officers and directors of the Debtor, the Debtor's professionals, the Official Committee of Unsecured Creditors and their professionals, are hereby exculpated from any Cause of Action for any claim related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of, the Chapter 11 case, the Plan and Disclosure Statement, the Sale Transactions, including any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or the distribution of property under the Plan or any other related agreement. Notwithstanding the foregoing, nothing in the Plan shall exculpate any personnel listed above from (a) any act or omission determined by a Final Order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or gross negligence; (b) any Retained Cause of Action; or (c) any post-Effective Date obligations arising under the Plan, the Confirmation Order, the Liquidating Trust Agreement, or any document executed to implement the Plan.

## L. Indemnification

The Debtor and Liquidating Trustee, together with their respective consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that are grossly negligent, fraudulent, or which constitute willful misconduct (in each case, liability shall be subject to determination by final order of a court of competent jurisdiction). However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute gross negligence, fraud, or willful misconduct. In addition, the Debtor, the Liquidating Trust, and the estate shall, as applicable and to the fullest extent permitted by the laws of the State of New York, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Debtor, the Liquidating Trust, and the estate or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Debtor, the Liquidating Trust, and the estate. To the extent the

Liquidating Trust indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidating Trustee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidating Trust Expenses. All rights of the Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan.

### M. Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer of real or personal property under, in furtherance of, or in connection with the Plan and Disclosure Statement, including any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan and Disclosure Statement shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### N. No Discharge

Because the Debtor is liquidating and will not engage in business after consummation of the Plan, it is not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims or Interests.

### O. Miscellaneous Provisions of the Plan

The Bankruptcy Court will retain jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157, over the Chapter 11 case, and any adversary proceedings that may be filed, after the Confirmation Date and until the case is closed for certain specific purposes. For example, the Bankruptcy Court will, among other things and without limitation, (a) hear and determine any objections to Claims, (b) any and all controversies, suits and disputes (c) hear and determine all applications for compensation by professionals, and (d) interpret and enforce the provisions of the Plan and Disclosure Statement.

This Plan may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, the Debtor may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

On the Effective Date, this Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

In order for all notices, requests, and demands to or upon the Debtor, or the Liquidating Trustee, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

{00357013.3 / 1539-002 }

33

| Debtor | Counsel to the Debtor |
|---|---|
| E Gluck Corporation | **HALPERIN BATTAGLIA BENZIJA, LLP**<br>Alan D. Halperin, Esq.<br>(ahalperin@halperinlaw.net)<br>Julie Dyas Goldberg, Esq.<br>(jgoldberg@halperinlaw.net)<br>40 Wall Street, 37th Floor<br>New York, New York 10005<br>Phone:  (212) 765-9100 |
| **Liquidating Trustee** | **Counsel to the Liquidating Trustee** |
| To be included in the Plan Supplement. | To be included in the Plan Supplement. |

## VII.

## TAX IMPLICATIONS OF THE PLAN

The U.S. federal income tax consequences to a holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim will depend on a number of factors, including the nature of the Claim, the holder's method of tax accounting, and its own particular tax situation.

**Because the holders' Claims and tax situations differ, holders should consult their own tax advisors to determine how the Plan and Disclosure Statement affects them for federal, state and local tax purposes, based on their particular tax situations.**

Among other things, the U.S. federal income tax consequences of a payment to a holder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender. The U.S. federal income tax consequences of a transfer to a holder may also depend on whether the item to which the payment relates has previously been included in the holder's gross income or has previously been subject to a loss or a worthless security or bad debt deduction.  For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a holder's trade or business, the holder had previously included the amount of such receivable payment in its gross income under its method of tax accounting, and had not previously claimed a loss or a worthless security or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the holder but may result in a loss. Conversely, if the holder had previously claimed a loss or worthless security or bad debt deduction with respect to the item previously included in income, the holder generally would be required to include the amount of the payment in income.

{00357013.3 / 1539-002 }

34

A holder receiving a payment pursuant to the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (i) the amount of cash and the fair market value (if any) of any property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) its adjusted tax basis in the Claim (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim.

Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands. When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim has been held for more than one year.

(remainder of page intentionally blank)

## IX.

## CONCLUSION

The Debtor and the Committee believe that the Plan and Disclosure Statement is in the best interest of all holders of Claims and interests and urges all holders of impaired Claims against the Debtor to vote to accept the Plan and Disclosure Statement and to evidence such acceptance by returning their ballots in accordance with the instructions accompanying this document.

Dated:  [April ___], 2026

**E. GLUCK CORPORATION**
Debtor and Debtor-in-Possession


By:     _____
             Adam Gelnick
             Chief Financial Officer

**HALPERIN BATTAGLIA BENZIJA, LLP**
Alan D. Halperin, Esq. (ahalperin@halperinlaw.net)
Julie Dyas Goldberg, Esq. (jgoldberg@halperinlaw.net)
40 Wall Street, 37th Floor
New York, New York 10005
Phone:  (212) 765-9100

*Counsel to the Debtor and Debtor in Possession*

   - and -

**PORZIO, BROMBERG & NEWMAN, P.C.**
1675 Broadway
Suite 1810
New York, NY 10019
(646) 348-6723
Brett S. Moore, Esq. (BSMoore@pbnlaw.com)
Robert M Schechter, Esq (RMSchechter@pbnlaw.com)
Jenny Zhou, Esq. (JZhou@pbnlaw.com) (pro hac vice)

