Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

*Counsel to the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

In re:

**E. GLUCK CORPORATION,**

                                Debtor.

---------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (MG)

### FIRST INTERIM FEE APPLICATION OF HALPERIN BATTAGLIA BENZIJA, LLP AS COUNSEL TO THE DEBTOR FOR ALLOWANCE OF COMPENSATION <u>FOR THE PERIOD DECEMBER 1, 2025 THROUGH MARCH 31, 2026</u>

| | |
|---|---|
| Name of Applicant: | Halperin Battaglia Benzija, LLP ("<u>HBB</u>") |
| Authorized to Provide Professional Services to: | The debtor and debtor in possession ("<u>Debtor</u>") |
| Date of Retention: | January 27, 2026 *nunc pro tunc* to December 1, 2025 |
| Period for which Compensation and Reimbursement is Sought: | December 1, 2025 through March 31, 2026 |
| Actual Amount of Compensation Sought as Actual, Reasonable and Necessary: | **$534,598.00 (80% $427,678.40)** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable and Necessary: | <u>$3,793.70</u> |
| Total Amount of Fees and Expense Reimbursement Sought as Actual, Reasonable and Necessary: | **<u>$431,472.10</u>** |

This is a(n) ____ monthly       <u>X</u>  interim        ____ final application
The total time expended for fee application preparation was approximately 10 hours.

{00357349.1 / 1539-002 }

**Fee Detail**

| ACTIVITY | TIME SPENT | FEES INCURRED |
|---|---|---|
| Asset Sales | 264.8 | $188,275.50 |
| Case Administration | 77.9 | $48,406.00 |
| Claims Review & Analysis | 26.8 | $18,989.00 |
| DIP Financing | 41.8 | $31,592.50 |
| Executory Contracts | 77.3 | $56,222.00 |
| Fee Application | 1.1 | $895.00 |
| Meetings and Hearings | 108.1 | $78,082.50 |
| Motions and Applications | 128.5 | $73,493.00 |
| Plan and Disclosure Statement | 54.2 | $38,642.50 |
| **TOTAL** | 780.5 | $534,598.00 |

**Time Entries by Professional**

| Professional | Title | Number of Hours |
|---|---|---|
| Alan D. Halperin | Partner | 70.8 |
| Walter Benzija | Partner | 4.1 |
| Donna H. Lieberman | Of Counsel | 8.5 |
| Julie D. Goldberg | Of Counsel | 597.4 |
| Neal W. Cohen | Of Counsel | 2.9 |
| Ligee Gu | Of Counsel | 0.8 |
| Andrew P. Digiorgio | Associate | 91.5 |
| Monique Minto-Gonzalez | Paralegal | 1.1 |
| Courtney A. Mainer | Paralegal | 3.4 |
|  | **TOTAL** | **780.5** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re:

**E. GLUCK CORPORATION,**

Debtor.

-----------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (MG)

**FIRST INTERIM APPLICATION OF HALPERIN BATTAGLIA BENZIJA, LLP
FOR ALLOWANCE OF COMPENSATION AND FOR REIMBURSEMENT
OF EXPENSES FOR SERVICES RENDERED IN THIS CASE**

TO THE HONORABLE MARTIN GLENN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Halperin Battaglia Benzija, LLP ("HBB" or "Applicant"), bankruptcy counsel to

E. Gluck Corporation (the "Debtor"), as and for its first interim application, pursuant to pursuant

to sections 330 and 331 of title 11 of the United States Code, as amended (the "Bankruptcy

Code"), for an allowance of compensation for services rendered and for reimbursement of

expenses incurred in this case, respectfully represents:

**INTRODUCTION**

1.      By this application, Applicant seeks a first interim allowance of

compensation for professional services rendered as bankruptcy counsel to the Debtor in the

amount of $427,678.40[1] based upon 780.5 hours in professional services rendered during the

period December 1, 2025, the date the bankruptcy case commenced, through and including

March 31, 2026 (the "Compensation Period"), plus reimbursement of actual and necessary

expenses incurred by Applicant during the Compensation Period in the amount of $3,793.70.[2]

---

[1] Applicant consents to a voluntary holdback of twenty percent (20%) of the fees incurred, pending the final
application in this case.  For the avoidance of doubt, total fees incurred in the Compensation Period are $534,598.00,
of which approval of 80%, or $427,678.40, is requested by this Application.
[2] To the extent certain expenses incurred during the Compensation Period have not been invoiced, such expenses

Prior to the commencement of the Chapter 11 case, Applicant received a pre-petition retainer, of which $248,037.59 remained as of the Petition Date.

