UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

    E. GLUCK CORPORATION,

                Debtor.

NOT FOR PUBLICATION

Case No. 25-12683 (MG)

Chapter 11

**MEMORANDUM OPINION AND ORDER CONDITIONALLY
APPROVING COMBINED DISCLOSURE STATEMENT AND
JOINT LIQUIDATING PLAN OF E. GLUCK CORPORATION**

*A P P E A R A N C E S :*

HALPERIN BATTAGLIA BENZIJA, LLP
*Attorneys for the Debtors*
40 Wall Street, 37th Floor
New York, New York 10001
By:    Julie Dyas Goldberg, Esq.
        Alan D. Halperin, Esq.

PORZIO, BROMBERG & NEWMAN, P.C.
*Attorneys for the Official Committee of Unsecured Creditors*
1675 Broadway
New York, New York 10019
By:    Brett S. Moore, Esq.
        Zhenyi Zhou, Esq.

WILLIAM K. HARRINGTON
*United States Trustee for Region 2*
*U.S. Department of Justice*
One Bowling Green
New York, New York 10707
By:    Tara Tiantian

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the Debtor's *Combined Disclosure Statement and Joint Liquidating Plan of E. Gluck Corporation* (the "Plan," ECF Doc. # 122.)  Attached to the Amended Plan, the Debtor included a liquidation analysis (the "Liquidation Analysis") as Exhibit A.  No objections were filed.

The Debtor seeks approval of the disclosure statement embodied in the Combined Plan and Disclosure Statement prior to solicitating votes from Class 3, the only voting class.  The Court concludes that the Disclosure Statement is **APPROVED** and the Plan is **CONDITIONALLY APPROVED** subject to later voting.

## I.    BACKGROUND

### A.  General Background

The E. Gluck Corporation (the "Debtor") was incorporated in 1977 as the Terry Watch Corporation.  (Plan at 10.)  It is held by the Barbara Weichselbaum 2022 Family Trust, the Sidney Gluck 2023 Family Trust and the Rose Friedman 2022 Irrevocable Trust, which each own 33.3% of the common shares of the Debtor.  (*Id.*)

For over six decades, the Debtor operated in the watch industry as a designer, importer and distributor of certain proprietary and licensed brands.  (*Id.*)  The Debtor's primary client is Armitron, but it also engages in business on behalf of licensed brands such as Anne Klein, Nine West, and others.  (*Id.*)  At its peak, the Debtor generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores.  The Debtor also developed an international distribution network through third-party distributors and operates in the travel retail market, including duty-free and cruise channels.  (*Id.* at 10-11.)

The recent rise of smart devices put pressure on the traditional watch industry.  (*Id.* at 11.)  To diversify and meet changes in consumer behavior, management acquired WITHit, which specializes in reading accessories and smartwatch and wearable-tech accessories.  (*Id.*)  The Debtor intended to use WITHit to extend its reach into faster-growing product categories and hedge against the long-term decline of conventional watch demand due to the increased market share of smart devices.  (*Id.*)

However, the acquisition of WITHit did not bring about the changes expected.  The Debtor anticipated that smartwatch accessories, and the broader category of wearables, would offset the gradual decline in traditional watch demand, but the market proved more competitive and difficult to scale than the Debtor projected.  (*Id.*)  Integration challenges, overlapping costs and slower-than-expected consumer adoption all contributed to results that fell short of projections and WITHit's legacy business's sales even trended downward from pre-merger periods.  (*Id.*)

In addition, lingering impacts from the COVID-19 pandemic disrupted supply chains, tightened retail ordering, and shifted consumer demand patters.  (*Id.*)  Tariffs and increased freight costs further eroded the Debtor's margins.  (*Id.*)  Retail partners became more aggressive in managing their inventories and relied on suppliers to absorb costs and risks.  (*Id.*)  Additionally, the traditional watch category faced further headwinds due to the continued growth of the market share of smart devices.  (*Id.*)  The cumulative effect resulted in the Debtor bearing the burden of fixed costs and new obligations stemming from the WITHit acquisition that were not offset by projected increases in revenue.  (*Id.*)  Simultaneously, the Debtor's core revenue and profitability faced pressure from macroeconomic shocks and long-term shifts in the consumer marketplace.  (*Id.*)

### B. Bankruptcy Proceedings

The Debtor filed a Voluntary Petition for Chapter 11 relief on December 1, 2025 (the "Voluntary Petition," ECF Doc. # 1).  The Court held a hearing on December 2, 2025 on the First Day Motions.  After the hearing, the Court granted interim orders authorizing the following Motions:

- *Motion of the Debtor for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing (I) Use of Existing Business Forms and Records; (II) Limited Maintenance of Existing Corporate Bank Accounts; and (III) Maintenance of Cash Management System* (the "Cash Management Motion," ECF Doc. # 3);

- *Motion of the Debtor for an Order Authorizing Payment of Pre-Petition Accrued Employee Wages, Salaries, Expenses and Related Taxes and Payment of Employee Benefits* (the "Wages Motion," ECF Doc. # 4);

- *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363(b) and 507(A)(8) of the Bankruptcy Code Authorizing Payment of Certain Pre-Petition Sales, Use and Trust Fund Taxes and Related Obligations* (the "Taxes Motion," ECF Doc. # 5);

- *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363, and 503(b)(1) of the Bankruptcy Code Authorizing the Debtor to Honor Certain Pre-Petition Policies and Obligations to Customers* (the "Customer Programs Motion," ECF Doc. # 6); and

- *Motion for an Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, and (B) Grant Senior Secured Priming Liens and Superpriority Administrative Expense Claims; (II) Granting Adequate Protection; (III)Modifying the Automatic Stay; (IV) Authorizing the Use of Cash Collateral; (V) Scheduling Final Hearing; and (VI) Granting Related Relief.* (the "DIP Motion," ECF Doc. # 7.)

