Alan D. Halperin, Esq.
Julie Dyas Goldberg, Esq.
**HALPERIN BATTAGLIA BENZIJA, LLP**
40 Wall Street, 37th Floor
New York, NY 10005
Telephone: (212) 765-9100
Facsimile: (212) 765-0964

*Counsel to the Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

**E. GLUCK CORPORATION,**

Debtor.

------------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (sab)

**SECOND INTERIM AND FINAL FEE APPLICATION OF HALPERIN BATTAGLIA BENZIJA, LLP AS COUNSEL TO THE DEBTOR FOR ALLOWANCE OF COMPENSATION FOR THE PERIOD APRIL 1, 2026 THROUGH AUGUST 28, 2026**

| | |
|---|---|
| Name of Applicant: | Halperin Battaglia Benzija, LLP ("HBB") |
| Authorized to Provide Professional Services to: | The debtor and debtor in possession ("Debtor") |
| Date of Retention: | January 27, 2026 *nunc pro tunc* to December 1, 2025 |
| Interim Period for which Compensation and Reimbursement is Sought: | April 1, 2026 through August 28, 2026 |
| Actual Amount of Compensation Sought as Actual, Reasonable and Necessary for Interim Period: | $322,342.00 |
| Amount of Expense Reimbursement for the Interim Period Sought as Actual, Reasonable and Necessary: | $3313.07 |
| Total Amount of Interim Fees and Expense Reimbursement Sought as Actual, Reasonable and Necessary: | $325,655.07 |

This is a(n) ___ monthly ______ interim _X_ final application
The total time expended for preparation of this fee application was approximately 15 hours.

## Fee Detail

| ACTIVITY | TIME SPENT | FEES INCURRED |
|---|---|---|
| Asset Sales | 60.6 | $43,111.50 |
| Case Administration | 43.0 | $29,562.00 |
| Claims Review & Analysis | 81.5 | $57,922.00 |
| Executory Contracts | 61.0 | $43,422.00 |
| Fee Application | 21.4 | $15,194.00 |
| Meetings and Hearings | 29.8 | $21,300.50 |
| Motions and Applications | 9.3 | $6,013.50 |
| Plan and Disclosure Statement | 160.7 | $105,816.50 |
| **TOTAL** | 467.3 | $322,342.00 |

## Time Entries by Professional

| Professional | Title | Number of Hours |
|---|---|---|
| Alan D. Halperin | Partner | 4.0 |
| Walter Benzija | Partner | 1.4 |
| Donna H. Lieberman | Of Counsel | 2.8 |
| Julie D. Goldberg | Of Counsel | 427.5 |
| Scott A. Ziluck | Of Counsel | 0.2 |
| Andrew P. Digiorgio | Associate | 28.3 |
| Monique Minto-Gonzalez | Paralegal | 1.5 |
| Courtney A. Mainer | Paralegal | 1.6 |
| | **TOTAL** | **467.3** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

**E. GLUCK CORPORATION,**

Debtor.
-----------------------------------------------------------x

Chapter 11 Case
Case No. 25-12683 (sab)

**SECOND INTERIM AND FINAL APPLICATION OF HALPERIN BATTAGLIA BENZIJA, LLP FOR ALLOWANCE OF COMPENSATION AND FOR REIMBURSEMENT OF EXPENSES FOR SERVICES RENDERED IN THIS CASE**

TO THE HONORABLE MARTIN GLENN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

Halperin Battaglia Benzija, LLP ("HBB" or "Applicant"), bankruptcy counsel to E. Gluck Corporation (the "Debtor"), as and for its second interim and final application, pursuant to pursuant to sections 330 and 331 of title 11 of the United States Code, as amended (the "Bankruptcy Code"), for an allowance of compensation for services rendered and for reimbursement of expenses incurred in this case, respectfully represents:

**INTRODUCTION**

1. By this application, Applicant seeks a second interim allowance of compensation for professional services rendered as bankruptcy counsel to the Debtor in the amount of $322,342 based upon 467.3 hours in professional services rendered during the period April 1, 2026 through and including August 28, 2026 (the "Compensation Period"), which was the Effective Date of the Debtor's Combined Joint Plan and Disclosure Statement (the "Plan"), plus reimbursement of actual and necessary expenses incurred by Applicant during the Compensation Period in the amount of $3313.07. Applicant's first interim application for compensation, covering the period December 1, 2025 (the "Petition Date") through March 31,

2026 (the "First Interim Period") was granted by Order of the Court dated May 4, 2026, Docket No. 139 (the "First Interim Order").