*Counsel to the Official Committee of Unsecured Creditors*

{00357013.3 / 1539-002 }

**Exhibit A**

E. Gluck Corporation Liquidation Analysis (Draft)

| Consolidated Debtors Liquidation (Actual Dollars) | Notes | Book Value | Ch. 7 Liquidation Asset Recovery Estimates % | $ | Proposed Ch.11 Plan Asset Recovery Estimates % | $ |
|---|---|---|---|---|---|---|
| Current Assets | | | | | | |
| Cash and Cash Equivalents | | $ 536,257 | 100.00% | 536,257 | 100.00% | 536,257 |
| Accounts Receivable (Net) | 1 | 1,807,637 | 100.00% | 1,807,637 | 100.00% | 1,807,637 |
| Merchandise Inventory | | - | 0.00% | - | 0.00% | - |
| Inventory in Transit | | - | 0.00% | - | 0.00% | - |
| Prepaid Inventory | | - | 0.00% | - | 0.00% | - |
| Other Current Assets | 2 | 2,675,000 | 0.00% | - | 10.00% | 267,500 |
| **Total Current Assets** | | **5,018,894** | **46.70%** | **2,343,894** | **52.03%** | **2,611,394** |
| **Non-Current Assets** | | | | | | |
| Right of Use Assets | | $- | 0.00% | - | 0.00% | - |
| Net Intangible Assets | | - | 0.00% | - | 0.00% | - |
| Net Property Plant & Equipment | | - | 0.00% | - | 0.00% | - |
| Other Non-Current Assets | | - | 0.00% | - | 0.00% | - |
| **Total Non-Current Assets** | | **$-** | **0.00%** | **-** | **0.00%** | **-** |
| **Total Distributable Value Before Liquidation Costs** | | **$ 5,018,894** | **46.70%** | **2,343,894** | **52.03%** | **2,611,394** |
| Less: Liquidation Costs | | | | | | |
| Wind Down Expenses | 3 | | | 520,000 | | 320,000 |
| Chapter 7 Professional Fees | 4 | | | 530,000 | | - |
| Trustee Fees | 5 | | | 93,567 | | - |
| **Total Liquidation Costs** | | | | **$ 1,143,567** | | **$ 320,000** |
| **Net Liquidation Proceeds Available for Distribution** | | **N/A** | **23.92%** | **1,200,327** | **45.66%** | **2,291,394** |

| Claims | Notes | Ch. 7 Est. Claims Low | High | Ch. 7 Liquidation Claim Recovery Estimates Low % | Low $ | High % | High $ | Ch. 11 Plan Est. Claims Low | High | Proposed Ch. 11 Plan Claims Recovery Low % | Low $ | High % | High $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Net Liquidation Proceeds Available for Distribution** | | | | | $ 1,200,327 | | $ 1,200,327 | | | | $ 2,291,394 | | $ 2,291,394 |
| **Miscellaneous Secured Claims** | | $ - | $ - | 0.00% | $ 0 | 0.00% | $ - | $ - | $ - | 0.00% | $ - | 0.00% | $ - |
| Remaining Liquidation Proceeds Available for Distribution | | | | | 1,200,327 | | 1,200,327 | | | | 2,291,394 | | 2,291,394 |
| Other Priority Claims | 6 | $ 150,000 | $ - | 100.00% | $ 150,000 | 0.00% | - | $ 150,000 | $ - | 100.00% | $ 150,000 | 0.00% | - |
| Remaining Liquidation Proceeds Available for Distribution | | | | | 1,050,327 | | 1,200,327 | | | | 2,141,394 | | 2,291,394 |
| General Unsecured Claims | | $ 14,000,000 | $ 14,000,000 | 8.16% | $ 1,142,750 | 8.57% | $ 1,200,327 | $ 14,000,000 | $ 14,000,000 | 15.30% | $ 2,141,394 | 16.37% | $ 2,291,394 |
| Remaining Liquidation Proceeds Available for Distribution | | | | | - | | $ - | | | | $ - | | $ - |
| Subordinated Claims | | $ - | $ - | 0.00% | $ - | 0.00% | $ - | $ - | $ - | 0.00% | $ - | 0.00% | $ - |
| Remaining Liquidation Proceeds Available for Distribution | | | | | - | | $ - | | | | $ - | | $ - |
| Existing Equity | | $ - | $ - | 0.00% | $ - | 0.00% | $ - | $ - | $ - | 0.00% | $ - | 0.00% | $ - |
| Remaining Liquidation Proceeds Available for Distribution | | | | | - | | $ - | | | | $ - | | $ - |

1. Includes receivables from the Stalking Horse Bidder and purchasers of the WITHit shares.
2. The Debtor's estimated book balance of Other Current Assets is approximately $2.675 million. These assets consist of investments in Hedgehog and amount owed by BT Supply West.
3. Represents the Debtors' related expenses incurred during the Liquidation Period, including estimated tax related expenses, technology continuation, documentation retention and storage, and other estate wind down related expenses. Chapter 11 plan scenario includes plan administrator professional fees.
4. Represents an estimate for certain professionals that would be retained by the Trustee during the Liquidation Period, including financial advisors and legal counsel. Chapter 7 Professional Fees are estimated to be approximately $530,000 to account for any potential litigation following the Chapter 7 Conversion Date.
5. Represents Chapter 7 Trustee fees payable in connection with the Sale. Percentage calculated in accordance with the Chapter 7 Trustee fee schedule, with fees generated as 3% of Total Distributable Value above $1 million.
6. Represents priority claims related to estimated pre-petition sales, property, and franchise taxes and accrued administrative expenses incurred in the Chapter 11 Cases.