## JURISDICTION

2.    This Court has jurisdiction over this case and this application pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  Venue of this case and this application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are 11 U.S.C. §§ 330 and 331, and Federal Rules of Bankruptcy Procedure 2002(a) and 2016.

## BACKROUND

3.    On December 1, 2025 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4.    On December 23, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

5.    On December 15, 2025, the Debtor filed its bankruptcy schedules, as may be amended from time to time, and statement of financial affairs (the "Schedules") [Docket Nos. 28 & 29].

6.    As of the Petition date, E. Gluck has been in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Its proprietary anchor was Armitron, a longstanding name in the U.S. watch

---

will be included in a subsequent application to the Court.

market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others. At its peak, the company generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores. Beyond the domestic market, E. Gluck also built international distribution through third-party distributors and maintained a meaningful presence in travel retail, including duty-free and cruise channels.

7.     In recent years, management recognized that traditional watches were a mature, slow-growth category, increasingly pressured by shifts in consumer behavior and the rise of smart devices. To diversify and with the goal of positioning the company for future growth, E. Gluck acquired WITHit, a company specializing in reading accessories and smartwatch and wearable-tech accessories. The strategic goal was for WITHit to extend E. Gluck's reach into faster-growing product categories, leverage E. Gluck's retail distribution muscle and create a hedge against the long-term decline of conventional watch demand due to, among other reasons, the advent and increased market share of smart devices.  Unfortunately, the acquisition of WITHit did not deliver the benefits that management anticipated.

8.     E. Gluck sought relief under Chapter 11 to reset its cost structure, shed unproductive obligations, and position its long-standing business for long-term stability. Additional information regarding E. Gluck's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Declaration of Adam Gelnick Pursuant to Local Bankruptcy Rule 1007-2 (the "Gelnick Declaration") [Docket No. 2].

9.     As part of its restructuring strategy, on the Petition Date, the Debtor filed its *Motion to Sell Substantially All of Its Non-WITHit Assets* (the "Legacy Sale Motion") [Docket No. 8].  The Order granting the Legacy Sale Motion was entered on February 4, 2026 [Docket

No. 90] and the sale (the "Legacy Sale") went effective on February 13, 2026 (the "Legacy Effective Date").

10.    On January 21, 2026, the Debtor filed its *Motion to Sell the Membership Interests of WITHit Holdings, LLC* (the "WITHit Sale Motion") [Docket No. 71].  The Order granting the WITHit Sale Motion was entered on February 4, 2026 [Docket No. 91] and the sale (the "WITHit Sale" together with the Legacy Sale, the "Sales") went effective on February 11, 2026 (the "WITHit Effective Date").  The sales effectuated by these two motions accomplished the liquidation of substantially all of the Debtor's assets.

11.    On January 29, 2026, the Debtor filed its Ex Parte Application to Establish the Deadline for Filing Certain proofs of Claim and Approving the Form and Manner of Notice Thereof (the "Bar Date Motion") [Docket No. 84].  The Court granted the Bar Date Motion by Order dated February 4, 2026 [Docket No. 89] and set the last date for filing proofs of claim on account of pre-petition debts as March 30, 2026 for general claimants (the "General Bar Date") and May 30, 2026 for governmental agencies (the "Governmental Bar Date").

12.    The Debtor has now turned to the final stage of its chapter 11 efforts. Applicant has been working in concert with counsel to the Committee and recently proposed the Combined Disclosure statement and Joint Liquidating Plan of E. Gluck Corporation (the "Plan and Disclosure Statement" or the "Plan") [Docket No. 122].