Final orders authorizing the Cash Management Motion, Wages Motion, Taxes Motion, and Customer Program Motion were signed after a hearing held on December 22, 2025.  (ECF Docs. ## 40-43.)  The Second Interim Order extending DIP Financing (ECF Doc. # 38) was also entered on December 22, 2025.  The Official Committee of Unsecured Creditors was appointed December 23, 2025.  (*See* Notice Appointing Creditors Committee, ECF Doc. # 44.)  The Final Order authorizing DIP Financing (ECF Doc. # 64) was entered January 15, 2026.

### C.  The Legacy Sale

After conducting an extensive marketing process, the Debtor secured the stalking horse bid of E. Gluck Holdings, LLC for the non-WITHit assets.  (Plan at 13.)  The Buyer is an industry leader in the licensed apparel and consumer goods business and offered reasonable assurance of future performance to the Debtor's licensors and a fair and reasonable offer memorialized in the Sale Agreement.  (*Id.* at 14.)  On February 4, 2026, the Court entered an *Order (A) Approving the Sale of Substantially All of the Debtor's Non-WITHit Assets, Free and Clear of All Liens, Claims and Encumbrances, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (ECF Doc. # 90).

The Legacy Sale satisfied the Debtor's DIP Loan, but for certain amounts by which the estate was over formula as to its Approved Budget.  (Plan at 14.)  However, when combined with the WITHit Sale, discussed below, the Debtor was able to satisfy the DIP Loan in full at closing on the Legacy Sale and secure releases of all liens from the DIP Lender.  (*Id.*)  As the DIP Lender was the only party with a lien on substantially all of the Debtor's assets, satisfaction of the DIP Facility poised the Debtor to propose this Plan and Disclosure Statement for the benefit of creditors and its estate.  (*Id.*)  In connection with the mechanics of the sale closings, approximately $800,000 of proceeds is currently being held in a temporary escrow.  (*Id.*)

### D.  The WITHit Sale

Though the Legacy Sale was proposed contemporaneously with the Petition Date, the Debtor subsequently sought entry of an Order approving a private sale of the Debtor's fifty-one percent membership interest in WITHit Holdings, LLC (the "WITHit Interest") to WITHit's founding members (the "Founders") who, collectively, owned the remaining forty-nine percent.

(*Id.* at 14.)  Under the LLC Agreement, the WITHit Interest was not transferable to a competitor; the options were to sell the WITHit Interests to the Founders or to force a liquidation.  (*Id.*)  On February 4, 2026, the Court entered an *Order Pursuant to 11 U.S.C. 363(b), (f), and (m) and Fed. R. Bankr. P. 2002 and 6004, (I) Authorizing Sale of Membership Units in WITHit Holdings, LLC to Buyer, (II) Authorizing the Debtor to Close on the Sale to Buyer Pursuant to the Terms of the Sale Agreement; and (III) Granting Related Relief* (ECF Doc. # 91).  The WITHit Sale yielded a purchase price of approximately $3.6 million, subject to certain adjustments, and after satisfaction of the DIP Facility, more than three-quarters of this amount remained in the estate to fund the final stages of administration of the Chapter 11 case and provide for recoveries under the Plan and Disclosure Statement.  (*Id.* at 15.)

### E.  Remaining Assets

Post the Legacy Sale and WITHit Sale, the Debtor's estimated book balance of Other Current Assets is approximately $2.675 million. These assets consist of investments in Hedgehog and amount owed by BT Supplies West, Inc.  (*See* Plan at 15-16; Liquidation Analysis.)

### F.  Overview of the Plan

#### 1.  Generally

The Plan, which contemplates the ultimate dissolution of the Debtor, classifies holders of claims and interests into 4 classes.  (Plan at 18.)  Only Class 3 (General Unsecured Claims) and Class 4 (Equity Interests) are impaired.  (*Id.*)  Because holders of Class 4 Equity Interests will not receive or retain any property under the Plan on account of those Equity Interests, the holders of Class 4 Equity Interests are deemed to reject the Plan and will not receive ballots.  (*Id.*) Holders of Claims in Class 3 are entitled to vote on this Plan.  (*Id.*)

2. Proposed Classification of Claims and Interests

The Plan proposes to classify claims and interests in the following manner:

| Class | Estimated Allowed Claims | Treatment | Estimated Recovery to Holders of Allowed Claims |
|---|---|---|---|
| Class 1 –Secured Claims | $0 | Unimpaired - not entitled to vote – deemed to accept | Obligation unaltered by the Plan except on consent. |
| Class 2 – Priority Claims | $0 | Unimpaired – not entitled to vote – deemed to accept | 100% |
| Class 3 – General Unsecured Claims | $14,000,000 | Impaired – entitled to vote | Estimated to be 10-20% |
| Class 4 – Equity Interests | N/A | Impaired – deemed to reject – not entitled to vote | None |

(*Id.* at 19.)  The Plan also details the treatment of U.S. trustee fees, administrative expenses and other unclassified claims, including claims for professional fees and priority tax claims.  (*Id.* at 19–20.).