2. By this application, Applicant also seeks final approval of all fees and expenses incurred in this Chapter 11 case, as well as release of the twenty percent (20%) voluntary holdback on fees incurred during the First Interim Period, in the amount of $106,919.60. Prior to the commencement of the Chapter 11 case, Applicant received a pre-petition retainer, of which $248,037.59 remained as of the Petition Date. A portion of the pre-petition retainer was applied to the fees and expenses accrued in the First Interim Period and retainer funds of $115,583.69 remain as of the date of this Application.

**JURISDICTION**

3. This Court has jurisdiction over this case and this application pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.). Venue of this case and this application is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 330 and 331, and Federal Rules of Bankruptcy Procedure 2002(a) and 2016.

**BACKROUND**

4. On December 1, 2025 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. On December 23, 2025, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").

6. On December 15, 2025, the Debtor filed its bankruptcy schedules, as may be amended from time to time, and statement of financial affairs (the "Schedules") [Docket Nos. 28 & 29].

7. As of the Petition date, E. Gluck has been in the watch business for more than six decades, operating as a designer, importer and distributor of certain proprietary and licensed brands. Its proprietary anchor was Armitron, a longstanding name in the U.S. watch market, complemented by licensed fashion brands such as Anne Klein, Nine West, and others. At its peak, the company generated hundreds of millions of dollars in revenue by supplying a wide spectrum of U.S. retail partners, including mass merchants, department stores, mid-tier chains, off-price retailers and club stores. Beyond the domestic market, E. Gluck also built international distribution through third-party distributors and maintained a meaningful presence in travel retail, including duty-free and cruise channels.

8. In recent years, management recognized that traditional watches were a mature, slow-growth category, increasingly pressured by shifts in consumer behavior and the rise of smart devices. To diversify and with the goal of positioning the company for future growth, E. Gluck acquired WITHit, a company specializing in reading accessories and smartwatch and wearable-tech accessories. The strategic goal was for WITHit to extend E. Gluck's reach into faster-growing product categories, leverage E. Gluck's retail distribution muscle and create a hedge against the long-term decline of conventional watch demand due to, among other reasons, the advent and increased market share of smart devices. Unfortunately, the acquisition of WITHit did not deliver the benefits that management anticipated.

9. E. Gluck sought relief under Chapter 11 to reset its cost structure, shed unproductive obligations, and position its long-standing business for long-term stability.

Additional information regarding E. Gluck's business, capital structure and the circumstances leading to this chapter 11 case is contained in the Declaration of Adam Gelnick Pursuant to Local Bankruptcy Rule 1007-2 (the "Gelnick Declaration") [Docket No. 2].

10. As part of its restructuring strategy, on the Petition Date, the Debtor filed its *Motion to Sell Substantially All of Its Non-WITHit Assets* (the "Legacy Sale Motion") [Docket No. 8]. The Order granting the Legacy Sale Motion was entered on February 4, 2026 [Docket No. 90] and the sale (the "Legacy Sale") went effective on February 13, 2026 (the "Legacy Effective Date").

11. On January 21, 2026, the Debtor filed its *Motion to Sell the Membership Interests of WITHit Holdings, LLC* (the "WITHit Sale Motion") [Docket No. 71]. The Order granting the WITHit Sale Motion was entered on February 4, 2026 [Docket No. 91] and the sale (the "WITHit Sale" together with the Legacy Sale, the "Sales") went effective on February 11, 2026 (the "WITHit Effective Date"). The sales effectuated by these two motions accomplished the liquidation of substantially all of the Debtor's assets.

12. On January 29, 2026, the Debtor filed its *Ex Parte Application to Establish the Deadline for Filing Certain proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "Bar Date Motion") [Docket No. 84]. The Court granted the Bar Date Motion by Order dated February 4, 2026 [Docket No. 89] and set the last date for filing proofs of claim on account of pre-petition debts as March 30, 2026 for general claimants (the "General Bar Date") and May 30, 2026 for governmental agencies (the "Governmental Bar Date").

13. On April 2, 2026, the Debtor and the Committee filed their Combined Disclosure Statement and Joint Plan of Liquidation [Docket No122]. The Court entered its Order Conditionally Approving the Disclosures and Plan on May 20, 2026 [Docket No. 145] and

the Debtor subsequently solicited votes on the Plan. Creditors voted to accept the Plan, as described in the Voting Certification [Docket No. 161] and the Court held a hearing on final approval of the Plan on July 13, 2026 and entered an order confirming the Plan on July 14, 2026 (the "Confirmation Order" Docket No. 175]. The Plan went effective on August 28, 2026 (the "Effective Date") and the estate filed a Notice of Effective Date on August 28, 2026 [Docket No. 182].