**REQUEST FOR COMPENSATION**

13.    Applicant maintains written records of the time expended by attorneys and paraprofessionals in the rendition of their professional services to the Debtor.  Such time records are made contemporaneously with the rendering of services by the person rendering such services, and in the ordinary course of HBB's practice.  The records show the name of the

attorney or paraprofessional, the date on which the services were performed, the services rendered, and the amount of time spent in performing the services during the Compensation Period.  Copies of the records are annexed hereto as **Exhibit A**.

14.     Annexed hereto as **Exhibit B** is a list of the attorneys and paraprofessionals who have worked on this case during the Compensation Period, their date of admission to the bar (where applicable), the aggregate time expended by each person, their current normal hourly billing rate, and the value of the total time expended by each person.

15.     HBB also maintains records of all actual and necessary expenses incurred in connection with the rendition of its professional services, all of which are also available for inspection.  A schedule of the categories of expenses and amounts for which reimbursement is requested is annexed hereto as **Exhibit C**.

16.     As set forth in the certification of Alan D. Halperin, annexed hereto as **Exhibit D**, Applicant believes that this application is in compliance with the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York Bankruptcy Cases, as amended (the "Guidelines").

### SUMMARY OF SERVICES RENDERED

17.     During the Compensation Period, Applicant assisted the Debtor in achieving its primary goal in the case - - to maximize assets values through the Sales and assist the Debtor in the discharge of its obligations as it transitioned the business to its purchasers.  The Debtor and the Committee have also prepared the Plan and Disclosure Statement, which is pending interim approval by the Court and, if appropriate, solicitation of acceptances and rejections from voting creditors will shortly follow.  Following the Compensation Period, the Debtor anticipates seeking confirmation of the Plan and implementing its ultimate exit strategy

from Chapter 11, pursuant to which all assets are proposed to be transferred to a liquidating trust for the benefit of creditors.

18.    The following is a summary and overview of the work performed by HBB in its role as bankruptcy counsel to the Debtor during the Compensation Period.  Reference is made to the contemporaneous time records annexed as **Exhibit A** for greater detail of all of the services rendered on behalf of the Debtor.

**First Day Orders and Retention Applications for Debtor's Professionals**

19.    HBB prepared, filed and successfully prosecuted certain applications and motions following the commencement of the case to facilitate the Debtor's smooth transition into Chapter 11.  HBB prepared multiple motions, and the Bankruptcy Court entered orders on these motions including, without limitation, the: (a) *Motion of the Debtor for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing (I) Use of Existing Business Forms and Records; (II) Maintenance of Existing Corporate Bank Accounts; and (III) Maintenance of Cash Management System*; (b) *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363 and 503(b)(1) of the Bankruptcy Code Authorizing the Debtor to Honor Certain Pre-Petition Policies and Obligations to Customers*; (c) *Motion of the Debtor for an Order Authorizing Payment of Pre-Petition Accrued Employee Wages, Salaries, Expenses and Related Taxes and Payment of Employee Benefits and Authorizing and Directing Banks to Honor Employee Wage, Salary and Expense Reimbursement Checks*; (d) *Application to Employ Halperin Battaglia Benzija, LLP as Counsel to the Debtor*; (e) *Application to Employ Cometrics Partners as Chief Restructuring Officer to the Debtor,* and *(f) Application to Employ East Wind Securities, LLC as Investment Banker to the Debtor.*  Applicant addressed any and all issues raised by the U.S. Trustee, parties-in-interest and the Court with respect to the foregoing motions and applications.

Approval of the motions and applications was a necessary component to the Debtor's smooth transition into Chapter 11.

20.     At "first day" hearings held on December 2, 2025 (the "First Day Hearings"), this Court approved the cash management motion, and authorized relief sought in the customer obligations motion and the wage motion and others on an interim basis, pending a final hearing.  At hearings held on December 22, 2025, the Court approved the motions on a final basis.  Following notice, the Court approved applications for the retention of Halperin Battaglia Benzija, LLP, as bankruptcy counsel to the Debtor, CoMetrics Partners as Chief Restructuring Officer, and East Wind Securities, LLC as Investment Banker.