3. Means for Implementation

a. *Post-Effective Date Dissolution*

From and after the Effective Date, the Debtor for all purposes shall be deemed to have dissolved and withdrawn its business operations from any state or country in which it was previously conducting, or is registered or licensed to conduct, its business operations.  (*Id.* at 21.) Additionally, the Debtor shall be deemed to have cancelled all Equity Interests and the Board of Directors shall be disbanded.  (*Id.*)  The Plan provides that entry of the Confirmation Order shall constitute authorization for the Debtor to engage in wind-down actions.  (*Id.*)

7

### b. Liquidation Trust

Upon the Effective Date, the Liquidation Trust shall be formed to dispose of substantially all of the assets of the Debtor and distribute the net proceeds thereof to holders of Allowed Claims and shall be entitled to pursue litigation, waive, settle and compromise all causes of action, and to collect any other amounts owed to or collectible by the Debtor's estate to maximize recoveries to creditors. (*Id.* at 22.) The Plan additionally outlines the Liquidation Trustee's authority and scope of duties including preservation of Causes of Action (*Id.* at 22-26.)

### c. Title to Assets

On the Effective Date, all assets of the Debtor will be transferred to the Liquidation Trust. (*Id* at 22.) Thereafter, the Debtor will have no assets of any kind. (*Id.*) All assets transferred to the Liquidation Trust shall be transferred free and clear of all liens, claims and encumbrances of creditors and holders of equity interests. (*Id.*)

### d. Other Provisions

The Plan includes procedures for unclaimed distributions, which will revert to the Liquidation Trust if not claimed within three months. (*Id.* at 27.) The Plan provides a minimum distribution amount of $100. (*Id.*) Remaining cash following final distribution will be donated to one or more charitable organizations of the Liquidating Trustee's choice. (*Id.*)

### 4. Best Interests Test and Liquidation Analysis

The Debtor includes the Liquidation Analysis as support for the assertion that the best interests test is satisfied. (*Id.* at 28; Liquidation Analysis.) The Debtor states that distributions under Chapter 7 liquidation would be lower than under the Plan because conversion would require the appointment of a Chapter 7 trustee and new professionals, which would come with a learning curve that would increase costs. (Plan at 28.) Additionally, a Chapter 7 trustee would

8

be entitled to statutory fees relating to distributions of the already monetized assets made to creditors.  (*Id.*)

## II. <u>ADEQUACY OF THE DISCLOSURE STATEMENT</u>

### A.  Legal Standard

Section 1125 of the Bankruptcy Code provides that a proponent of a proposed Chapter 11 plan must provide "adequate information" regarding the plan to holders of impaired claims and interests entitled to vote.  11 U.S.C. § 1125.  Specifically, section 1125(a)(1) of the Bankruptcy Code states, in relevant part, that:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1).  Accordingly, a disclosure statement must, as a whole, provide information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders, if applicable, to vote on a plan.  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995) (stating that the adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties) (internal citation omitted).

Generally, "adequate information" is a flexible standard, based on the facts and circumstances of each case.  *See e.g., Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988)

(indicating that the legislative history to section 1125(a) makes clear that "what constitutes adequate information in any particular instance will develop on a case-by-case basis") (quoting H.R. REP. NO. 595, at 408–09 (1977)); *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) (noting that the adequacy of a disclosure statement is to be "determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties."). Moreover, determination of what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code falls within the broad discretion of a court. *See In re WorldCom, Inc.,* No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. Jun. 30, 2003) (stating that "[t]he determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court.") (quoting *Ionosphere Clubs*, 179 B.R. at 29); *Kirk*, 82 B.R. at 682 (stating that "[t]he legislative history could hardly be more clear in granting broad discretion to bankruptcy judges under § 1125(a)").

Accordingly, in determining whether a disclosure statement contains adequate information, courts look to whether a disclosure statement contains disclosures with respect to the following:

- the events and circumstances that gave rise to the filing of the bankruptcy petition;
- a complete description of the available assets and their value;
- the anticipated future of the debtor;
- the source of the information provided in the disclosure statement;
- a disclaimer, which typically indicates that no statements or information concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;
- the financial condition and performance of the debtor while in chapter 11;
- information regarding claims against the debtor's estate;
- a liquidation analysis identifying the estimated return that creditors would receive if the debtor's bankruptcy case were a case under chapter 7 of the Bankruptcy Code;

10

- the accounting and valuation methods used to produce the financial information in the disclosure statement;

- information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors or officers of the debtor;

- a summary of the plan of reorganization;

- an estimate of all administrative expenses, including attorneys' fees and accountants' fees;

- the collectability of any accounts receivable;

- any financial information, valuations or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan of reorganization;

- information relevant to the risks being taken by the creditors and interest holders;

- the actual or projected value that could be obtained from avoidable transfers;

- the existence, likelihood and possible success of nonbankruptcy litigation;

- the tax consequences of the plan of reorganization; and

- the relationship of the debtor with its affiliates.

*See, e.g., In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988)

(specifying the factors courts have considered in determining the adequacy of information

provided in a disclosure statement); *In re Metrocraft Pub. Serv., Inc.* 39 B.R. 567, 568 (Bankr.

N.D. Ga. 1984) (same); *see also Copy Crafters Quickprint*, 92 B.R. at 980 (evaluating the

adequacy of a disclosure statement in light of the factors articulated in *Scioto Valley Mortgage*).