**THE FIRST INTERIM COMPENSATION PERIOD**

14. During the First Interim Compensation Period, Applicant assisted the Debtor in achieving its primary goal in the case - - maximizing asset values through the Sales and assisting the Debtor in the discharge of its obligations as it transitioned the business to its purchasers. The Debtor and the Committee also prepared and filed the form of proposed Plan and Disclosure Statement. A more detailed description of services provided during the First Interim Compensation Period follows.

**First Day Orders and Retention Applications for Debtor's Professionals**

15. HBB prepared, filed and successfully prosecuted certain applications and motions following the commencement of the case to facilitate the Debtor's smooth transition into Chapter 11. HBB prepared multiple motions, and the Bankruptcy Court entered orders on these motions including, without limitation, the: (a) *Motion of the Debtor for an Order Pursuant to Section 105(a) of the Bankruptcy Code Authorizing (I) Use of Existing Business Forms and Records; (II) Maintenance of Existing Corporate Bank Accounts; and (III) Maintenance of Cash Management System*; (b) *Motion of the Debtor for an Order Pursuant to Sections 105(a), 363 and 503(b)(1) of the Bankruptcy Code Authorizing the Debtor to Honor Certain Pre-Petition Policies and Obligations to Customers*; (c) *Motion of the Debtor for an Order Authorizing*

*Payment of Pre-Petition Accrued Employee Wages, Salaries, Expenses and Related Taxes and Payment of Employee Benefits and Authorizing and Directing Banks to Honor Employee Wage, Salary and Expense Reimbursement Checks*; (d) *Application to Employ Halperin Battaglia Benzija, LLP as Counsel to the Debtor*; (e) *Application to Employ Cometrics Partners as Chief Restructuring Officer to the Debtor,* and *(f) Application to Employ East Wind Securities, LLC as Investment Banker to the Debtor.* Applicant addressed any and all issues raised by the U.S. Trustee, parties-in-interest and the Court with respect to the foregoing motions and applications. Approval of the motions and applications was a necessary component to the Debtor's smooth transition into Chapter 11.

16. At "first day" hearings held on December 2, 2025 (the "First Day Hearings"), the Court approved the cash management motion, and authorized relief sought in the customer obligations motion and the wage motion and others on an interim basis, pending a final hearing. At hearings held on December 22, 2025, the Court approved the motions on a final basis. Following notice, the Court approved applications for the retention of Halperin Battaglia Benzija, LLP, as bankruptcy counsel to the Debtor, CoMetrics Partners as Chief Restructuring Officer, and East Wind Securities, LLC as Investment Banker.

**The DIP Facility**

17. Contemporaneously with the commencement of the Chapter 11 case, the Debtor filed a *Motion for an Order (I) Authorizing Debtor (A) to Obtain Postpetition Financing Pursuant to 11 U.S.C. Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(d)(1), and 364(e) and (B) to Utilize Cash Collateral Pursuant To 11 U.S.C. Section 363, (II) Granting Adequate Protection to Prepetition Secured Party Pursuant to 11 U.S.C. Sections 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "DIP

Motion"). As of the Petition Date, the Debtor had no unencumbered assets or credit available to fund its business operations and required additional monies to fund operations during the pendency of the case. Applicant undertook a primary role in identifying potential sources of debtor-in-possession financing and ultimately was able to assist in negotiating acceptable financing terms from the Debtor's pre-petition lender to provide necessary liquidity pending the Sales.

18. The relief requested in the DIP Motion sought approval of a $29 million secured debtor-in-possession financing facility from Israel Discount Bank of New York as administrative agent, as well as the use of cash collateral, both in accordance with a negotiated budget (the "DIP Facility"). Applicant assisted the Debtor in all stages of negotiation of the DIP Facility, including preparation and finalization of the DIP Agreement and the DIP Budget (each as defined in the DIP Motion) and pleadings seeking approval of the foregoing agreements before the Bankruptcy Court.

19. At the First Day Hearings, HBB requested authority from the Court for the Debtor to obtain immediate advances under the DIP Facility. Without an immediate infusion of funds, Applicant was concerned that the Debtor would not be able to operate its business pending the Sales, placing the business and its value as a "going concern" in grave jeopardy, and all but ruining any chance for a successful sale process. The Interim Order approving the DIP Facility was entered on December 3, 2025 (Docket No. 22). Pending the final hearing on the DIP Facility, Applicant assisted the Debtor in negotiating consensual resolutions to the issues raised by all responding parties.

20. The Court approved the DIP Facility on a final basis on January 15, 2026 (Docket No. 64). The DIP Facility provided the Debtor with the funds necessary to operate on a

"going concern" basis pending the Sales - - thus enabling the estate to maximize asset values for the benefit of creditors and all parties in interest, preserve jobs and maintain a trading partner for the estate's creditors.