**The DIP Facility**

21.     Contemporaneously with the commencement of the Chapter 11 case, the Debtor filed a *Motion for an Order (I) Authorizing Debtor (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), and 364(e) and (B) to Utilize Cash Collateral Pursuant To 11 U.S.C. Section 363, (II) Granting Adequate Protection to Prepetition Secured Party Pursuant to 11 U.S.C. Sections 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "DIP Motion").  As of the Petition Date, the Debtor had no unencumbered assets or credit available to fund its business operations and required additional monies to fund operations during the pendency of the case.  Applicant undertook a primary role in identifying potential sources of debtor-in-possession financing and ultimately was able to assist in negotiating acceptable financing terms from the Debtor's pre-petition lender to provide necessary liquidity pending the Sales.

22.    The relief requested in the DIP Motion sought approval of a $29 million secured debtor-in-possession financing facility from Israel Discount Bank of New York as administrative agent, as well as the use of cash collateral, both in accordance with a negotiated budget (the "DIP Facility").  Applicant assisted the Debtor in all stages of negotiation of the DIP Facility, including preparation and finalization of the DIP Agreement and the DIP Budget (each as defined in the DIP Motion) and pleadings seeking approval of the foregoing agreements before the Bankruptcy Court.

23.    At the First Day Hearings, HBB requested authority from the Court for the Debtor to obtain immediate advances under the DIP Facility.  Without an immediate infusion of funds, Applicant was concerned that the Debtor would not be able to operate its business pending the Sales, placing the business and its value as a "going concern" in grave jeopardy, and all but ruining any chance for a successful sale process.  The Interim Order approving the DIP Facility was entered on December 3, 2025 (Docket No. 22).  Pending the final hearing on the DIP Facility, Applicant assisted the Debtor in negotiating consensual resolutions to the issues raised by all responding parties.

24.    The Court approved the DIP Facility on a final basis on January 15, 2026 (Docket No. 64).  The DIP Facility provided the  Debtor with the funds necessary to operate on a "going concern" basis pending the Sales - - thus enabling the estate to maximize asset values for the benefit of creditors and all parties in interest, preserve jobs and maintain a trading partner for the estate's creditors.

**Preparation of Debtor's Schedules and Statement of Financial Affairs**

25.    Applicant assisted the Debtor in preparation of its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules").  Though the Debtor

was operating its business at this juncture and, thus access to the Debtor's principals was provided, substantial review and compilation of business records was necessary to accurately ready the Schedules for filing with the Court and review by the U.S. Trustee and parties-in-interest, including potential purchasers of the Debtor's business.  Applicant and the Debtor's principals, along with the Debtor's Chief Restructuring Officer, held several meetings in preparation of the Schedules in their final and complete form.  Time was of the essence in preparing the Schedules, particularly in light of the contemporaneous marketing process under way for the Sales.  Applicant filed the Schedules on December 15, 2025, consistent with the requirements of the Bankruptcy Code.

**The Legacy Sale**

26.     As noted, the Debtor filed the Legacy Sale Motion simultaneously with the commencement of the Chapter 11 case.  Annexed as an exhibit to the Sale Motion was a form of asset purchase agreement (the "Sale Agreement") negotiated and agreed to between the Debtor and its stalking horse buyer.  Given the Debtor's precipitous filing and urgent need for financing under the DIP Facility, the Sale Agreement was initially filed without exhibits or schedules thereto (the "Seller's Disclosure Schedules").  The Seller's Disclosure Schedules were not only an integral part of the Sale Agreement, but were critical to providing prospective bidders with detailed information necessary to comprehend the nature of the assets proposed to be acquired by buyer.

27.     During the early stages of the case, Applicant worked with Debtor's management to review and incorporate documents and information in order to complete the Seller's Disclosure Schedules.  Preparation of the Seller's Disclosure Schedules involved substantial time and resources to analyze information and compile the voluminous schedules and

supporting documentation. Applicant reviewed substantial amounts of documents and files relating to the assets and liabilities of the Debtor and its affiliated entities.

28. Applicant reviewed and analyzed executory contracts and leases and interfaced with counterparties to assigned contracts and assigned leases to obtain necessary consents. HBB worked with Debtor's management and professionals to make proper disclose of financial statements of the Debtor and its subsidiaries as required by the Sale Agreement. Additionally, Applicant reviewed the Debtor's business records and information and prepared certain disclosures and exhibits regarding title matters, tax matters, sufficiency of assets, legal proceedings, permits and licenses, benefit plans, intellectual property, licenses, affiliate transactions, material contracts and leases, accounts payable and receivables.