Matters to be addressed at a hearing on the adequacy of a disclosure statement should be

limited to disclosure issues. Accordingly, any issues raised that are functionally premature plan

objections are more appropriately evaluated at a hearing on confirmation. *See, e.g.*, 7 COLLIER

ON BANKRUPTCY ¶ 1125.03 (16th ed. 2023) ("At disclosure statement hearings, courts should

refuse to hear issues that are confirmation rather than disclosure issues, such as classification of

claims, feasibility . . . or whether a plan is fair and equitable."); *In re Foxwood Hills Prop.*

*Owners Ass'n, Inc.*, No. CV 20-02092-HB, 2021 WL 3059716, at *5 (Bankr. D.S.C. June 1,

2021) (same). Indeed, disputed issues related to confirmation are not relevant to assessing

whether a disclosure statement contains "adequate information." *See, e.g., In re Quigley Co., Inc.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (approving the disclosure statement while acknowledging that settlements with the debtors' non-debtor former parent "implicate several confirmation issues"); *In re Hyatt*, 509 B.R. 707, 711 (Bankr. D.N.M. 2014) (approving the disclosure statement because questions about the debtor's proposed classification scheme "require[d] additional evidence that may be presented at a confirmation hearing" and, therefore, the "proposed classification scheme does not render the [p]lan patently unconfirmable as a matter of law").

The only time a court may entertain plan objections at a disclosure statement hearing is when any subsequent solicitation would be futile because the proposed plan is "patently unconfirmable." *See In re Quigley Co., Inc.*, 377 B.R. at 119 ("For present purposes, the application to approve the disclosure statement is granted since it contains 'adequate information,' and does not describe a plan that is unconfirmable as a matter of law.").

**B. Discussion – Confirmation of the Plan**

The Disclosure Statement, which was filed in conjunction with the Plan, is comprehensive and informative and contains information necessary for impaired creditors to make an "informed judgment" about the Plan. *See* 11 U.S.C. § 1125 (requiring a chapter 11 plan proponent to provide "adequate information" regarding a plan to holders of impaired claims and interests entitled to vote). As set forth therein, only Class 3 (General Unsecured Claims) and Class 4 (Equity Interests) are impaired. (*Id.* at 18.) Because holders of Class 4 Equity Interests will not receive or retain any property under the Plan on account of those Equity Interests, the holders of Class 4 Equity Interests are deemed to reject the Plan and will not receive ballots. (*Id.*) Holders of Claims in Class 3 are entitled to vote on this Plan. (*Id.*) Critical to this chapter 11 case is whether each class of impaired claim holders can make an informed decision

12

regarding whether to vote in favor or against the Plan.  *See Kirk*, 82 B.R. at 682 (indicating that "adequate information" is to be determined on a case-by-case basis).  As such, this discussion will focus on holders of Class 3 claims.

The Disclosure Statement includes, among other things, an overview of the Debtor's operations and capital structure, key events leading up to and during the commencement of the Debtor's chapter 11 case, a summary of the Plan and the proposed liquidation process, as well as a discussion of a best interests test and a chapter 7 liquidation analysis.  (*See generally* Plan.)  In addition, the Disclosure Statement also contains a discussion of certain risk factors, stating what alternatives exist if the Plan is not confirmed.  (*Id.* at 28 ("If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan.  However, the additional costs, including, among other things, additional professional fees or asserted substantial contribution Claims, which could constitute administrative Claims against the estate, may be so significant that one or more parties could request that the Chapter 11 case be converted to one under Chapter 7."))

The Debtor provides a fulsome liquidation analysis that supports that the "Plan contemplates a greater recovery than is likely to be achieved if the Debtor is liquidated under Chapter 7 of the Bankruptcy Code."  (*Id.* at 3; Liquidation Analysis)  The Debtor states that distributions under Chapter 7 liquidation would be lower than under the Plan because conversion would require the appointment of a Chapter 7 trustee and new professions, which would come with a learning curve that would increase costs.  (*Id.* at 28.)  Additionally, a Chapter 7 trustee would be entitled to statutory fees relating to distributions of the already monetized assets made to creditors.  (*Id.*)

The Disclosure Statement lacks financial projections, making it harder to determine whether the Plan is feasible.  The Disclosure Statement does state, however, that "confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization." (*Id.* at 28.)  Additionally, the Disclosure Statement further states:

> Based on the Debtor's analysis and their existing cash on hand, the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Plan and Disclosure Statement. The Plan provides for the liquidation or distribution of all of the Debtor's Assets. Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor and the liquidation pursuant to the Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code. Because distributions will be made initially only to the extent of existing assets, the Debtor believes the Plan is feasible.

(*Id.*)

Accordingly, the Court **APPROVES** the Disclosure Statement.

### III.    DISCUSSION – CONFIRMATION OF THE PLAN

To obtain confirmation of a plan of reorganization, a plan proponent must establish by a preponderance of the evidence that the plan has satisfied the requirements set forth under section 1129 of the Bankruptcy Code.  *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns, Inc.)*, 419 B.R. 221, 244 (Bankr. S.D.N.Y. 2009) (finding that the plan proponent bears the burden of establishing compliance with the factors set forth in section 1129 by a preponderance of the evidence); *see also In re Young Broad. Inc.*, 430 B.R. 99, 128 (Bankr. S.D.N.Y. 2010) (same).

#### A.  Section 1129(a)(1)

Section 1129(a)(1) requires that the Plan comply with applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The Plan, therefore, must satisfy sections 1122 and 1123 of the Bankruptcy Code.  *In re Texaco Inc.*, 84 B.R. 893, 905 (Bankr. S.D.N.Y. 1988) ("In

14

determining whether a plan complies with section 1129(a)(1), reference must be made to Code §§ 1122 and 1123 with respect to the classification of claims and the contents of a plan of reorganization.").