**Preparation of Debtor's Schedules and Statement of Financial Affairs**

21. Applicant assisted the Debtor in preparation of its schedules of assets and liabilities and statement of financial affairs (collectively, the "Schedules"). Though the Debtor was operating its business at this juncture and, thus access to the Debtor's principals was provided, substantial review and compilation of business records was necessary to accurately ready the Schedules for filing with the Court and review by the U.S. Trustee and parties-in-interest, including potential purchasers of the Debtor's business. Applicant and the Debtor's principals, along with the Debtor's Chief Restructuring Officer, held several meetings in preparation of the Schedules in their final and complete form. Time was of the essence in preparing the Schedules, particularly in light of the contemporaneous marketing process under way for the Sales. Applicant filed the Schedules on December 15, 2025, consistent with the requirements of the Bankruptcy Code.

**The Legacy Sale**

22. The Debtor filed the Legacy Sale Motion simultaneously with the commencement of the Chapter 11 case. Annexed as an exhibit to the Sale Motion was a form of asset purchase agreement (the "Sale Agreement") negotiated and agreed to between the Debtor and its stalking horse buyer. Given the Debtor's precipitous filing and urgent need for financing under the DIP Facility, the Sale Agreement was initially filed without exhibits or schedules thereto (the "Seller's Disclosure Schedules"). The Seller's Disclosure Schedules were not only an integral part of the Sale Agreement, but were critical to providing prospective bidders with

detailed information necessary to comprehend the nature of the assets proposed to be acquired by buyer.

23. During the early stages of the case, Applicant worked with Debtor's management to review and incorporate documents and information in order to complete the Seller's Disclosure Schedules. Preparation of the Seller's Disclosure Schedules involved substantial time and resources to analyze information and compile the voluminous schedules and supporting documentation. Applicant reviewed substantial amounts of documents and files relating to the assets and liabilities of the Debtor and its affiliated entities.

24. Applicant reviewed and analyzed executory contracts and leases and interfaced with counterparties to assigned contracts and assigned leases to obtain necessary consents. HBB worked with Debtor's management and professionals to make proper disclosure of financial statements of the Debtor and its subsidiaries as required by the Sale Agreement. Additionally, Applicant reviewed the Debtor's business records and information and prepared certain disclosures and exhibits regarding title matters, tax matters, sufficiency of assets, legal proceedings, permits and licenses, benefit plans, intellectual property, licenses, affiliate transactions, material contracts and leases, accounts payable and receivables.

25. Applicant prepared and made available information responsive to the Seller's Disclosure Schedules in virtual data room established in connection with the Legacy Sale so that all prospective bidders would have access to such information on a timely and equal basis. Upon completion of the Seller's Disclosures Schedules, the Applicant continued to work closely with the Debtor, the "stalking horse" bidder and prospective bidders as such information was revised and/or updated from time to time.

26. Applicant represented the Debtor at the hearing to consider approval of the bidding and sale procedures in connection with the Legacy Sale that took place on December 22, 2025. HBB assisted East Wind Securities, the Debtor's investment banker, with resolution of legal issues with respect to prospective bidders, including negotiating forms of nondisclosure agreements and assisting in canvassing the marketplace for bidders in distressed markets. In connection with the Sale Agreement, Applicant negotiated, and commented on, certain ancillary documents related to the Legacy Sale, including the transition services agreement, domain name assignments, assignment and assumption agreements, trademark assignments, and bills of sale.

27. Finally, HBB prepared all notices to creditors and prospective bidders concerning the possibility of an auction, the results of the 363 sale process, and represented the Debtor at the sale hearing that took place on February 4, 2026.

**The WITHit Sale**

28. HBB also assisted the Debtor in negotiating and documenting the sale of its fifty-one percent (51%) majority membership interest in WITHit Holdings, LLC to WITHit's founders, who, collectively, owned the remaining forty-nine percent (49%). While the Legacy Sale was undoubtedly the larger and more material group of assets to generate value for the estate, the Debtor used its early days in Chapter 11 to consider how to best maximize the value of its majority interest in WITHit as WITHit has always been a closely-held joint-venture and could not be traditionally marketed. HBB assisted the Debtor in negotiating and closing a sale that generated $3.6 million in value for the estate and provided a path forward for the Debtor to confirm a liquidating plan.