29. Applicant prepared and made available information responsive to the Seller's Disclosure Schedules in virtual data room established in connection with the Legacy Sale so that all prospective bidders would have access to such information on a timely and equal basis. Upon completion of the Seller's Disclosures Schedules, the Applicant continued to work closely with the Debtor, the "stalking horse" bidder and prospective bidders as such information was revised and/or updated from time to time.

30. Applicant represented the Debtor at the hearing to consider approval of the bidding and sale procedures in connection with the Legacy Sale that took place on December 22, 2025. HBB assisted East Wind Securities, the Debtor's investment banker, with resolution of legal issues with respect to prospective bidders, including negotiating forms of nondisclosure agreements and assisting in canvassing the marketplace for bidders in distressed markets. In connection with the Sale Agreement, Applicant negotiated, and commented on, certain ancillary

documents related to the Legacy Sale, including the transition services agreement, domain name assignments, assignment and assumption agreements, trademark assignments, and bills of sale.

31.     Finally, HBB prepared all notices to creditors and prospective bidders concerning the possibility of an auction, the results of the 363 sale process, and represented the Debtor at the sale hearing that took place on February 4, 2026.

**The WITHit Sale**

32.     HBB also assisted the Debtor in negotiating and documenting the sale of its fifty-one percent (51%) majority membership interest in WITHit Holdings, LLC to WITHit's founders, who, collectively, owned the remaining forty-nine percent (49%).  While the Legacy Sale was undoubtedly the larger and more material group of assets to generate value for the estate, the Debtor used its early days in Chapter 11 to consider how to best maximize the value of its majority interest in WITHit as WITHit has always been a closely-held joint-venture and could not be traditionally marketed.  HBB assisted the Debtor in negotiating and closing a sale that generated $3.6 million in value for the estate and provided a path forward for the Debtor to confirm a liquidating plan.

33.     Though smaller than the Legacy Sale in scope, the WITHit transaction has required material time and attention by the Debtor's legal and other professionals including negotiation of not only the membership unit purchase agreement, but various escrow agreements to assist with closing, transition services, periodic calls involving the professional and business teams to resolve post-closing issues that are still ongoing.  Paramount to the WITHit closing was negotiation and formulation of a lien release document from Israel Discount Bank of New York, the Debtor's DIP Lender, in order to ensure that the sale could occur on consent, free and clear of IDB's liens.  The transaction also required negotiation and documentation of termination of the

Master Services Agreement by which the Debtor had provided material services to WITHit, as well as negotiation of termination of the Limited Liability Company Agreement, various officer certificates, third party consents and forms of management resignation. Finally, HBB assisted the parties in negotiating tertiary issues related to the WITHit sale, such as division of WITHit versus estate product inventory and resolution of ownership of potential tariff refunds.

**Rejection of Executory Contracts and Leases**

34.     On behalf of the Debtor, HBB undertook a comprehensive re view and analysis of the Debtor's executory contacts, both to facilitate and address issues in connection with the Legacy and WITHit Sales, and to help determine what contracts should be rejected. After the successful conclusions of the two asset sales, HBB prepared an Omnibus *Motion to Reject Executory Contracts and Nonresidential Real Property Leases*. This application was necessary to facilitate the Debtor obligations under the sale agreements and also to minimize ongoing administrative costs of the estate. Following the Closing, Applicant worked diligently with Debtor's management and the buyer to timely reject numerous executory contracts and leases.

**Development of an Exit Strategy From Chapter 11**

*Establishment of a Bar Date*

35.     In order to embark on the claims analysis necessary to formulating the Debtor's exit strategy from Chapter 11, Applicant prepared and filed an application requesting the Court to set a deadline to file proofs of claim in the case. By the application, the Debtor seeks to fix the universe of general unsecured claims against the estate. By Order dated February 4, 2026 (the "Bar Date Order," Docket No. 89), the Court established March 30, 2026 as bar date for all claims that arose prior to the Petition Date (except that governmental entities were

required to file proofs of claim on or before May 30, 2026).