1. Section 1122: Meets Requirements

Section 1122 governs the classification of claims in plans. Section 1122 states:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Claims or interests may only be placed in a particular class if such claims or interests are "substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). "A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a reasonable basis for the classification scheme and if all claims within a particular class are substantially similar." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *see also Aetna Cas. & Sur. Co. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason.").

The Plan provides for four classes of claims. (*Id.* at 19.) Clams and interests are separated into secured claims, priority claims, general unsecured claims, and equity interests. (*Id.*) The classification scheme is reasonable and does not appear to have been created for any

15

improper purpose nor unfairly discriminate among holders of claims and interests.  Accordingly,

the Plan **MEETS** the requirements of section 1122.

    2.  <u>Section 1123(a): Meets Requirements</u>

A plan must fulfill the following eight requirements to satisfy section 1123(a):

    (1)    designate classes of claims and interests, other than claims of a kind specified in section 507(a)(2) (administrative expense claims), 507(a)(3) (involuntary gap claims), or 507(a)(8) (unsecured tax and custom duties claims);

    (2)    specify unimpaired classes of claims and interests;

    (3)    specify treatment of impaired classes of claims and interests;

    (4)    provide for equality of treatment within each class (unless the holder of a claim or interest agrees to less favorable treatment);

    (5)    provide adequate means for the plan's implementation;

    (6)    if the debtor is a corporation, provide for the inclusion in the charter of the debtor a prohibition on the issuance of non-voting equity securities, and provide an appropriate distribution of voting power among the classes of securities;

    (7)    contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors; and

    (8)    in a case in which the debtor is an individual, provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan.

As required by sections 1123(a)(1)–(3), the Plan designates the classes of claims and

interests, specifies whether each is impaired as well as the treatment within each class.

Accordingly, subsections (1)–(3) are satisfied.

Unless holders of claims agree to otherwise, the Plan provides for identical treatment for

all claims within each class.  Accordingly, section 1123(a)(4) is satisfied.

With respect to section 1123(a)(5), the Plan provides for mechanisms for its implementation, including the establishment of a Liquidation Trust.  The Liquidation Trust shall be formed to dispose of substantially all of the assets of the Debtor and to distribute the net proceeds thereof to holders of Allowed Claims and shall be entitled to pursue litigation, waive, settle and compromise all causes of action, and to collect any other amounts owed to or collectible by the Debtor's estate to maximize recoveries to creditors.  (*Id.* at 22.)

Section 1123(a)(6) is not applicable, as the Plan does not contemplate the issuance of new membership or equity interests in the Debtor.

Section 1123(a)(7) is also not appliable, as the Plan provides that the Board of Directors shall be disbanded.  (*Id.* at 21.)

Finally, Section 1123(a)(8) does not apply as the Debtor is not an individual.

Accordingly, the Plan **MEETS** the requirements of section 1123(a).

3.  Section 1123(b): Meets Requirements

Section 1123(b) of the Bankruptcy Code sets forth provisions that may be incorporated into a chapter 11 plan subject to the requirements of section 1123(a).  Each of the relevant non-mandatory provisions of the Plan is consistent with section 1123(b) of the Bankruptcy Code.  The Plan **MEETS** the relevant provisions of section 1123(b).

a.  *Section 1123(b)(1)*

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C. § 1123(b)(1).  The Plan provides that Class 3 and Class 4 of Creditors are impaired.  (*Id.* at 19.)

17

b. *Section 1123(b)(2)*

Section 1123(b)(2) provides that, "subject to section 365 . . . [a plan may] provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section." Article F of Section VI of the Plan provides for the rejection of executory contracts and unexpired leases the Debtors are party to unless previously assumed or otherwise provided for in the Plan. (*Id.* at 29.)

c. *Section 1123(b)(3)*

Section 1123(b)(3) permits a plan to provide for "(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest." 11 U.S.C. § 1123(b)(3). The Plan provides that the Litigation Trustee shall be entitled to pursue litigation, waive, settle and compromise all causes of action, and to collect any other amounts owed to or collectible by the Debtor's estate to maximize recoveries to creditors. (*Id.* at 22.) The Plan additionally outlines the Liquidation Trustee's authority and scope of duties including preservation of Causes of Action (*Id.* at 22-26.)

**B. Section 1129(a)(2)**

Under section 1129(a)(2), the plan proponent must comply "with the applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). Courts have interpreted the section 1129(a)(2) requirement to include satisfaction of the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. *In re WorldCom, Inc.*, No. 02-13533(AJG), 2003 WL 23861928, at **25–26 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986).

1. Section 1125: To Be Determined

Section 1125 of the Bankruptcy Code provides:

> (b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.
>
> (c) The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

The Debtor seeks approval of the Disclosure Statement as part of the Combined Plan. Accordingly, satisfaction of section 1125 is **TO BE DETERMINED** subject to the Court's approval of the Disclosure Statement as containing adequate information.

2. <u>Section 1126: To Be Determined</u>

Section 1126 indicates that a holder of a claim or interest may accept or reject a plan, outlines the classes entitled to vote on proposed plans, and describes how it is determined whether a class of claims or interests either accepts or rejects a plan. "A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan." 11 U.S.C. § 1126(c). "Only creditors that actually voted count in determining whether the requisite majorities in number and amount are met." 7 COLLIER ON BANKRUPTCY ¶ 1126.04. "[A] class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation . . . is not required." 11 U.S.C. § 1126(f).