29. Though smaller than the Legacy Sale in scope, the WITHit transaction has required material time and attention by the Debtor's legal and other professionals including

negotiation of not only the membership unit purchase agreement, but various escrow agreements to assist with closing, transition services, periodic calls involving the professional and business teams to resolve post-closing issues that are still ongoing. Paramount to the WITHit closing was negotiation and formulation of a lien release document from Israel Discount Bank of New York, the Debtor's DIP Lender, in order to ensure that the sale could occur on consent, free and clear of IDB's liens. The transaction also required negotiation and documentation of termination of the Master Services Agreement by which the Debtor had provided material services to WITHit, as well as negotiation of termination of the Limited Liability Company Agreement, various officer certificates, third party consents and forms of management resignation. Finally, HBB assisted the parties in negotiating tertiary issues related to the WITHit sale, such as division of WITHit versus estate product inventory and resolution of ownership of potential tariff refunds.

**<u>Rejection of Executory Contracts and Leases</u>**

30. On behalf of the Debtor, HBB undertook a comprehensive re view and analysis of the Debtor's executory contacts, both to facilitate and address issues in connection with the Legacy and WITHit Sales, and to help determine what contracts should be rejected. After the successful conclusions of the two asset sales, HBB prepared an Omnibus *Motion to Reject Executory Contracts and Nonresidential Real Property Leases*. This application was necessary to facilitate the Debtor obligations under the sale agreements and also to minimize ongoing administrative costs of the estate. Following the Closing, Applicant worked diligently with Debtor's management and the buyer to timely reject numerous executory contracts and leases.

**Development of an Exit Strategy From Chapter 11**

*Establishment of a Bar Date*

31. In order to embark on the claims analysis necessary to formulating the Debtor's exit strategy from Chapter 11, Applicant prepared and filed an application requesting the Court to set a deadline to file proofs of claim in the case. By the application, the Debtor seeks to fix the universe of general unsecured claims against the estate. By Order dated February 4, 2026 (the "Bar Date Order," Docket No. 89), the Court established March 30, 2026 as bar date for all claims that arose prior to the Petition Date (except that governmental entities were required to file proofs of claim on or before May 30, 2026).

32. Applicant undertook preparation of the relevant notices to creditors that had been approved by the Bar Date Order and served the notices and form proofs of claim on all creditor constituencies in accordance with the Bar Date Order. Service was effectuated on February 13, 2025.

*Formulation of Plan and Disclosure Statement*

33. During the First Interim Compensation Period, Applicant worked with counsel to the Committee to prepare a combined joint plan of liquidation and disclosure statement, which provides for treatment of all claims and interest in the case. HBB reviewed the terms of the plan documents with Debtor's management and professionals and established procedures to solicit votes from relevant creditors.

*Claims Reconciliations*

34. During the Compensation Period, Applicant began review of proofs of claim filed in the case and undertook a review and analysis of claims that should be reclassified and/or expunged on various grounds, including that such claims are duplicative of previously

filed claims, superseded by a subsequently filed claims and/or fail to establish a *prima facie* claim for relief against the Debtor's estate. Applicant proposes to commence the claims reconciliation process promptly following the results of the Bar Dates.

**Case Administration/Miscellaneous**

*General Case Administration*

35. Applicant's attention to the Debtor's needs during the Compensation Period enabled the Debtor to operate smoothly both before, during and after consummation of the Sales. Through telephone conferences, in-person meetings and correspondence, Applicant assisted the Debtor in fulfilling its fiduciary duty to make informed decisions regarding the issues that have arisen in this case. Applicant kept the Debtor well informed in all aspects of the case and Applicant asserts that its efforts contributed to a more efficient and effective administration of the Chapter 11 case.

*Retention Applications and Compliance*

36. In addition to HBB's own retention application, HBB assisted the Debtor's Chief Restructuring Officer, SAX Advisors, LLC, with drafting and submission of their retention application, compliance with U.S. Trustee protocols, service of process, and submission of their monthly fee statements in accordance with the J. Alix protocol. Likewise, HBB assisted the Debtor's investment bankers, East Wind Securities, LLC, with drafting and submission of their retention documents, compliance with the terms of the related retention order, and ultimately drafting and submission of their first and final fee application, which was granted by the Court on March 31, 2026 [Docket No. 121].

*Committee Information Re*quests

37. At the time of the Committee's formation and its professionals' engagement, Applicant and counsel for the Committee agreed to a protocol that would permit the Debtor to disclosure confidential information to the Committee and its advisors. To that end, the Committee executed a non-disclosure agreement in a form acceptable to Applicant. During the Compensation Period, the Committee, through its counsel and advisors, made a series of informal information requests upon Applicant for information concerning the Debtor's pre-petition operations, assets and liabilities, prior budgets, actual-to-projected budget analyses, analyses of payments to certain creditors, various financial data and information pertaining to contracts and leases. Applicant reviewed and advised Debtor's management with respect to the various information requests and supplied information to the Committee as appropriate on a consensual basis.