36.     Applicant undertook preparation of the relevant notices to creditors that had been approved by the Bar Date Order and served the notices and form proofs of claim on all creditor constituencies in accordance with the Bar Date Order.  Service was effectuated on February 13, 2025.

*Formulation of Plan and Disclosure Statement*

37.     During the Compensation Period, Applicant worked with counsel to the Committee to prepare a combined joint plan of liquidation and disclosure statement, which provides for treatment of all claims and interest in the case.  HBB has reviewed the terms of the plan documents with Debtor's management and professionals and plans to solicit votes from relevant creditors when appropriate.  Given the Sales and the liquidation of all material estate assets, the proposed plan contemplates mechanisms to provide for distributions to creditors at the earliest possible time.

*Claims Reconciliations*

38.     During the Compensation Period, Applicant began review of proofs of claim filed in the case and undertook a review and analysis of claims that should be reclassified and/or expunged on various grounds, including that such claims are duplicative of previously filed claims, superseded by a subsequently filed claims and/or fail to establish a *prima facie* claim for relief against the Debtor's estate.  Applicant proposes to commence the claims reconciliation process promptly following the results of the Bar Dates.

## Case Administration/Miscellaneous

*General Case Administration*

39.     Applicant's attention to the Debtor's needs during the Compensation

Period enabled the Debtor to operate smoothly both before, during and after consummation of the Sales.  Through telephone conferences, in-person meetings and correspondence, Applicant assisted the Debtor in fulfilling its fiduciary duty to make informed decisions regarding the issues that have arisen in this case.  Applicant kept the Debtor well informed in all aspects of the case and Applicant asserts that its efforts contributed to a more efficient and effective administration of the Chapter 11 case.

*Retention Applications and Compliance*

40.    In addition to HBB's own retention application, HBB assisted the Debtor's Chief Restructuring Officer, CoMetrics Partners, with drafting and submission of their retention application, compliance with U.S. Trustee protocols, service of process, and submission of their monthly fee statements in accordance with the J. Alix protocol.  Likewise, HBB assisted the Debtor's investment bankers, East Wind Securities, LLC, with drafting and submission of their retention documents, compliance with the terms of the related retention order, and ultimately drafting and submission of their first and final fee application, which was granted by the Court on March 31, 2026 [Docket No. 121].

*Committee Information Re*quests

41.    At the time of the Committee's formation and its professionals' engagement, Applicant and counsel for the Committee agreed to a protocol that would permit the Debtor to disclosure confidential information to the Committee and its advisors.  To that end, the Committee executed a non-disclosure agreement in a form acceptable to Applicant.  During the Compensation Period, the Committee, through its counsel and advisors, made a series of informal information requests upon Applicant for information concerning the Debtor's pre-petition operations, assets and liabilities, prior budgets, actual-to-projected budget analyses,

analyses of payments to certain creditors, various financial data and information pertaining to contracts and leases. Applicant reviewed and advised Debtor's management with respect to the various information requests and supplied information to the Committee as appropriate on a consensual basis.

*Monthly Operating Reports*

42.     In coordination with the Debtor's principals and Chief Restructuring Officer, Applicant has assisted in the preparation of monthly operating reports in accordance with the Bankruptcy Code. Applicant interfaced with the Debtor's Chief Financial Officer to ensure the accuracy of these reports and continues to assist the Debtor by reviewing, filing and serving the same. Applicant also assisted the Debtor's principals in timely completing the U.S. Trustee's quarterly fee report and payment.

*Miscellaneous*

43.     Applicant interfaced with all interested parties as well as the U.S. Trustee and others, and became the central source of information with respect to all issues involved in the case. Applicant assisted the Debtor in complying with the U.S. Trustee Guidelines, including, as stated above, payment of U.S. Trustee fees. Applicant responded to numerous inquiries made by various creditors, employees and other parties in interest, and resolved all problems that arose in connection therewith.