Under the Plan, Class 3 (General Unsecured Claims) and Class 4 (Equity Interests) are impaired. (*Id.* at 18.) Because holders of Class 4 Equity Interests will not receive or retain any

19

property under the Plan on account of those Equity Interests, the holders of Class 4 Equity

Interests are deemed to reject the Plan and Disclosure Statement and will not receive ballots.

(*Id.*)  Holders of Claims in Class 3 are entitled to vote on this Plan and Disclosure Statement.

(*Id.*)  However, voting has not yet occurred.  As such, whether the Plan meets the requirements

of section 1126(c) is **TO BE DETERMINED**.

### C.  Section 1129(a)(3): Meets Requirements

Section 1129(a)(3) requires the plan to be "proposed in good faith and not by any means

forbidden by law."  11 U.S.C. § 1129(a)(3).  This means that the plan must have been "proposed

with honesty and good intentions and with a basis for expecting that a reorganization can be

effected."  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).  Courts have held

that a plan is considered proposed in good faith "if there is a likelihood that the plan will achieve

a result consistent with the standards prescribed under the [Bankruptcy] Code."  *In re The Leslie*

*Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (quoting *In re Texaco Inc.*, 84 B.R. 893,

907 (Bankr. S.D.N.Y. 1988)).  "The requirement of good faith must be viewed in light of the

totality of the circumstances surrounding the establishment of a chapter 11 plan."  *Leslie Fay*,

207 B.R. at 781 (citations omitted); *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL

694421, at *9 (S.D.N.Y. Dec. 4, 1996) ("failure to propose a plan in good faith occurs when the

Plan is not proposed with honesty, good intentions, and to effectuate the reorganization of the

enterprise, but rather for some other motive") (citing *Kane*, 843 F.2d at 649).

The Plan appears to have been proposed in good faith, which is defined to be with

"honesty and good intentions and with a basis for expecting that a reorganization can be

effected."  *Johns-Manville*, 843 F.2d at 649.  The Debtors state they have proposed the Plan in

good faith. (*Id.* at 5.) There is nothing to suggest otherwise, and no one has objected to the Plan on this basis.

Accordingly, the Plan **MEETS** the requirements of section 1129(a)(3).

### D. Section 1129(a)(4): Meets Requirements

Section 1129(a)(4) mandates that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

This requires a plan to provide for the disclosure and Court approval of payment of any fees promised or received in connection with the chapter 11 case. *See* 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4].

The Plan provides that:

> All final applications for payment of Professional Fee Claims for the period through and including the Effective Date shall be filed with the Bankruptcy Court on or before the Professional Fee Bar Date, and served on the parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders issued by the Bankruptcy Court. It is estimated that Professional Fee Claims will, collectively, total approximately $675,000, for services rendered to the estate. That estimate is net of all pre-petition retainers and amounts funded pursuant to the funded professional fee carve-out in connection with the DIP Loan.

(*Id.* at 20.) In other words, professional fees and expenses may only be paid after application to and approval by the Court. Accordingly, the Plan **MEETS** the requirements of section 1129(a)(4).

### E. Section 1129(a)(5): Inapplicable

Section 1129(a)(5) requires that:

21

(A)

> (i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

> (ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

11 U.S.C. § 1129(a)(5). Few cases discuss what it means for an appointment to be "consistent with public policy." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[5][b]. To fail this requirement, either bad faith or incompetence of current management must be demonstrated. *See In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 150 (Bankr. S.D.N.Y. 1984).

The Plan provides that the Board of Directors shall be disbanded. (*Id.* at 21.) As such, section 1129(a)(5) is **INAPPLICABLE**.

### F.  Section 1129(a)(6): Inapplicable

Under section 1129(a)(6), if the plan provides for changes in rates controlled by governmental agencies, the rate change must have been pre-approved by the relevant agency. 7 COLLIER ON BANKRUPTCY ¶ 1129.03[6]. This requirement applies to debtors who are "utilities or other entities whose ability to price their products or services are subject to regulation by governmental agencies." *Id*.

As this does not apply to the Debtor, Section 1129(a)(6) is **INAPPLICABLE**.

22

### G. Section 1129(a)(7): Meets Requirements

Section 1129(a)(7)—the so-called "best-interests" requirement—mandates that each creditor or interest holder impaired under a plan must either have (i) accepted the plan, or (ii) would receive at least as much under the plan as it would under a chapter 7 liquidation.  11 U.S.C. § 1129(a)(7); 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7].  To satisfy this second prong, parties will often submit estimates regarding the liquidation value of the company.  These valuations are estimates, "designed to reach a calculated decision on the basis of the hypotheses and assumptions in light of a set of facts."  *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990).

> Section 1129(a)(7) operates on the individual creditor or interest holder level. . . .  With respect to *each member*, section 1129(a)(7)(A) requires that the member either accept the plan, or will "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date."

7 COLLIER ON BANKRUPTCY ¶ 1129.02[7][b] (emphasis added).

The Debtor includes the Liquidation Analysis as support for the assertion that the best interests test is satisfied.  (*Id.* at 28; Liquidation Analysis)  The Debtor states that distributions under Chapter 7 liquidation would be lower than under the Plan because conversion would require the appointment of a Chapter 7 trustee and new professions, which would come with a learning curve that would increase costs.  (Plan at 28.)  Additionally, a Chapter 7 trustee would be entitled to statutory fees relating to distributions of the already monetized assets made to creditors.  (*Id.*) Accordingly, the Plan **MEETS** the requirements of section 1129(a)(7).