*Monthly Operating Reports*

38. In coordination with the Debtor's principals and Chief Restructuring Officer, Applicant has assisted in the preparation of monthly operating reports in accordance with the Bankruptcy Code. Applicant interfaced with the Debtor's Chief Financial Officer to ensure the accuracy of these reports and continues to assist the Debtor by reviewing, filing and serving the same. Applicant also assisted the Debtor's principals in timely completing the U.S. Trustee's quarterly fee report and payment.

*Miscellaneous*

39. Applicant interfaced with all interested parties as well as the U.S. Trustee and others, and became the central source of information with respect to all issues involved in the case. Applicant assisted the Debtor in complying with the U.S. Trustee Guidelines,

including, as stated above, payment of U.S. Trustee fees. Applicant responded to numerous inquiries made by various creditors, employees and other parties in interest, and resolved all problems that arose in connection therewith.

**THE SECOND INTERIM COMPENSATION PERIOD**

40. Applicant continues to maintain written records of the time expended by attorneys and paraprofessionals in the rendition of their professional services to the Debtor. Such time records are made contemporaneously with the rendering of services by the person rendering such services, and in the ordinary course of HBB's practice. The records show the name of the attorney or paraprofessional, the date on which the services were performed, the services rendered, and the amount of time spent in performing the services during the Compensation Period. Copies of the records are annexed hereto as **Exhibit A**.

41. Annexed hereto as **Exhibit B** is a list of the attorneys and paraprofessionals who have worked on this case during the Compensation Period, their date of admission to the bar (where applicable), the aggregate time expended by each person, their current normal hourly billing rate, and the value of the total time expended by each person.

42. HBB also maintains records of all actual and necessary expenses incurred in connection with the rendition of its professional services, all of which are also available for inspection. A schedule of the categories of expenses and amounts for which reimbursement is requested is annexed hereto as **Exhibit C**.

43. As set forth in the certification of Alan D. Halperin, annexed hereto as **Exhibit D**, Applicant believes that this application is in compliance with the Amended Guidelines for Fees and Disbursements for Professionals in the Southern District of New York Bankruptcy Cases, as amended (the "Guidelines").

44. During the current Compensation Period, Applicant assisted the Debtor in reaching and implementing the final stage of its Chapter 11 case – confirming the Plan and working with the Committee to transfer the Debtor's assets to a liquidating trust for the benefit of creditors. The following is a summary and overview of the work performed by HBB in its role as bankruptcy counsel to the Debtor during the Compensation Period. Reference is made to the contemporaneous time records annexed as **Exhibit A** for greater detail of all of the services rendered on behalf of the Debtor.

**Post-Closing Issues Following the Sales**

*The Legacy Sale*

45. As noted, the Debtor filed the Legacy Sale Motion simultaneously with the commencement of the Chapter 11 case, then sought and received authority for the sale during the First Compensation Period. During the current Compensation Period, the Debtor continued to address post-closing issues such as final exit from its legacy premises and provision of services to the purchaser pursuant to the related Transition Services Agreement. Applicant reviewed and analyzed executory contracts and leases and interfaced with counterparties to assigned contracts and assigned leases to obtain necessary consents. HBB worked with Debtor's management and professionals minimize rejection damages from related executory contracts and to address the Debtor's business records, prepare certain disclosures and exhibits regarding title matters, tax matters, sufficiency of assets, legal proceedings, permits and licenses, intellectual property, licenses, material contracts and leases, accounts payable and receivables.

46. HBB assisted the Debtor in reaching agreements with key vendors and counterparties resulting in several stipulations memorializing the relevant agreements, including that certain Stipulation with the Chubb Companies pertaining to the Debtor's insurance programs

[Docket No. 136], the Stipulation with Morgan Stanley permitting relief from the automatic stay in order to release collateral in connection with rejection of the Debtor's warehouse premises [Docket No. 142], and the Stipulation with Infor (US) resolving a substantial intellectual property claim related to the Legacy Sale [Docket No. 174].

*Closing Deliverables for the WITHit Sale*

47. HBB also assisted the Debtor in post-closing issues for the WITHit Sale. Though the sale of the Debtor's fifty-one percent (51%) majority membership interest in WITHit Holdings, LLC to WITHit's founders was undoubtedly the smaller of its bankruptcy sales, divesting WITHit proved to be time-consuming and cumbersome due to the pre-petition integration of the Debtor's businesses. HBB assisted the Debtor in addressing disputes among the parties as to certain closing deliverables and with the assistance of Committee counsel, negotiated the release of $400,000 in escrowed funds, followed by the full release of remaining escrowed funds as well as negotiation of a global settlement agreement resulting in the release of all sale proceeds for the benefit of creditors to be managed and distributed by the Liquidation Trustee.