**FACTORS TO BE CONSIDERED IN AWARDING ATTORNEYS' FEES**

44.     The factors to be considered in awarding attorneys' fees are enumerated in *In re First Colonial Corporation of America*, 544 F.2d 1291, 1298 - 99 (5th Cir.), *reh'g denied*, 547 F.2d 573, *cert. denied, Baddock v. American Benefit Life Insur. Co.*, 431 U.S. 904 (1977), and are as follows: (a) the time and labor required, (b) the novelty and difficulty of issued raised,

(c) the skill required to perform the legal services properly, (d) the preclusion of other employment due to acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or contingent, (g) time limitations imposed by the client or other circumstances, (h) the amount involved and the results obtained, (i) the experience, reputation and ability of the attorneys, (j) undesirability of the case, and (k) the nature and length of the professional relationship.  HBB respectfully submits that consideration of these factors should result in the allowance of the full compensation requested.

45.     HBB respectfully submits that the fee sought in this case is reasonable given the issues confronted and the work performed and is commensurate with fees HBB has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience and expertise.  The Debtor's operations were widespread and the business was in extremis.  This case was also contentious from the outset, at least with respect to certain aspects of the Sales.  HBB frequently had to work under significant time pressure and HBB professionals rendered substantial, yet cost effective, services necessary to address each and every issue that confronted the Debtor in this case.  Also, HBB had limited funding for fees in this case and, absent a competitive auction process, bore significant risk of non-payment.

**ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES**

46.     The professional services rendered by HBB required a high degree of professional competence and expertise so that the Debtor could protect and maximize its asset base for the benefit of creditors, while, post consummation of the sale process, turning its attention to formulation of an exit strategy.  It is respectfully submitted that the services rendered to the Debtor were performed efficiently, effectively and economically.

47.     With respect to the level of compensation, §330 of the Bankruptcy Code

provides, in pertinent part, that the Court may award a professional reasonable compensation for actual necessary services rendered by such professional based upon consideration of all of the relevant factors, including time spent, rates charged, necessity or benefit of services rendered, reasonableness of time spent and cost of comparable services other than in a bankruptcy case. *See* 11 U.S.C. §330(a).  The clear Congressional intent and policy expressed in this section is to provide for adequate compensation in order to continue to attract qualified and competent practitioners to bankruptcy cases.  As this is an interim application, final approval of the fees and expenses requested herein will be sought at a later juncture.

48.      During the Compensation Period, HBB professionals expended an aggregate of 780.5 hours in rendering services on behalf of the Debtor for a total fee of $534,598.00 (80% of which is $427,678.40).  HBB submits that its fee is reasonable for the work performed in this case.

49.      In addition, HBB incurred out-of-pocket expenses in connection with the rendition of the professional services described above in the sum of $3,793.70, for which HBB respectfully requests reimbursement in full.  None of these expenses reflect HBB's overhead costs and all of the expenses were incurred exclusively in connection with this case.

### SOURCES OF PAYMENT

50.      The DIP Facility included provisions for payment of some portion of the fees and expenses of professionals retained in the case, including a funded carve-out in the amount $300,000 for the benefit of HBB.  The earmarked funds for payment of the fees and expenses of HBB include the $248,037.59 pre-petition retainer and the $300,000 funded carve-out, with the balance (subject to approval of this Court) to be paid from general funds of the Debtor's estate.

## **CONCLUSION**

51.     No agreement or understanding exists between HBB and any other person for the sharing of any compensation to be received for professional services rendered or to be rendered in connection with this case.

52.     No prior application has been made to this or any other Court for the relief requested herein for the Compensation Period, nor has any payment been received by HBB on account of the legal services rendered or on account of the out-of-pocket expenses incurred in connection therewith.

*[concluded on following page]*

**WHEREFORE**, HBB respectfully requests that this Court enter an order (a) approving the allowance of $427,678.40 for compensation for services rendered during the Compensation Period, (b) approving the reimbursement of HBB's out-of-pocket expenses in the amount of $3,793.70, and (c) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      April 13, 2026

                    HALPERIN BATTAGLIA BENZIJA, LLP
                    Counsel to the Debtor and Debtor in Possession


                    By: */s/ Julie D. Goldberg*
                        Alan D. Halperin, Esq.
                        Julie D. Goldberg, Esq.
                    40 Wall Street, 37th Floor
                    New York, NY 10005
                    (212) 765-9100
                    ahalperin@halperinlaw.net;
                    goldberg@halperinlaw.net