**H. Section 1129(a)(8): To Be Determined**

Pursuant to section 1129(a)(8), a plan may be confirmed where, with respect to each class, either (i) such class has accepted the plan; or (ii) such class is not impaired under the plan. 11 U.S.C. § 1129(a)(8).  A class of claims is considered to have accepted a plan when at least two-thirds in amount (i.e., dollar value) and more than one-half in number of allowed claims of such class accept the plan, measured out of the claims that are actually voted.  11 U.S.C. § 1126(c).  For a class of "interests" (i.e., equity), acceptance by two-thirds in amount of allowed interests is required.  11 U.S.C. § 1126(d).

If section 1129(a)(8) is not met, and if a plan otherwise satisfies section 1129(a) (including the requirement that at least one impaired class of creditors has accepted the plan under section 1129(a)(10)), the plan may still be confirmed provided section 1129(b) is met.  7 COLLIER ON BANKRUPTCY ¶ 1129.03[8].

As discussed above, voting has not yet occurred. Accordingly, whether the Plan meets the requirements of section 1129(a)(8) is **TO BE DETERMINED**.

**I. Section 1129(a)(9): Meets Requirements**

Section 1129(a)(9) requires that, except to the extent that the holder of a particular claim agrees to a different treatment of such claim, the plan provide that:

> (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive . . . cash equal to the allowed amount of such claim;

> (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of [the Bankruptcy Code], each holder . . . will receive—

>> (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

24

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive . . . regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief . . . and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan . . .

As discussed below, the Plan **MEETS** the requirements of section 1129(a)(9).

1.   Section 1129(a)(9)(A): Meets Requirements

Section 1129(a)(9)(A) requires that claims identified in section 507(a)(2) and (3) are paid in cash in full on the effective date of a plan, except to the extent that the claimholder has agreed to different treatment.  Section 507(a)(2) specifies administrative expenses allowed under section 503(b).  Section 507(a)(3) specifies unsecured claims in involuntary cases.

The treatment of Administrative Expense Claims is set forth in Section C of Section IV of the Plan.  (*Id.* at 19.)  The Plan provides that "each holder of an allowed Administrative Expense Claim shall receive cash in an amount equal to any unpaid portion of such Allowed Administrative Expense Claim within seven (7) business days after the later of (i) the Effective Date or (ii) the date that such Claim is allowed, unless the holder of that allowed Administrative Expense Claim and the estate agree to different treatment." (*Id.*)  As such, the Plan **MEETS** the requirements of section 1129(a)(9)(A).

2.  Section 1129(a)(9)(B): Meets Requirements

There are no classes of claims of a kind specified in section 507(a)(1) (domestic support obligations), 507(a)(4) (wages, salaries, and commissions), 507(a)(5) (employee benefit plans), 507(a)(6) (grain producers and United States fishermen), or 507(a)(7) (consumer deposits). Accordingly, the Plan **MEETS** the requirements of section 1129(a)(9)(B).

3.  Section 1129(a)(9)(C): Meets Requirements

Section 1129(a)(9)(C) requires that each holder of a section 507(a)(8) priority tax claim receive installment payments in cash over a period not longer than five years after the order for relief a value equal to the allowed amount of such claim as of the effective date of the plan.

The Plan states that:

> Each holder of an allowed Priority Tax Claim shall receive, in full satisfaction of such allowed Priority Tax Claim, (a) payment in cash equal to the unpaid portion of such allowed Priority Tax Claim (as determined in accordance with Section 1129(a)(9)(C)), within seven (7) business days after the later of (i) the Effective Date or (ii) the date that such Priority Tax Claim is allowed, (b) payment in cash equal to the unpaid portion of such allowed Priority Tax Claim in equal annual installments, with payment in full to be made within five (5) years of the Petition Date, or (c) in a lesser amount and upon a schedule agreed to by the Debtor or the estate, as applicable, and the holder of the allowed Priority Tax Claim.

(*Id.* at 20.)  Accordingly, the Plan **MEETS** the requirements of section 1129(a)(9)(C).

**J.  Section 1129(a)(10): To Be Determined**

Section 1129(a)(10) requires at least one class of impaired claims—if there are any impaired classes—to have accepted the Plan.  Here, Class 3, the only class entitled to vote on the Plan, has not yet voted.  Accordingly, it is **TO BE DETERMINED** whether the Plan meets the requirements of section 1129(a)(10).

26

### K. Section 1129(a)(11): Meets Requirements

Section 1129(a)(11) requires the Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  That requirement, commonly known as the "feasibility" standard, requires that "the Plan is workable and has a reasonable likelihood of success." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. at 762.  "It is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success." *Id.* (quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11], at 1129–54 (15th ed. 1991)); *see also In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994) ("[T]he plan proponent need only demonstrate that there exists the reasonable probability that the provisions of the Plan can be performed.") (internal quotation omitted).

"Liquidating plans provide somewhat different considerations" and "there is less emphasis on future performance." 7 COLLIER ON BANKRUPTCY ¶ 1129.02[11].  However, "[e]ven with such a reduced emphasis" the liquidation proposed in the plan must still be feasible. *Id.*

"A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012).  "The debtor must offer more than speculation about the source of funding for the plan." *Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1003 (E.D. Va. 1994).