**Combined Disclosure Statement and Joint Plan of Liquidation**

*Voting Solicitation*

48. HBB assisted the Debtor in compliance with the solicitation process, including finalizing the forms of ballot and support letter from the Committee, responding to numerous requests from creditors, and distributing more than 160 solicitation packets to interested parties. HBB oversaw the solicitation process and coordinated with counsel to the Committee to ensure all procedures were followed in tallying and certifying the votes for

acceptance or rejection of the Plan. Ultimately, ninety-six percent (96%) in amount and 11/12 in number of the creditor body voted to accept the plan. HBB prepared and filed a Voting Certification in advance of the hearing to consider final confirmation of the Plan [Docket No. 161].

*Confirmation Hearing*

49. HBB assisted the Debtor's Chief Financial Officer, Mr. Adam Gelnick, in preparing his Declaration in Support of Confirmation [Docket No. 164] and represented the Debtor at the July 13, 2026 hearing seeking final approval of the disclosures made in the Plan and confirmation thereof. HBB worked with all responding parties, including the Chubb Group, which filed a limited objection to confirmation, which was resolved on consent prior to the Confirmation Hearing. HBB worked with counsel to the Committee to finalize the proposed form of Confirmation Order along with the post-confirmation documents such as the Liquidation Trust Agreement, the list of Retained Causes of Action, and final list of Assumed Contracts.

*Claims Reconciliations*

50. During the Compensation Period, Applicant continued the review of proofs of claim filed in the case and undertook an analysis of claims that should be reclassified and/or expunged on various grounds, including that such claims are duplicative of previously filed claims, superseded by a subsequently filed claims and/or fail to establish a *prima facie* claim for relief against the Debtor's estate. In particular, HBB focused on claims that were duplicative with respect to the Debtor's schedules, as well as claims with inherent legal issues such as the priority claim asserted by the Internal Revenue Service, the § 502(b)(6) calculation of the Debtor's primary landlord, Steele Tribune, and the background and historical facts

concerning the claim of the New York IDA. Applicant provided this analysis to the Liquidation Trustee to assist in the post-confirmation claims reconciliation process.

**Case Administration/Miscellaneous**

*General Case Administration*

51. Applicant's attention to the Debtor's needs during the Compensation Period enabled the Debtor to operate smoothly during the Plan confirmation process. Through telephone conferences, in-person meetings and correspondence, Applicant assisted the Debtor in fulfilling its fiduciary duty to make informed decisions regarding the issues that have arisen in this case. Applicant kept the Debtor well informed in all aspects of the case and Applicant asserts that its efforts contributed to a more efficient and effective administration of the Chapter 11 case.

*Compliance with Retention Applications*

52. In addition to HBB's own retention application, HBB assisted the Debtor's Chief Restructuring Officer, SAX Advisors, LLC, with drafting and submission of their renewed retention application and retention order following a change in ownership structure, as well as the required monthly fee statements in accordance with the J. Alix protocol. HBB, on behalf of the Debtor, also reviewed, commented upon, and updated the Debtor's management team regarding the fee applications of other professionals such as the Committee's counsel and financial advisors.

*Committee Information Re*quests

53. At the time of the Committee's formation and its professionals' engagement, Applicant and counsel for the Committee agreed to a protocol that would permit the Debtor to disclose confidential information to the Committee and its advisors. During the

Compensation Period, the Committee, through its counsel and advisors, continued to examine certain pre-petition transactions, making a series of informal information requests upon Applicant for information concerning the Debtor's pre-petition operations, assets and liabilities, prior budgets, actual-to-projected budget analyses, analyses of payments to certain creditors, various financial data and information pertaining to contracts and leases. Applicant reviewed and advised Debtor's management with respect to the various information requests and supplied information to the Committee as appropriate on a consensual basis.

*Monthly Operating Reports*

54. In coordination with the Debtor's principals and Chief Restructuring Officer, Applicant has assisted in the preparation of monthly operating reports in accordance with the Bankruptcy Code. Applicant interfaced with the Debtor's Chief Financial Officer to ensure the accuracy of these reports and continues to assist the Debtor by reviewing, filing and serving the same. Applicant also assisted the Debtor's principals in timely completing the U.S. Trustee's quarterly fee report and payment.

*Miscellaneous*

55. Applicant interfaced with all interested parties as well as the U.S. Trustee and others, and became the central source of information with respect to all issues involved in the case. Applicant assisted the Debtor in complying with the U.S. Trustee Guidelines, including, as stated above, payment of U.S. Trustee fees. Applicant responded to numerous inquiries made by various creditors, employees and other parties in interest, and resolved all problems that arose in connection therewith, including responding to and ultimately resolving a *subpoena duces tecum* of the Debtor from the New York State Worker's Compensation Board.