27

Courts have identified a number of factors to examine to determine whether a proposed plan is feasible:

(1) the adequacy of the capital structure;

(2) the earning power of the business;

(3) the economic conditions;

(4) the ability of management;

(5) the probability of the continuation of the same management;

(6) the availability of prospective credit, both capital and trade;

(7) the adequacy of funds for equipment replacements;

(8) the provisions for adequate working capital; and

(9) any other matter bearing on the successful operation of the business to enable performance with the provisions of the plan.

The Plan provides that "confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization." (*Id.* at 28.) Additionally, the Debtor further states:

> Based on the Debtor's analysis and their existing cash on hand, the Liquidating Trust will have sufficient assets to accomplish their tasks and satisfy their obligations under the Plan and Disclosure Statement. The Plan provides for the liquidation or distribution of all of the Debtor's Assets. Accordingly, the Debtor believes that all Plan obligations will be satisfied without the need for further reorganization of the Debtor and the liquidation pursuant to the Plan and Disclosure Statement will meet the feasibility requirements of the Bankruptcy Code. Because distributions will be made initially only to the extent of existing assets, the Debtor believes the Plan is feasible.

(*Id.*) Accordingly, the Plan **MEETS** the requirements of section 1129(a)(11).

28

**L. Section 1129(a)(12): Meets Requirements**

Section 1129(a)(12) requires that fees payable under 28 U.S.C. § 1930, as determined by the court at a hearing on confirmation of a plan, have been paid or are provided under the plan to be paid on its effective date.

The Plan provides that all U.S. Trustee Fees of the Debtors payable pursuant to Section 1930 of title 28 of the United States Code shall be paid within seven days of the Effective Date. (*Id.* at 19.) The UST shall "shall not be required to file an Administrative Claim in these Chapter 11 Cases and shall not be deemed to provide any release under the Plan." (*Id.*)

Accordingly, the Plan **MEETS** the requirements of section 1129(a)(12).

**M. Section 1129(a)(13): Inapplicable**

To satisfy section 1129(a)(13), a plan must provide for continued payment of retiree benefits at either (1) the level originally provided by the debtor in possession without modification or (2) at the modified level established pursuant to the requirements of section 1114 by court order or agreement. 7 COLLIER ON BANKRUPTCY ¶ 1129.02[13]. Section 1129(a)(13) is **INAPPLICABLE** as the Debtors do not pay retiree benefits.

**N. Section 1129(a)(14): Inapplicable**

Section 1129(a)(14) applies to individual chapter 11 debtors who are required to pay a domestic support obligation. 7 COLLIER ON BANKRUPTCY ¶ 1129.02[14]. As the Debtors are not individuals, section 1129(a)(14) is **INAPPLICABLE**.

**O. Section 1129(a)(15): Inapplicable**

Section 1129(a)(15) applies only "in a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan." 11

29

U.S.C. § 1129(a)(15).  As the Debtors are not individuals, section 1129(a)(15) is

**INAPPLICABLE**.

### P.  Section 1129(a)(16): Inapplicable

Section 1129(a)(16) states that "all transfers of property under [a] plan shall be made in

accordance with any applicable provisions of non-bankruptcy law that govern the transfer of

property by a corporation or trust that is not a moneyed, business, or commercial corporation or

trust."  11 U.S.C. § 1129(a)(16).  "This provision limits the permissible transfers by any

nonprofit entity . . . ."  7 COLLIER ON BANKRUPTCY ¶ 1129.02.  As the Debtors are not nonprofit

entities, section 1129(a)(16) is **INAPPLICABLE**.

### Q.  Section 1129(b): Inapplicable

When at least one class of impaired creditors votes for confirmation of a plan, pursuant to

section 1129(b) the court may "cram down" a plan over the dissent of another impaired class.

Cramdown is permitted so long as, with respect to all impaired dissenting classes, a plan (i) does

not discriminate unfairly; and (ii) is fair and equitable.  "Unfair discrimination works only

among claimants of equal non-bankruptcy priority."  7 COLLIER ON BANKRUPTCY ¶

1129.03[3][b][ix].  In addition, "there can be 'discrimination,' so long as it is not 'unfair.'"  *Id.* ¶

1129.03[3].  Courts will consider a cramdown fair and equitable if the absolute priority rule is

followed.  That is, if no claim that is junior to the dissenting class benefits from the proposed

plan if the dissenting class is not paid in full.  *Id.* ¶ 1129.03[4][a][i].

Voting has not yet occurred.  As such, section 1129(b) is **INAPPLICABLE**.

**R.  Section 1129(c): Meets Requirements**

Section 1129(c) of the Bankruptcy Code provides that a court "may only confirm one plan." 11 U.S.C. § 1129(c).  The Plan is the only plan for the Court's consideration.  Accordingly, the Plan **MEETS** the requirements of section 1129(c).

**S.  Section 1129(d): Inapplicable**

Section 1129(d) provides that "on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 4 of the Securities Act of 1933."  Here, no such request was made from a governmental unit.  Accordingly, section 1129(d) is **INAPPLICABLE**.  Regardless, it does not appear the purpose of the Plan is the avoidance of taxes or the application of the securities laws.

## IV.    CONCLUSION

For the reasons detailed herein, the Court **APPROVES** the Disclosure Statement as containing adequate information.  Additionally, the Court **CONDITIONALLY APPROVES** the Plan subject to later voting.

**IT IS SO ORDERED.**

Dated:    May 20, 2026
         New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge

31