## FACTORS TO BE CONSIDERED IN AWARDING ATTORNEYS' FEES

56. The factors to be considered in awarding attorneys' fees are enumerated in *In re First Colonial Corporation of America*, 544 F.2d 1291, 1298 - 99 (5th Cir.), *reh'g denied*, 547 F.2d 573, *cert. denied, Baddock v. American Benefit Life Insur. Co.*, 431 U.S. 904 (1977), and are as follows: (a) the time and labor required, (b) the novelty and difficulty of issued raised, (c) the skill required to perform the legal services properly, (d) the preclusion of other employment due to acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or contingent, (g) time limitations imposed by the client or other circumstances, (h) the amount involved and the results obtained, (i) the experience, reputation and ability of the attorneys, (j) undesirability of the case, and (k) the nature and length of the professional relationship. HBB respectfully submits that consideration of these factors should result in the allowance of the full compensation requested.

57. HBB respectfully submits that the fee sought in this case is reasonable given the issues confronted and the work performed and is commensurate with fees HBB has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience and expertise. The Debtor's operations were widespread and the business was in extremis. This case was also contentious from the outset, at least with respect to certain aspects of the Sales. HBB frequently had to work under significant time pressure and HBB professionals rendered substantial, yet cost effective, services necessary to address each and every issue that confronted the Debtor in this case. Also, HBB had limited funding for fees in this case and, absent a competitive auction process, bore significant risk of non-payment.

**<u>ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES</u>**

58. The professional services rendered by HBB required a high degree of professional competence and expertise so that the Debtor could protect and maximize its asset base for the benefit of creditors and implement its exit strategy from Chapter 11. It is respectfully submitted that the services rendered to the Debtor were performed efficiently, effectively and economically.

59. With respect to the level of compensation, §330 of the Bankruptcy Code provides, in pertinent part, that the Court may award a professional reasonable compensation for actual necessary services rendered by such professional based upon consideration of all of the relevant factors, including time spent, rates charged, necessity or benefit of services rendered, reasonableness of time spent and cost of comparable services other than in a bankruptcy case. *See* 11 U.S.C. §330(a). The clear Congressional intent and policy expressed in this section is to provide for adequate compensation in order to continue to attract qualified and competent practitioners to bankruptcy cases.

60. During the current Compensation Period, HBB professionals expended an aggregate of 467.3 hours in rendering services on behalf of the Debtor for a total fee of $322,342. HBB submits that its fee is reasonable for the work performed in this case.

61. In addition, HBB incurred out-of-pocket expenses in connection with the rendition of the professional services described above in the sum of $3313.07, for which HBB respectfully requests reimbursement in full. None of these expenses reflect HBB's overhead costs and all of the expenses were incurred exclusively in connection with this case.

## SOURCES OF PAYMENT

62. With respect to the First Compensation Period, the DIP Facility included provisions for payment of some portion of the fees and expenses of professionals retained in the case, including a funded carve-out in the amount $300,000 for the benefit of HBB. The earmarked funds for payment of the fees and expenses of HBB included the $248,037.59 pre-petition retainer and the $300,000 funded carve-out, with the balance (subject to approval of this Court) to be paid from general funds of the Debtor's estate. With respect to the Second Compensation Period, the Debtor has liquidated all of its assets and is, upon information and belief, administratively solvent.

## CONCLUSION

63. No agreement or understanding exists between HBB and any other person for the sharing of any compensation to be received for professional services rendered or to be rendered in connection with this case.

64. No prior application has been made to this or any other Court for the relief requested herein for the current Compensation Period, nor has any payment been received by HBB on account of the legal services rendered or on account of the out-of-pocket expenses incurred in connection therewith.

[*concluded on following page*]

**WHEREFORE**, HBB respectfully requests that this Court enter an order (a) approving the allowance of $322,342.00 for compensation for services rendered during the current Compensation Period, (b) approving the reimbursement of HBB's out-of-pocket expenses during the current Compensation Period in the amount of $3313.07, (c) approving the fees and expenses included by HBB during the First Compensation Period and the current Compensation Period on a final basis, including release of the Holdback from the First Compensation Period in the amount of $106,919.60; and (c) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
September 15, 2026

HALPERIN BATTAGLIA BENZIJA, LLP
Counsel to the Debtor and Debtor in Possession

By: */s/ Julie D. Goldberg*
Alan D. Halperin, Esq.
Julie D. Goldberg, Esq.
40 Wall Street, 37th Floor
New York, NY 10005
(212) 765-9100
ahalperin@halperinlaw.net;
goldberg@halperinlaw.net